Table of Contents
of
Memorandum in Support of Motion for Summary Judgment

Page

I.   STATEMENT OF THE NATURE OF THE CASE..........................................................1

II.  STATEMENT OF UNCONTROVERTED FACTS ........................................................5

    A.  Atchison Hospital Association.................................................................5
    B.  Medical Staff Bylaws.............................................................................6
    C.  Medical Staff Officers -- The Medical Executive Committee..............................10
    D.  Medical Staff Rules, Regulations and Procedures ..................................................13
    E.  The Scope of the Medical Staff Privilege .........................................................14
    F.  Medical Staff Assignments......................................................................15
    G.  Committees of the Medical Staff ..............................................................18
    H.  AHA Board of Directors .........................................................................20
    I.  Peer Review ........................................................................................21
    J.  Ryan Thomas, M.D. .............................................................................22
    K.  Douglas Goracke, M.D. ..........................................................................23
    L.  Donald Swayze, D.O.............................................................................24
    M.  Michael Jones, M.D. .............................................................................24
    N.  James W. Rider, M.D.............................................................................25
    O.  The Deposition Testimony of Pitt Vesom, M.D. ...................................................25
    P.  1996 Resignation by Vesom .....................................................................37
    Q.  Mid-America Cardiology Associates.................................................................37
    R.  1998 Reappointment Request ....................................................................42
    S.  1999 Settlement Agreement......................................................................43
    T.  2001 Reappointment Request .....................................................................45
    U.  The Reappointment Process.......................................................................45
    V.  2003 Reappointment Request .....................................................................47
    W.  Consideration of Dr. Vesom's Reappointment Request .......................................48
    X.  Disruptive Physician Provisions of the Bylaws ..................................................49
    Y.  Recommendation of the Medical Executive Committee ......................................53
    Z.  Due Process Afforded Dr. Vesom Following the Recommendation of the
        Medical Executive Committee...................................................................54
    AA. Appeal Proceedings Before the Fair Hearing Panel .............................................58
    BB. Due Process Afforded Dr. Vesom as Part of Appeal to AHA Board of
        Directors................................................................................................63
    CC. Appeal Proceedings Before the AHA Board of Directors ....................................64
    DD. Affidavit of Kathleen Butler ....................................................................65
    EE. Kansas Department of Health and Environment Complaint and
        Subsequent Investigation ...........................................................................69
    FF. Complaints by David R. Ware, M.D., A.K. Tayiem, M.D. and Dr. Vesom..........76
    GG. The Actions Were Taken in the Furtherance of the Quality of Health Care
        at the Hospital .......................................................................................77

Table of Contents
(continued)

HH.   There is No Evidence of Improper Racial or Retaliatory Motive.........................82
II.   The National Practitioner Data Bank ("NPDB")....................................84
JJ.   Each of the Adequate Notice and Hearing Requirements of HCQIA Have
      Been Satisfied ................................................................................85

III.  STANDARDS FOR SUMMARY JUDGMENT ...............................................88

IV.   QUESTIONS PRESENTED.........................................................................89

V.    ARGUMENT AND AUTHORITIES ...............................................................90

      A.   Dr. Vesom Has Expressly Waived Each of His Claims .........................90
      B.   Dr. Vesom Has No "Right" to be on the Medical Staff -- the Association
           With AHA is Appropriately Called a Medical Staff "Privilege"..........93
      C.   The Defendants are Entitled to Immunity Under Kansas Law .............95
      D.   There is No Evidence of Discrimination ..........................................97
      E.   Dr. Vesom Has Failed to State a § 1981 Claim (Count I) ....................98
      F.   Dr. Vesom Has Failed to State a § 2000d Claim (Count II)...............102
      G.   The Claim Under 42 U.S.C. Title VI (Count II) is Not Viable Against the
           Individual Defendants....................................................................103
      H.   Dr. Vesom Has Failed to State a § 1985(3) Claim (Count III)...........103
      I.   Plaintiff Does Not Establish a *Prima Facie* Case of Public Policy Whistle-
           Blower Protection ..........................................................................105
      J.   Defendants Have HCQIA Immunity Against Dr. Vesom's Non-Civil
           Rights Claims................................................................................109
      K.   The Medical Executive Committee's Recommendation and the Board's
           Ultimate Decision Not to Reappoint Were Proper "Peer Review" Activity
           Under HCQIA.................................................................................111
           1.   The Executive Committee's Recommendation and the Board's
                Decision Not to Reappoint Dr. Vesom's Privileges Were Based
                Upon the Reasonable Belief That the Action was in the
                Furtherance of Quality Health Care........................................114
           2.   The Decision To Not Reappoint Dr. Vesom to the Medical Staff
                Was Made After a Reasonable Effort to Obtain the Facts of the
                Matter ................................................................................116
           3.   The Decision Not to Reappoint Dr. Vesom to the Medical Staff
                Was Made After Adequate Notice and Hearing Procedures Had
                Been Provided......................................................................117
                a.   Dr. Vesom was given Proper Notice of the Proposed
                     Decision Not to Reappoint His Privileges ...................118
                b.   Dr. Vesom Was Given Proper Notice of the Fair Hearing..........118
                c.   Dr. Vesom was given a Proper Fair Hearing ...............119

Table of Contents
(continued)

Page

d.    The Denial of Dr. Vesom's Privileges at AHA Was Done With the Reasonable Belief That it Was Warranted by the Facts Known ..................................................................120

L.    Dr. Vesom Has Failed to State a Sherman Antitrust Act Claim (Count IV) .......121
M.    Dr. Vesom Has Failed to State a Claim for Intentional Interference With Plaintiff's Business Relationships (Count VI) ....................................................124
N.    Dr. Vesom Failed to Exhaust His Administrative Remedies With Regard to Requesting a Review of the Report to the National Practitioner Data Bank ..................................................................................................................125
O.    Plaintiff Has Failed to Establish Recoverable Damages....................................126
      1.    Any Claims Based Upon Conduct Occurring Prior to 2003 Would be Time-Barred .........................................................................................126
      2.    Any Claims Arising Prior to 2003 Would be Prohibited by the Authority and Liability Waiver.................................................................127
      3.    Plaintiff Has Failed to Establish Any Economic Loss............................127
P.    There is No Evidence of Lack of Good Faith or Malice to Present a Question of Material Fact for a Jury ...................................................................128

VI.   CONCLUSION...........................................................................................................129

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PITT VESOM, M.D.,                              )
                                               )
            Plaintiff,                         )
                                               )  Case No.        04-2218 CM
      vs.                                      )
                                               )
ATCHISON HOSPITAL ASSOCIATION,                 )
RYAN THOMAS, M.D.,                             )
DOUGLAS GORACKE, M.D. and                      )
DONALD SWAYZE, D.O.,                           )
                                               )
            Defendants.                        )

**MEMORANDUM IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Atchison Hospital Association, Ryan Thomas, M.D., Douglas Goracke, M.D. and Donald Swayze, D.O. (collectively referred to as the "defendants"), pursuant to FED. R. CIV. P. 56, and Local Rule 56.1, submit this Memorandum in Support of defendants' Motion for Summary Judgment.

**I.      STATEMENT OF THE NATURE OF THE CASE**

The Complaint filed by Pitt Vesom, M.D. asserts six (6) claims:  a 42 U.S.C. § 1981 claim (Count I); a 42 U.S.C. § 2000d claim (Count II); a 42 U.S.C. § 1985(3) claim (Count III); a Sherman Antitrust Act claim (Count IV); a public policy whistle-blower protection claim under Kansas law (Count V); and a claim for intentional interference with business relationships (Count VI).  Dr. Vesom named four (4) defendants in his lawsuit: Atchison Hospital Association ("AHA") and three (3) of the five (5) physicians who served on the Medical Executive Committee ("MEC") charged with the responsibility for reviewing physician requests for

appointment to the medical staff of the Hospital.  The three (3) physicians have been sued in

their individual capacity because they "served on that committee and voted to rescind Vesom's

staff privileges."  (*See* Complaint at ¶ 8)  Contrary to plaintiff's assertions, Dr. Vesom's medical

staff privileges were not "rescinded."  Dr. Vesom's privileges were not terminated or otherwise

limited during his existing term.  Instead, after participating in the peer review process, these

physicians recommended that the Board not reappoint Dr. Vesom to the medical staff for the

next term of the Active Medical Staff at AHA.  Plaintiff alleges that it is the formal "actions of

the committee [in] denying Vesom's staff privileges at the Hospital" which is the precipitating

event which gives rise to each of these claims.  (*See* Complaint at ¶ 12-16)

The Hospital chronicled a long history of Dr. Vesom's unprofessional behavior.

Although the credentials file documents his deficient conduct rather than his clinical skills, the

interpersonal interactions certainly implicate his professional competence and quality of care.

The decision is justified by Dr. Vesom's extensive pattern of disruptive behavior since 1999.  As

a result, Dr. Vesom was found to be a "disruptive physician" under the Medical Staff Bylaws and

he was not permitted to continue his medical staff association with the Hospital after April 2,

2004.

*This is not an employment discrimination claim.*  Dr. Vesom was not an employee of

AHA.  Dr. Vesom was neither under a contract with AHA nor any of the individual defendants

to provide professional medical services.  Instead, Dr. Vesom was associated with AHA by

virtue of the grant of a "privilege" to serve as a member of the AHA medical staff for a two (2)

year appointment period.  The catalyst for Dr. Vesom's claims is that the AHA governing Board

of Directors exercised its power under Kansas law and decided not to reappoint Dr. Vesom to

CWDOCS 429590v1 :13728.422195

another two-year reappointment cycle effective April 2, 2004.  As a result, Dr. Vesom's medical staff privileges expired at the end of the term and he was not reappointed to the medical staff.[1]

It is alleged by plaintiff that the recommendation of the MEC on February 18, 2003 was "racially motivated."  Therefore, the common allegation between Counts I, II and III of Dr. Vesom's Complaint is that the defendants acted on the basis of Dr. Vesom's race.  (Complaint at ¶ 17, 24 and 26)  However, conspicuously absent from the record is any factual evidence to support claims of "acts of discrimination because of race with regard to Vesom's staff privileges."  (Complaint, Wherefore Clause of Counts I, II and III)  Except for the conclusory allegations of Dr. Vesom, no factual evidence exists in the pleadings, exhibits, declarations, deposition testimony or discovery to support the claim of discrimination on the basis of Dr. Vesom's **race**.  Dr. Vesom's self-serving speculation and suspicion of discriminatory and retaliatory motive is insufficient to meet the burden necessary to overcome summary judgment.

Additional legal justification for granting summary judgment in favor of defendants includes the following:  Dr. Vesom waived any potential claims that might arise through the credentialing process, by his execution of an express liability waiver.  Dr. Vesom executed the liability waiver as part of his reappointment process and specifically released the defendants from any "claim" or "action" should his application for the reappointment of medical staff privileges at AHA be denied "for any reason."

Additionally, Kansas public policy favors a private hospital board's ability to control the Hospital's procedures for granting and withholding medical staff privileges.  Dr. Vesom has no right to an association with AHA, and the medical staff's recommendation and the discretion of the Board should be supported.  Kansas statutes (K.S.A. § 65-442(a)) provide for immunity from

---

[1] Dr. Vesom's privileges were not terminated, nor was he summarily suspended from the medical staff.  In fact, Dr. Vesom's medical staff privileges remained fully intact and unaffected for almost fourteen (14) months until after the appeal process had been completed and all due process was afforded to him under the Bylaws and the law.

CWDOCS 429590v1 :13728.422195

all liability in this case; and the actions of the MEC should be protected from judicial scrutiny by state and/or federal peer review privileges. Dr. Vesom fails to establish each of the *prima facie* elements of Counts I-VI, including damages.

Retaliation for "whistle-blowing" assumes that these defendants had knowledge that Dr. Vesom reported acts to the Kansas Department of Health and Environment ("KDHE") or the office of the Attorney General of the State of Kansas before acting. As the uncontroverted facts clearly establish, the defendants were unaware that any complaints had been made, let alone that Dr. Vesom was the source of an anonymous KDHE complaint.

Finally, the Motion for Summary Judgment must be granted pursuant to the immunity provided under the Federal Health Care Quality Improvement Act of 1986 ("HCQIA") (42 U.S.C. § 11101, et seq.). HCQIA grants immunity to professional review bodies when the prescribed due process requirements are satisfied. Following the recommendation of the MEC, a Fair Hearing Panel was composed consistent with the requirements of HCQIA, which reached the independent determination that Dr. Vesom was a "disruptive physician" under the Bylaws and his behavior adversely affected the quality of health care at AHA. After an appeal to AHA's Board of Directors, the Board decided not to reappoint Dr. Vesom to the AHA medical staff.[2] The defendants should be granted judgment in their favor because the evidence clearly establishes that defendants acted in good faith and without malice, and satisfied all of the provisions of HCQIA. As a result, the defendants are entitled to immunity from liability for Counts IV through VI of Dr. Vesom's Complaint.

---

[2] The AHA Board of Directors is the body that took formal action which affected Dr. Vesom's medical staff privileges. The MEC merely made a non-binding recommendation.

4

**II.      STATEMENT OF UNCONTROVERTED FACTS**

  **A.      Atchison Hospital Association**

1.      AHA is a hospital located at 1301 North Second Street, Atchison, KS  66002.

AHA is organized as a not-for-profit 501(c)(3) corporation, acting solely and exclusively as a

charitable, religious, scientific, literary and educational organization.  (*See* Amended and

Restated Articles of Incorporation of Atchison Hospital Association attached as Exhibit 1; *see*

Certificate of Good Standing for AHA issued by the Kansas office of the Secretary of State

attached as Exhibit 2; *see* Excerpts from AHA website attached as Exhibit 3; and *see* AHA

Medical Staff Bylaws attached as Exhibit 4)

2.      AHA is a full service community hospital, with 24-hour emergency care, serving

the citizens of the City of Atchison, Kansas and the surrounding area.  The stated purpose of

AHA is to "operate and maintain health care facilities for the purpose of providing health care

services for the residents of Atchison County, Kansas, and the surrounding area; to operate and

maintain facilities for the diagnosis, care and treatment of the sick and injured; to operate and

maintain long-term care facilities."  (Ex. 1, 3, 4)

3.      AHA was incorporated as a Kansas Not For Profit Corporation on November 22,

1912.  AHA remains in good standing today.  (*See* Certificate of Good Standing issued by the

Kansas Office of the Secretary of State on October 10, 2005, attached as Exhibit 2)

4.      A "nonprofit medical facility" is defined as a "medical facility owned and

operated by one or more nonprofit corporations or associations, no part of the net earnings of

which inures, or may lawfully inure, to the benefit of any private shareholder or individual."

(*See* K.S.A. § 65-411(e))  (Ex. 1, 3, 4)

5.      Atchison is a town of approximately 12,000 residents.  (*See* Deposition of Pitt

Vesom, M.D. attached as Exhibits 35 and 36 at p. 99, l. 2-4)

### B.    Medical Staff Bylaws

6.    The Preamble to the AHA Bylaws state that the AHA medical staff "is dedicated to achieving quality patient care for in-patients and out-patients of the hospital and will accept and discharge its responsibility subject to the ultimate authority of the Hospital Governing Board."  (Ex. 4; AHA 931)[3]

7.    The Preamble of the Bylaws also states that "the physicians and dentists practicing at Atchison Hospital Association, recognizing that the welfare and interest of the Hospital's patients may best be protected and guaranteed by systematic, concerted professional effort, hereby organize themselves in conformity with these Bylaws, which establish the mechanisms to carry out the direct and delegated responsibilities of the Medical Staff in cooperation with the Hospital Administration and the Governing Board of the Hospital, and do hereby agree to accept and abide by the following Bylaws and such Rules and Regulations which are adopted in accord with these Bylaws."  (Ex. 4; AHA 931) (*See generally* K.A.R. 28-34-5a)

8.    The following are specifically defined terms in the Bylaws:

   a.    <u>Hospital</u>:  shall mean the health care facility known as Atchison Hospital, operated by Atchison Hospital Association, at Atchison, Atchison County, Kansas.

   b.    <u>Governing Board</u>:  shall mean that group of men and women who constitute the Board of Directors of Atchison Hospital Association, having the ultimate responsibility for the operation of the Hospital and for providing patient care.

   c.    <u>Chief Executive Officer</u>:  shall mean the Chief Executive Officer of the Hospital as selected and appointed by the Governing Board of the Hospital to act as its direct executive representative in the management of the Hospital, subject to the Governing Board policies and corporate bylaws.

---

[3] The additional citation to "AHA ###" throughout the Statement of Uncontroverted Facts is the reference to the Bates stamp designation on the lower right hand corner of the page of the document.  Occasionally, the specific Bates stamp page number citation will also be provided in order to allow better identification of documents in the record.  If the exhibit is Bates stamped with "AHA ###," then it means that the document was provided to plaintiff during discovery.  (Vesom Depo. at p. 62, l. 5-12)

6

     d.      <u>Medical Staff</u>:  shall mean practicing and appropriately licensed physicians and dentists formally appointed and privileged to attend patients at the Hospital.

     e.      <u>Chief of Staff</u>:  shall mean the Chief Administrative Officer of the Medical Staff as elected by the active members of the Medical Staff at their annual meeting and who shall carry out the duties as set forth in Article VII, Section 7(a).

     f.      <u>Executive Committee</u>:  shall mean the Executive Committee of the Medical Staff.

     g.      <u>Medical Staff Year</u>:  shall begin on January 1 and end on December 31.

(Ex. 4, Bylaws at p. 1; AHA 931)

9.      The name of the organization is designated as the "Medical Staff of Atchison Hospital Association."  (Ex. 4, Bylaws at Article I; AHA 932)

10.     The purposes of the medical staff are:

     a.      to assure that all patients admitted to or treated at any of the facilities, departments or services of the Hospital receive care in accordance with recognized medical standards available through the resources of the Hospital;

     b.      to be the formal organizational structure through which the benefits of membership on the Medical Staff may be obtained by individual practitioners and the obligations of Medical Staff membership may be fulfilled;

     c.      to serve as the primary means for providing assurance as to the ethical conduct of its members and to strive toward assuring that the pattern of patient care in the Hospital is maintained at the level of quality and efficiency which is consistent with the recognized standards for medical practice in the same or similar communities; and

     d.      to provide a means through which the Medical Staff may participate in the policy-making and planning process of the Hospital.

(Ex. 4, Bylaws at Article II, 1.; AHA 932)

11.     The responsibilities of the medical staff are:

     a.      to delineate the clinical privileges that each member may exercise in the Hospital and conduct ongoing review and evaluation of each member's performance in the Hospital;

     b.      to participate in and, when appropriate, to initiate education and training programs for the Hospital employees and other health care personnel;

     c.      to identify community health needs and recommend appropriate institutional goals and, when appropriate, implement programs to meet those needs;

7

d.      to provide the Governing Board with regular evaluation reports and recommendations with respect to patient care;

e.      to make recommendations to the Governing Board of the Hospital with respect to appointment, reappointment and staff category;

f.      to initiate and pursue corrective action with respect to members when warranted and to advise the Governing Board regarding such action; and

g.      to develop, administer and seek compliance with the Bylaws, the Rules and Regulations, and other patient care-related policies of the Medical Staff and the Hospital.

(Ex. 4, Bylaws at Article II, 2; AHA 932)  (Vesom Depo. at p. 63, l. 22-25; p. 65, l. 19-25)

12.     Dr. Vesom believes that many of the responsibilities of the medical staff are delegated to the MEC.  (Vesom Depo. at p. 65, l. 19 - p. 67, l. 21)

13.     The active medical staff is defined as "those physicians and dentists who agree to assume all the functions and responsibilities of membership on the active staff.  Active staff members shall regularly admit patients to, or be otherwise regularly involved in, the care of patients in the Hospital.  Members of the active staff must admit at least ten (10) patients to the Hospital during each medical staff year or otherwise be regularly involved in the care of patients in the Hospital."  (Ex. 4, Bylaws at Article IV, 1; AHA 933)

14.     The medical staff is divided into Active, Courtesy, Consulting and Honorary staff privileges.  (Ex. 4; AHA 933)  Throughout his association with AHA, Dr. Vesom was designated as an "active medical staff member."  (Vesom Depo. at p. 61, l. 15-22)

15.     AHA did not employ Dr. Vesom.  (Vesom Depo. at p. 246, l. 9-13)  The status as an employee is not what dictates access to the Hospital.  A physician must be a member of the AHA medical staff to practice at the Hospital.  (Ex. 4)

16.     All of the members of the medical staff are responsible for complying with the Bylaws.  (Vesom Depo. at p. 63, l. 22-25)  (K.A.R. 28-34-5a)

8

17.     Dr. Vesom agrees that as a member of the AHA medical staff, he was required to comply with the Medical Staff Bylaws.  (Vesom Depo. at p. 57, l. 10-13; p. 61, l. 9-14; p. 63, l. 22-25)

18.     Dr. Vesom also agrees that the version of the Medical Staff Bylaws dated December 19, 2002 would be the version that would have been in place at the time his credentials were reviewed in January and February of 2003.  (Vesom Depo. at p. 57, l. 10-20)

19.     As a member of the active medical staff of AHA, Dr. Vesom could get copies of the Medical Staff Bylaws, with all updates, attachments and revisions, at any time by requesting a copy from the Medical Staff office.  (Vesom Depo. at p. 58, l. 5-22; p. 61, l. 1-4)

20.     The section of the Bylaws which discusses medical staff membership states, in part, that there is no entitlement to medical staff membership:  "No physician or dentist shall be entitled to membership to the medical staff or to the exercise of particular clinical privileges at the Hospital merely by virtue of the fact that he/she:  (a) is licensed to practice medicine or dentistry in this or any other state; (b) is a member of any particular professional organization; or (c) has previously had medical staff membership or privileges in this Hospital, or has had or currently has medical staff membership or privileges in any other hospital or health care facility."  (Ex. 4, Bylaws at Article XI, 3; AHA 946)

21.     The Bylaws describe the nature of the medical staff membership and specifically state that "Membership in the medical staff is a privilege which shall be extended only to professionally competent physicians or dentists who continuously meet the qualifications, standards and requirements set forth in these Bylaws, and in such policies as are adopted from time to time by the medical staff and approved by the governing Board."  (Ex. 4, Bylaws at Article XI, 1(a); AHA 945)

22.     The Bylaws specify that to qualify for membership to the medical staff, a physician must provide documentation of their background, relevant training and/or experience, professional competency, good reputation, and ability to work with others so that all patients treated by them in the Hospital will receive quality care, and so that the Hospital and its medical staff will be able to operate in an orderly manner.  (Ex. 4, Bylaws at Article XI, 2(b); AHA 946)

23.     The Bylaws further state the responsibilities of membership acceptance. Acceptance of membership shall constitute the member's agreement that he/she will "abide by the Medical Staff Bylaws and by all other lawful standards, policies and rules of the Hospital." (Ex. 4, Bylaws at Article XI, 4(b); AHA 946)  (Vesom Depo. at p. 63, l. 22-25; p. 138, l. 23 - p. 140, l. 10)

24.     The Medical Staff Bylaws also dictate that acceptance of membership of the medical staff shall constitute the member's agreement that he will "discharge such staff, committee and hospital functions for which he/she is responsible by staff category assignment, appointment, election or otherwise."  (Ex. 4, Bylaws at Article XI, 4(c); AHA 946)

25.     The Medical Staff Bylaws also dictate that acceptance of membership of the medical staff shall constitute the member's agreement that he will "conduct him/herself in a professional, cooperative manner with colleagues and members of the Hospital Staff."  (Ex. 4, Bylaws at Article XI, 4(h); AHA 946) (Vesom Depo. at p. 137, l. 17-25; p. 138, l. 1-22)

**C.     Medical Staff Officers -- The Medical Executive Committee**

26.     The medical staff elects officers for the purpose of carrying out certain functions on behalf of the medical staff.  (Vesom Depo. at p. 64, l. 1-4)

27.     The officers of the medical staff include the Chief of the Medical Staff (Chief of Staff), Vice Chief of Staff and Secretary/Treasurer.  (Ex. 4, Bylaws at Article VII, 1; AHA 938; Vesom Depo. at p. 64, l. 5-10)

28.     The Medical Executive Committee ("MEC") shall consist of the three (3) general officers of the medical staff, the immediate past Chief of Staff and a "member at large" elected from the active medical staff at the time of the annual meeting of the medical staff.  (Ex. 4, Bylaws at Article VIII, 2; AHA 941)

29.     Nominations for each office shall be made by the Nominating Committee. Officers shall be elected at the annual meeting of the medical staff.  Only members of the active medical staff shall be eligible to vote.  Nominations for Nominating Committee members may be made by the Chief of Staff and nominations may also be made from the floor.  (Ex. 4, Bylaws at Article VII, 3; AHA 939)  (Vesom Depo. at p. 102, l. 4-9)

30.     Dr. Vesom never made any nominations for anyone, including himself, to serve on the Executive Committee.  (Vesom Depo. at p. 102, l. 10 - p. 104, l. 7)  As a member of the medical staff, Dr. Vesom had a part in the governance process, but chose not to nominate himself or seek appointment.  (Vesom Depo. at p. 104, l. 15 - p. 105, l. 11; p. 107, l. 5-15)

31.     The Chief of Staff:

1.      shall serve as the chief administrative officer of the Medical Staff;
2.      shall aid in coordinating the activities and concerns of the Hospital administration and of the nursing and other patient care services with those of the Staff;
3.      shall call, preside and be responsible for the agenda of all regular and special meetings of the Staff;
4.      shall be responsible for the enforcement of these Medical Staff Bylaws and Rules and Regulations, for implementation of applicable sanctions, and for the Medical Staff's compliance with procedural safeguards in all instances where corrective action has been requested against a practitioner;
5.      shall communicate and represent the opinions, policies, concerns, needs and grievances of the Medical Staff to the Governing Board of the Hospital and to the Hospital Chief Executive Officer;
6.      shall receive and interpret to the Medical Staff the policies of the Governing Board of the Hospital and report to the Governing Board on the performance of the Staff in discharging its obligation to maintain quality medical care;

11

    7.      shall receive reports of reportable incidents regarding members of the Medical Staff;

    8.      shall serve as the spokesperson of the Medical Staff in its external, professional and public relations;

    9.      shall attend meetings of the Governing Board, shall coordinate matters of a medical/administrative nature with the Hospital CEO and the Governing Board, and shall serve as the liaison between the Medical Staff and the Governing Board and the Hospital CEO through which communications between the Staff and the Board and the Hospital CEO shall be transmitted; and

    10.    shall serve as an ex-officio member of all Medical Staff Committees.

(Ex. 4, Bylaws at Article VII, 7(a); AHA 939-940)

32.      The duties of the Vice Chief of Staff are to: "perform all the duties and assume all the responsibilities of the Chief of Staff in the absence or disability of the Chief of Staff. He/she shall be expected to perform such duties of supervision as may be assigned by the Chief of Staff." (Ex. 4, Bylaws at Article VII, 7(b); AHA 940)

33.      The duties of the Secretary/Treasurer are to: "be responsible for the preparation of complete and accurate minutes of all Medical Staff meetings or meetings of any committee of the Medical Staff. He/she shall keep and maintain or cause to be kept and maintained, adequate and correct accounts of the funds, if any, and business transactions of the Medical Staff. He/she shall attend to all correspondence and perform such other duties as ordinarily pertain to or be delegated to the office of Secretary/Treasurer." (Ex. 4, Bylaws at Article VII, 7(c); AHA 940)

34.      Dr. Vesom agrees that the MEC performs and carries out these responsibilities on behalf of the entire medical staff. (Vesom Depo., p. 67, l. 1-21)

35.      K.A.R. 28-34-5a(6) provides that the authority of the MEC is limited to making recommendations to the Board and such recommendations are not binding until approved by the Board.

36.     Specific duties of the MEC are set forth in the Medical Staff Rules and Regulations.  (Ex. 4, Bylaws at Article VIII, 2; AHA 941)  (*See also* Affidavit of John Jacobson at Exhibit 33, at ¶ 9)  One of the roles of the MEC is to review physicians for the appointment and reappointment of medical staff privileges.  The MEC's authority is specifically limited, however, "to making recommendations to the governing board, as such actions are not binding until approved by the governing board."  (Ex. 4, Bylaws at Article VIII, 2; AHA 941)  The MEC is an advisory body and does not have the authority to take binding action.  All formal action is taken by the Governing Board of the Hospital.  *Id*.

37.     The MEC may recommend that a staff member's privileges remain the same, be increased, reduced or terminated.  (Ex. 4, Bylaws, Appendix A, 5(g); AHA 961)

**D.     Medical Staff Rules, Regulations and Procedures**

38.     The medical staff is responsible for monitoring and evaluating the quality and appropriateness of medical care provided within the Hospital.  The medical staff must be able to initiate and/or recommend corrective action concerning infractions of its members.  The procedures for reporting of reportable incidents and for implementation of corrective action is set forth in Article XII of the Bylaws and Appendix B thereto.  (Ex. 4, Bylaws at Article XII and Appendix B; AHA 950, 962-965)

39.     The medical staff is required to maintain a system of hearing and appellate review procedures to assure fundamentally fair treatment to members of the medical staff or applicants to the medical staff against whom an adverse recommendation or decision is made.  The procedures for hearing an appellate review with respect to an adverse recommendation or decision are set forth in the Bylaws at Article XIII and Appendix C thereto.  (Ex. 4, Bylaws at Article XIII and Appendix C; AHA 951, 966-971)

13

40.     A denial of medical staff reappointment is deemed to be an adverse action entitling the practitioner to the fair hearing procedures set forth in the Bylaws.  (Ex. 4, Bylaws at Article XIII, 2(a))

41.     The fair hearing procedures are set forth in Article XIII and Appendix C to the Bylaws.  (Ex. 4, Appendix C; AHA 951, 966-971)

42.     The medical staff is also permitted to adopt Rules and Regulations as may be necessary to implement more specifically the general principles found within the Bylaws.  These Rules and Regulations relate to the proper conduct of medical organizational activities as well as embody the level of practice that is required of each practitioner in the Hospital.  The Rules and Regulations are part of the Bylaws.  (Ex. 4, Bylaws at Article XV; AHA 953)

**E.      The Scope of the Medical Staff Privilege**

43.     Physicians who want to use the AHA facilities and/or see patients at AHA are required to have an association with the Hospital through a "medical staff privilege" conferred upon them by AHA.  (Ex. 4, Bylaws at Article XI, 1, 9; AHA 945, 947)

44.     AHA Medical Staff Bylaws provide that no physician is entitled to privileges at AHA merely because they are licensed to practice medicine and have had previous medical staff privileges at AHA.  (Ex. 4, Bylaws at Article XI, 3; AHA 946)

45.     Dr. Vesom acknowledges that the doctor's association with AHA, also referred to as "medical staff privilege," is a privilege, not a "right" to which the doctor is entitled.  (Vesom Depo. at p. 137, l. 3-25)

46.     The Bylaws have detailed procedures for the application and renewal of clinical privileges.  (Ex. 4, Bylaws at Appendix A; AHA 955-961)  AHA Medical Staff Bylaws provide that physicians are appointed medical staff privileges at AHA for a two year period.  (Ex. 4, Bylaws at Appendix A, 4(h); AHA 959)

14

47.     All physicians wanting to maintain medical staff privileges at AHA after the two

(2) year period expires are required to file an application for the reappointment of medical staff

privileges.  (Ex. 4, Bylaws at Appendix A, 5; AHA 960-961)

**F.     Medical Staff Assignments**

48.     AHA periodically publishes a Medical Staff Roster which identifies each of the

members of the MEC, along with the names of the chairpersons of the service Departments and

all members of the medical staff committees, designating the committee chairpersons.  (*See*

Medical Staff Rosters for the years 1983-2005 attached as Exhibit 5)[4]  (Vesom Depo. at p. 114, l.

6 - p. 115, l. 10)

49.     In 1985, Dr. Vesom served as Chairman of the Intensive Care Unit ("ICU")

Committee.  (Ex. 5; AHA 11241)[5]

50.     In 1986, Dr. Vesom served as Vice Chief of Staff on the MEC.  Dr. Vesom also

served as Chairman of the ICU Department and Chairman of the Drug Utilization Committee.

(Ex. 5; AHA 11237)

51.     In 1987, Dr. Vesom served as Secretary/Treasurer of the MEC.  Dr. Vesom also

served as chairman of the ICU Committee.  (Ex. 5; AHA 11236)

52.     In 1988, Dr. Vesom served as Chairman of the ICU Committee.  (Ex. 5; AHA

11235)

53.     In 1989, Dr. Vesom served as Chairman of the ICU Department and Chairman of

the ICU Committee.  (Ex. 5; AHA 11234)

---

[4] Each year may have more than one Medical Staff Roster as changes are made during the year.  A date in the lower left hand corner designates the effective date for the year's assignment.

[5] In addition to each of the leadership positions noted, Dr. Vesom may have also served as a member of one of the various committees.  These uncontroverted facts only highlight when Dr. Vesom served as a member of the MEC, a department chair or a medical staff committee chairperson.  For example, in 1991, Dr. Vesom also served as a member of the Executive/Credentials Committee, but was not the chairperson of this committee.  (AHA 11232)

54.     In 1990, Dr. Vesom served as Chairman of the Drug Usage Committee, Chairman of the ICU Department, and Chairman of the ICU Committee.  (Ex. 5; AHA 11233)

55.     In 1991, Dr. Vesom served as Secretary/Treasurer of the MEC, Chairperson of the Medicine Department, Chairman of the Cardiopulmonary Committee, Chairman of the ICU Committee and a member of the Executive/Credentials Committee.  (Ex. 5; AHA 11232)

56.     In 1992, Dr. Vesom served as Chairperson of the Medicine Department and Chairperson of the ICU Committee.  (Ex. 5; AHA 11231)

57.     In 1993, Dr. Vesom served as Chairperson of the Cardiopulmonary Department and Chairperson of the ICU Committee.  (Ex. 5; AHA 11230)

58.     In 1994, Dr. Vesom served as Chairperson of the Cardiopulmonary Department, Chairperson of the ICU Committee and Chairperson of the Medical Records Committee.  (Ex. 5; AHA 11229)

59.     In 1995, Dr. Vesom served as Chairperson of the Cardiopulmonary Department and Chairperson of the ICU Committee.  (Ex. 5; AHA 11227)

60.     In 1998, the MEC included Dr. Goracke as Chief of Staff.  (Ex. 5; AHA 11222-11223)

61.     At the annual medical staff meeting, Dr. Vesom voted against the election of Chief of Staff Douglas Goracke for 1998.  (Vesom Depo. at p. 117, l. 1-19; p. 118, l. 1-5; p. 119, l. 11-14)

62.     In 2000, Dr. Vesom served as Chairperson of the Pharmacy/Therapeutics Committee (partial year), Chairperson of the Cardiopulmonary Department (partial year), and Chairperson of the ICU Committee (partial year).  (Ex. 5; AHA 11218-11219)

CWDOCS 429590v1 :13728.422195

63.     In 2001, Dr. Vesom served as chairperson of the Cardiopulmonary Department, chairperson of the Intensive Care Unit (Critical Care Services) Committee.  (Ex. 5; AHA 11216-11217)

64.     In 2001, Dr. Vesom voted against the Executive Committee nominations at the annual medical staff meeting because Dr. Thomas was listed as the Chief-of-Staff candidate. (Vesom Depo. at p. 120, l. 8-14; p. 120, l. 25 - p. 121, l. 7)

65.     During 2002, the MEC consisted of Ryan Thomas (Chief of Staff), Jon Siebert (Vice Chief of Staff), Sabrina Schmidt (Secretary/Treasurer), James S. Haug (Member-at-Large) and Pitt Vesom (Second Member-at-Large).

66.     During 2002, Dr. Vesom served as chairperson of the Cardiac/Pulmonary Rehab Department (partial year), chairperson of the Cardiopulmonary Department (partial year), chairperson of the Medicine Department (partial year) and as chairman of the Intensive Care Unit (Critical Care Services) Committee (for a portion of the year).  Dr. Vesom also served as second member at large on the MEC during 2002.  (Ex. 5; AHA 11213-11215)

67.     During 2003, the MEC consisted of Douglas Goracke (Chief of Staff), Donald Swayze (Vice Chief of Staff), Michael Jones (Secretary/ Treasurer), James Rider (Member-at-Large), and Ryan Thomas (past Chief of Staff).  (Ex. 5; AHA 11210-11212)

68.     If Dr. Vesom had attended the November 2002 annual medical staff meeting, he would have voted against the slate of MEC officers because he did not like Dr. Goracke. (Vesom Depo. at p. 123, l. 24 - p. 125, l. 8)

69.     During 2003, Dr. Vesom served as chairperson of the Cardiopulmonary Department and a member of the ICU/Critical Care Services Committee.  (Ex. 5; AHA 11210-11212)

70.     During 2004, Dr. Vesom served as chairperson of the Cardiopulmonary Department, and a member of the ICU/Critical Care Services Committee.  (Ex. 5; AHA 11208-11209)

71.     Dr. Vesom testified that he would have voted against Dr. Goracke and Dr. Ryan Thomas as officers on the MEC because he did not like them.  (Vesom Depo. at p. 116, l. 6-16)

72.     If Dr. Vesom had attended the November 2003 annual medical staff meeting, he would have voted against the slate of MEC officers because he did not like Dr. Swayze, who was a candidate for Chief of Staff.  (Vesom Depo. at p. 125, l. 9 - p. 126, l. 1)  (Ex. 5; AHA 11208-11209)

73.     Dr. A.K. Tayiem's medical staff privileges have not been adversely affected since he jointly signed the January 27, 2003 letter with Dr. Vesom and Dr. Ware.  Dr. Tayiem is currently serving as the Member-at-Large on the Medical Staff Executive Committee for the 2005 medical staff year.  (Ex. 5; AHA 11205-11207)

**G.     Committees of the Medical Staff**

74.     The Bylaws establish several committees of the medical staff.  (Ex. 4, Bylaws at Article VIII, 1-8; AHA 940-942)

75.     The Bylaws define the Credentials Committee as follows:

The Credentials Committee shall consist of the members of the Executive Committee.  The Chairperson will be the recent Chief of Staff.  The Credentials Committee shall carry out the initial evaluation of new applicants to the Medical Staff and members applying for reappointment as described in these Bylaws. Meetings of the Credentials Committee shall occur as needed for consideration of new applicants, credentialing questions concerning present Medical Staff members, and as necessary to complete the process of reapplication and reappointment of Medical Staff members

(Ex. 4, Bylaws at Article VIII, 3; AHA 941)  (Vesom Depo. at p. 162, l. 2-5)

76.     The Medical Credentials Committee and the Medical Executive Committee are comprised of the same members.  (Ex. 4, Bylaws at Article VIII, 3; AHA 941)

77.     The medical staff engages in the peer review process through its Credentials Committee.  The Credentials Committee makes recommendations to the Hospital Board of Trustees, guided by the Hospital's credentialing policy and Bylaws, regarding whether particular physicians meet the minimum professional requirements to practice at the Hospital, both as to their admission to and renewal of medical staff membership.  (Ex. 4, Bylaws at Article VIII, 3, Appendix A; AHA 941, 955-961)

78.     The MEC has the authority to make a nonbinding recommendation to the Board on reappointment to the medical staff.  *Id.*

79.     The Bylaws define the Peer Review Committee as follows:

> The Chief of the Medical Staff, or his/her designee, will perform peer review for the Medical Staff utilizing criteria/indicators established by the Medical Staff for all services.  These criteria will be selected from indicators offered by practice specialty groups, Joint Commission or state regulatory agencies.  Following established Medical Staff protocol, the Executive Committee shall perform screening following review by the Chief of Staff, or his/her designee.  The findings of these reviews and any recommendations for improvement from the Executive Committee shall be reported to the Medical Staff by the Chief of Staff or his/her designee.

> The committee will meet at least ten (10) times per year to perform case review.  Attendance shall be restricted to committee members, a recording secretary and such advisors or other attendees as the presiding chairperson may specifically request to attend.

(Ex. 4, Bylaws at Article VIII, 4; AHA 941)

80.     The Bylaws define the Intensive Care Unit Committee as follows:

> The Intensive Care Unit (ICU) Committee shall consist of at least three (3) members of the Active Medical Staff, one of whom shall be designated the chairman by the Chief of Staff.  One member of the committee shall be a surgeon.  The purpose of the Committee shall be to provide clinical supervision to the ICU; review policies and procedures related to the ICU; monitor and evaluate the

19

quality and appropriateness of care provided therein.  The Intensive Care Unit Committee shall meet quarterly.

(Ex. 4, Bylaws at Article VIII, 6; AHA 942)

81.     Other special committees may be created and their membership appointed by the Chief of Staff as needs arise.  Committees may be appointed specifically to deal with issues that arise from the chart review activities of Peer Review.  (Ex. 4, Bylaws at Article VIII, 7; AHA 942)

### H.     AHA Board of Directors

82.     AHA Medical Staff Bylaws provide that the Board has "the ultimate responsibility for the operation of the Hospital and for providing patient care."  (Ex. 4, Bylaws, Preamble; AHA 931)

83.     The Board has the ultimate authority in granting a practitioner clinical privileges in all actions concerned with the exercise or limitation of those privileges.  (Ex. 4, Bylaws, Appendix A, 4(f); AHA 959)  (*See* Affidavit of Carol Niemann attached as Exhibit 31, Aff. at ¶ 22)

84.     All terms, conditions and procedures relating to initial medical staff privileges are applied to an individual's ongoing medical staff membership and to subsequent reappointments.  (Ex. 4, Bylaws, Appendix A, 5(a); AHA 960)  (Ex. 31, Niemann Aff. at ¶ 23)

85.     The Board, after receiving the recommendation from the MEC, follow the Bylaws and review all the "pertinent information available for the purpose of determining its recommendation for staff reappointment, changing category, increasing or decreasing clinical privileges, or for non-reappointment for the ensuing year, including the decision of the Fair Hearing Panel members."  (Ex. 4, Bylaws, Appendix A, 5(i); AHA 961)

## I.       Peer Review

86.     AHA Medical Staff Bylaws provide that "[a]ll committees of the Medical Staff

shall be considered Peer Review Committees, as their primary function is to monitor and

evaluate the quality and appropriateness of health care within the institution.  Such is the

responsibility delegated to the Medical Staff by the Governing Board."  (Ex. 4, Bylaws at Article

VIII, 1; AHA 940)  (Ex. 34, Butler Aff. at ¶ 24)  (Vesom Depo. at p. 68, l. 10-18)

87.     Kansas law defines "peer review" to mean any of the following functions:

(A)     Evaluate and improve the quality of health care services rendered
by health care providers;
(B)     determine that health services rendered were professionally
indicated or were performed in compliance with the applicable standard of care;
(C)     determine that the cost of health care rendered was considered
reasonable by the providers of professional health services in this area;
(D)     evaluate the qualifications, competence and performance of the
providers of health care or to act upon matters relating to the discipline of any
individual provider of health care;
(E)     reduce morbidity or mortality;
(F)     establish and enforce guidelines designed to keep within
reasonable bounds the cost of health care;
(G)     conduct of research;
(H)     determine if a hospital's facilities are being properly utilized;
(I)     supervise, discipline, admit, determine privileges or control
members of a hospital's medical staff;
(J)     review the professional qualifications or activities of health care
providers;
(K)     evaluate the quantity, quality and timeliness of health care services
rendered to patients in the facility;
(L)     evaluate, review or improve methods, procedures or treatments
being utilized by the medical care facility or by health care providers in a facility
rendering health care.

K.S.A. § 65-4915(a)(3) (Affidavit of Kathleen Butler attached as Exhibit 34, Butler Aff. at ¶ 23).

88.     "Peer review officer or committee" means:  "An individual employed, designated

or appointed by, or a committee of or employed, designated or appointed by, a health care

provider group and authorized to perform peer review."  K.S.A. §§65-4915(a)(4).

89.     The peer review statute defines the peer review privilege:

21

> . . . the reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers shall be privileged and shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity or be admissible in evidence in any judicial or administrative proceeding.  Information contained in such records shall not be discoverable or admissible at trial in the form of testimony by an individual who participated in the peer review process.  The peer review officer or committee creating or initially receiving the record is the holder of the privilege established by this section.  This privilege may be claimed by the legal entity creating the peer review committee or officer, or by the commissioner of insurance for any records or proceedings of the board of governors.

K.S.A. § 65-4915(b).

90.     Peer review applies to everyone.  (Vesom Depo. at p. 69, l. 16 - p. 70, l. 5; p. 82, l. 1-20)

91.     The MEC was entitled to look at all aspects of the physician and evaluate if the physician's reappointment was in the best interest of the quality of patient care provided at the Hospital.  (Ex. 27, Thomas Aff. at ¶ 31; Ex. 29, Swayze Aff. at ¶ 25; Ex. 28, Goracke Aff. at ¶ 31; Ex. 30, Jones Aff. at ¶ 21)

**J.     Ryan Thomas, M.D.**

92.     Defendant Ryan Thomas, M.D. is a Board Certified family practitioner with obstetrical privileges, is a former Chief of Staff of AHA and has been a member of the medical staff at AHA for over nine (9) years.  (*See* Affidavit of Ryan Thomas, M.D., attached as Exhibit 27; *see also* Ex. 16, Transcript of Fair Hearing Panel Appeal at pages 51: 15-25, 52: 1-6)

93.     Dr. Thomas has been practicing medicine and has lived and worked in the Atchison community since 1995.  (Ex. 27)

94.     Dr. Thomas was a hospital employed physician until September of 2003.  Dr. Thomas currently is a self-employed physician, but has an association with the Hospital through his "medical staff privilege" which has been conferred upon him by the Governing Board of the

Hospital according to the AHA Medical Staff Bylaws.  (Ex. 27)  (*See generally*, Ex. 4, Bylaws at Article XI, 1)

95.     Dr. Thomas has provided testimony that he understands that his association with AHA, referred to as a "medical staff privilege," is a privilege, not a "right," to which he has an absolute entitlement.  (Ex. 27)

96.     Dr. Thomas has held numerous medical staff positions during his almost ten (10) years as a member of the medical staff at AHA.  (Ex. 27)

### K.     Douglas Goracke, M.D.

97.     Defendant Douglas Goracke, M.D., is a Board Certified anesthesiologist and is a former Chief of Staff of AHA.  (*See* Affidavit of Douglas Goracke, M.D., attached as Exhibit 28)

98.     Dr. Goracke has been practicing medicine since 1989 and has lived and worked in the Atchison community since 1992.  (Ex. 28)

99.     Dr. Goracke is a self-employed physician, but has an association with AHA through his "medical staff privilege" which has been conferred upon him by the Governing Board of the Hospital according to the AHA Medical Staff Bylaws.  (Ex. 28)  (*See generally*, Ex. 4, Bylaws at Article XI, 1)  In this capacity, Dr. Goracke is not an employee of AHA.

100.     Dr. Goracke has provided testimony that he understands that his association with AHA, referred to as a "medical staff privilege," is a privilege, not a "right," to which he has an absolute entitlement.  (Ex. 28)

101.     During his thirteen (13) years on the medical staff, Dr. Goracke has held numerous medical staff positions during his association with AHA, including:  Chief of Medical Staff (1997-98, 2003); Vice Chief of Medical Staff (1995); Secretary/Treasurer Medical Staff Executive Committee (1994); Service Chairman Anesthesia (1993-2004); Risk Management Oversight Committee (1997-98, 2001, 2003), Performance Improvement Committee (1997-98,

23

2003); ICU Committee (2002); Medical Records Committee Chairman (2000); JCAHO Co-Liaison (1997); ICU Committee (1996); Medical Staff Development Committee (1995-96); and Quality Improvement Committee (1993).  (Ex. 28)

  **L.**  **Donald Swayze, D.O.**

  102. Defendant Donald Swayze, D.O., is a board certified surgeon.  Prior to being named Chief of Staff at AHA in 2004, Dr. Swayze served as the Vice Chief of Staff at AHA. (*See* Affidavit of Donald Swayze, M.D., attached as Exhibit 29)  (Ex. 16, Transcript of Fair Hearing at page 26: 3-25)

  103. Dr. Swayze has lived and worked in the Atchison community since August of 2001.  (Ex. 29)

  104. Dr. Swayze is a self-employed physician, but has an association with AHA through his "medical staff privilege" which has been conferred upon him by the Governing Board of the Hospital according to the AHA Medical Staff Bylaws.  (Ex. 29)

  105. Dr. Swayze has provided testimony that he understands that his association with AHA, referred to as a "medical staff privilege," is a privilege, not a "right," to which he has an absolute entitlement.  (Ex. 29)

  106. Attached to Dr. Swayze's affidavit is a list of medical staff positions Dr. Swayze has held during his association with AHA.  Dr. Swayze also maintains privileges at Cushing Memorial Hospital, St. John's Hospital and Northeast Kansas Center for Health and Welfare. (Ex. 29)

  **M.**  **Michael Jones, M.D.**

  107. Michael P. Jones, M.D. is a board certified family practitioner with obstetrical privileges.  Dr. Jones has been practicing medicine and has lived and worked in the Atchison

community since June of 1986.  (*See* Affidavit of Michael P. Jones, M.D., attached hereto as Exhibit 30)

108.    At this time, Dr. Jones is a hospital employed physician of AHA.  Dr. Jones professional address is Atchison Medical Services, Inc., 1225 North 2nd Street, Atchison, KS 66002.  Dr. Jones has an association with AHA through his "medical staff privilege" which has been conferred upon him by the AHA Governing Board according to the AHA Medical Staff Bylaws.  (Ex. 30; *see generally*, Ex. 4, Bylaws at Article XI, 1)

109.    Dr. Jones has provided testimony that he understands that his association with AHA, referred to as a "medical staff privilege," is a privilege, not a "right," to which he has an absolute entitlement.  (Ex. 30)

110.    During his nineteen (19) years on the medical staff, Dr. Jones has held numerous medical staff offices during his association with AHA.  Dr. Jones also maintains privileges at the University of Kansas Medical Center.  (Ex. 30)

**N.      James W. Rider, M.D.**

111.    One (1) of the five (5) members of the MEC was James W. Rider, M.D.  Dr. Rider was in attendance at all of the MEC meetings in which the MEC discussed the application for reappointment of Dr. Vesom's hospital privileges.[6]

**O.      The Deposition Testimony of Pitt Vesom, M.D.**

112.    Dr. Vesom is a board certified internist and cardiologist who was first granted medical staff privileges at AHA in September of 1983.  Plaintiff's formal name is Pittaya Vejviboonsom.  (Vesom Depo. at p. 16, l. 20-25)

---

[6] It is significant to point out who plaintiff elected not to sue.  Dr. Vesom elected not to sue his former employee and friend, James W. Rider, M.D.  Dr. Vesom also elected not to sue his friend, Michael Jones, M.D., despite the fact that Dr. Jones also voted in favor of the motion to recommend to the Board that Dr. Vesom should not be reappointed to the AHA medical staff.

113.    Dr. Vesom changed his name to shorten it and make it easier for most American patients to pronounce in 1983.  (Vesom Depo. at p. 17, l. 1-7)

114.    Dr. Vesom was born on November 5, 1949 in Suksothi, Thailand.  Dr. Vesom came to the United States in 1977 and became a U.S. Citizen in 1996.  (Vesom Depo. at p. 17, l. 10-25)

115.    When Dr. Vesom arrived in 1983, there was already another doctor from Thailand, Dr. Arkom,  who had medical staff privileges at AHA.  (Vesom Depo. at p. 247, l. 4-10)

116.    Dr. Vesom established a friendship with Dr. Arkom, another doctor from Thailand.  (Vesom Depo. at p. 24-25)  Dr. Arkom has never shared with Dr. Vesom that Dr. Arkom believes he has been discriminated against in any way because of his race, being from Thailand.  (Vesom Depo. at p. 32, l. 12-16)  Dr. Arkom never voiced any belief that he has been discriminated against because of his race.  (Vesom Depo. at p. 33)

117.    Dr. Vesom has shared his beliefs and opinions that he feels that he has been discriminated against based upon his race, being from Thailand, with Dr. Arkom.  Dr. Arkom did not respond to the one-sided conversation, only listened and did not support or deny Dr. Vesom's feelings.  (Vesom Depo. at p. 32, l. 17 - p. 33, l. 15)

118.    Dr. Vesom voluntarily resigned his courtesy medical staff privileges with Cushing Memorial Hospital in conjunction with his move to Poplar Bluff, Missouri in 2004.  (Vesom Depo. at p. 33, l. 16 - p. 35, l. 1)

119.    Dr. Vesom also voluntarily resigned his courtesy medical staff privileges with Horton County Hospital in Horton, Kansas when Dr. Vesom relocated to Poplar Bluff, Missouri in 2004.  (Vesom Depo. at p. 35)

CWDOCS 429590v1 :13728.422195

120.    Dr. Vesom lost his privileges to AHA in April of 2004.  (Vesom Depo. at p. 37, l. 20-22)

121.    It is stipulated that the Executive Committee met February 18, 2003 and voted to recommend non-renewal of privileges and that the Board of Directors approved that recommendation on April 4, 2004, a little over a year later.  (*See* Stipulation of Dr. Vesom's legal counsel, Charles Kugler in Vesom Depo. at p. 40, l. 14 - p. 42, l. 5; p. 43, l. 11-16; p. 44, l. 4-17)

122.    From February 18, 2003 to April 2, 2004, Vesom maintained active medical staff privileges during the approximately fourteen (14) months that Dr. Vesom pursued his appeal of the recommendation not to reappoint him to medical staff privileges.  (Vesom Depo. at p. 44, l. 13 - p. 45, l. 3)

123.    After Vesom lost his privileges at Atchison, he could have continued to utilize his courtesy medical staff privileges and see patients for specialty cardiology services at Horton Community Hospital if he chose to do so.  (Vesom Depo. at p. 47, l. 16 - p. 48, l. 8; p. 48, l. 9 - p. 49, l. 12)

124.    After Vesom lost his privileges at Atchison, he could also have continued to utilize his courtesy medical staff privileges and see patients at Cushing Memorial Hospital in Leavenworth, Kansas if he chose to do so.  (Vesom Depo. at p. 48, l. 9 - p. 50, l. 21)

125.    Between April 2, 2004 and the time that Dr. Vesom transferred to Poplar Bluff, Missouri, he continued to service his cardiac patients at Cushing Memorial Hospital.  (Vesom Depo. at p. 51, l. 11-19; p. 52, l. 5-21)

126.    Dr. Vesom was critical of the AHA system of peer review.  According to Dr. Vesom, he believed that the system was unfair and that the Chief of Staff should not be designated as the point of contact for reviewing all medical records:

>       A.      Each committee should be responsible for -- for their own review, because it would be fairer to have a people who review their own surgical case, the surgeon review surgery.  The medicine man, the critical care people who involved in ICU review that specialty.  That would be fair.  That's -- that's supposed to be function like that, like any other hospital.

(Vesom Depo. at p. 73, l. 22 - p. 74, l. 4)

127.    Dr. Vesom agreed that this system, whereby the specialists were responsible for reviewing their own cases could be viewed as the fox guarding the hen house:

>       Q.      Could it also be argued that the fox was guarding the hen house in that situation?
>       A.      You can make that argument, it's true.

(Vesom Depo. at p. 74, l. 5-7)

128.    It is Dr. Vesom's belief that the peer review system at AHA gave the Chief of Staff too much authority to decide what cases come out for peer review by the rest of the medical staff.  (Vesom Depo. at p. 74, l. 22 - p. 75, l. 2; p. 76, l. 2-4, 16-21; p. 78, l. 7-25)

129.    Dr. Vesom acknowledges that peer review can be very subjective.  Dr. Vesom agrees that a difference of opinion can exist as to whether or not proper care was provided in any particular peer review of a medical case.  Because of the inherent subjectivity, the peer review process provides an opportunity for appeal associated with the peer review of the case if there is a disagreement with the findings.  (Vesom Depo. at p. 79, l. 5-19)

130.    Dr. Vesom acknowledged that there are at least three (3) different recognized peer review systems available, each of which have features which could be argued to be unfair.  (Vesom Depo. at p. 82, l. 9 - p. 87, l. 23)

131.    Not every case that is subject to peer review is a "reportable incident" which warrants further discussion or discipline.  (Vesom Depo. at p. 87, l. 24 - p. 88, l. 3)  In fact, based upon the inherently subjective nature of peer review, the conclusion of the peer review might be that the claim is frivolous and might not merit discipline, counseling or any further action. (Vesom Depo. at p. 88, l. 4-13; p. 88, l. 19 - p. 91, l. 10)

132.    Dr. Vesom agrees that each peer review case is unique, and based upon the specific facts and circumstances of that case.  By definition, each complaint is viewed on its own merits, and each complaint is separate and distinct.  Therefore, one cannot draw any conclusions about how the result of one peer review case would be applied to another.  Nor can someone rely upon the physician's report of a situation to determine whether or not the peer review process was reasonable.  Peer review is not an individual determination and requires a group decision. (Vesom Depo. at p. 92, l. 5 - p. 93, l. 16; p. 95, l. 18 - p. 96, l. 2)

133.    Dr. Vesom does not have any statistics to support his belief that the number of peer review complaints has increased over the time of the twenty (20) years that he has been at AHA.  (Vesom Depo. at p. 97, l. 6-10)

134.    Dr. Vesom agrees that in a small community hospital, it is important to develop a positive relationship with your peers so that you can have somebody available to cover on weekends, evenings, middle of the night, or while on vacation, so that the physician can meet the obligation to provide continuous care for their patients.  (Vesom Depo. at p. 99, l. 5 - p. 100, l. 15)

135.    The medical staff and the governing board of the Hospital require that all members of medical staff conduct themselves in a professional and cooperative manner.  Dr.

CWDOCS 429590v1 :13728.422195

Vesom agrees that if a physician does not conduct him/herself in a professional and cooperative manner, they should be removed from the medical staff.  (Vesom Depo. at p. 129, l. 2-12)

136.    Dr. Vesom agrees with the concept that the medical staff privilege is a privilege and not a right.  (Vesom Depo. at p. 137, l. 3-25)

137.    When questioned about the concept of privileges versus rights, Dr. Vesom testified as follows:

> Q.      (By Mr. Ferguson) Dr. Vesom, do you agree with the concept that the medical staff privilege is a privilege and not a right?
> A.      Yes.
> Q.      So -- and you understand -- what is your understanding of the difference between a privilege and a right?
> A.      The privilege is -- is the thing that can be granted base on your ability to do those thing.  And a right is a thing that -- is the law that -- governing the -- everyone in United States, in -- in the U.S.  That's what I understand that. And I can explain you that -- that's how I -- I understand.
> Q.      So at page 946, sub-part 3, the bylaws address the fact that there's no entitlement to membership.  So more accurately stated in the bylaws, just because -- because you have been given a license to practice in the State of Kansas, you're not automatically entitled to membership of the medical staff of Atchison Hospital?
> A.      That is correct.
> Q.      So you can't just demand to be a member, it's a privilege that's granted to you?
> A.      That is correct.
> Q.      And you understand that with privileges come responsibilities and that if you don't meet those responsibilities, those privileges can be taken away?
> A.      That is correct.  So everything apply across board, everyone.
> Q.      And just like there's a process by which the hospital privileges are granted, the hospital privileges can be taken away from you, that doesn't mean you automatically continue privileges forever and ever once you've been granted privileges?
> A.      That is correct.
> Q.      And under the bylaws, your privileges last for two years and then you have to go through the reappointment and reapplication process?
> A.      That's correct.  Like everyone else.
> Q.      And that applies to everyone?
> A.      That's correct.

(Vesom Depo. at p. 137, l. 3 - p. 138, l. 22)

CWDOCS 429590v1 :13728.422195

138.     Dr. Vesom testifies that decisions by the MEC are acts of discrimination based upon his race.  However, Dr. Vesom does not state any facts or circumstances to support his conclusions, only his own personal feelings.  The MEC in 1998 was different than the MEC that participated in the decision not to reappoint Dr. Vesom to the medical staff in 2003.  However, Dr. Vesom believes that the recommendation not to be granted active staff membership privileges in 1998 for the 1999 year was also an act of discrimination based upon race:

> Q.       Okay.  Did the physicians who constituted the medical executive committee and the medical credentialing committee who recommended that you not be granted your active staff member privileges in 1998 for the 1999 year, did they discriminate against you for -- on the basis of your race in reaching that recommendation?
> A.       I believe so.
> Q.       So you think that in 1998 the -- Dr. Goracke, Dr. Campbell, Dr. Sontheimer, Dr. Shriwise and Dr. Eplee in making a recommendation that your medical staff privileges not be granted was an act of discrimination based upon your race at that time?
> A.       I believe so.
> Q.       And what -- on what facts do you base that opinion?
> A.       I just feel that way.
> Q.       Okay.  So if there's something that happens that you're not happy with, namely here in this example, the decision not to reappoint your staff privileges, you would label that as race discrimination?
> MR. KUGLER:  Object to the form of the question as argumentative.
> A.       I would not answer that question because I could not label them racist.  In my thought process at that time was discrimination.  Based on racial.  And that's all I can say.  That's my feeling.
> Q.       (By Mr. Ferguson) And what I want to get at, sir, is your -- the basis for that feeling.  I mean, what leads you to the conclusion that in 1998 the recommendation of the medical executive committee and the medical credentialing committee was based upon race?
> A.       They have not given me adequate reason why would not grant the privilege.  And by knowingly that some of the other staff privilege being granted in very fast and quick.  That's all I can say.
> Q.       Okay.  So here I don't want to put words in your mouth, but I do want to try to understand your thought process.  Because you've made an allegation of race discrimination, not only against the doctors in the lawsuit now, but now today you're advising me that you believe that the recommendation in 1998 was also racially motivated.  And I want to understand that you don't have any specific facts or circumstances to support that belief.  You're just drawing the conclusion that because -- because you did not receive your approval as quickly

as others and that they did not give you a reason, it's you that are drawing the conclusion that that's based on race?

MR. KUGLER:  Object to the form of the question.  It's compound.

A.    I still could not draw a conclusion.

Q.    (By Mr. Ferguson) You could not draw what conclusion?

A.    That just the personal feeling at that -- at that -- at that time when I got back.  Okay?  Then after that, I kind of compile more knowledge of how thing being done towards me.  And that's later on in the testimony.

Q.    And we'll get to that point.

A.    Yes.

Q.    But our beliefs are based upon our observations, our experiences, things that people say to you.  You would agree with that?

A.    There are some other part that when we go through and it will be some -- if you were to ask me at that time that -- how do I being -- feel that being treat differently than the other doctors, then I will go for it.  But I think this is initial that the first time that I have been there for years, and left on my own, when I coming back and did not give me adequate reason why would not grant me the privilege.  And I start to suspect and feeling that is a racially motivated.

Q.    Okay.  Could it have been that they simply didn't like you?

A.    Yeah, I believe so.

Q.    Okay.  Could it have been that they had their eye on another cardiologist or internal medicine doctor at the time and they didn't want your application?

A.    Likely.

Q.    Could it have been that the sun was shining that day and they just simply didn't want to approve it?

A.    I could not make that assumption.

Q.    Okay.  It could have been any number of reasons why they didn't want to give you any feedback as to why your -- the recommendation was made, and you, though, have drawn the conclusion that it's based on race?

A.    I said my feeling thought process at that time likelihood racially motivated.

Q.    And I'm trying to get at the core of your feelings as to what was said to you, what was not said to you, what was -- what were the circumstances that supported your feelings that you were not recommended for credentials and privileges with Atchison Hospital Association back in 1998?

A.    Repeat that question again.

MR. FERGUSON:  Would you read the question, please.  (The last question was read by the reporter.)

A.    I could not make that comment.  There was no answer yes or no on this question.

Q.    (By Mr. Ferguson) It was intentionally open-ended.

A.    Yeah.  I could not -- and this is first experience that I had when I first got back in here and then my feeling is that racially motivated, and that is my feeling I'm saying.  Okay?  But I -- nobody said to me, okay, nobody act on me.

Q.    Nobody what?

      A.     Nobody act -- interacted with me at that time.  There was no explanation from the letter and said why.  You understand what I'm talking about?  That's -- I would say it's just my personal feeling at that time.  And that -- that's just about all.

      Q.     Okay.  Unsupported by anything other than your own feelings?

      A.     That's my own feeling, that is correct.

(Vesom Depo. at p. 162, l. 10 - p. 167, l 17)

139.    Prior to the lawsuit, Dr. Vesom did not file any complaints or make any charges that the Hospital had discriminated against him based upon his race.  (*See* Complaint)

140.    During his deposition on March 28, 2005, Dr. Vesom referred to the incidents which he believed support his claim of race discrimination:

- A former member of the hospital board, Harry Franz (now deceased) made a comment outside the Cray Manor Nursing Home during a barbeque party referring to giving Dr. Vesom chopsticks.  (Vesom Depo. at p. 169, l. 2-18)
- Dr. Vesom's office in the hospital was not renovated and "looked so bad."  The ceiling leaked and was not repaired.  (Vesom Depo. at p. 169, l. 21 - p. 170, l. 25)
- Because Dr. Vesom's accommodations were not like those of Dr. Eplee and other doctors.  (Vesom Depo. at p. 176, l. 14 - p. 180, l. 21)
- Dr. Vesom offered to buy an empty lot at the southwest corner of the Hospital for $48,000.00 and to build an office, but the Board did not accept his offer.  (Vesom Depo. at p. 293, l. 14 - p. 295, l. 20)
- Dr. Vesom wrote the offer ten (10) months after the letter of invitation to purchase was sent to Corky Jackson, Director of Facilities at AHA.  The letter to Jackson responds to a letter that Dr. Vesom received from former administrator, David Drew, stating that he was willing to sell the lot to Dr. Vesom at a price of $48,000.00.  When Mr. Bourne wrote back to Dr. Vesom on October 25, 2001, he acknowledged Dr. Vesom's letter and his interest in purchasing the property, and informed Dr. Vesom that subsequent to the December 2000 letter, the Hospital Board reviewed the matter and decided that it was not interested in selling the property.  The letter from Mr. Bourne also indicated that in December of 2000, Dr. Vesom indicated that he was not interested in purchasing the property, already declining the invitation to purchase at the time of its acceptance.  (Vesom Depo. at p. 296-299)

141.    Dr. Vesom was not able to provide a year that Mr. Franz allegedly made this "chopsticks" comment, was not able to identify specific individuals who overhead the comment,

33

and the parties may not question Mr. Franz because he is not deceased.  (Vesom Depo. at p. 171, l. 19 - p. 176, l. 6)  Dr. Vesom did not express his dissatisfaction with the comment to anybody at the party, he just turned around and left the party.  (Vesom Depo. at p. 176, l. 4-7)  Dr. Vesom testified that Mr. Franz never made any other comments to him that he construed to be discriminatory.  (Vesom Depo. at p. 176, l. 8-13)

142.    The office that Dr. Vesom is talking about in the second floor of the Cray Manor is the first office that Dr. Vesom occupied when he arrived in Atchison in 1983.  It had been vacant for quite some time, and he entered into a lease with the Hospital for the space.  He paid rent and in exchange the Hospital provided Dr. Vesom certain services.  Any issues that Dr. Vesom had about a leaky ceiling or a toilet that needed to be repaired would have been covered under the lease agreement with the Hospital, and the Hospital would have had certain obligations under the lease to fix those problems.  (Vesom Depo. at p. 180, l. 22 - p. 183, l. 6)  No one ever made any comments to Dr. Vesom to support his belief that his inferior accommodations were based on his race, and Dr. Vesom did not make any comments toward the administration that suggested he believed that his physical office space accommodations were less than acceptable because of his race.  (Vesom Depo. at p. 183, l. 7 - p. 184, l. 24)

143.    At the time that Dr. Vesom left Atchison in 1996, he still had financial obligations under the lease for rent after that time and the lease had not expired.  However, the Hospital did not hold Dr. Vesom accountable under his lease obligations, and allowed him to vacate the premises and avoid paying any additional rent.  (Vesom Depo. at p. 186, l. 1 - p. 187, l. 25)

144.    Dr. Vesom admits that the reappointment form that he signed on December 15 possessed some incorrect responses to questions:

Q.    Okay.  Is your answer to the question at paragraph 4, "Have your privileges at any hospital ever been suspended, diminished, revoked, not renewed

34

or (voluntarily or involuntarily) relinquished," is your answer in your Reappointment Information Form of 2002, is it accurate?

A.     Then by looking back and using 1998 into account, I signed and that should be answered yes.  That's correct.

Q.     So the answer to my question is no, your answer is not correct?

A.     That is correct.  That's true.

Q.     And with regard to the last question on that -- on page 1 under paragraph 4, you responded to the question, "Have you ever requested a fair hearing or board panel," and you responded no, that answer is also incorrect, is it not?

A.     That's correct.  That's true.  Because I have pretty much my mind set on the 1996 events for most, you know.

Q.     And on page 2, the third question, "Have you ever been denied appointment or clinical privileges, or renewal thereof, or have you ever voluntarily or involuntarily relinquished clinical privileges or resigned from a medical staff," and you answered no.  And the answer to that question should --

A.     Should be yes.

Q.     -- have been yes?

A.     Yeah, that's correct.

Q.     So three of those questions were answered incorrectly?

A.     Yeah.

(Vesom Depo. at p. 222, l. 8 - p. 223, l. 16)  (*See* Ex. 6)

145.     In the reappointment information form, Dr. Vesom certified that he has been given access to the medical staff's current Bylaws and Hospital policies, and agreed to abide by those.  (Vesom Depo. at p. 225, l. 1-10)  (Ex. 6)

146.     Dr. Vesom does not have any testimony that would call the Hospital's hiring practices into question based upon the protected classes of race, sex, age or disability.  He only has testimony about his belief of racially discriminatory actions with regard to him individually.  (Vesom Depo. at p. 245, l. 17-23)

147.     Dr. Vesom believes that he is a member of a protected class because of his race because he was born in Thailand.  (Vesom Depo. at p. 256, l. 16-19)  This same category (race) would also apply to Dr. Tayiem and Dr. Arkom.  (Vesom Depo. at p. 256, l. 20-23)

148.    Dr. Vesom provided another example of an incident he believed to be
discriminatory.  When referring to a comment that Dr. Eplee made years ago, Dr. Vesom
testified as follows:

Years ago in the medical dictation room, the -- what do you call it, the
record room, one day I set side-by-side by him.  He set on the left, I set on right.
And dictating the chart.  Usually the chart summary he dictate over here, I dictate,
(indicating).  He made a very inflammatory statement towards me.  Well, of
course, I'm a foreign born doctor and I dictate kind of slow.  He said to me, Dr.
Vesom, I can do a discharge summary in just -- just -- in a minute.  And I said,
well, are you implying that I'm a -- have a foreign tongue.  He laughed at it and
stop it at that point.  Not only that, that's a very inflammatory to me.
Q.      Why is that?
A.      Well, he implied that I have a foreign tongue so I dictate slow.
Well, of course, I have a foreign tongue.  Now, Dr. Tran, for example, during
those year that with me, he made a inflammatory statement to Dr. Tran and said
he couldn't understand his accent.  I think Dr. Tran is pretty good.  Of course, all
of us had a little foreign accent when we born and raised there.  Of course.  Even
you may not catch it right now what my dialect, this may be a little bit different,
of course, when you talk more and more and learning more slang, those kind of
thing, you will notice that my accent is not American born or like Asian born in
U.S. and raised here.  Those are the inflammatory statements that Dr. Eplee have
made in the past and plus me, myself, and Dr. Tran.  I personally believe even
though he acts to be a nice guy, but I do believe Dr. Eplee is -- is a highly -- many
of his comment is highly racially motivated.  That's how you feel when you
interact with people.  That has been ongoing.  If you ask me when, where, well, I
can tell you where, I can't tell you when.  I never jot down the incident at the time.
And -- but that -- that's kind of thing that I'm telling you that when this thing build
on over years, do you think you trust a man when you have these two foreign
doctor, Anwar and Bahadur and make application and he just lingering on and say
I want this, I want that.  And -- I finish my statement.
Q.      Do you recognize the difference, Dr. Vesom, between someone
who doesn't like you and somebody who -- strike that.  Do you recognize a
difference, Dr. Vesom, between someone who doesn't like you just because they
have conflicts with you or they disagree with your opinion, or they don't like you
as a person, as contrasted to somebody who doesn't like you because you're from
Thailand?
A.      Yes.
Q.      And before you refer to your notes for specific incidents, what --
what's the difference, in your mind?
A.      If someone make that kind of comment, you would have no idea
about the action people like or dislike you if they don't say it.  If you don't talk,
you would not know.  Only you would know it if a person talk, okay?  If I would
pass by with a black guy and then walk along with my  colleagues, oh, he's a

black guy, okay, that guy -- that black guy, listen to me, oh, he been called black a
lot, okay, yeah, he's black.  But if I would walk past by and talk about, oh, he's
nigger, and suppose that person listen and said, gee, Dr. Vesom, he knows right
away that by interpretation Dr. Vesom doesn't like black people.  Is that true?

     Q.     Because you used a racially derogatory word?

     A.     That's correct.

     Q.     That's unacceptable under any standards?

     A.     Unacceptable.  And should not say that.  Should never, ever, ever
say that.

(Vesom Depo. at p. 281, l. 17 - p. 284, l. 22)  However, Dr. Vesom could not provide any similar

racially derogatory words in his history at AHA.

150.     Dr. Vesom interprets racially neutral comments as being racially motivated.  Dr.

Vesom alleges that Virgil Bourne, President/CEO of AHA, said to Dr. Ware about Dr. Vesom,

"Watch your back, he'll put a knife in it."  Dr. Vesom concluded that this was a "very racial

motivated comment.  It's very racial."  (Vesom Depo. at p. 286, l. 21 - p. 287, l. 19)

### P.     1996 Resignation by Vesom

150.     Dr. Vesom voluntarily resigned from the active medical staff at AHA on June 28,

1996.  Also at the same time, Dr. Vesom's wife, Dr. Uraiwan Vesom, resigned her position as a

pathologist from the consulting medical staff at AHA.  (AHA 206)  (Vesom Depo. at p. 160, l.

10-15)

151.     The Board formally accepted Dr. Vesom's resignation on July 22, 1996.  (Vesom

Depo. at p. 160, l. 10-15)

### Q.     Mid-America Cardiology Associates

152.     The deposition of Tracy Allen Rasmussen was taken on July 11, 2005.  (*See*

Deposition Transcript of Tracy Rasmussen at Exhibit 50)

153.     Tracy Rasmussen has been employed as Administrator of Mid-America

Cardiology Associates ("MAC") for approximately ten (10) years.  MAC is a subsidiary of

Jayhawk Primary Care, which is a subsidiary of the University of Kansas Hospital Authority.
(Ex. 50, Rasmussen Depo. at p. 3, l. 18 - p. 4, l. 7)

154.     The kinds of cardiology services that MAC provides in the Atchison community
through its clinics include a consultation and ongoing evaluation in management of cardiac
disease.  MAC physicians conduct electrocardiograms.  They do holter monitoring, they do rest
echocardiography and stress echocardiography, they do vascular ultrasound and read
echocardiograms.  These are the basic services that MAC provides.  (Ex. 50, Rasmussen Depo. at
p. 63, l. 8 - p. 64, l. 3)

155.     As Administrator, Mr. Rasmussen's responsibilities are to supervise MAC's
entire medical practice, including clinical and business operations.  MAC runs clinics in the
Kansas City Metropolitan region and the surrounding area, including the following locations:
Atchison, Emporia, KU, Overland Park, Parkville, Liberty, Harrisonville, Hickman Mills and
Grandview.  (Ex. 50, Rasmussen Depo. at p. 4, l. 1024)

156.     All MAC cardiologists are employees of the University of Kansas Hospital.  (Ex.
50, Rasmussen Depo. at p. 6, l. 8-11)

157.     MAC specializes in cardiology and its subspecialties.  MAC cardiologists require
the minimum of board certification by the American Board of Internal Medicine.  Many of the
MAC cardiologists are also certified by the American Board of Internal Medicine in cardiology,
and some of the MAC cardiologists are also board certified in further subspecialties.  (Ex. 50,
Rasmussen Depo. at p. 7)

158.     At the time of the deposition, MAC had seven (7) physicians who have active or
courtesy medical staff privileges at AHA.  Some of the MAC physicians actually travel to

Atchison to see patients.  Others read echocardiograms remotely that are billed and provided through AHA.  (Ex. 50, Rasmussen Depo. at p. 10)

159.    MAC has had a relationship with AHA since 1988.  Mr. Rasmussen has a extensive historical knowledge as to the relationship that MAC has had with AHA.  (Ex. 50, Rasmussen Depo. at p. 12, l. 22 - p. 13, l. 24)  Initially, the MAC relationship was a referring relationship with physicians in the Atchison community.  There was no formal business relationship, but a referral network where physicians in the Atchison community would rely upon services that MAC provided to deliver patient care.  This would include referrals to Dr. Vesom, Dr. John Eplee, and others in the Atchison community.  (Ex. 50, Rasmussen Depo. at p. 14, l. 1-17)  MAC's interaction with AHA physicians would be to receive transfers from AHA to other MAC facilities outside of the Atchison community, and occasional consultations from the physicians in the Atchison community.  (Ex. 50, Rasmussen Depo. at p. 14, l. 19 - p. 16, l. 6)

160.    MAC entered the Atchison community to establish a clinic in 1995.  (Ex. 50, Rasmussen Depo. at p. 16, l. 13-25; p. 13, l. 1-2)

161.    The key reason that MAC established a clinic in Atchison in 1995 was to protect its market.  In late 1994 or early 1995, Dr. Vesom contacted a practicing cardiologist by the name of Jim Harbrecht, President of MAC at the time, and initiated discussions with MAC.  Dr. Vesom informed Mr. Harbrecht that he was possibly leaving the community and was interested in selling his medical practice to MAC.  (Ex. 50, Rasmussen Depo. at p. 17-19)

162.    Mr. Rasmussen recalls that Dr. Vesom initiated the discussion regarding selling his practice or, as an alternative, requested to become an employee of MAC.  (Ex. 50, Rasmussen Depo. at p. 18, l. 7-25)

163.    In considering the purchase of Dr. Vesom's medical practice, MAC looked at the financial impact of not having a continuing relationship with the Atchison community once Dr. Vesom left the community, which would interrupt MAC's referral patterns.  MAC analyzed its billing data, and evaluated the risk of not having a presence in the Atchison community through a referring cardiologist.  (Ex. 50, Rasmussen Depo. at p. 20)

164.    Since the referral sources between the physicians in Atchison to MAC clinics was strong at the time, MAC was concerned that if Dr. Vesom left, then other referral sources might send their patients to MAC's competitors.  (Ex. 50, Rasmussen Depo. at p. 21, l. 17 - p. 22, l. 9)

165.    MAC knew that St. Joseph Hospital was sending cardiologists to service the Atchison community at the time.  St. Joseph is eighteen (18) miles from Atchison, and Kansas City is approximately sixty (60) miles from Atchison.  MAC had to consider the impact of this competition on its referral sources as well.  (Ex. 50, Rasmussen Depo. at p. 23)  At the time, the St. Joseph Hospital, through Heartland Health, was sending a cardiologist to the Atchison community one-half (1/2) day a week to see patients and provide cardiology services.  Heartland Health has continued to provide a constant level of cardiology service in Atchison since approximately 1996.  (Ex. 50, Rasmussen Depo. at p. 24; p. 25, l. 1-4)

166.    On April 5, 1996, Mid-America Cardiology Associates, P.C. entered into an Asset Purchase Agreement with Pitt Vesom, M.D. to purchase the assets of Dr. Vesom's medical practice, Midwest Med, P.A.  (Ex. 50, Rasmussen Depo. at p. 32, l. 17 - p. 34, l. 13; *see also* Ex. 50A, Rasmussen Depo. Exhibit 304, p. 14-23)  The total purchase price for all assets purchased by MAC was $200,000.00.  This purchase price was allocated between goodwill ($150,000.00) and all other assets ($50,000.00).  (Ex. 50, Rasmussen Depo. at p. 34-35)

167.     MAC did not buy the medical records of Midwest Med, P.A.  (Ex. 50, Rasmussen Depo. at p. 27, l. 18)

168.     Contained within Section 8.11 of the Asset Purchase Agreement that Dr. Vesom signed, there is a Non-Compete provision.  The non-compete provision stated:

> Seller hereby covenants and agrees that neither it nor any of its employees or contractors shall for a period of two (2) years from and after the closing date, compete with the Buyer in any business activities of the Buyer or solicit any business of the Buyer within a one hundred (100) mile radius of any medical practice location of the Buyer, including any office in Atchison, Kansas.  This restriction shall be effective and/or include, but not be limited to, becoming involved directly or indirectly with the Buyer's patients or business associates as they existed prior to or for a period of two (2) years following the closing date; or potential patients or business associates within the above-described geographical area.  Seller further agrees that neither it nor its employees or independent contractors shall be engaged in or associated with any business which involves or relates to the provision of cardiology services or which otherwise competes directly or indirectly with the activities of the Buyer.  Seller further covenants and agrees that it will execute agreements with any and all employees and contractors of Seller requiring same to be subject to all of the restrictions and obligations imposed upon Seller under this Agreement.  The parties hereto agree that the duration of this covenant not to compete, the geographic area covered herein and any other terms and conditions hereof, are reasonable and necessary for the proper protection of the business activities of Buyer.

(Ex. 50, Rasmussen Depo. at p. 38-41; *see also* Ex. 50A, Rasmussen Depo. Exhibit 304 at p. 26)

169.     The non-compete restricted Dr. Vesom from practicing cardiology for a two (2) year period after the date of sale.  The non-compete did not restrict Dr. Vesom from the practice of internal medicine in the Atchison community during the two (2) years following the transaction.  (Ex. 50, Rasmussen Depo. at p. 38-41; *see also* Ex. 50A, Rasmussen Depo. Exhibit 304 at p. 26)

170.     When Dr. Vesom returned to the Atchison community, he initiated discussions with MAC about either buying back his medical practice, establishing an employee relationship, or some other association with MAC.  MAC was not interested in pursuing any of these options with Dr. Vesom.  MAC was "engrained in the community" and had established itself over the

41

preceding two (2) years and felt confident in its ability to maintain its market share without an association with Dr. Vesom.  MAC did not perceive Dr. Vesom's return to the Atchison community as a threat to its business.  (Ex. 50, Rasmussen Depo. at p. 41, 17 - p. 44, l. 2; p. 45, l. 9-21; p. 46, l. 20-25)

171.     MAC has maintained a constant level of physician presence in Atchison since 1996, providing three (3) days of cardiology services at its clinic in Atchison.  The basic service plan has been to send cardiologists to Atchison on Monday, Wednesday, and Fridays.  There are occasional times when the days must be altered, but in general, MAC provides approximately one hundred fifty (150) days of scheduled cardiologist time per year in the Atchison clinic.  (Ex. 50, Rasmussen Depo. at p. 56-57)

172.     After Dr. Vesom returned to Atchison, MAC did not have a reason to refer cardiac patients to Dr. Vesom.  If MAC needed to refer a patient to a cardiologist involving a subspecialty, MAC would not have referred the matter to Dr. Vesom after he returned, because he was a general cardiologist, not a super subspecialist kind of cardiologist.  Essentially, there was no referral relationship between Dr. Vesom and MAC after Dr. Vesom returned to the Atchison community.  (Ex. 50, Rasmussen Depo. at p. 57, l. 23 - p. 60, l. 10)

173.     When asked why there was no referral relationship, Mr. Rasmussen responded: "Well, probably -- I don't know, probably because it was a competitive environment then.  You know, I mean, maybe we didn't make him happy with -- with the relationship."  (Ex. 50, Rasmussen Depo. at p. 60, l. 13-17)

**R.     1998 Reappointment Request**

174.     When Dr. Vesom returned to the Atchison community and requested appointment to the AHA Active Medical Staff.  Dr. Vesom's application for Medical Staff privileges was

dated September 14, 1998.  (Ex. 31, Niemann Aff. at ¶ 7)  (Vesom Depo. at p. 160, l. 16 - p. 161, l. 1)

175.    On October 9, 1998, the MEC recommended that Dr. Vesom not be granted Active Staff Membership privileges.  (Vesom Depo. at p. 161, l. 2-7; Ex. 31, Niemann Aff. at ¶ 7)

176.    On October 29, 1998, the former Chief Executive Officer of AHA, W. David Drew, sent a letter to Dr. Vesom informing him that the MEC had voted against his reappointment application, that the Board had not yet voted and taken formal action on his Application for Reappointment.  The letter advised Dr. Vesom that he was entitled to a Fair Hearing if he so desired.  (Ex. 31, Niemann Aff. at ¶ 8)  (Vesom Depo. at p. 189, l. 4-16)

177.    On November 3, 1998, Dr. Vesom requested a Fair Hearing.  (Vesom Depo. at p. 189, l. 17-20; p. 190, l. 11-14)

178.    The MEC recommended that the Board not appoint Dr. Vesom to the medical staff, but the Board voted to appoint him anyway.  (Ex. 27, Thomas Aff. at ¶ 40; Ex. 29, Swayze Aff. at ¶ 34; Ex. 28, Goracke Aff. at ¶ 41; Ex. 30, Jones Aff. at ¶ 30)  The Board did not follow the recommendation of the MEC not to reappoint Dr. Vesom.  (Ex. 31, Niemann Aff. at ¶ 9) (Vesom Depo. at p. 189, l. 24 - p. 190, l. 21)

**S.    1999 Settlement Agreement**

179.    The Board rejected the recommendation of the MEC and offered Dr. Vesom conditional reappointment if he agreed to the terms of the Settlement Agreement.  This Settlement Agreement granted Dr. Vesom Active Medical Staff status (provisional) and privileges on March 4, 1999.  (Ex. 31, Niemann Aff. at ¶ 11)  (Vesom Depo. at p. 190, l. 15 - p. 191, l. 1; p. 195, l. 5-10)  (Ex. 38)

180.    After negotiation and entry of an AGREEMENT AND RELEASE ("Settlement Agreement"), the Board granted Dr. Vesom a one (1) year provisional status and privileges to the active medical staff.  The terms of the Settlement Agreement provided:  a proctor would review the medical records for one (1) year and meet with Dr. Vesom at least monthly; Hospital departments were to submit monthly written reports of his behavior (Exhibit 38 at ¶ 1(c)); Dr. Vesom agreed not to be alone with any female employee or patient within the Hospital (Exhibit 38 at ¶ 1(d)); and Dr. Vesom would comply with Kansas Medical Society - Medical Advocacy Program recommendations.  (*See* Agreement and Release dated March 4, 1999, attached hereto as Exhibit 38, ¶ 3)  (Ex. 31, Niemann Aff. at ¶ 10)  (Vesom Depo. at p. 191, l. 2-8; p. 192, l. 14-19; p. 193, l. 23 - p. 194, l. 5; p. 236, l. 15 - p. 237, l. 11; p. 239, l. 20 - p. 240, l. 21; p. 243, l. 2-14)

181.    As part of the Settlement Agreement, it was stipulated that in any inquiries as to whether Dr. Vesom's privileges had ever been suspended, revoked or disciplined at the Hospital, the Hospital would answer "Yes."  (Exhibit 38 at ¶ 16)  (Ex. 31, Niemann Aff. at ¶ 12)  (Vesom Depo. at p. 195, l. 11-25)

182.    In the Settlement Agreement, Dr. Vesom stipulated to the following:

During his tenure on the Medical Staff, Dr. Vesom shall enjoy all the rights and privileges and be subject to the all the rules, restrictions and sanctions as may be granted or imposed by the Bylaws upon any physician on the Medical Staff, **including but not limited to, any and all sections thereof governing or relating to 'Disruptive Physicians.'**

(Ex. 38 at ¶ 2)  (emphasis added)

183.    Pursuant to the Bylaws, Dr. Vesom was subject to reappointment two (2) years after the entry of the Settlement Agreement in 1999.  (Ex. 38)

44

184.     Thereafter, Dr. Vesom's next reappointment request was approved.  On February 27, 2001, Dr. Vesom was advised that the Board approved his reappointment request for the next two (2) years.  (Vesom Depo. at p. 196, l. 1-6)

**T.     2001 Reappointment Request**

185.     On February 27, 2001, Dr. Vesom was advised that the AHA Board approved his reappointment to the active medical staff of the Hospital for the next two (2) years.  Dr. Vesom's clinical privileges were granted as requested, but Dr. Vesom's letter of approval explicitly reminded him that the reappointment was subject to all the terms and conditions of his initial appointment and to the Bylaws, Rules and Regulations, and Policies of the Hospital and medical staff.  (Ex. 31, Niemann Aff. at ¶ 5-13)  As a result, Dr. Vesom's medical staff privileges were calendared to expire on February 27, 2003.  (Vesom Depo. at p. 209, l. 1-13; p. 211, l. 1 - p. 212, l. 22)

**U.     The Reappointment Process**

186.     In reaching its decision on whether to recommend reappointment of a physician to the medical staff, the MEC reviews the "credentials file" of the physician in question and may consider the physicians behavior in the hospital, cooperation with medical and hospital personnel, general attitude towards patients, the hospital and its personnel, the physicians attendance at committee meetings and participation in staff duties, and compliance with AHA's Medical Staff Bylaws and Policies.  (Ex. 4, Bylaws, Appendix A, Sec. 5(f); AHA 959)

187.     Like every other physician who is granted medical staff privileges at AHA, Dr. Vesom is required by the Bylaws to reapply for hospital privileges every two (2) years.  (Vesom Depo. at p.138, l. 10-22; p. 159, l. 11-25)

188.    Dr. Vesom is familiar with the procedure for reappointment of medical staff privileges because he had gone through the process on several prior occasions.  (Ex. 31, Niemann Aff. at ¶ 5)  (Vesom Depo. at p. 160, l. 1-9)

189.    As part of this reminder letter, a "Reappointment Packet" is sent to each physician.  This "Reappointment Packet" includes a form letter that is sent to each physician when their privileges are about to expire.  The letter explains the documentation and information that will be needed by AHA in order for the physician to be considered for reappointment.  (Ex. 31)  (Ex. 4, Bylaws at Appendix A)

190.    When a physician's current appointment to the medical staff and clinical privileges is about to expire, Ms. Niemann routinely sends out a reminder letter to the physician, notifying the physician that the privileges are about to expire, and clearly stating the steps that are necessary to apply for reappointment.  (Ex. 31, Niemann Aff. at ¶ 14)  (Vesom Depo. at p. 196, l. 7-16)

191.    This is standard procedure for all physicians who desire to apply for reappointment.  (Ex. 31, Niemann Aff. at ¶ 15)

192.    Along with this detailed instruction letter, Ms. Niemann provides the physician with the following documentation:  Reappointment Information Form, Confidentiality Statement, Authority and Liability Waiver, Conflict of Interest Statement, and Privilege Request Form.  The physician is requested to fill out the forms provided, return copies of the certification documentation as outlined in the letter, and pay the reappointment fee.  (Ex. 31, Niemann Aff. at ¶ 16)  (Vesom Depo. at p. 214, l. 14 - p. 215, l. 18)

193.    The detailed process for application for reappointment is clearly spelled out in the Medical Staff Bylaws (Ex. 4, Bylaws, Article XI, Section 7; Appendix A) and is strictly followed

46

in every application for reappointment.  This procedure was followed in the reappointment

application process for Dr. Vesom.  (Ex. 31, Niemann Aff. at ¶ 19)  (Vesom Depo. at p. 214, l. 8-

24)

### V.    2003 Reappointment Request

194.    A Reappointment Information Packet, with all of the required forms, was

submitted to Dr. Vesom on December 12, 2002.  (Vesom Depo. at p. 204, l. 9-17; p. 212, l. 23 -

p. 213, l. 3)

195.    Dr. Vesom had thirty (30) days to complete the reappointment application packet.

(Vesom Depo. at p. 213, l. 4 - p. 214, l. 7)

196.    Dr. Vesom's Reappointment Information Form and all the required documents

were signed by Dr. Vesom and returned to Ms. Niemann's office on December 16, 2002.  (Ex.

31, Niemann Aff. at ¶ 17)  (Vesom Depo. at p. 217, l. 9-23)  (*See* Vesom's Reappointment

Information Form attached hereto as Exhibit 6; *see* the Authority and Liability Waiver signed by

Dr. Vesom on December 15, 2002, attached hereto as Exhibit 7)

197.    Along with Dr. Vesom's application for the reappointment of medical privileges

at AHA, Dr. Vesom signed a document on December 15, 2002 entitled **"AUTHORITY AND**

**LIABILITY WAIVER."**  (Ex. 7)  The Authority and Liability Waiver signed by Dr. Vesom

states the following:

> I further waive any rights under Educational Rights and Privacy Act or any statute
> granting immunity to such Boards or Committees and further agree to hold
> harmless such President, Board or Committees evaluating my application from
> any claim or action by or on my behalf in the event such application for
> reappointment is denied for any reason.
>
> In making application for reappointment to the Medical/Dental Staff of Atchison
> Hospital, I hereby agree to abide by the Bylaws, Rules and Regulations of the
> Medical/Dental Staff and to abide by policies that apply to my activities as a
> member of the Medical/Dental Staff.

(Ex. 7)  (Ex. 31, Niemann Aff. at ¶ 21)  (Vesom Depo. at p. 225, l. 17 - p. 226, l. 13; p. 229, l. 7-19; p. 233, l. 13-25; p. 234, l. 1-6)

198.    Dr. Vesom acknowledges that AHA requires this Waiver of every doctor as an essential part of the appointment or reappointment process.  (Vesom Depo. at p. 228, l. 7-25; p. 229, l. 1-6)

199.    After receiving this documentation in December of 2002, the entire packet of information was put in Dr. Vesom's credentials file.  (*See* Second Affidavit of Carol Niemann, attached hereto as Exhibit 32, at ¶ 4; *see also* Ex. 31, Niemann Aff. at ¶ 18)

**W.    Consideration of Dr. Vesom's Reappointment Request**

200.    In 2003, Ryan Thomas, M.D., Douglas Goracke, M.D. and Donald Swayze, D.O., served on the five person MEC.  (Ex. 5, AHA 11210-11212)

201.    The role of the Medical Credentials Committee is principally to review physicians for the appointment and reappointment of medical staff privileges.  The members of the Medical Credentials Committee are one and the same as the members of the MEC.  (Ex. 4, Bylaws at Article VIII, 3)

202.    In February of 2003, the MEC reviewed Dr. Vesom's application for the reappointment of privileges and the records from his "credentials file" at AHA.  (*See* AHA's Medical Executive Committee Fair Hearing Exhibits, attached hereto as Exhibit 8)  (Ex. 9)  (Ex. 27, Thomas Aff. at 12, 21, 29, 32, 34-37, 47; Ex. 28, Goracke Aff. at 14, 18, 32-35, 38, 48; Ex. 29, Swayze Aff. at 14, 24, 26, 28-32, 41; Ex. 30, Jones Aff. at 12, 16, 22, 24-28, 37; Ex. 32, Second Niemann Aff. at 4-13)

203.    Pursuant to the AHA Medical Staff Bylaws, at Section 5(f), the members of the MEC reviewed the "credentials file" of Dr. Vesom and considered his behavior in the Hospital, including his ability to cooperate with the medical staff and Hospital personnel, his general

48

attitude towards patients, the Hospital and its personnel, the physician's attendance at committee meetings, and participation in staff duties as well as overall compliance with AHA's Medical Staff Bylaws and Policies. *Id.*

204.   Attached to Ms. Niemann's Affidavit are the official minutes from the MEC meetings on January 13 and February 18, 2003 and Credentials Committee meeting on February 18, 2003. (Ex. 31)

205.   In a regular meeting conducted on February 18, 2003, the MEC formally concluded and recommended to the Board that Dr. Vesom should not be reappointed to the medical staff at AHA, effective March 18, 2003. *Id*; (*see* February 18, 2003 letter from AHA to Vesom, with attached Hearing and Appellate Review Procedure, attached hereto as Exhibit 9)

### X.   Disruptive Physician Provisions of the Bylaws

206.   AHA Medical Staff Bylaws state, in relevant part, as follows:

> Disruptive Behavior.
> (a)   Policy.  It is the policy of the Medical Staff that all individuals within the Hospital be treated *courteously, respectfully and with dignity*.  To that end, the Medical Staff and the Governing Board of the Hospital require that all members of the Medical Staff conduct themselves in a professional and *cooperative* manner.
> (b)   Objective.  The objective of this policy is to ensure *optimum patient care* by promoting a safe, cooperative and professional healthcare environment and to *prevent or eliminate conduct which disrupts the operation of the Hospital, affects the ability of others to do their jobs*, creates a hostile work environment for hospital employees or other individuals or interferes with an individual's ability to practice competently.
> (c)   Guidelines.  Unacceptable behavior includes, but is not limited to:
> > 1.   *attacks (verbal or physical) leveled at individuals, Hospital personnel* or patients which are *personal, irrelevant or go beyond the bounds of fair professional conduct*;
> > ****
> > 3.   *non-constructive criticism addressed to its recipient in such a way as to intimidate, undermine*

> *confidence, belittle or imply stupidity or incompetence*;
>
> 4.      refusal to accept Medical Staff assignments, or to *participate in committee or departmental affairs on anything but his or her own terms or to do so in a disruptive manner*;
>
> ****
>
> 7.      *verbal or physical threats of retribution, litigation or violence directed at individuals, Hospital personnel or patients*; or
>
> 8.      use of foul, abusive language.

(Ex. 4, Bylaws at Article X, 1; AHA 944)  (emphasis added)  (Vesom Depo. at p. 128, l. 15 - p. 130, l. 12)

207.    Dr. Vesom agrees that there are "other things that might constitute disruptive behavior under the Bylaws."  (Vesom Depo. at p. 129, l. 18-24)

208.    Dr. Vesom agrees that the "actions and behaviors noted in these [disruptive behavior] guidelines should not be tolerated within the medical staff" and "the Medical Executive Committee have a legitimate interest in making sure that these behaviors and actions do not occur within the Hospital."  (Vesom Depo. at p. 129, l. 25 - p. 130, l. 12)

209.    Dr. Vesom agrees that there is nothing in the disruptive behavior provisions of the Bylaws that requires that the Hospital provide the disruptive physician with notice and an opportunity to provide a response.  (Vesom Depo. at p. 132, l. 22 - p. 133, l. 12; p. 134, l. 4-10)

210.    AHA Medical Staff Bylaws also provide, in relevant part:

> Acceptance of membership on the Medical Staff shall constitute said member's agreement that he/she will:
>
> (a)     provide his/her patients with *care at the generally recognized professional level of quality and efficiency* consistent with the recognized standards of practice in the same or similar communities and the resources locally available;
>
> (b)     *abide by the Medical Staff Bylaws* and by all other lawful standards, policies and rules of the Hospital;

50

(c)     discharge such Staff, Committee and Hospital functions for which he/she is responsible by staff category assignment, appointment, election or otherwise;

****

(f)     abide by the ethical principles of the profession;

****

(h)     conduct him/herself in a *professional, cooperative manner* with colleagues and members of the Hospital Staff.

(Ex. 4, Bylaws at Article XI, 4; AHA 946) (emphasis supplied)  (Vesom Depo. at p. 138, l. 17 - p. 140, l. 14)

211.    The MEC concluded that Dr. Vesom was a "disruptive physician" and was in violation of AHA's Bylaws on "disruptive behavior" and in violation for his failure to properly discharge his responsibilities for AHA staff, committee and hospital functions.  (Ex. 8)  (Ex. 9) (Ex. 27, Thomas Aff. at 12, 21, 29, 32, 34-37, 47; Ex. 28, Goracke Aff. at 14, 18, 32-35, 38, 48; Ex. 29, Swayze Aff. at 14, 24, 26, 28-32, 41; Ex. 30, Jones Aff. at 12, 16, 22, 24-28, 37; Ex. 32, Second Niemann Aff. at 4-13)

212.    The "Fair Hearing Procedure" set forth in Article XIII of the Bylaws is the procedure which governs the review of the recommendation of the MEC to the Board.  (Ex. 4, Bylaws at Article XIII; AHA 951, 966-971)

213.    The recommendation of the MEC not to reappoint Dr. Vesom's medical staff privileges was not a "Corrective Action" under the procedures set forth in Appendix B of the Bylaws.  As a result, the "Corrective Action" procedures did not apply to his request for "Reappointment" to the AHA Medical Staff.  Hospital CEO John Jacobson clarifies that the "Corrective Action" procedures under the Bylaws are not triggered as a result of the MEC's recommendation to the Board not to reappoint him to the medical staff.  (Ex. 33, Jacobson Aff. at ¶ 18-25)

51

214.     Under the circumstances outlined in the "Corrective Action" portion of the Bylaws, there are specific procedures for reporting of "reportable incidents" and for implementation of "Corrective Action" under the Bylaws.  These procedures are set forth in Appendix B to the Bylaws.  These "Corrective Action" procedures are extensive but do not always lead to the "due process" procedure found in the "Fair Hearing procedure."  (Ex. 4, Bylaws, Article XII, 5 & 1; Appendix B; AHA 950)

215.     The Bylaws provide for "Corrective Action" where there are infractions by the medical staff in the quality and appropriateness of medical care provided within any medical staff member's two (2) year appointment cycle.  (Ex. 4, Bylaws at Article XII, 1; AHA 950, 962-965)

216.     The principles behind the use of "Corrective Action" under the Bylaws require the medical staff or other officers to report any direct knowledge that any member of the staff "has committed an act that is or may be below the applicable standard of care" in the Hospital or "may be grounds for disciplinary action by the Kansas Board of Healing Arts."  (Ex. 4, Bylaws at Article XII, 2; AHA 950)

217.     The section of the Bylaws which addresses "Corrective Action" does not apply to the recommendations of the MEC regarding reappointment.  As opposed to the "Corrective Action Procedure," which deals with infractions and punishment primarily for acts which are below the "applicable standard of care" in the Hospital, the "Fair Hearing Procedure" deals with due process rights after a recommendation of adverse actions which might adversely affect a practitioner's medical staff privileges.  The recommendation to deny reappointment is one of the specifically enumerated items of "adverse recommendation" described in Article III, Section 2(a), thereby triggering the "Fair Hearing Procedure."  The Fair Hearing Procedure is a separate

52

and distinct hearing and appellate review procedure, attached as Appendix C to the Bylaws.  (Ex. 33, Jacobson Aff. at ¶ 18-25)

**Y.   Recommendation of the Medical Executive Committee**

218.   The MEC's authority is specifically limited under the Bylaws "to making recommendations to the Governing Board, as such actions are not binding until approved by the Governing Board.  (Ex. 4, Bylaws at Article VIII, 2; AHA 941)

219.   Four (4) of the five (5) members of the MEC concluded that Dr. Vesom was a "disruptive physician" and that his disruptive behavior adversely impacted the quality of patient care at AHA.  (Ex. 8)  (Ex. 9)  (Ex. 27, Thomas Aff. at 12, 21, 29, 32, 34-37, 47; Ex. 28, Goracke Aff. at 14, 18, 32-35, 38, 48; Ex. 29, Swayze Aff. at 14, 24, 26, 28-32, 41; Ex. 30, Jones Aff. at 12, 16, 22, 24-28, 37; Ex. 32, Second Niemann Aff. at 4-13)

220.   The MEC concluded that Dr. Vesom was a "disruptive physician" and was in violation of AHA's Bylaws on "disruptive behavior" and failure to properly discharge his responsibilities for AHA staff, committee and hospital functions.  *Id.*

221.   The MEC recommended to the Board that Dr. Vesom should not be reappointed to the medical staff at AHA, effective March 18, 2003.  (Ex. 9)

222.   The MEC recommended that the Board not terminate Dr. Vesom's privileges until he had exhausted his Fair Hearing rights.  Despite the MEC's recommendation that Dr. Vesom not be reappointed to the medical staff, Dr. Vesom's privileges at AHA remained active pending the outcome of the Fair Hearing and the decision of the Board on Appeal.  (Ex. 30, Jones Aff. at ¶ 24-29)

223.   The Board has the ultimate decision-making authority.  This is evidenced by the fact that in 1999 the MEC recommended that the Board not appoint Dr. Vesom to the medical

53

staff, but the Board voted to appoint him anyway.  (Ex. 27, Thomas Aff. at ¶ 40; Ex. 29, Swayze

Aff. at ¶ 34; Ex. 28, Goracke Aff. at ¶ 41; Ex. 30, Jones Aff. at ¶ 30)

224.    Drs. Thomas, Swayze, Goracke and Jones have testified that the recommendation

by the MEC not to reappoint Dr. Vesom to the medical staff was not taken lightly.  The

recommendation was reached after a reasonable effort to obtain all the facts.  Prior to a final

decision being rendered by the Board, adequate notice and hearing procedures were afforded to

Dr. Vesom.  These procedures were fair to Dr. Vesom under the circumstances.  (Ex. 27, Thomas

Aff. at ¶ 49; Ex. 29, Swayze Aff. at ¶ 43; Ex. 28, Goracke Aff. at ¶ 50; Ex. 30, Jones Aff. at ¶ 39)

225.    The ultimate decision was made with the reasonable belief that the action was

warranted by the facts known after deliberation and reasonable efforts to obtain the facts and

after meeting the requirements of the notice and hearing procedures set forth in the AHA

Medical Staff Bylaws.  (Ex. 27, Thomas Aff. at ¶ 50; Ex. 29, Swayze Aff. at ¶ 44; Ex. 28,

Goracke Aff. at ¶ 51; Ex. 30, Jones Aff. at ¶ 40)

**Z.    Due Process Afforded Dr. Vesom Following the Recommendation of the Medical Executive Committee**

226.    By letter dated February 18, 2003, Virgil Bourne, CEO of AHA, advised Dr.

Vesom of the MEC's recommendation to the Board to not reappoint him for medical privileges

effective March 18, 2003.  (Ex. 9)

227.    In the letter, AHA advised Dr. Vesom of the specific reasons for the proposed

denial to reappoint his medical staff privileges, which were as follows:

- [Dr. Vesom's] failure to comply with Medical Staff Bylaws and Rules and Regulations; and

- [Dr. Vesom's] behavior in the hospital, which showed a lack of cooperation with medical and hospital personnel as it relates to patient care, and the orderly operation of AHA, and [his] general attitude toward AHA and its personnel.

- [Dr. Vesom's] fail[ure] to discharge [his] responsibilities for Staff, Committee and Hospital functions for which [he] was responsible by staff category assignment, appointment, and election or otherwise.

- [Dr. Vesom] engaged in verbal attacks on individuals and AHA personnel that were personal, irrelevant, and went beyond the bounds of fair professional conduct.

- [Dr. Vesom] made impertinent and inappropriate comments in official documents, including the impugning of the quality of care in AHA and attacked particular individuals and AHA policies.

- [Dr. Vesom] engaged in non-constructive criticism addressed to recipients in such a way as to intimidate, undermine confidence, belittle, or imply stupidity or incompetence.

- [Dr. Vesom] refused to accept Medical Staff assignments or participate in committee or departmental affairs on anything but [his] own terms, and did so in a disruptive manner.

- [Dr. Vesom] made verbal threats of retribution and litigation towards individuals and AHA personnel including members of the Medical Staff.

- [Dr. Vesom] used abusive language.

(Ex. 9)

228.    AHA further advised Dr. Vesom in the February 18, 2003, letter that he had the right to a Fair Hearing if Dr. Vesom requested the Fair Hearing within thirty days of his receipt of the letter.  Dr. Vesom was also advised of the rights he would have at the Fair Hearing.  (Ex. 9)

229.    By letter dated March 6, 2003, Dr. Vesom requested a Fair Hearing.  (Ex. 10)

230.    By letter dated March 18, 2003, AHA sent Dr. Vesom a Notice of Hearing stating the place, time and date of the Fair Hearing.  The letter identified five proposed members of the Fair Hearing Panel.  Pursuant to the letter, Dr. Vesom was expressly given the right to object to any of the individuals identified to serve on the Fair Hearing Panel with whom Dr. Vesom believed he was in direct economic competition.  The letter identified the specific charges made

against Dr. Vesom, which included an itemized listing of the specific information upon which the MEC relied in making its recommendation. The letter also identified the witnesses that would be requested to testify at the Fair Hearing in support of the charges against Dr. Vesom. (Ex. 11)

231.    By letter dated March 21, 2003, Dr. Vesom's legal counsel acknowledged receipt of the March 18, 2003 letter and made written objections to the composition of two of the proposed members of the Fair Hearing Panel. (Ex. 12)

232.    By letter dated May 1, 2003, AHA sent Dr. Vesom an Amended Notice of Hearing. The Amended Notice contained the same information as in the original March 18, 2003, Notice of Hearing, except it advised Dr. Vesom of the new scheduled Fair Hearing date of June 26, 2003; in response to Dr. Vesom's objection to the original composition of the Fair Hearing Panel, it identified the full composition of the Fair Hearing Panel, which included the substituted panel members. Dr. Vesom was again given the express opportunity to object to the new composition of the Fair Hearing Panel. (Ex. 13)

233.    On June 5, 2003, AHA provided Dr. Vesom's counsel with all of the written exhibits that would be (and were) used at the Fair Hearing in support of the charges against Dr. Vesom. (Ex. 51; AHA 5404; Ex. 4, Bylaws at Article XIII, Appendix C; AHA 966, respectively; Transcript of Fair Hearing at p. 2; and AHA Executive Committee's Fair Hearing Exhibits, Ex. 8)

234.    The June 26, 2003 scheduled Fair Hearing was required to be rescheduled because one of the panel members had an emergency that prevented him from attending the Fair Hearing. Subsequent thereto, another Fair Hearing Panel member advised AHA that he could not serve on the hearing panel. (Ex. 14)

235.     On July 22, 2003, AHA sent Dr. Vesom another Amended Notice of Hearing that contained the same information as was in the previous notices.  (Ex. 14)

236.     By letter dated December 18, 2003, AHA sent Dr. Vesom another Amended Notice of Hearing that contained the same information as was in the previous notices, except it advised Dr. Vesom of the new scheduled Fair Hearing date of January 22, 2004, and further advised him of the Fair Hearing Panel's new composition.  Dr. Vesom was again given the opportunity to object to the composition of the Fair Hearing Panel.  (Ex. 15)

237.     On January 9, 2004, Dr. Vesom was provided with another copy of all exhibits that were expected to be used at the Fair Hearing.  (*See* Affidavit of Andrew R. Ramirez, attached as Exhibit D in Support of Memorandum in Opposition to Plaintiff's Renewed Motion to Compel Discovery, Doc. #110; Ramirez Aff. at ¶ 21 and 22; *see also* Ex. 37, RFA no. 57)

238.     At the Hearing, Dr. Vesom was represented by Charles Kugler, plaintiff's attorney in this action.  The MEC of AHA was also represented by Andrew Ramirez.  (*See* complete transcript of Appeal to the Fair Hearing Panel conducted on January 22, 2004, attached hereto as Exhibit 16)

239.     Each party had the opportunity to present witnesses and offered testimony to support their case.  The witnesses were also cross-examined by the other party.  The attorneys provided statements of their position at the Hearing.  The members of the Fair Hearing Panel were also permitted to ask questions of the parties, the witnesses and the attorneys during the Hearing.  (Ex. 16)

240.     AHA's Medical Staff Bylaws provide for a Fair Hearing for physicians who are denied reappointment to the medical staff at AHA.  (Ex. 4, Bylaws at Article XIII; AHA 951) AHA's Fair Hearing procedure entitles a physician to one hearing and one appeal.  (*Id.*)

**AA.    Appeal Proceedings Before the Fair Hearing Panel**

241.    Prior to the actual Fair Hearing Panel hearing process, Dr. Vesom was provided with a complete copy of all of the exhibits which the Fair Hearing Panel would be reviewing. (Ex. 51; AHA 5404)  Dr. Vesom was provided a complete copy of the Fair Hearing Exhibits (now marked as Ex. 8) on June 5, 2003 and January 9, 2004.  (*See* Affidavit of Andrew R. Ramirez, attached as Exhibit D in Support of Memorandum in Opposition to Plaintiff's Renewed Motion to Compel Discovery, Doc. #110; Ramirez Aff. at ¶ 21 and 22; *see also* Ex. 37, RFA no. 57)

242.    The Fair Hearing Panel was instructed to make its own independent recommendation, which would ultimately be decided by the AHA Board of Directors:

> The gravamen of all of this is that Dr. Vesom is a disruptive physician.  And that's what the Medical Executive Committee concluded based upon the information that it had available to it.  And on the basis of that, it made a recommendation to the board that Dr. Vesom's privileges not continue at Atchison Hospital.
>
> At the end of this proceeding, we're going to ask you to make a recommendation, your own recommendation, and that needs to be done within 15 days of the conclusion of this hearing.  And we're going to ask you to affirm the decision of the Medical Executive Committee, and we're going to ask you to submit your report that should go to Mr. Bourne consistent with the fair hearing plan.  And after that, Mr. Bourne will submit a copy of that report to Dr. Vesom and to me, and it will be forwarded also to the board of directors who will ultimately have the decision about what happens with Dr. Vesom's privileges at this facility.

(Ex. 16 at p. 9-10) (emphasis added)

243.    Plaintiff's attorney did not object to this argument to the Fair Hearing Panel and consented to this instruction to the Fair Hearing Panel.  (*Id.*)

244.    Dr. Vesom's hearing before the Fair Hearing Panel took place on January 22, 2004.  (Ex. 16)

245.     At the Fair Hearing, Dr. Vesom was represented by legal counsel and provided the opportunity to call, examine, and cross-examine witnesses.  Dr. Vesom also presented evidence in his defense.  The Fair Hearing lasted approximately six (6) hours.  (*See* Transcript of Fair Hearing, Ex. 16)

246.     The Fair Hearing Panel was composed of five (5) members, including Mark F. Lierz, M.D., an adult and pediatric urologist from St. Joseph, Missouri, Andrea L. Bock-Kunz, M.D., an ophthalmologist from Atchison, Kansas, James L. Wetzel, M.D., an internist from Olathe, Kansas, Eugene A. Klingler, M.D., a surgeon from Manhattan, Kansas, and Pierre Podrebarac, M.D., an otolaryngologist from Kansas City, Kansas (the members of the "Fair Hearing Panel").  (Ex. 15 and 16)

247.     As Chair of the Fair Hearing Panel, Mark F. Lierz, M.D. prepared a written report, dated January 28, 2004.  (*See* January 28, 2004 letter from Mark Lierz, M.D., attached hereto as Exhibit 17)

248.     Three other separate written reports from the Fair Hearing Panel members were issued and all such reports were provided to Dr. Vesom.  (Ex. 51; AHA 5327)

249.     Dr. Lierz noted in his written report on behalf of the entire Fair Hearing Panel that Dr. Vesom had "an established pattern of disruptive behavior that created a poor environment for hospital personnel, medical staff, patients and his physician colleagues as he was warned on multiple occasions that this was in direct violation of the Medical Staff Bylaws."  Dr. Lierz additionally noted that Dr. Vesom repeatedly failed to "attend special meetings with the CEO and Medical Chief of Staff to discuss his conduct which he chose to not attend and made no discernible effort to rectify the situation."  Dr. Lierz concluded his report by noting that Dr. Vesom's "own uncooperative, hostile and threatening behavior affected not only the function of

the staff, physician colleagues and hospital, but also distracted from the business of the hospital in general." (Ex. 17)

250.     Dr. Bock-Kunz noted in her separate written report that "there was established a clear pattern of disruptive behavior that created a difficult work environment for persons involved, including medical staff, patients, and hospital personnel.  This was in direct violation of the medical staff bylaws."  Dr. Bock-Kunz further noted that although Dr. Vesom "had been notified by nursing personnel that his actions were creating difficult situations . . . he appeared to do nothing to change his behavior and promote cooperation."  (*See* undated letter from Andrea Bock-Kunz, M.D., attached hereto as Exhibit 18)

251.     Dr. Klingler noted in his separate written report, dated January 26, 2004, that "Dr. Vesom failed to attend both general staff meetings and committee meetings.  There is no record that any communications were carried out concerning his absence."  Dr. Klingler further noted that "[t]here was repeated failure to attend meetings with the CEO and Medical Chief of Staff to discuss conduct within the hospital as well as patient care."  Additionally, Dr. Klingler noted that Dr. Vesom had failed to communicate with surgical colleagues concerning the care of patients thereby putting the patients in danger.  Dr. Klingler concluded by stating that "[t]here appears to be an inability, or a lack of desire to adapt, reconcile or modify [Dr. Vesom's] behavior."  (*See* January 26, 2004 letter from Eugene A. Klingler, M.D., attached hereto as Exhibit 19)

252.     Dr. Wetzel noted in his separate written report, dated January 25, 2004, that the testimony and written evidence presented at the Fair Hearing showed that "Dr. Vesom met the definition of a disruptive practitioner."  Dr. Wetzel noted that Dr. Vesom had difficulty interacting with his peers, did not communicate well with other physicians, and placed patient care secondary to his own needs.  Dr. Wetzel also noted that "Dr. Vesom believed that his

expertise was such that he should receive specialty committee assignments.  After having been assigned those committees to which he claimed expertise, he was unable to carry out the assignments without further conflict, disrupting the committee process."  (*See* January 25, 2004 letter from James Wetzel, M.D., attached hereto as Exhibit 20)

253.    Dr. Wetzel further noted that Dr. Vesom "held himself to be the most capable of reading EKG's but at times declined to assist in the reading of EKG's.  This had the potential of patient care compromise."  (Ex. 20)

254.    Finally, Dr. Wetzel concluded by stating:

> Dr. Vesom was uncooperative, sometimes hostile and sometimes threatening to medical staff, hospital employees and hospital administration.  Caring for special needs, responding to threats and the frequent mediation of disputes involving Dr. Vesom distracted from the business of the hospital.  The hospital cannot allow that kind of distraction and still provide quality services.  Dr. Vesom had a pattern of miscommunication, disparaging comments, racial accusations, special treatment requirements and failure to carry out assigned duties.  He meets the Bylaw criteria of a disruptive practitioner.

(Ex. 20)

255.    Pierre Podrebarac, M.D., is an Otolaryngologist who has a specialty ear, nose and throat ("ENT") medical practice with the medical group of Burrows, Hill, Podrebarac & Associates, P.A., located at 8919 Parallel Parkway, Suite 430, Kansas City, Kansas  66112.  (Ex. 21, Podrebarac Aff.)

256.    Since November of 1999, Dr. Podrebarac maintained active medical staff privileges at AHA.  Prior to December of 2004, Dr. Podrebarac scheduled two (2) days per month of clinical visits in Atchison to see patients at AHA.  Dr. Podrebarac is professionally acquainted with Dr. Vesom.  Over the years, Dr. Vesom and Dr. Podrebarac have referred several patients to one another in Atchison.  Other than the referral of patients, these doctors do

not do any business together, nor are they in direct economic competition with one another.  (Ex. 21)

257.    Dr. Podrebarac served as a member of a Fair Hearing Panel to consider the appeal of Dr. Vesom arising from recommendation by the MEC not to reappoint Dr. Vesom to the medical staff at AHA.  (Ex. 21)

258.    Dr. Podrebarac remembers the hearing very well because the proceedings commenced in the afternoon and concluded at approximately 9:00 at night.  (Ex. 21)

259.    Dr. Podrebarac recalls that the members of the Fair Hearing Panel reviewed numerous documents prior to reaching their decision.  (*See* Affidavit of Pierre Podrebarac dated August 3, 2005, attached hereto as Exhibit 21, ¶ 8)

260.    At the conclusion of the Hearing, Dr. Lierz requested the members of the Fair Hearing Panel get together to discuss the Hearing.  After reviewing the documentary evidence and the testimony presented at the Hearing, it was decided that the MEC was justified in its decision to recommend that Dr. Vesom not be reappointed to the AHA medical staff because he was a "disruptive physician" under the AHA Medical Staff Bylaws.  (Ex. 21, ¶ 9)

261.    It was the unanimous decision of the Fair Hearing Panel that the recommendation of non-reappointment was justified.  There were many well-documented incidents which supported this recommendation.  Dr. Lierz stated that each of the members of the Panel could submit written statements to support their decision.  Dr. Podrebarac elected not to write a separate letter since it was his understanding that Dr. Lierz's final report would include the findings and conclusions of the entire Fair Hearing Panel.  Nevertheless, Dr. Podrebarac concurred with the statements made in Dr. Lierz's letter dated January 28, 2004 and

recommended upholding the decision of the MEC that Dr. Vesom was a disruptive physician. (Ex. 21, ¶ 10)

262.    Dr. Podrebarac believed that the testimony of the witnesses as well as the documentation presented confirmed that Dr. Vesom had exhibited a pattern of disruptive behavior which justified the MEC's recommendation that his medical staff privileges not be reappointed.  (Ex. 21, ¶ 11)

263.    Dr. Podrebarac is of the belief that all of the members of the Fair Hearing Panel were fair and impartial in their deliberation of the appeal of Dr. Vesom and both parties were given sufficient opportunity to present their case at the hearing.  (Ex. 21, ¶ 12)

264.    The Fair Hearing Panel voted to uphold the MEC's recommendation to not reappoint Dr. Vesom's medical staff privileges at AHA.  (Ex. 17-21)

**BB.     Due Process Afforded Dr. Vesom as Part of Appeal to AHA Board of Directors**

265.    On February 11, 2004, Dr. Vesom requested appellant review to AHA's Board of Directors of the decision of the Fair Hearing Panel ("Appeal").  (Ex. 22)

266.    On February 20, 2004, Mr. Bourne acknowledged Dr. Vesom's request for appeal.  The letter advised Dr. Vesom of the date of the hearing, the rights he would have at the Appeal and other procedural rights available to Dr. Vesom through the Appeal.  (Ex. 23)

267.    Dr. Vesom was advised that he had the right to submit a written statement that describes the basis for his appeal.  (Ex. 23)

268.    On March 9, 2004, Dr. Vesom submitted a detailed written statement in support of his appeal to the Board of Directors.  (Ex. 24)

**CC.    Appeal Proceedings Before the AHA Board of Directors**

269.    The Appeal of the recommendation of the Fair Hearing Panel was conducted before the AHA Board on March 25, 2004.  (Ex. 25)

270.    At the Appeal, Dr. Vesom was represented by legal counsel and was allowed oral argument before the Board.  (Ex. 25)

271.    The Board, after receiving the recommendation from the MEC and the Fair Hearing Panel, followed the Bylaws and reviewed all the "pertinent information available for the purpose of determining its recommendation for staff reappointment, changing category, increasing or decreasing clinical privileges, or for non-reappointment for the ensuing year."  (Ex. 4, Bylaws, Appendix A, 5(i); AHA 961; Ex. 26)

272.    The Board reached an independent judgment and voted unanimously not to reappoint Dr. Vesom's medical staff privileges because his "disruptive behavior" adversely impacted on the quality of care provided at AHA.  (Ex. 26; Ex. 33, Jacobson Aff. at ¶ 28, 29; Ex. 31, Niemann Aff. at ¶ 25)

273.    On April 2, 2004, the Board issued its written decision and, based upon the MEC's recommendation and the findings of the Fair Hearing Panel, decided to not reappoint Dr. Vesom to the medical staff at AHA, effective April 2, 2004.  (Ex. 26)

274.    Dr. Vesom was provided with the written decision from the Board, signed by Chairman of the Board, William R. Thornton.  (Ex. 26)

275.    The Chairman of the AHA Board, William R. Thornton, is an African American attorney licensed to practice law in the state of Kansas.  Mr. Thornton's legal practice has included representation of plaintiff's in employment discrimination actions.  Mr. Thornton was the Chairman of the Board on April 2, 2004 when the AHA Board voted not to reappoint Dr.

64

Vesom to the Active Medical Staff at AHA.  (Ex. 33, Jacobson Aff. at ¶ 12-15)  (Affidavit of

Ryan Thomas, M.D. attached as Exhibit 27, Thomas Aff. at ¶ 20)  (Ex. 3)

276.    Dr. Vesom agrees that the Board has the authority to take independent action,

irregardless of what the Credentialing Committee or the Executive Committee recommends.

(Vesom Depo. at p. 190, l. 15-21)

277.    Despite the fact that Dr. Jones also voted in favor of the recommendation not to

reappoint Dr. Vesom to the medical staff, Dr. Jones was not sued in his individual capacity.  (*See*

Complaint)

278.    Despite the fact that the five (5) members of the Fair Hearing Panel reached a

unanimous decision affirming the recommendation of the MEC, the members of the Fair Hearing

Panel were not named as parties in the lawsuit.  (*See* Complaint)

**DD.    Affidavit of Kathleen Butler**

279.    Kathleen ("Kathy") Butler has worked intermittently in various positions at AHA

since 1969.  Since November of 2001, Kathy Butler has held the positions of AHA Risk

Manager and Director of Performance Improvement.  As Director of Performance Improvement,

Ms. Butler's duties include coordination of performance improvement activities for the Hospital

and Medical Staff.  As Risk Manager, Ms. Butler coordinates risk management efforts between

Hospital staff, medical staff, clinics, insurance carriers and attorneys and has been responsible

for maintaining records for compliance with State Risk Management laws.  Ms. Butler also

assists with the coordination of peer review activities for the Hospital, medical staff and nursing

staff.  (Ex. 34 Butler Aff. at ¶ 1-3)

280.    Through her many years at the Hospital, both working directly with Dr. Vesom

and supervising nursing staff with whom Dr. Vesom worked, Ms. Butler has been made aware of

incidents of disruptive behavior which were attributed to Dr. Vesom.  Additionally, she is aware

that Dr. Vesom experienced personality conflicts and did not get along with many of the other physicians on the AHA medical staff.  To her knowledge, none of these problems relate to Dr. Vesom's race.  (Ex. 34, Butler Aff. at ¶ 4, 8)

281.  Ms. Butler has known Dr. Vesom since he first arrived in the Atchison community in 1983.  Ms. Butler testifies that during these many years, she has become familiar with Dr. Vesom and has had many personal and professional interactions with him.  Ms. Butler has been made aware of Dr. Vesom's disruptive personal demeanor because physicians and nurses reported to her that Dr. Vesom was difficult to work with and had problems communicating with physicians and staff regarding patient referrals.  Dr. Vesom's behavior has been a distraction to patient care.  Since physicians and nurses are forced to deal with personnel issues and conflicts surrounding Dr. Vesom, this has the potential to have an adverse impact on the quality of healthcare at the Hospital.  (Ex. 34, Butler Aff. at ¶ 4, 9)

282.  Ms. Butler has testified that she is not aware of any facts which would support the allegations of Dr. Vesom that the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence.  (Butler Aff. at ¶ 5-7, 10, 21, 26)  Ms. Butler agrees with the decision that Dr. Vesom was a "disruptive physician" at the Hospital.  (Ex. 34, Butler Aff. at ¶ 32)

283.  Since Ms. Butler was responsible for coordinating peer review activities for the Hospital and the medical staff, she is familiar with the complaints made by Dr. Ware and Dr. Vesom.  These complaints were primarily raised by Dr. Ware, but were later joined in by Dr. Vesom.  The complaints concern a maternal death case of patient Gloria Blackmon, which occurred on October 15, 2001.  (Patient Blackmon is referred to by medical record number

186806.)  Dr. Ware was critical of the results of the peer review of the Blackmon case.  (Ex. 34, Butler Aff. at ¶ 11)

284.    The circumstances surrounding the Blackmon case involved the caesarian section delivery of a baby girl, Natalia Blackmon (medical record number 187326).  The mother, Gloria Blackmon, was a 39-year old female who expired while giving birth.  The medical diagnosis was that patient Blackmon suffered from an amniotic fluid embolism.  (Ex. 34, Butler Aff. at ¶ 12)

285.    Ms. Butler is familiar with the peer review of the Blackmon case.  Following the death of Ms. Blackmon, the medical staff conducted a peer review of the case.  The conclusion was that the medical services provided were not below the standard of care.  Thereafter, on September 17, 2002, the Medical Staff Peer Review Committee met as a whole to discuss the peer review findings.  Those in attendance at this committee meeting were Drs. Kunz, Eplee, Fadare, Growney, Jones, Schmidt, Seibert, Shriwise, Tayiem, Thomas, Tivorsak, Twombly, Vesom, Wallace and Ware.  Also in attendance were physician assistant's Brosa, Schrick, Sigrist and Stephenson.  Carol Niemann also attended.  At this committee meeting on September 17, 2002, it was decided to send the Blackmon case to outside peer review.  (Ex. 34, Butler Aff. at ¶ 12)  The written opinion of the outside reviewer from the professional review service, dated December 6, 2002, reported that "the cardiopulmonary collapse was due to amniotic fluid embolism which could have occurred in any hospital setting.  It is obvious from the record that the resuscitative efforts were extensive and complete.  Given the mortality of amniotic fluid embolism, the fatality was not preventable.  In summary, this reviewer assigns a Level I, Standard of Care Met, and comments that excellent medical care was provided this patient.  This opinion is provided by FP/OB # 104, who is a board certified family physician practicing

67

obstetrics in the state of Kansas." This report and the outcome of outside peer review was published to the medical staff on January 21, 2003. (Ex. 34, Butler Aff. at ¶ 12)

286.    In the fall of 2002, Ms. Butler recalls that Dr. Ware was very vocal about peer review and expressed concern with the peer review process as it related to the Blackmon case. Dr. Ware requested that the case be sent to outside peer review, which it was. Ms. Butler also recalls that Dr. Ware also made comments at a public meeting of the Advisory Board of the Hospital wherein he openly and publicly criticized the peer review process and the handling of the Blackmon case. (Ex. 34, Butler Aff. at ¶ 13)

287.    Although Dr. Ware, and to a lesser degree, Dr. Vesom, continued to raise awareness of their concerns regarding peer review of the Blackmon case, there was no particular extraordinary concern raised by these complaints that the Hospital was attempting to prevent or cover up. AHA has policies and procedures in place to encourage the reporting of these kinds of peer review concerns. (Ex. 34, Butler Aff. at ¶ 14)

288.    Based upon Ms. Butler's review of the peer review documents related to the Blackmon case, she has concluded that all Hospital and state peer review procedures were followed. There was never a finding that the care provided in the Blackmon case was below the acceptable standard of care. (Ex. 34, Butler Aff. at ¶ 15, 24, 30)

289.    Ms. Butler testified in her Affidavit that the collegiality among the medical and nursing staff and Hospital administration has substantially improved since Dr. Vesom's departure. She attributes this improvement in the environment around the Hospital to the fact that Dr. Vesom is no longer present on the medical staff. (Ex. 34, Butler Aff. at ¶ 31-33)

**EE.    Kansas Department of Health and Environment Complaint and Subsequent Investigation**

290.    The Kansas Department of Health and Environment ("KDHE") is the state licensing agency for hospitals in Kansas.  The KDHE administers the provisions of the Hospital Licensure Act, K.S.A. § 65-425, et seq., and enforces the rules and regulations promulgated thereunder.  K.A.R. 28-34-1 et seq.

291.    On March 4, 2003, Mary Kabriel, Risk Management Specialist, KDHE, Bureau of Health Facilities, arrived at AHA for an unannounced survey due to a complaint that had been filed against the Hospital.  (Ex. 34, Butler Aff. at ¶ 16)

292.    Ms. Kabriel returned to AHA for further investigation on March 5, March 6, March 12, March 13, and March 17, 2003.  The KDHE survey was completed on March 17, 2003.

293.    The KDHE Surveyors never disclosed the identity of the individual(s) who made the KDHE complaint.

294.    Because of the timing of the events and the anonymity of the KDHE complaints, the MEC's recommendation not to reappoint Dr. Vesom could not possibly have been used in retaliation for Dr. Vesom's reports against AHA.  (Ex. 31, Niemann Aff. at ¶ 28-30)

295.    Although AHA was notified that a complaint was filed with the KDHE, the identity of the complaining party was never disclosed and remained anonymous to the Hospital. At the time that the MEC met to consider Dr. Vesom's request for reappointment to medical staff privileges, the Hospital administration was not aware that Dr. Vesom was the source of the KDHE complaint.

296.    At the time that the MEC met on February 18, 2003, the MEC was not aware of the KDHE complaint.  The KDHE interviews, referred to as "surveys," were conducted in March

69

of 2003 and the survey was completed on March 17, 2003.  It was not until after this lawsuit was filed on May 18, 2004 (fourteen (14) months after the KDHE site visit) that the AHA administration knew that Dr. Vesom was the source of the KDHE complaint, and only then because he alleges he was the source of the KDHE complaints in his lawsuit.  (Ex. 34, Butler Aff. at ¶ 16-19)

297.    Dr. Vesom confirmed in his own Declaration at ¶ 5 that the maternity death that he was concerned about was investigated by the KDHE **"after"** he learned that his staff privileges would not be renewed.  (Vesom Declaration at ¶ 5 (emphasis added))  (Ex. 28, Goracke Aff. at ¶ 20-29)

298.    At the time that the MEC met, neither the Hospital, nor the MEC was aware of the confidential report made to the KDHE.  It was not until after this lawsuit was filed on May 18, 2004 that anyone new that Dr. Vesom was the source of the KDHE complaint, and only then because Dr. Vesom reveals that he was the source of the KDHE complaints in his lawsuit.  (Ex. 34, Butler Aff. at ¶ 19)

299.    The incidents of disruptive behavior considered by the MEC all occurred prior to members of the MEC being made aware of a KDHE complaint.  (Ex. 34, Butler Aff. at ¶ 25-29)

300.    At the time that the MEC was considering Dr. Vesom's application for reappointment, there had not been an investigation by the KDHE to determine whether or not there was "substandard care of patients."  (Ex. 34, Butler Aff. at ¶ 26)

301.    As Medical Staff Coordinator, Carol Niemann reports to the Risk Manager, Kathy Butler.  Ms. Niemann was the person responsible for coordination of the schedule of the onsite interviews of KDHE's surveys with physicians and staff.  Ms. Niemann and Ms. Butler confirm that they were unaware of the source of the KDHE complaint and had no knowledge of any

complaint prior to the site visit on March 4, 2004.  (Ex. 34, Butler Aff. at ¶ 20; Ex. 31, Niemann Aff. at ¶ 26-30)

302.    The deposition of Mary Janann Kabriel, State Survey Manager for the Kansas Department of Health and Environment, was taken on June 16, 2005.  (*See* Mary Kabriel Deposition attached as Exhibit 47)

303.    Ms. Kabriel has thirty-eight (38) years of nursing experience in all different types of nursing:  OB, surgery, psych, emergency, and nursing home care.  (Kabriel Depo., p. 5, l. 9-11)  During the relevant time period of this dispute, Ms. Kabriel served as Risk Management Specialist for KDHE.  In that position, she was responsible for the risk management programs for the State and investigated risk management issues, including conducting risk management education and hospital surveys.  (Ex. 47, Kabriel Depo., p. 5, l. 20 – p. 6, l. 3)

304.    Ms. Kabriel defines "risk management" as the process by which ambulatory centers, surgical centers, and hospitals review their procedures, developing a standard of care determination for an issue and developing corrective action to follow through with a plan to correct the action as a way for the facility to improve patient care.  (Ex. 47, Kabriel Depo, p. 6, l. 4-12)  If the healthcare facility receives a notice of deficiency, the facility is responsible for writing a plan of corrective action on a form called a "Statement of Deficiency" (or Form 2567). If the plan of corrective action is acceptable to enable the facility to meet the regulations, then KDHE accepts the plan.  If the plan is not acceptable, the facility must provide more information for the proposed corrective action.  (Ex. 47, Kabriel Depo, p. 8, l. 11-20)  Ms. Kabriel, on behalf of KDHE, conducted a survey of AHA in the spring of 2003.  (Ex. 47, Kabriel Depo, p. 10, l. 14-18)  KDHE received a complaint (Complaint No. 20009, ID No. 314503) by Dr. Vesom, dated

71

January 23, 2003.  The complaint involved an anesthesiologist at AHA, Dr. Douglas Goracke.
(Ex. 47, Kabriel Depo, p. 13, l. 15 – p. 14, l. 12)

305.    Ms. Kabriel independently confirmed that the KDHE audit began on March 4,
2003, and was completed on March 17, 2003.  (Ex. 47, Kabriel Depo, p. 15, l. 13-21)

306.    The documents in the KDHE file confirm that there was a complaint filed by Drs.
David Ware and Melanie Ware with the KDHE on January 21, 2003 -- the same day that the
results of the outside peer review of the Blackmon case were published.  (Ex. 47, Kabriel Depo,
p. 20, l. 4-18)  (Ex. 34, Butler Aff. at ¶ 12)

307.    Ms. Kabriel entered the facility on March 4 and was not accompanied by anyone.
She first contacted Mr. Virgil Borne to explain the purpose of her visit.  (Ex. 47, Kabriel Depo,
p. 22, l. 9-20)  Once KDHE receives a complaint, the Centers of Medicare and Medicaid
("CMS") provide authorization for KDHE to conduct a survey.  (Ex. 47, Kabriel Depo, p. 13, l.
12-17; p. 26, l. 9 – p. 27, l. 12)  The stimulus for the survey was the report by Dr. Vesom
(regarding Dr. Goracke) and the complaint of Drs. Melanie and David Ware on January 21, 2003
(regarding infant mortality and morbidity).  (Ex. 47, Kabriel Depo, p. 25-32)

308.    Ms. Kabriel defined "swing bed" as a "regular bed in a hospital that a patient who
no longer needs acute care can swing over into a swing bed and the facility can still be paid by
Medicare, Medicaid on the swing bed level," resulting in a difference in pay.  A hospital can
have swing beds and any of their beds can be put over into that swing bed status under a different
pay system.  (Ex. 47, Kabriel Depo, p. 33, l. 4-24)

309.    Ms. Kabriel testified that during her investigation at AHA, no one tried to steer
her away from any of the deficiencies that she ultimately found and documented.  (Ex. 47,
Kabriel Depo, p. 80, l. 21-25)  This included Dr. Goracke, who was cited for deficiencies.  Dr.

Goracke did not say anything negative and was very polite.  (Ex. 47, Kabriel Depo, p. 81, l. 1-7)

The purpose of Ms. Kabriel's audit and recommendations was to improve the quality of the

health care at AHA.  The Hospital's plan of correction should have shown some improvement in

the quality of health care at the Hospital and KDHE has not received any subsequent complaints

about these issues at AHA.  (Ex. 47, Kabriel Depo, p. 81, l. 8-18)  Ms. Kabriel's only prior

experience in working with AHA was in conversations with AHA Risk Manager, Kathy Butler.

The conversations involved the Blackmon case wherein Ms. Kabriel was assisting the Hospital to

make sure that the Hospital followed all the appropriate procedures to review an incident such as

a death that occurred in the Hospital.  During Ms. Kabriel's telephone visit with Kathy Butler,

Ms. Kabriel found that the Hospital was properly following peer review processes and the

Blackmon case had been properly reported to Risk Management and gone through the peer

review process.  (Ex. 47, Kabriel Depo., p. 85-88)  During her investigation of the Blackmon

case, Ms. Kabriel determined that the Hospital had conducted itself appropriately.  Otherwise, if

AHA had not followed proper peer review procedures with regard to this case, she would have

written deficiencies at the time.  (Ex. 47, Kabriel Depo, p. 89, l. 11-21)  Ms. Kabriel testified that

she did not talk with anyone at AHA about the complaints until she made her unannounced visit

to the facility on March 4, 2003.  (Ex. 47, Kabriel Depo., p. 96, l. 10-15; p. 123, l. 14-25; p. 124,

l. 1 - p. 125, l. 15)

      310.    Anonymity and confidentiality of the complaining party is not only essential to

the KDHE investigation, but the investigator could be subject to criminal liability if the

investigator gave advance notice of her arrival to the facility or disclosed the source of the

complaint.  (Ex. 47, Kabriel Depo., p. 125, l. 16 – p. 127, l. 12)

311.    When Ms. Kabriel showed up unannounced at the facility on Tuesday, March 4, 2003, AHA administration was "very cooperative."  (Ex. 47, Kabriel Depo., p. 130, l. 15-18)  They treated Ms. Kabriel in a professional way.  (Ex. 47, Kabriel Depo., p. 131, l. 7-9)

312.    Ms. Kabriel does not have the authority to levy or impose fines against the facility, nor does she have the authority to pull the credentials from a facility.  The "biggest hammer" or authority that a KDHE investigator would have against a hospital as a result of finding an allegation to be substantiated would be to make written findings of the deficiency and require the Hospital to provide an adequate plan of correction.  (Ex. 47, Kabriel Depo., p. 132, l. 3-16)

313.    When Ms. Kabriel met with AHA administration, they expressed a sincere desire to make sure that there was good quality of care for its patients.  They cooperated with Ms. Kabriel to make sure that there would be an appropriate correction plan in place.  (Ex. 47, Kabriel Depo., p. 132, l. 17 – p. 133, l. 11)  In response to the substantiated charges, AHA presented Ms. Kabriel with an acceptable action plan for change and successfully implemented the action plan.  No subsequent complaints have been made against AHA.  (Ex. 47, Kabriel Depo., p. 133-135)

314.    Ms. Kabriel made a total of six (6) on-site visits, visiting AHA on March 4, 5, 6, 12, 13, and 17, 2003.  (Ex. 47, Kabriel Depo., p. 135, l. 19 – p. 136, l. 16)

315.    During her dealings with the AHA administration, Ms. Kabriel believed that the Hospital acted in good faith and took the issues seriously in an attempt to resolve the complaints to her satisfaction.  (Ex. 47, Kabriel Depo., p. 137, l. 18 – p. 138, l. 3)  Ms. Kabriel did not conduct a peer review of a particular case as part of her investigation.  She is not authorized by statute, regulation or any particular medical staff bylaw to conduct peer review.  Her only

74

purpose with regard to peer review was to make sure that the organization had complied with its own peer review standards and that the recordkeeping was complete so that if someone else were to review a file and conduct peer review, they would have the necessary information to do so. (Ex. 47, Kabriel Depo., p. 148-149)

316.    Ms. Kabriel got the feeling from talking with other physicians and nursing personnel at AHA that they felt that Dr. Vesom was disruptive.  (Ex. 47, Kabriel Depo., p. 146, l. 8-19)

317.    Based upon the timing of the complaints, Ms. Kabriel concluded that Dr. Vesom and Drs. (David and Melanie) Ware were making a coordinated and concerted effort to report health care issues against AHA.  (Ex. 47, Kabriel Depo., p. 96, l. 22 – p.97, l. 15)

318.    Ms. Kabriel reviewed the medical record of Gloria Blackmon, the mother who died after delivery of her baby by C-section.  In the written complaint by Drs. Ware, the allegation was made that "the facility is accused of killing mothers."  Ms. Kabriel agreed that this was a very harsh accusation and would characterize the statement as quite "different than two maternal deaths."  Ultimately, Ms. Kabriel concluded that "it did not appear that the facility was trying to whitewash or cover up these cases."  (Kabriel Depo., p. 161-164)  Therefore, Ms. Kabriel did not substantiate any of the problems with patient care that Dr. David Ware and Dr. Melanie Ware were complaining of.  (Ex. 47, Kabriel Depo., p. 165-167)

319.    The "*Blackmon* case" was the subject of a lawsuit captioned *Lois Blackmon, Administrator of The Estate of Gloria A. Blackmon, Deceased and Natiala Gloria Ann Blackmon, By and through her guardian ad-litem, Geneva Wedlow v. Atchison Hospital, Sabrina J. Schmidt, M.D., Ryan M. Thomas, M.D., and Douglas M. Goracke, M.D.*; Case No. 03 CV

00027; In the District Court of Atchison County, Kansas.  On June 16, 2005, a Journal Entry of Dismissal without prejudice was filed.  (*See* Ex. 51)

**FF.    Complaints by David R. Ware, M.D., A.K. Tayiem, M.D. and Dr. Vesom**

320.    On January 3, 2003, a meeting occurred between Dr. David Ware, Dr. Vesom, Dr. A.K. Tayiem, CEO Virgil Bourne, and Dr. Goracke.  It was Dr. Ware, not Dr. Vesom, who was exceptionally vocal about expressing these issues during the meeting.  Three (3) doctors documented "complaints and recommendations" in a letter to AHA Board Chair William Thornton on January 27, 2003.  Dr. Vesom, David R. Ware, M.D. and A.K. Tayiem, M.D. all signed the letter.  The letter dated January 27, 2003 contained Dr. Vesom's signature, but it was Dr. Ware who was advancing these recommendations and insisting upon action at the January 3, 2003 meeting in an effort to increase the volume of patients he was treating.  (Ex. 27-30)

321.    The members of the MEC did not retaliate against Dr. Vesom for his support of Dr. Ware in raising these issues.  Dr. Ware's issues of specialty care were addressed through normal channels and had nothing to do with the MEC's decision not to recommend reappointment of his medical staff privileges.  The acts of disruptive behavior found in Dr. Vesom's credentials file, along with the defendant physicians personal observations of his demeanor with other physicians and staff, led the MEC to the conclusion that Dr. Vesom should not be recommended for reappointment.  (Ex. 28, Goracke Aff. at ¶ 27)  (*See generally*, Ex. 27-30)

322.    Dr. Vesom has alleged that the MEC's recommendation was based upon the fact that Dr. Vesom had been critical of the quality of medicine being practiced at AHA and because he had raised issues about what he perceived as substandard care of patients treated by the individual defendant doctors.  (Complaint at ¶ 31-32)

323.     The defendant physicians deny Dr. Vesom's allegation that the MEC's recommendation was based upon the fact that Dr. Vesom had been critical of the quality of medicine being practiced at AHA and because he had raised issues about what he perceived as substandard care of patients treated by the individual defendant doctors.  These allegations are false and categorically denied by each of the defendant physicians.  (Ex. 27, Thomas Aff. at ¶ 26; Ex. 29, Swayze Aff. at ¶ 21; Ex. 28, Goracke Aff. at ¶ 20; Ex. 30, Jones Aff. at ¶ 18)

324.     Dr. Vesom was not the only physician who signed the letter.  Dr. Vesom joined David R. Ware, M.D. and A.K. Tayiem, M.D. in signing the letter.  At the time that these "complaints and recommendations" were raised, the defendant physicians did not perceive these issues to be a personal complaint against them or a matter of "professional incompetency."  Instead, the issues in the letter had more to do with issues of "specialty care."  The issues involved related to directing patient care away from physicians with a "general" practice of medicine towards physicians who specialized in obstetrical care.  (Ex. 27-30)

**GG.    The Actions Were Taken in the Furtherance of the Quality of Health Care at the Hospital**

325.     The four (4) members of the MEC have provided testimony that they took their responsibility very seriously.  They knew that it was extremely likely, based upon Dr. Vesom's prior conduct, that he would file a lawsuit against the Hospital, so they wanted to be sure that their recommendations were sound and based upon a thorough review of all of the issues and facts involved.  (Ex. 27-30)

326.     After reviewing the credentials file and considering Dr. Vesom's history of "disruptive behavior," the four (4) members of the MEC felt that a decision not to reappoint Dr. Vesom to the Hospital's medical staff was warranted under the circumstances.  (Ex. 27-30)

327.     Even knowing that a lawsuit was likely, Drs. Thomas, Swayze, Goracke and Jones concluded that the recommendation that the Board not reappoint Dr. Vesom to the Hospital's medical staff was in the best interest of the Hospital.  All of the actions of the MEC were taken with the reasonable belief that its actions were in the furtherance of the quality health care at the Hospital.  (Ex. 27, Thomas Aff. at ¶ 46-48; Ex. 28, Goracke Aff. at ¶ 47-49; Ex. 29, Swayze Aff. at ¶ 40-42; Ex. 30, Jones Aff. at ¶ 36-38)

328.     Dr. Thomas has stated:  "I can truly and honestly state that the discussion of the MEC about whether or not to recommend reappointment of Dr. Vesom to the AHA medical staff was based upon facts which the MEC considered to have an affect on the quality of health care at the Hospital.  Neither the deliberations nor the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence."  (Ex. 27, Thomas Aff. at ¶ 18)

329.     Dr. Thomas is not aware of any direct or indirect reference to Dr. Vesom's race by anyone during the MEC's deliberations on his request for reappointment.  Dr. Thomas never heard anyone at AHA, including other physicians, hospital administration, personnel, patients, or anyone else speak disparagingly about Dr. Vesom based upon his race.  Dr. Thomas denies that there is merit to Dr. Vesom's allegations since the deliberation and decisions of the MEC were not racially motivated or in retaliation for any complaints he made.  Based upon Dr. Thomas' experiences with him, Dr. Vesom exhibited a clear pattern of disruptive behavior and repeatedly refused to take responsibility for his own actions.  In Dr. Thomas' opinion, the fact that Dr. Vesom claimed race discrimination and retaliation was not surprising to him, given Dr. Vesom's denial and/or refusal to accept decisions that he disagrees with or the consequences of his actions.  Dr. Thomas was also aware that Dr. Vesom has alleged that the MEC's

78

recommendation was based upon the fact that Dr. Vesom had been critical of the quality of medicine being practiced at AHA and because he had raised issues about what he perceived as substandard care of patients treated by myself and the other individual defendant doctors. Dr. Thomas denies this allegation. (Ex. 27)

330. Dr. Thomas has known Dr. Vesom since 1995. Dr. Thomas testifies in his affidavit that: "I am aware of Dr. Vesom acting in an unprofessional and/or disruptive fashion in several areas of the Hospital and I believe this affected patient care adversely. Some of these issues are from personal experience. Others are from reports from various Hospital personnel during my tenure as Chief of Staff or Vice Chief of Staff. While I served as Chief of Staff, individuals would frequently pull me aside to complain about some behavior or interaction with Dr. Vesom. I always asked them to put their complaint in writing (as I did with any complaint I had against other doctors). Most of the time, the individuals would not follow through with this request so what the MEC presented to the Fair Hearing Panel in support of its recommendation is just the 'tip of the iceberg.' Dr. Vesom is disrespectful of other physicians and undermines their authority with their patients, i.e. canceling all previous orders, telling patients that a certain doctor is not a good doctor, telling patients that if they go to a certain doctor he won't care for them, accusing me of being 'racist' because I didn't put him in the position of ICU committee chairman, creating a false sense of division between Hospital employed physicians and non-employed physicians. Dr. Vesom intimidated nurses by yelling at them for questioning his orders, by questioning nurses on the obstetrics floor about any problems that may have occurred (one was intimidated to the point that she hid under a desk to avoid him), by hanging up on nurses, etc. Dr. Vesom treated patients inappropriately by transferring them inappropriately, by refusing to read stat EKG's, and on at least one occasion by refusing to come in when asked to

79

care for a patient.  Dr. Vesom often neglected obligations for committee meetings and patient care plan meetings.  He often failed to show up to committee meetings, including the ICU committee meetings that he was so angry about not chairing.  I believe he missed nine (9) of the seventeen (17) executive meetings when he was on the MEC.  Having participated in the deliberations of the MEC, I can truly and honestly state that the discussion of the MEC about whether or not to recommend reappointment of Dr. Vesom to the AHA medical staff was based upon facts which the MEC considered to have an affect on the quality of health care at the Hospital.  Neither the deliberations nor the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence."  (Ex. 27, Thomas Aff. at ¶ 13-18)

331.    Drs. Goracke and Swayze state:  "Having participated in the deliberations of the MEC, I can truly and honestly state that the discussion of the MEC about whether or not to recommend reappointment of Dr. Vesom to the AHA medical staff was based upon facts which the MEC considered to have an affect on the quality of health care at the Hospital.  Neither the deliberations nor the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence."  (Ex. 29, Swayze Aff. at ¶ 16; Ex. 28, Goracke Aff. at ¶ 16)

332.    The individual doctors deny that the MEC's recommendation was based upon the fact that Dr. Vesom had been critical of the quality of medicine being practiced at AHA and because he had raised issues about what he perceived as substandard care of patients treated by myself and the other individual defendant doctors.  (Ex. 29, Swayze Aff. at ¶ 21)

333.    Dr. Goracke has known Dr. Vesom since 1992.  During these years, Dr. Goracke has become familiar with Dr. Vesom and has had numerous personal and professional

80

interactions with him and Dr. Goracke is aware of Dr. Vesom's disruptive behavior.  (Ex. 28, Goracke Aff. at ¶ 15)

334.    Dr. Swayze has known Dr. Vesom since August of 2001.  During these years, he has become familiar with Dr. Vesom and had personal and professional interactions with him.  Dr. Swayze has testified in his affidavit:  "I am aware of his disruptive demeanor because I have witnessed him threatening staff and patients, demeaning and belittling staff, attempting to discredit staff, not communicating with physicians regarding patient care, not upholding administrative duties and providing care only by his own terms.  Dr. Vesom's behavior distracted from patient care and necessitated a great deal of extra time to deal with family and staff issues that he created."  (Ex. 29, Swayze Aff. at ¶ 15)

335.    Dr. Jones has known Dr. Vesom since June of 1986.  Dr. Jones testified in his affidavit:  "During these eighteen (18) years, I have become familiar with Dr. Vesom and have had numerous personal and professional interactions with him.  I have personally observed Dr. Vesom's disruptive demeanor in the following manner:  Dr. Vesom has been threatening to staff and patients.  He has encouraged patients to seek litigation against physicians on staff at the Hospital.  He has written multiple letters to fellow staff members in a threatening tone.  Dr. Vesom has refused to see ICU patients and has not fulfilled his committee service obligations to AHA.  Dr. Vesom has undermined other AHA physicians and has provided false data to patients, AHA Board members, and other physicians regarding Dr. Swayze's credentials and surgical training.  Dr. Vesom refused to attend scheduled meetings to rectify the above problems.  Having participated in the deliberations of the MEC, I can truly and honestly state that the discussion of the MEC about whether or not to recommend reappointment of Dr. Vesom to the AHA medical staff was based upon facts which the MEC considered to have an affect on the quality of health

care at the Hospital.  Neither the deliberations nor the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence."  (Ex. 30, Jones Aff. at ¶ 13-14)

### HH.   There is No Evidence of Improper Racial or Retaliatory Motive

336.   Neither the deliberations nor the recommendation not to reappoint was motivated by Dr. Vesom's race or in retaliation for his reports of what Dr. Vesom believed to be professional incompetence.  (Ex. 27, Thomas Aff. at ¶ 18; Ex. 29, Swayze Aff. at ¶ 16; Ex. 28, Goracke Aff. at ¶ 16; Ex. 30, Jones Aff. at ¶ 14)

337.   Neither Drs. Swayze, Goracke, Thomas or Jones is aware of any direct or indirect reference to Dr. Vesom's race by anyone during the MEC's deliberations on his request for reappointment.  In fact, none of the physicians has ever heard anyone at AHA, including other physicians, hospital administration, personnel, patients, or anyone else speak disparagingly about Dr. Vesom based upon his race.  (Ex. 27, Thomas Aff. at ¶ 19; Ex. 29, Swayze Aff. at ¶ 17; Ex. 28, Goracke Aff. at ¶ 17; Ex. 30, Jones Aff. at ¶ 15)

338.   AHA has an antidiscrimination policy which reads:  "No applicant shall be denied membership on the basis of sex, race, creed, color, national origin, age, sexual orientation, * handicap or an individual's participation or nonparticipation in contracts with a third party which contracts with the hospital."  (Ex. 4, Bylaws at Article XI, 1(b) (* revised 4/28/03); AHA 945)

339.   AHA strictly enforces its antidiscrimination policy.  (Ex. 33, Jacobson Aff. at ¶ 12)

340.   AHA is a small community hospital which has a racially diverse medical staff.  In 2003, the category of "Active" Medical Staff members consisted of:

> 11 Caucasian Males
> 4 Caucasian Females
> 2 Thailand Males (including Dr. Vesom)

1 Nigerian Male
1 Palestinian Male
1 Pakistan Male

A copy of the Hospital's EEO-1 Report dated September 1, 2004 is attached to Mr. Jacobson's

Affidavit.  The EEO-1 Report shows the gender and racial composition of the Hospital's

employees.  (Ex. 33, Jacobson Aff. at ¶ 13-14)

341.    The Board, the administration and the physicians make decisions without regard

to sex, race, creed, color, national origin, age, sexual orientation or handicap.  (Ex. 33, Jacobson

Aff. at ¶ 15)

342.    During the consideration of Dr. Vesom's application for reappointment, the

members of the MEC reviewed numerous complaints made about Dr. Vesom.  Those complaints

served as the basis for the MEC's recommendation and were discussed in detail.  None of the

incidents had any reference to Dr. Vesom's race or made racially derogatory remarks, unless

made by Dr. Vesom himself, claiming that the actions of others were racially motivated.  (Ex.

27, Thomas Aff. at ¶ 21; Ex. 29, Swayze Aff. at ¶ 18; Ex. 28, Goracke Aff. at ¶ 18; Ex. 30, Jones

Aff. at ¶ 16)

343.    The first time that Dr. Thomas ever heard any issue related to Dr. Vesom's race

come up was when Dr. Vesom himself raised the issue of "racism" with Dr. Thomas.  In his

affidavit, Dr. Thomas describes the situation:  "On February 12, 2002, I wrote Dr. Vesom a letter

in my capacity as Chief of Staff.  The purpose of the letter was to inform Dr. Vesom 'of a

decision to change [his] position as Chairman of Intensive Care Unit.'"  The letter set forth the

details of the telephone conversation I had with Dr. Vesom on January 8, 2002, the same day as

the January MEC meeting.  The letter explained the basis for the MEC's unanimous approval

appointing Dina Seibert, D.O. as Chairman of the Intensive Care Unit.  In direct response to my

letter dated February 12, 2002, Dr. Vesom wrote me a letter dated March 11, 2002 "regarding

reassignment and removing [Dr. Vesom] as the Chairman of the Intensive Care Unit and reinstalling Dr. Dina Seibert, D.O. as Chairperson of the ICU Committees."  In the letter, Dr. Vesom took exception to the MEC's removal of his chairmanship of the ICU and replacement of Dr. Seibert.  Dr. Vesom attributed the MEC's decision to "racial discrimination."  Dr. Vesom specifically stated:  ". . . Dr. Seibert was placed based on the fact that she is employed by the hospital and Caucasian.  I am an Asian minority and could never hold the position of chairman in those regards.  I will label you as RACIST."  Therefore, it is Dr. Vesom who has made previous unfounded claims of racism when he has been dissatisfied or unhappy with a decision.  There is no merit to Dr. Vesom's allegations since the deliberation and decisions of the MEC were not racially motivated or in retaliation for any complaints he made.  Based upon my experiences with him, Dr. Vesom has exhibited a clear pattern of disruptive behavior and repeatedly refuses to take responsibility for his own actions.  Therefore, claiming race discrimination and retaliation are not surprising, given his denial and/or refusal to accept decisions that he disagrees with or the consequences of his actions."  (Ex. 27, Thomas Aff. at ¶ 22-25)

## II.    The National Practitioner Data Bank ("NPDB")

344.    The HCQIA established a national reporting system requiring that hospitals report adverse professional review information to the National Practitioner Data Bank ("NPDB").  42 U.S.C. § 11133.

345.    Hospitals have immunity from liability for complying with this statute unless the report filed is knowingly false.  42 U.S.C. § 11137(c).

346.    Following the decision of the AHA Board, AHA reported the objective facts surrounding the procedural events related to the Board's action to the NPDB as required by law. (*See*    NPDB Report, including Dr. Vesom's response, attached as Exhibit 40)

**JJ.    Each of the Adequate Notice and Hearing Requirements of HCQIA Have Been Satisfied**

347.    Section 11112(b) of the Health Care Quality Improvement Act ("HCQIA")

provides the following elements for "adequate notice and hearing procedures:"

(1)  Notice of proposed action
The physician has been given notice stating –
(A)(i) that a professional review action has been proposed to be taken against the physician,
(ii) reasons for the proposed action,
(B)(i) that the physician has the right to request a hearing on the proposed action,
(ii) any time limit (of not less than 30 days) within which to request such a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).

(2)  Notice of hearing
If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating –
(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3)  Conduct of hearing and notice
If a hearing is requested on a timely basis under paragraph (1)(B) –
(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity) –
(i) before an arbitrator mutually acceptable to the physician and the health care entity,
(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;
(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;
(C) in the hearing the physician involved has the right –
(i) to representation by an attorney or other person of the physician's choice,
(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
(iii) to call, examine, and cross-examine witnesses,
(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
(v) to submit a written statement at the close of the hearing; and
(D) upon completion of the hearing, the physician involved has the right –

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and
(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.
A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

348.    Dr. Vesom was given notice stating that a professional review action was proposed to be taken against him.  (42 U.S.C. § 11112(b)(1)(A)(i))  (Vesom Depo. at p. 44, l. 13-18)  (Ex. 9)  (*See* Plaintiff's Responses to Defendant AHA's First Request for Admissions ("RFA") attached at Exhibit 37, RFA no. 1 & 2; Ex. 9, 11, 13, 14, 15 and 23))

349.    The notice of proposed action to Dr. Vesom stated the reasons for the proposed action.  (42 U.S.C. § 11112(b)(1)(A)(ii))  (Ex. 9, 11, 13, 14, 15 and 23; Ex. 37, RFA no. 1, 2, 46, 47, 50, 51, 54, 55, 56, 57)

350.    The notice of proposed action to Dr. Vesom stated that he had the right to request a hearing on the proposed action within thirty (30) days.  (42 U.S.C. § 11112(b)(1)(B)(i) and (ii))  (Ex. 9, 10; Ex. 37, RFA no. 1-4)

351.    The notice of proposed action to Dr. Vesom provided a summary of his rights in the hearing (42 U.S.C. § 11112(b)(1)(C))  (Ex. 9, 11, 13, 14, 15 and 23; Ex. 37, RFA no. 1, 2, 3, 4-9, 11-14, 17, 19, 20)

352.    Once Dr. Vesom requested a hearing, the health care entity provided Dr. Vesom with further notice of the hearing procedures and conduct of the parties permitted at the hearing.  (42 U.S.C. § 11112(b)(3))  (Ex. 11, 13, 14, 15 and 23; Ex. 37, RFA no. 9, 11-14, 17, 19, 20)

353.    Once Dr. Vesom requested a hearing, he was given further notice of hearing stating the place, time, and date of the hearing, which was not less than thirty (30) days after the date of the notice.  (42 U.S.C. § 11112(b)(2)(A))  (Ex. 11, 13, 14, 15 and 23)

354.     The notice of hearing provided to Dr. Vesom included a list of the witnesses expected to testify at the hearing on behalf of the professional review body.  (42 U.S.C. § 11112(b)(2)(B))  (Ex. 9, 11, 13, 14, 15 and 23; Ex. 37, RFA no. 44, 48, 52, 56, 57)

355.     The notice of hearing advised Dr. Vesom that the hearing would be conducted before a panel of individuals who were appointed by the health care entity and were not in direct economic competition with Dr. Vesom.  (42 U.S.C. § 11112(b)(3)(A)(iii))  (Ex. 9, 11, 13, 14, 15 and 22; Ex. 37, RFA no. 45, 49, 53)

356.     The notice of hearing advised Dr. Vesom that his right to the hearing may be forfeited if he failed, without good cause, to appear.  (42 U.S.C. § 11112(b)(3)(B))  (Ex. 11, 13, 14, 15 and 23)

357.     At the hearing, Dr. Vesom had the right to representation by an attorney or other person of Dr. Vesom's choice.  (42 U.S.C. § 11112(b)(3)(C)(i))  (Ex. 9, 10, 11, 12, 13, 14, 15, 16, 23 and 25; Ex. 37, RFA no. 1, 2, 7, 8, 9, 39, 40)

358.     At the hearing, Dr. Vesom had the right to have a record made of the proceedings and copies were made available to him after payment of the reasonable charges associated with the preparation thereof.  (42 U.S.C. § 11112(b)(3)(C)(ii))  (Ex. 9, 11, 13, 14, 15 and 23; Ex. 37, RFA no. 10, 12; Ex. 16)

359.     At the hearing, Dr. Vesom had the right to call, examine and cross examine witnesses.  (42 U.S.C. § 11112(b)(3)(C)(iii))  (Ex. 9, 11, 13, 14, 15 and 23; Ex. 37, RFA no. 13, 14, 25, 26, 41 and 42; Ex. 16)

360.     At the hearing, Dr. Vesom had the right to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law.  (42 U.S.C.

§ 11112(b)(3)(C)(iv))  (Ex. 9, 11, 13, 14, 15 and 23; Ex. 37, RFA no. 17, 19, 20, 25, 26 and 42; Ex. 16)

361.    At the hearing, Dr. Vesom had the right to submit a written statement at the close of the hearing.  (42 U.S.C. § 11112(b)(3)(C)(v))  (Ex. 23 and 24)

362.    Following the completion of the hearing, Dr. Vesom had the right to receive the written recommendation of the hearing panel, including a statement of the basis for the recommendations.  (42 U.S.C. § 11112(b)(3)(D)(i))  (Ex. 16-20; Ex. 37, RFA no. 28-32)

363.    Following the completion of the appeal to the governing board of AHA, Dr. Vesom had the right to receive a written decision of the health care entity, including a statement of the basis for the decision.  (42 U.S.C. § 11112(b)(3)(D)(ii))  (Vesom Depo. at p. 44, l. 4-12, 19-23) (Ex. 37, RFA no. 37, 38) (Ex. 26)

III.    STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In applying this standard, the court must review the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)  (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Id.*  (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2505).

Defendants in this case bear the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  In attempting to meet that

standard, defendants do not bear the ultimate burden of persuasion at trial and need not negate the plaintiff's claim; rather, defendants need simply point out to the Court a lack of evidence for the other party on an essential element of plaintiff's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).

Once defendants have met this initial burden, the burden shifts to plaintiff to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256, 106 S. Ct. 2505;  *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment). Plaintiff may not simply rest upon his pleadings to satisfy this burden.  *Anderson*, 477 U.S. at 256, 106 S. Ct. 2505.  Rather, plaintiff must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the non-movant." *Adler*, 144 F.3d at 671.

Finally, summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex,* 477 U.S. at 327, 106 S. Ct. 2548; *Kester v. Shawnee Mission U.S.D. No. 512* (Case No. 01-CV-02476-CM, 8/15/05).

## IV.    QUESTIONS PRESENTED

A.    Whether Dr. Vesom's Complaint should be dismissed due to the express liability waiver he signed (Counts I – VI)?

B.    Whether a physician has an absolute right to medical staff privileges at a private hospital?

C.    Whether defendants are entitled to immunity from liability under K.S.A. § 65-442(a) (Counts I-VI)?

D.    Whether plaintiff has established discrimination based upon race (Counts I-III)?

E.    Whether plaintiff has stated a *prima facie* claim under 42 U.S.C. § 1981 (Count I)?

F.  Whether plaintiff has stated a *prima facie* claim under 42 U.S.C. § 2000d (Count II)?

G.  Whether 42 U.S.C. § 2000d permits a claim against individuals?

H.  Whether plaintiff has stated a *prima facie* claim under 42 U.S.C. § 1985(3) (Count III)?

I.  Whether plaintiff has stated a *prima facie* claim of public policy whistle-blower retaliation under Kansas Law (Count V)?

J.  Whether the defendants are entitled to immunity under HCQIA so as to shield the defendants from Dr. Vesom's Sherman Antitrust Act claim (Count IV), whistle-blower protection claim (Count V), and claim for intentional interference with business relationships (Count VI)?

K.  Whether the MEC's recommendations were proper peer review activity under HCQIA?

L.  Whether plaintiff has stated a *prima facie* claim the Sherman Antitrust Act (Count IV)?

M.  Whether plaintiff has stated a *prima facie* claim for intentional interference with business relationships (Count VI)?

N.  Whether plaintiff has failed to exhaust his administrative remedies for review of the report to the National Practitioner Data Bank (non-monetary claims)?

O.  Whether plaintiff has failed to establish recoverable damages?

P.  Whether there is any evidence of lack of good faith or malice to present a question of material fact to a jury?

## V.  ARGUMENT AND AUTHORITIES[7]

### A.  Dr. Vesom Has Expressly Waived Each of His Claims

On December 15, 2002, Dr. Vesom signed a document entitled "**AUTHORITY AND LIABILITY WAIVER**" ("Waiver").  Ex. 7; Statement of Uncontroverted Facts ("Facts") at 186-193, 196-198.  Dr. Vesom signed the Waiver and returned it along with his application for reappointment of medical staff privileges to AHA.  Facts, ¶ 196.  According to the express language of the Waiver, Dr. Vesom waived his rights and "*agree[d] to hold harmless such*

---

[7] This section extended to forty (40) pages.  See Doc. #156.

*President, Board or Committees evaluating [his] application from any claim or action by or on [his] behalf in the event such application for reappointment is denied for any reason*." (Emphasis added)  Ex. 7; Facts, ¶ 197.  Based upon the express language of the Waiver, Dr. Vesom has agreed to hold AHA and the other defendants harmless from claims arising from the reappointment process.  Liability waivers and liability limitations clauses are generally enforceable in Kansas.  The court should enforce the liability Waiver in this case.

Dr. Vesom clearly understood the significance of the liability Waiver.  He routinely signs such liability waivers as part of each application for medical staff privileges he submits and has repeated the procedure with each reapplication process.  Facts at 188, 198.  It was clearly the intent of the parties to waive any liability for the application for reappointment which was occurring contemporaneously with the submission of the reappointment application.  The purpose of the liability Waiver is expressed in clear and unequivocal language and accompanied the Application for Reappointment of medical staff privileges.  Less than thirty (30) days after Dr. Vesom signed the liability Waiver, the MEC began review of his credentials file.  The submission of the liability Waiver was an integral part of the reappointment process and the Waiver applied to reappointment being considered at the time of submission -- not some future, distant, unspecified or unanticipated claim.  Facts at ¶ 186-199.  As such, the liability Waiver should operate to bar each of the claims Dr. Vesom has brought against these defendants because his claims arise out of the denial of his application for reappointment.

Several recent cases have upheld exculpatory or hold harmless clauses contained in applications submitted to professional organizations in conjunction with a health care provider's request for certification.  In *American Registry of Radiologic Technologists v. McClellan*, No. 3:00-CV-2577-K, 2003 U.S. Dist. LEXIS 3222 (N.D. Tex. March 5, 2003), presented with a

91

release contained in a renewal application submitted to the American Registry of Radiologic Technologists ("ARRT"), the United States District Court for the District of Texas considered the viability of a counterclaim alleging defamation, breach of contract, tortious interference with business relationships, invasion of privacy, violation of the Fair Credit Reporting Act, violation of the Sherman Act, deprivation of constitutional rights under 42 U.S.C. § 1983 and wrongful injunction. *Id*. at *3. The release stated that McClellan "hereby waive[s] and release[s], and shall indemnify and hold harmless, the ARRT" from any and all claims that arise or are alleged to have arisen out of or in connection with any action that ARRT fails to take as a result of or in connection with the application or "ARRT's revocation of any certificate previously issued." *Id*. at *4-5. Citing Texas law upholding agreements not to sue, and rejecting the proposition that a release may not encompass unknown claims and damages that develop in the future, the court determined that all the claims asserted by McClellan were related to ARRT's revocation of his certificate and the reasons for that revocation, and were, therefore, barred by the exculpatory clause. *Id*. at *6-7. As the court explained, "McClellan contracted away his right to bring a claim against ARRT for *any action* that arose from the revocation of his certification." *Id*. at 7 (emphasis added).

A similar clause was upheld in *Balaklaw v. American Board of Anesthesiology, Inc*., 149 Misc. 2d 11, 562 N.Y.S.2d 360 (N.Y. 1990). The clause at issue stated that the applicant agrees "to hold [defendant test administrator] free from any damage or complaint by reason of any action that [it] take[s] in connection with . . . the failure of said [defendant] to issue [a] Certification." *Id*. at ¶ 1. In reviewing the enforceability of the clause, the New York Supreme Court found that the language was clear and unambiguous, and held that the "terms of the contract bar plaintiff's action," which involved a claim for compensation related to the

defendant's alleged deprivation of career advancement opportunities and money damages for mental anguish and embarrassment.  *Id*. at 13.

Two other recent cases have recognized the validity of exculpatory or hold harmless clauses under related circumstances.  *Sanjuan v. American Board of Psychiatry & Neurology*, 40 F.3d 247 (7th Cir. 1994), involved a clause stating, "I hereby release, discharge and exonerate the Board, its directors, officers, members, examiners, representatives and agents from any actions, suits, obligations, damages, claims or demands arising out of, or in connection with, this application . . . ."  *Id*. at 249.  The Seventh Circuit Court of Appeals explained the rationale behind such a clause as follows: "The need to turn down many applicants implies a substantial risk of retaliatory litigation by physicians who esteem their abilities more highly than does the Board."  *Id*.  Applying Illinois law enforcing covenants not to sue, the court found that as a private organization, the Board was entitled to set the rules of application and "is entitled to insist that applicants agree to a legal cease-fire."  *Id*.

In consideration of the Hospital's acceptance of his application, Dr. Vesom knowingly and voluntarily waived any liability that might arise from his submission of the application. Such exculpatory contracts should not be viewed as inherently void as contrary to the law.

### B.   Dr. Vesom Has No "Right" to be on the Medical Staff -- the Association With AHA is Appropriately Called a Medical Staff "Privilege"

The Bylaws provide that membership in the medical staff is a privilege which is only extended to physicians who meet the qualifications, standards and requirements set forth in the Bylaws.  Facts at 13, 16-25.  The Bylaws also establish the responsibilities of membership to the medical staff.  Facts at 23.  Failure to abide by the policies and conduct oneself in a professional, cooperative manner interferes with the mission of the Hospital and subjects the physician to limitations on his/her medical staff membership.  Facts at 43-45, 206-210.  The authority of the

medical staff to regulate its membership should not be limited, but instead should be judicially enforced.  *Moore v. Middlebrook*, 96 Fed. Appx. 634, 639, WL 928262 (10th Cir. 2004) (No property interest in medical staff privileges).  In Kansas, the statutory authority to select the professional staff members that it appoints or employs to provide medical care at its facility is conferred upon the Board of Trustees of the hospital:

> Boards of trustees or directors of facilities licensed pursuant to the provisions of this [hospital licensing] act shall have the right, in accordance with law, to select the professional staff members of such facilities . . ., and no rules and regulations or standards of the licensing agency shall be valid which, if enforced, would interfere in such selection . . . .

K.S.A. § 65-431(b).  The Hospital's "plenary power" to select its medical staff is not diminished by Dr. Vesom's claims of entitlement to continued medical staff privileges.

The Hospital's absolute right to select professional staff in accordance with K.S.A. § 65-431(b) was tested by a physician in the Kansas Supreme Court case of *Foote v. Cmty. Hosp. of Beloit,* 195 Kan. 385, 405 P.2d 423 (Kan. 1965).  In *Foote*, a physician brought a mandamus action to compel his admittance as a surgeon to the medical staff of a private, non-profit hospital.  *Id*. at 385-86.  The Court first looked to the language of section 65-431 and stated that "[t]he board of directors of a hospital is thus given plenary power to select its professional staff and the state has expressed a policy not to interfere with that selection."  *Id*. at 387.  In reaching its decision, the court noted, "It seems to be the practically unanimous opinion that **private hospitals have the *right* to exclude licensed physicians from the use of the hospital**, and that such exclusion rests within the sound discretion of the managing authorities."  *Id*. at 388.  (*Citing* 26 Am. Jur. *Hospitals and Asylums* § 9.) (emphasis supplied)[8]

---

[8] Ultimately in *Foote*, the court held that the recommendations of the medical staff were advisory only, that the hospital had the ultimate control over personnel decisions, and that the hospital had the discretion to not grant medical staff admission to the plaintiff.  *Id*.

94

The *Foote* decision was later discussed by the Kansas Court of Appeals in *Kansas ex rel. Walker v. Bergman,* 12 Kan. App. 2d 695, 755 P.2d 557 (1988).  Although *Bergman* involved an adult care home and not a private hospital and, therefore, was not subject to K.S.A. § 65-431, the court's reflection upon the rationale of the *Foote* decision is insightful.  Specifically, the court stated that "[t]he hospital's authority to select its staff reflects the liability it assumes for patient care" - such liability being that "a private hospital is bound to exercise toward a patient such reasonable care as his known condition may require, the degree of care being in proportion to his known physical and mental ailments."  *Id.* at 702 (citing *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 510 P.2d 190 (1973)).

The law is clear and unequivocal that Dr. Vesom had no *right* to an association with AHA.  Instead, Dr. Vesom was granted a medical privilege which automatically expired after the two (2) year appointment cycle and could only be extended by the AHA Board.  The AHA directors had the exclusive authority and discretion to decide whether a physician should be granted medical staff privileges and whether those medical privileges should be extended after any appointment expires.

### C.    The Defendants are Entitled to Immunity Under Kansas Law

Kansas law provides immunity from liability to the members of the MEC since they acted pursuant to written Bylaws approved by the Board of the Hospital:

> **Limited liability for medical care facilities and certain duly appointed officials thereof; good faith requirement**.  (a) There shall be no liability on the part of, and no action for damages shall arise against, any duly appointed member of the governing board or the duly appointed member of a committee of the medical staff of a licensed medical care facility for any act, statement or proceeding undertaken or performed within the scope of the functions and within the course of the performance of the duties of such committee of the medical staff if such member acted in good faith and without malice, and the medical staff operates pursuant to written bylaws that have been approved by the governing board of the medical care facility.

K.S.A. § 65-442(a).

The facts reveal that the individual defendants were duly appointed members of the MEC.  Pursuant to the Bylaws, the MEC conducted a meeting to review the reappointment application of Dr. Vesom.  There is no evidence to support a claim that any of the members of the MEC failed to act in good faith or acted with malice in carrying out the performance of their duties of the committee.  Therefore, there should be no liability against the individual members of the committee for their recommendation that the Hospital directors not reappoint Dr. Vesom to the medical staff; and no liability of AHA for its independent decision in this regard.[9]

This immunity statute was recently interpreted in the case of *Davis v. Hildyard*, 34 Kan. App. 2d 22, 113 P.3d 827 (June 17, 2005).  In *Davis*, the Court of Appeals affirmed the grant of summary judgment in favor of defendant doctors who had been sued for making what had been alleged to be false and defamatory statements about plaintiff physician at a medical staff meeting and at an emergency medical services meeting.  The court found that K.S.A. § 65-442 provides for a qualified privilege from liability for those statements made by any member of a medical staff committee, such as a peer review committee, in the furtherance of his or her duties, provided that those statements were made in good faith and without malice.  *Davis* at 830-831 (*citing Smith v. Farha*, 266 Kan. 991, 974 P.2d 563 (1999)).  The court recognized that immunity is granted in the peer review process in an effort to "encourage hospitals to actively engage in peer review of staff physicians."  *Davis* at 830 (*citing Lemuz v. Fieser*, 261 Kan. 936, 950, 933 P.2d 134 (1997)).  This legislation was enacted under the belief that with the threat of liability removed, the effective use of peer review would increase and be promoted.  *Id.*  After listing all the functions enumerated under the peer review statute, K.S.A. § 65-4915, the appeals court

---

[9] The statute states that it applies to "medical care facilities and certain duly appointed officials thereof."

agreed with the trial court's analysis that the statements were made "within the ambit of peer review," and therefore privileged.  The Court of Appeals also affirmed the trial court's grant of summary judgment because the plaintiff failed to offer clear and convincing evidence of an extrinsic character to prove actual malice on the part of the defendant on a qualifiedly privileged occasion.  *Id*. at 832.  In the *Davis* case, the court ultimately found no evidence of malice that would lift the cloak of protection for the privileged statements.  The same rationale which grants immunity to the individuals should be applied to grant immunity to AHA as a defendant in this case, since AHA only acted through its medical staff.  This Court should apply the Kansas Immunity Statute and grant summary judgment to all defendants as a matter of law.

### D.    There is No Evidence of Discrimination

Each of Dr. Vesom's allegations under Counts I, II and III have the common element that he alleges to be "denied staff privileges at the Hospital by defendants because of his race, Asian."  (*See* Complaint at ¶ 17; *see also* ¶ 24 and 26)  Plaintiff cannot establish a *prima facie* case because he has no evidence of intent to discriminate.  After the completion of extensive discovery, these allegations remain unsubstantiated, with no factual evidence to support these conclusory allegations.  Facts at ¶ 202-203, 219-221, 275, 280-282, 328-343.  By contrast, the defendants have articulated a legitimate non-discriminatory and non-retaliatory well documented basis for the decision not to reappoint Dr. Vesom to the AHA medical staff -- Dr. Vesom was a "disruptive physician" as defined in the Bylaws.  Plaintiff must be required to adduce evidence of discrimination based upon Dr. Vesom's race, or summary judgment is required.

Defendants question whether or not plaintiff has properly asserted a claim for "race" discrimination in the first place.  Plaintiff's allegations seem to fall more under the category of "national origin" rather than race.  Although plaintiff appears to use the terms interchangeably, he commonly refers to being from Thailand, rather than being part of any particular race or

culture.  Defendants have provided testimony that they were unaware of plaintiff's race or national origin and that neither classification was a factor in their decision.

### E.    Dr. Vesom Has Failed to State a § 1981 Claim (Count I)

42 U.S.C. § 1981 provides that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2001).  For purposes of § 1981, the phrase "'make and enforce contracts'" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b) (2001).

Therefore, "in order for a plaintiff to predicate an action on this section, he or she must have been deprived of a right which, under similar circumstances, would have been accorded to a person of a different race."[10]

More factually specific to the case at bar is *Van v. Anderson*, 199 F. Supp. 2d 550 (N.D. Tex. 2002), *aff'd Van v. Anderson*, No. 02-10421, 2003 WL 21017016 (5th Cir. Apr. 14, 2003). In *Van*, a Vietnamese cardiologist brought a § 1981 action against a hospital and individual physicians that participated in his peer review.  *Id*. at 555.  The plaintiff alleged he was denied medical staff privileges due to race and national origin discrimination in violation of § 1981.  *Id*. The defendants moved for summary judgment, claiming that the physician's § 1981 action failed as a matter of law.  *Id*.

In *Van*, the plaintiff contended the defendants had engaged in a conspiracy against him that impaired his ability to make and enforce contracts, including in relevant part his contracts

---

[10] 15 Am. Jur. 2d , *Civil Rights* § 28 (*citing Walker v. Couture*, 804 F. Supp. 1408 (D. Kan. 1992) (providing that a mixed-race family of campers failed to prove a lake facility manager's refusal to rent them a cabin for Memorial Day weekend violated § 1981, where, although the family subjectively believed they were victims of intentional racial discrimination, the manager was merely enforcing facility rules – that the rental units were reserved for local members on holiday weekends)).

CWDOCS 429590v1 :13728.422195

with the hospital for hospital privileges and his contracts with his patients.  *Id*. at 560.  The *Van*

Court ruled as a matter of law that the plaintiff had failed to state a § 1981 claim under any of the

foregoing bases.  *Id*. at 564-565.

The court referenced the hospital's Medical Staff Bylaws, which expressly stated that "no

member shall be entitled to or have a vested right of renewal of his membership and privileges . .

. and each shall be considered for the renewal as an 'ab initio' basis."  *Van*, 199 F. Supp. 2d at

563.  The court aptly noted that "although the various hospital committees, including the

[Medical] Executive Committee, were charged with making recommendations on a member's

reappointment . . . the final authority on this decision rested solely with the Hospital's Governing

Body."  *Id*. at 563-564.

Accordingly, the *Van* Court held that the hospital's medical staff bylaws did not create a

contract between the plaintiff and the hospital.  *Id*. at 555.  Moreover, the court stated that even if

a contract were found to exist, the defendants' actions, which included peer review and providing

the plaintiff with procedural due process, would not constitute a breach of any such contract.  *Id*.

at 565.  The court, therefore, ruled that the plaintiff's § 1981 claim failed as a matter of law.  *Id*.;

*see also Thompson v. Wise Gen. Hosp.*, 707 F. Supp. 849 (W.D. Va. 1989) (holding that the

action of a private hospital in allowing a black physician hospital privileges did not create a

contract between them, precluding the physician from recovering from the hospital under a

§ 1981 action).

The *Van* Court was also not persuaded by the plaintiff's assertion that the defendants had

interfered with the contracts with his patients.  *Van*, 199 F. Supp. 2d at 565.  With respect to this

issue, the plaintiff admitted that "he did not have an exclusive arrangement with any of his

patients, and that at any time, they could stop seeing him and start seeing any other doctor they

wished." *Id*.  The court, accordingly, ruled that the plaintiff could not prove that defendants'

"alleged actions interfered with his rights to 'make and enforce contracts' with his non-exclusive

patients." *Id*.

In the case at bar, Dr. Vesom has no *right* to privileges at AHA.  *See Foote, supra*.

Furthermore, AHA Bylaws specify that a licensed physician has *no* entitlement to privileges

merely because the physician has previously had privileges at AHA.  Although it is not clear

from Dr. Vesom's Complaint with whom he allegedly had a contractual relationship, he had no

contractual right to medical staff privileges at AHA.  As in *Van*, Dr. Vesom does not claim to

have exclusive contracts with his patients.  Moreover, the individual defendants in this case are

even one step further removed and have no ability to interfere "with his right to make and

enforce contracts."  As a result, Dr. Vesom's § 1981 claim (Count I) should be dismissed as a

matter of law as to all defendants.

For purposes of establishing his *prima facie* case, plaintiff must show that he is a

"minority-owned business;" that he attempted to contract for certain services with defendants;

that he was denied the right to contract for those services; and that such services remained

available or were awarded to others outside the protected class.  *See Jackson v. Montgomery*, 999

F.2d 547, 1993 WL 261876, at *2 (10th Cir. 1993) (setting forth *prima facie* elements for claim

of contract discrimination under section 1981); *Asbury v. Brougham*, 866 F.2d 1276, 1279-80

(setting forth similar elements of *prima facie* case for analogous claim of housing discrimination

under section 1982).  *See Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir.

1991) (to establish a *prima facie* case in a § 1981 contract discrimination case, plaintiff must

show that the contract was "eventually given to an individual who is not a member of [the

plaintiff's] protected class").

CWDOCS 429590v1 :13728.422195

Plaintiff has not identified any contracts that he was denied on the basis of his race. Without any evidence whatsoever of specific contracts, the jury would be left to speculate whether defendant had even awarded any contracts during the relevant time period for which plaintiffs would have been qualified and able to perform.

It is simply not sufficient for plaintiff merely to assert that he was generally denied contracts on the basis of his race. Although there are no cases directly on point, the caselaw in the context of employment law is analogous. *See Jones v. Unisys Corp.*, 54 F.3d 624, 631 (10th Cir. 1995) (affirming summary judgment for employer; plaintiff failed to establish *prima facie* case of discrimination because he "did not identify specific jobs to which he claims he should have been transferred nor present evidence he was qualified for such jobs"); *accord Mueller v. Greenlee Textron Inc.*, No. 93-1256, 1993 WL 312891, at *4 (7th Cir. Aug. 18, 1993) (affirming summary judgment for employer where plaintiff failed to present any evidence that there were actual job opportunities matching his qualifications; such information, if it existed, should have been available to plaintiff when he conducted discovery); *Madiedo v. Miami-Dade County*, No. 99-1422-CIV, 2000 WL 1763845, at *7 (S.D. Fla. June 1, 2000) (granting summary judgment for employer where plaintiff failed to identify any specific assignment she desired but did not receive; "[t]he bare allegation that [plaintiff] did not receive assignments she desired is insufficient to raise a material issue of fact as to whether the County discriminated against her"). Based on the authorities set forth above, it is clear that plaintiff cannot establish a *prima facie* case of discrimination based on the theory that defendants denied plaintiff a right to contract.

There are no contracts at issue here. Dr. Vesom has no contract with his patients, he has no contract with the individual physicians and he has no contract with AHA. *See Miller v. St. Alphonsus Regional Medical Center, Inc.*, Docket No. 28639, 2004 Opinion No. 6 (Sup. Ct. *Id.*,

February 6, 2004) (The Hospital's Bylaws did not confer any contractual right on physician.)
(*citing St. Mary's Hospital of Athens, Inc. v. Radiology Professional Corp.*, 421 S.E.2d 731, 736
(1992).

Summary judgment is appropriate because there is no evidence to establish his *prima
facie* case of discrimination and plaintiff has failed to demonstrate that the actions taken by
defendants were motivated, even in part, by racial animosity.  Therefore, summary judgment in
favor of defendants is appropriate.

### F.     Dr. Vesom Has Failed to State a § 2000d Claim (Count II)

The Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000d, prohibits the use of federal
funds in any fashion that furthers discrimination.  Specifically, § 2000d provides that, "[n]o
person in the United States shall, on the ground[s] of race . . . be excluded from participation in,
be denied the benefits of, or subjected to discrimination under any program or activity receiving
Federal Financial Assistance."  As set forth above in connection with plaintiffs' § 1981 claims,
no reasonable jury could infer from the facts presented in the record before the court that
defendants intentionally discriminated against plaintiff.  Discrimination requires an intentional
motive.  *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312 (1992).

Dr. Vesom must assert specific facts disputing the employer's motive for termination.
The *only* evidence disputing the defendants' motives comes from Dr. Vesom's own
unsubstantiated opinion.  Facts at ¶¶ 138-143, 146-149, 202, 203, 219-221, 275, 280-282,
328-343.  Dr. Vesom has no other evidence to substantiate his claim that the defendants decision
not to renew his staff privileges were because of his race.  There is simply no evidence in this
case to support the allegation that the defendants' reason for its recommendation is a mere cover
up or pretext for retaliation.  Instead, the evidence shows that it was plaintiff's well documented
disruptive behavior that led to the MEC's recommendation and the AHA Board's action.

### G.     The Claim Under 42 U.S.C. Title VI (Count II) is Not Viable Against the Individual Defendants

Title VI suits may only be brought against entities that receive federal funds, not against individual employees of such entities.  *Sims v. Unified Gov't. of Wyandotte Cty*, 120 F. Supp. 2d 938 (D. Kan. 2000); Civil Rights Act of 1964, § 601, 604; 42 U.S.C.A. §§ 2000d, 2000d-3. Although not all of the individual defendants are AHA employed physicians, they certainly are not the kind of defendants contemplated by 42 U.S.C. § 2000d.  Therefore, the individual physician defendants or "members of the MEC" should be dismissed from this action because Title VI does not apply to them individually.

### H.     Dr. Vesom Has Failed to State a § 1985(3) Claim (Count III)

Section 1985(3) states in relevant part:

> [i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.  42 U.S.C. § 1985(3)

In *Holmes v. Finney*, 631 F.2d 150 (10th Cir. 1980), the court stated that "Section 1985(3) . . . creates no rights.  It is purely remedial a statute, providing a civil cause of action when some otherwise defined federal right – to equal protection of the laws or equal privileges and immunities under the law – is breached by a conspiracy in the manner defined by the section." *Id*. at 154.  The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id*.  The *Holmes* Court, accordingly, stated that "[w]e feel that infringement of some federally protected right independent of § 1985(3) is required for a violation of the conspiracy statute to be demonstrated.  *Id*.

First, Kansas law dictates that Dr. Vesom had no *right* to privileges at AHA. Furthermore, AHA's Medical Staff Bylaws specifically provide that a licensed physician has *no* entitlement to privileges merely because the physician has previously had privileges at AHA. Facts at 6-25, 38-45.

Second, Dr. Vesom has not been denied the right to practice medicine is simply false. Dr. Vesom still has his medical license and may freely practice medicine at another hospital or health care facility in the state of Kansas.  Facts at ¶ 118-120, 123-125.  In *Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384 (10th Cir. 1988.), a physician brought due process claims as a result of a peer review investigation into his medical practice.  *Id.* 1385.  "Setliff's argument regarding his liberty interest [was] that he ha[d] such an interest in the practice of his profession and that the investigation effectively destroyed his ability to pursue his profession, thereby depriving him of liberty interest without due process."  *Id.*  The *Setliff* court upheld "[t]he district court[s] grant[] . . . of summary judgment, holding that Setliff failed to demonstrate the existence of a recognized property or liberty interest."  *Id.*

Dr. Vesom's § 1985(3) claim also fails because he cannot establish the existence of a conspiracy among two or more persons.  In *Atkins v. Boeing Company*, No. 91-1404, 1993 WL 186170 (D. Kan. May 5, 1993), *aff'd Atkins v. Boeing Company,* No. 93-3177, 1994 WL 274066 (10th Cir. June 14, 1994), the court held that "[u]nder the 'intracorporate conspiracy' theory, a corporation cannot conspire with it own *agents*. . . ."  *Id.* at *9. (emphasis supplied.) The *Atkins* court further noted that "[i]t is the basic law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Id.*

104

The individual defendants in this case, Drs. Thomas, Goracke and Swayze, were members of the MEC, the committee charged with the responsibility of reviewing physicians applications for the reappointment of privileges.  When these defendants reviewed and ultimately made their recommendation to the Board concerning Dr. Vesom's application for reappointment, they were engaged in a protected peer review function of AHA.  In this function, Drs. Thomas, Goracke and Swayze were acting as administrators for AHA and, therefore, their acts are the acts of an agent of AHA.  Under the intracorporate conspiracy theory, there is no conspiracy and summary judgment should be granted in favor of defendants on Dr. Vesom's § 1985(3) claim (Count III).

I.    **Plaintiff Does Not Establish a *Prima Facie* Case of Public Policy Whistle-Blower Protection**

Plaintiff asks the Court to recognize a new cause of action in this case because no such claim exists in healthcare law since Dr. Vesom is not an employee of AHA.  The facts do not establish a *prima facie* case of retaliation in violation of public policy as to the Hospital or the individual physician defendants.  In Kansas, the elements of retaliatory discharge for whistle-blowing/reporting illegal conduct in an employment law case are well established.  In the employment law case, the plaintiff must prove that:

> (1) . . . a reasonably prudent person would have concluded that the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, (2) that the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee, and (3) that the employee was discharged in retaliation for making the report.

*Zinn v. McKune*, 949 F. Supp. 1530, 1537 (D. Kan. 1996).  S*ee also Herman v. Western Financial Corp.*, 254 Kan. 870, 881, 869 P.2d 696, 704 (1994); *Goodman v. Wesley Medical Center*, 276 Kan. 586, 78 P.3d 817 (2003); *Glover v. NMC Home Care, Inc.*, 106 F. Supp. 2d

105

1151 (D. Kan. 2000); *Parsells v. Manhattan Radiology Group*, 255 F. Supp. 2d 1217 (D. Kan. 2003).

     Kansas public policy does not, however, extend whistle-blower protection to persons outside the employer/employee relationship.[11]  Because Dr. Vesom was not in an employee/employer relationship with the defendants, he cannot claim whistle-blower protection. In Kansas, the tort of whistle-blower retaliation "is an excepti*on* to the Kansas employment-at-will doctrine."  *Zinn v. McKune*, 949 F. Supp. 1530, 1537–38 (D. Kan. 1996) (emphasis added). The tort does not exist in Kansas outside that context.  As the *Zinn* court points out, the focus of Kansas whistle-blower protection is "on the wrongful conduct of the entity with the power to terminate the employee," that is, the employer.  *Id*. at 1538.  In denying relief to the non-employee plaintiff, the *Zinn* court concluded that "the Kansas Supreme Court would not extend the tort of whistle-blower retaliation" to a non-employee.  *Id*.  Since *Zinn*, Kansas courts have not extended whistle-blower protection beyond the employee/employer relationship.  As a non-employee, Dr. Vesom cannot claim that the defendants violated Kansas public policy, because Kansas whistle-blower protection does not apply in this situation.

     Furthermore, Kansas public policy does not extend whistle-blower protection to independent contractors.  In *Parsells v. Manhattan Radiology Group, L.L.P.*, the court noted that a "clear majority of cases . . . have held that whistleblower protection does not extend to independent contractors."  255 F. Supp. 2d 1217, 1236–37 (D. Kan. 2003).  Because the *Parsells* court was unaware of any Kansas authority showing that Kansas would extend whistle-blower protection to an independent contractor, it refused to entertain an independent contractor plaintiff's whistle-blower claim unless she provided the court with such authority.  *Id*.

---

[11] Even the statutory protection only intends to protect "employees."  *See* K.S.A. § 65-4928.

CWDOCS 429590v1 :13728.422195

Even if the Court were to fashion a new cause of action for whistle-blowing in the medical staff relationship, reports of the kind that Dr. Vesom made, dealing with the internal operations of AHA, (i.e., issues of specialty care) are not the kind of "whistle-blowing" that Kansas law has contemplated -- in the employment law relationship.  The Complaint does not allege that the defendants retaliated against Dr. Vesom because they reasonably believed that he had reported activities that he believed to be in violation of rules, regulations or the law pertaining to public health, safety, and general welfare -- a required element to state a *prima facie* case of whistle-blowing in an employment law case.  *Klein v. Univ. of Med. and Dentistry of N.J.*, No. 93070-03, 2005 WL 901433 (N.J. Super. Ct. App. Div., April 20, 2005) ("Merely couching complaints in terms of broad-brush allegation of a threat to patients' safety is insufficient").  Furthermore, the evidence establishes that the defendants were not even aware that a KDHE complaint had been filed by Dr. Vesom.  The KDHE merely made an unannounced visit to the Hospital on March 4, 2003 -- <u>after</u> the MEC had met and had made its recommendation to the Board.

Furthermore, following *Polson v. Davis*, 895 F.2d 705 (10th Cir. 1990), plaintiff's unique "whistle-blowing" claim also is preempted[12] by the other causes of action in the Complaint.  The Tenth Circuit in *Polson* held that the Kansas Supreme Court would adopt the view that an adequate alternative remedy precludes a common-law retaliatory discharge action.  *Polson*, 895 F.2d at 709.  The fact that plaintiff is unable to satisfy his burdens of proof under Counts I-IV does not mean that the remedy is inadequate.

Dr. Vesom has argued that the causal connection between the protected activity (reporting to KDHE) and adverse action (non-reappointment) is satisfied by the close proximity

---

[12] The defendants argument could also be considered as one for preclusion.  *See Flenker v. Willamette Indus., Inc.*, 266 Kan. 198, 202, 967 P.2d 295, 299 (1998) (noting the difference between preemption and the alternative remedies doctrine, referenced sometimes as preclusion).

in time between notification of the complaints by Dr. Ware, Dr. Tayiem and Dr. Vesom to the

Board and the MEC's vote.  Once again, although the caselaw does not directly apply to the

medical staff relationship, this Court may draw on its experiences in employment law cases.

Close temporal proximity between the protected conduct and an adverse employment action is

insufficient to raise an issue of fact regarding pretext.  *Robinson v. Wilson Concrete Co.*, 913 F.

Supp. 1476, 1484 (D. Kan. 1996); *Lay v. Horizon/CMS Healthcare Corp.*, 60 F. Supp. 2d 1234

(D. Kan. 1999); *Tran v. Trustees of the State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th

Cir. 2004).  Plaintiff alleges that the "actions of defendants which resulted in the denial of Dr.

Vesom's staff privileges at the Hospital were undertaken in retaliation for his reports of

professional incompetence at the Hospital."  (Complaint at ¶ 33)  The burden should rest with the

plaintiff to prove that the defendants' decision was in response to, or was motivated by, his

"reports of professional incompetence."  Dr. Vesom must prove more than timing.

　　　Following the employment law analogy, to establish this burden, the plaintiff must

produce clear and convincing evidence to support his claim.  *Ortega v. IBP, Inc.*, 255 Kan. 513,

528, 874 P.2d 1188 (1994).  Specifically, the evidence must be "certain, unambiguous and plain

to the understanding" as well as "reasonable and persuasive enough to cause the trier of fact to

believe it."  *Id*.  The plaintiff cannot rely on speculation or conjecture to carry his burden.

　　　In this case, the defendants rely on the well documented evidence that Dr. Vesom was a

"disruptive physician."  The Board's decision not to reappoint plaintiff because he was a

disruptive physician is a legitimate, non-retaliatory reason for defendants' actions.  Moreover,

plaintiff cannot cloak himself in protection simply because he has engaged in what he believes to

be protected activity.  *See, e.g., Calder v. TCI Cablevision of Missouri, Inc.*, 298 F.3d 723, 731

(8th Cir. 2003) (holding that the filing of a complaint for discrimination does not "clothe [the plaintiff] with immunity for past and present inadequacies and unsatisfactory performance").

### J.   Defendants Have HCQIA Immunity Against Dr. Vesom's Non-Civil Rights Claims

HCQIA was enacted because Congress determined that the threat of liability and lawsuits brought by physicians displeased with peer review was discouraging effective peer review.  *See* 42 U.S.C. § 11101.  Congress recognized that the best, if not the only effective, way to protect the public from incompetent, irresponsible, and dangerous doctors, was to encourage peer review by hospitals and the physicians on their staffs.  *Id.*  Congress concluded that "[t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review."  *Id.*  Professional reviews meeting HCQIA standards immunize the participants from damages under all federal and state laws except for civil rights laws.  42 U.S.C. § 11111(a)(1).  *Hancock v. Blue Cross-Blue Shield of Kansas, Inc.*, 21 F.3d 373, 374 (1994); *Decker v. JHC Hospitals, Inc.*, 982 F.2d 433, 436 (1992).

A professional review action will be presumed to have met the standards necessary for immunity to attach unless the presumption is rebutted by a preponderance of the evidence.  42 U.S.C. § 11112(a):

> The HCQIA places a high burden on physicians to demonstrate that a professional review action should not be afforded immunity.  42 U.S.C. § 11112(a).  In fact, an action is presumptively immune if it was made 'in the reasonable belief that the action was in furtherance of quality health care.'  42 U.S.C. § 11112(a).  This test will be satisfied 'if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'  H.R. Rep. No. 99-903 at 10, reprinted in 1986 U.S.C.C.A.N. at 6393; 42 U.S.C. § 11112(a).

*Gordon v. Lewistown Hosp.*, 423 F.3d 184, No. 03-3370 at 25-26 (3d Cir. Sept. 12, 2005).

The presumption of immunity shifts the burden of proof to plaintiff to establish that the professional review process was unreasonable and thus did not meet the standard for immunity. (*See* Court's Orders, Docs. #135 and 153); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, No. 03-3370 at 25-26 (3d Cir. Sept. 12, 2005).  *See also Matthews v. Lancaster General Hosp.*, 87 F.3d 624, 633 (3d Cir. 1996); and *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 388 (3d Cir. 1999).

Throughout this litigation, plaintiff attempts to equate professional *competence* with professional *conduct*.  Dr. Vesom defends his action by pointing to the fact that he has not been the subject of a malpractice action and, therefore, his level of professional competence is beyond reproach.  The professional review action engaged in by AHA was not critical of Dr. Vesom's *competence*.  It was the extensive pattern of disruptive professional conduct that led the professional review body to the conclusion that it was Dr. Vesom's conduct which "could affect adversely the health or welfare of a patient or patients."  42 U.S.C. § 11151(g).  *See Gordon v. Lewistown Hosp.*, 423 F.3d 184, No. 03-3370 at 27 (3d Cir., Sept. 12, 2005) ("such unprofessional conduct on the part of a physician is within the purview of a 'professional review action' under the HCQIA").  Other courts have applied immunity in circumstances where a physician's unprofessional "conduct" was an issue in the challenged professional review actions. *See, e.g., Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 835 (3d Cir. 1999) (affirming summary judgment in favor of Hospital afforded HCQIA immunity for peer review decisions involving a surgeon characterized as "a disruptive force in the hospital"); *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1324 (11th Cir. 1994) (granting immunity when physician's privileges revoked for inappropriate and unprofessional behavior stemming from his "being a volcanic-tempered perfectionist, a difficult man with whom to work, and a person who regularly viewed it

110

as his obligation to criticize staff members at [the Hospital] for perceived incompetence or inefficiency," some of which occurred in front of patients about to undergo surgery); *Morgan v. PeaceHealth, Inc.*, 14 P.3d 773 (Wash. Ct. App. 2000) (upholding immunity when physician's privileges suspended for sexual harassment and inappropriate behavior with patients); *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461 (6th Cir. 2003) (upholding immunity when physician's reappointment denied because of failure to timely disclose disciplinary actions in another state, personality problem and various incidents of disruptive behavior); *Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026 (4th Cir. 1994) (affirming district court order granting summary judgment to hospital where physician's reappointment to staff denied on basis of hospital's conclusion that his professional activities did not meet standard of care, he was deficient in his record keeping, patient management, and work relationships with health care professionals at the hospital).

### K.   The Medical Executive Committee's Recommendation and the Board's Ultimate Decision Not to Reappoint Were Proper "Peer Review" Activity Under HCQIA

The threshold issue is whether the activity complained about meets the definitions of a "professional review body" and a "professional review action" and is, accordingly, within HCQIA's operative terms.[13]  The term "professional review body" is defined as "a *health care entity* and the *governing bod*y or any *committee* of a health care entity which conducts professional review activity, and includes any *committee* of the medical staff of an entity when assisting the governing body in a professional review activity."  42 U.S.C. § 11151(11) (emphasis supplied)

The term "professional review action" is defined in HCQIA as follows:

---

[13] With any challenge to the applicability of immunity to a professional review action, the burden is on the physician to overcome the presumption that the Hospital was engaged in a professional review action.  42 U.S.C. § 11112.

> [A]n *action* or *recommendation* of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or *professional conduct* of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician.

42 U.S.C. § 11151(9) (emphasis supplied); *see generally Gabaldoni v. Washington County Hosp. Ass'n*, 250 F.3d 255 (4th Cir. 2001) (holding that an announcement of a change in a physician's status was inherently part of the "professional review action" protected by HCQIA); *Meyers*, 82 F. Supp. 2d 707 (holding that a hospital's board of trustees decision to deny a physician's application for reappointment of privileges constituted "professional review action" under HCQIA. Additionally, the term "professional review activity" is defined as any activity of a health care entity to change or modify a physician's privileges or membership. 42 U.S.C. § 11151(10)(c).

According to Dr. Vesom's Complaint, the review activity and/or action complained of is the recommendation by the MEC not to grant him privileges and, presumably, the decision by AHA's Board to do the same. The MEC's recommendation and the Board's ultimate decision fall squarely within the protections of operative HCQIA terms. More specifically, the denial of privileges resulted from "professional review action" under HCQIA. Likewise, the individual defendants in this case that served on the MEC and made the recommendation to deny reappoint to the Board, were "professional review bodies" under HCQIA. These facts are further evidenced by AHA's Medical Staff Bylaws, which state that "[a]ll committees of the medical staff shall be considered peer review committees. . . ." Facts at 86. As a result, defendants are individuals qualified for immunity under HCQIA.

Dr. Vesom's Sherman Antitrust Act claim (Count IV),[14] whistle-blower claim (Count V), and claim for intentional interference with business relationships (Count VI), fall within the scope of the immunity afforded under HCQIA.  *See Wieters v. Roper Hosp., Inc.*, No. 01-2433, 2003 WL 550327 (4th Cir. Feb. 27, 2003) (ruling that a hospital was immune under HCQIA from a whistle-blower claim); *Austin v. McNamar*a, 979 F.2d 728 (9th Cir. 1992) (holding that HCQIA applies to antitrust claims);  *Meyers*, 82 F. Supp.2d 707 (providing immunity under HCQIA from antitrust violation claims); *Gordon v. Lewistown Hosp.*, 714 A.2d 539 (Pa. Commw. Ct. 1998) (providing immunity under HCQIA from a tortious interference claim).

To obtain immunity under HCQIA, the professional review action must have been taken:

(1)     in the reasonable belief that the action was in the furtherance of quality
        health care;
(2)     after a reasonable effort to obtain the facts of the matter;
(3)     after adequate notice and hearing procedures are afforded to the physician
        involved or after such other procedures as are fair to the physician under
        the circumstances; and
(4)     in the reasonable belief that the action was warranted by the facts known
        after such reasonable effort to obtain the facts and after meeting the
        requirement [of adequate notice and hearing procedures.]

42 U.S.C. §11112 (a).

HCQIA includes an express statutory presumption of compliance with its requirements for immunity.  42 U.S.C. § 11112(a).  The presumption language in HCQIA operates to shift the burden to Dr. Vesom to prove that the process in this case did not meet the conditions precedent to immunity.  *Bryan*, 33 F.3d at 1333.  The presumption can only be rebutted by a preponderance of the evidence.  42 U.S.C. § 11112(a).  As set forth below, each of the four (4) conditions of HCQIA immunity has been satisfied.

---

[14] The immunity provided under HCQIA specifically includes protection from "Federal antitrust law."  *See* 42 U.S.C. § 11101(4).

1.      **The Executive Committee's Recommendation and the Board's Decision Not to Reappoint Dr. Vesom's Privileges Were Based Upon the Reasonable Belief That the Action was in the Furtherance of Quality Health Care**

The record contains a plethora of evidence that Dr. Vesom's disruptive conduct adversely affected the health and welfare of patients.  According to HCQIA, this is an objective standard applicable to the presumption of immunity, and when the action is undertaken "in the reasonable belief that the action was in the furtherance of quality health care," then the immunity attaches. 42 U.S.C. § 11112(a).  The "reasonable belief" requirement of the statute imposes an objective standard of performance, not a subjective standard of good faith.  *See Austin,* 979 F.2d at 734. Allegations of conspiracy, animosity, and bad faith are irrelevant.  *Bryan*, 33 F.3d at 1335; *see also Smith v. Ricks*, 31 F.3d 1478, 1486 (9th Cir. 1994).  The relevant intent is that of the Hospital in undertaking the action, not the subjective intent of the physician.  If HCQIA immunity hinged on the disruptive physician's subjective intent, every disruptive physician would claim that the unprofessional conduct being reviewed was intended in such a way to implicate one of the statutory exceptions to professional review action.  42 U.S.C. § 11112(a). The real issue is the sufficiency of the basis for the action taken.  *Id.*

This requirement of the immunity statute is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Id.*  The responsibility of this Court is to determine whether the standards of HCQIA were met, not to evaluate whether the physicians involved made the correct decision.  Even if Dr. Vesom could show that an incorrect peer review decision was made, "that does not meet the burden of contradicting the existence of a *reasonable belief* that they were furthering health care quality in

participating in the peer review process." *See Imperial v. Suburban Hosp. Ass'n,* 37 F.3d 1026,

1030 (4th Cir. 1994); *Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 843 (3d Cir. 1999).

Although defendants are presumed to have satisfied this immunity requirement, given the

facts of the case, defendants clearly had a proper factual basis for their respective decisions.  Dr.

Vesom was denied reappointment by the Board on the basis that he was a "disruptive" physician.

Facts at 120, 121, 200-211, 220, 226, 227.  In a modern hospital setting a disruptive physician

has no place.  *See generally Mahmoodina v. United Hosp. Ctr., Inc.*, 404 S.E. 2d 754 (W. Va.

1991).  "The disruptive practitioner is by definition, contentious, threatening, unreachable,

insulting, and frequently litigious.  *Id.*  He will not, or can not play by the rules, nor is he able to

relate to or work well with others. . . ."  *Id.*  Accordingly, denying, revoking or terminating a

physician's privileges based upon the physician being "disruptive" has been universally upheld

by the courts.  *See Freilich v. Bd. of Dir. of Upper Chesapeake Health Inc.*, 313 F.3d 205 (4th

Cir. 2002); *Bryan v. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318 (11th Cir. 1994); *Robbins v. Ong*,

452 F. Supp. 110 (S.D. Ga. 1978); *Bessman v. Powell*, 991 F. Supp. 830 (S.D. Tex. 1998);

*Manasra v. St. Francis Med. Ctr.*, 764 So.2d 295 (La. Ct. App. 2000); *Hagan v. Osteopathic

Gen. Hosp. of Rhode Island*, 232 A.2d 596 (R.I. 1967); *Gaenslen v. Bd. of Dir. of St. Mary's

Hosp. and Med. Ctr.*, 232 Cal. Rptr. 239 (Cal. Ct. App. 1985); *Bricker v. Sceva Speare Mem'l

Hosp.*, 281 A.2d 589 (N.H. 1971).

Dr. Vesom had exhibited a well documented pattern of disruptive conduct that violated

AHA's Medical Staff Bylaws.  Facts at 227, 249-254, 261, 262, 272, 281, 282, 325-335.  Dr.

Vesom's conduct included the failure to comply with AHA Bylaws, disruptive behavior in the

hospital, verbal attacks on individuals and AHA personnel that were personal, irrelevant, and

went beyond the bounds of fair professional conduct, and engaging in non-constructive criticism

addressed to recipients in such a way as to intimidate, undermine confidence, belittle, or imply stupidity or incompetence.

Dr. Vesom's behavior did not go unnoticed by the Fair Hearing Panel.  In Dr. Lierz's written report, as Chair of the Fair Hearing Panel, he specifically noted that Dr. Vesom's "own uncooperative, hostile and threatening behavior affected not only the function of the staff, physician colleagues and hospital, but also distracted from the business of the hospital in general."  In Dr. Klingler's Fair Hearing Panel Report, he noted that Dr. Vesom had failed to communicate with surgical colleagues concerning the care of patients thereby putting the patients in danger.  Dr. Klingler also stated that "[t]here appears to be an inability, or a lack of desire to adapt, reconcile or modify [Dr. Vesom's] behavior."  Finally, Dr. Wetzel reported that Dr. Vesom's conduct "placed patient care secondary to his own needs."  Facts at 253.  Furthermore, he noted that Dr. Vesom's failure to timely read EKG's "had the potential of patient care compromise."  Facts at 253.  Dr. Wetzel concluded by stating that AHA could not allow that kind of distraction and still provide quality services.  Facts at 254.

The Board agreed with the Fair Hearing Panel and the recommendation of the MEC and concluded that, because of Dr. Vesom's behavior, his presence at AHA was disruptive and interfered with the work of other AHA staff and/or employees.  The facts in this case demonstrate that the denial of Dr. Vesom's application for reappointment of privileges was prompted by the reasonable belief that doing so would promote quality health care.  Accordingly, defendants' concern for quality health care was reasonable and legitimate.

> **2.    The Decision To Not Reappoint Dr. Vesom to the Medical Staff Was Made After a Reasonable Effort to Obtain the Facts of the Matter**

The relevant inquiry under this HCQIA condition "is whether the totality of the process leading up to the Board's 'professional review action' . . . evidenced a reasonable effort to obtain

the facts of the matter." *Mathews v. Lancaster*, 87 F.2d 624, 637 (3d Cir. 1996).  *Donnell v. HCA Health Services of Kansas, Inc*., 29 Kan. App. 2d 426, 28 P.3d 420 (2001), further defines the scope of this condition.  In *Donnell*, a physician sued a hospital and certain individuals that had been involved in the investigation of the care the physician had provided to a deceased patient.  *Id*.  As a result of the investigation, the hospital terminated the physician's privileges.  *Id*. at 424.  For purposes of summary judgment, the *Donnell* Court accepted as true that the investigation into the physician was "sloppy" and/or "grossly negligent."  *Id*.  Although the court ultimately ruled that the defendants were entitled to immunity under state peer review statutes, it noted that it also believed the defendants were immune under HCQIA.  *Id*. at 432.  Therefore, as set forth in *Donnell,* even if the effort to obtain the facts of a particular matter are "sloppy" and/or "grossly negligent," HCQIA applies.

Given the presumption of compliance, together with the standard set forth in *Donnell*, this HCQIA condition has been satisfied.  The process began with the MEC's review and ultimate recommendation concerning Dr. Vesom's privileges to the Board.  The Fair Hearing Panel was thereafter formed and Dr. Vesom was given the opportunity to call, examine and cross-examine witnesses, present evidence and submit a written statement at the close of the Fair Hearing.  Thereafter, an Appeal of the Fair Hearing Panel's decision was heard by the Board itself, where Dr. Vesom and his attorney were given the opportunity to make an oral argument to the Board.  In light of the standard set forth above, the professional review action was taken after a reasonable effort to obtain the facts in this case.

### 3. The Decision Not to Reappoint Dr. Vesom to the Medical Staff Was Made After Adequate Notice and Hearing Procedures Had Been Provided

The decision concerning Dr. Vesom's privileges was made only after an abundance of procedural due process was provided to him.  Although adequate procedural due process under

the HCQIA is presumed, § 11112(b) sets forth the "safe harbor" conditions that if followed, the notice and hearing requirements are, as a matter of law, deemed to be adequate.  Each is discussed in turn below.

      **a.**      **Dr. Vesom was given Proper Notice of the Proposed Decision Not to Reappoint His Privileges**

Under § 11112(b)(1) of HCQIA, Dr. Vesom was entitled to receive:  1) notice of the proposed action to be taken against him; 2) the reasons for the proposed action; 3) a hearing on the proposed action, provided that he requested a hearing in not less than thirty (30) days; and 4) a summary of the rights that would be afforded to him at the hearing.  Dr. Vesom was advised of all these requirements.

In February of 2003, the MEC considered Dr. Vesom's application for the reappointment of privileges and ultimately concluded with the recommendation that the Board should not reappoint Dr. Vesom to the medical staff.  Facts at 218-225.  Consistent with HCQIA and AHA's Medical Staff Bylaws, Virgil Bourne, President and CEO of AHA, notified Dr. Vesom by letter dated February 18, 2003, of the adverse recommendation.  Facts at 227.  Also included within the February 18, 2003, written notice to Dr. Vesom, were the reasons for the proposed action, notice that Dr. Vesom had the right to request a Fair Hearing on the proposed action, and notice that he had thirty (30) days to request a Fair Hearing, and a summary of the rights that would be afforded to him in the Fair Hearing.  Facts at 228.

      **b.**      **Dr. Vesom Was Given Proper Notice of the Fair Hearing**

Under § 11112(b)(2) of HCQIA, once Dr. Vesom requested a hearing, he was entitled to be given notice of the time, place, and date of the hearing, such date to be not less than thirty (30) days after the date of the notice, and a list of witnesses that were expected to testify at the hearing.

By Dr. Vesom's March 6, 2003, letter, he requested a Fair Hearing on the proposed denial of the reappointment of his privileges.  By letter dated March 18, 2003, AHA gave written notice to Dr. Vesom of the place, time and date of the Fair Hearing.  Facts at 230.  The Fair Hearing was originally scheduled for April 17, 2003, which was not less than the thirty (30) days after the date of the notice.  Thereafter, due to Dr. Vesom's objection to the composition of the Fair Hearing Panel and a subsequent emergency by one of the proposed panel members, the Fair Hearing was continued two separate times from its originally scheduled date, until January 22, 2004.  Facts at 231-236, 244.  By letters dated March 18, 2003, May 1, 2003, July 22, 2003 and December 18, 2003, Dr. Vesom was provided with complete notice of the Fair Hearing, including being advised of the witnesses that were expected to testify at the Fair Hearing.  Facts at 230-240.  It is important to note that Dr. Vesom retained his status as an active medical staff member pending the completion of the Fair Hearing process.

### c.      Dr. Vesom was given a Proper Fair Hearing

Pursuant to § 11112(B)(3)(A), AHA selected a five-member Fair Hearing Panel to review the adverse action recommended by the MEC.  Facts at 241-264.  Dr. Vesom was given the opportunity to object to the members selected for the panel.  Dr. Vesom's counsel made objections on such grounds to the composition of the initial Panel.  Pursuant to Dr. Vesom's objections, preliminary changes were made in the panel composition and, after several continuances, a hearing was scheduled for January 22, 2004.

Although neither required under AHA's Medical Staff Bylaws nor HCQIA, on June 5, 2003, AHA provided Dr. Vesom's counsel with all of the written exhibits that were going to (and were) used to support the charges against Dr. Vesom at the Fair Hearing.  Facts at 233.  Another copy of all exhibits was provided on January 9, 2004.  This is further evidence of the abundance

of due process that was afforded to Dr. Vesom, which was beyond that required by AHA's Medical Staff Bylaws or HCQIA.  Facts at 237.

Pursuant to and in compliance with § 11112(b)(c) of HCQIA, Dr. Vesom was represented by counsel at the Fair Hearing, was allowed to call and examine witnesses, introduce any relevant evidence including exhibits, question witnesses, challenge any witness, rebut any evidence, make a record of the hearing and to submit a written statement at the close of the hearing.  Facts at 238-246.

Pursuant to § 11112(b)(3)(D) of HCQIA, Dr. Vesom had the right and did receive the written report dated January 28, 2004, of the Chair of the Fair Hearing Panel, Mark F. Lierz, M.D.  Additionally, Dr. Vesom received three (3) separate written reports from other Fair Hearing Panel members.  These included an undated report from Dr. Boch-Kunz, a January 26, 2004 report from Dr. Klingler, and Dr. Wetzel's January 25, 2004 report.  Facts at 347-363.

Although not required by HCQIA, Dr. Vesom was afforded an Appeal of the Fair Hearing Panel's decision directly to the Board.  Dr. Vesom submitted a written appeal to the Board.  (Ex. 24)  The Appeal was conducted on March 25, 2004.  Dr. Vesom was represented by legal counsel at the appeal and was allowed oral argument before the Board.  On April 2, 2004, the Board issued its written decision and, based upon the MEC's recommendation and the findings of the Fair Hearing Panel, denied Dr. Vesom's application for reappointment of privileges at AHA.  Dr. Vesom was provided with the written decision from the Board.  Until the Board's final decision on April 2, 2004, Dr. Vesom's privileges at AHA had remained active throughout the Fair Hearing and Appeal.

       **d.**       **The Denial of Dr. Vesom's Privileges at AHA Was Done With the Reasonable Belief That it Was Warranted by the Facts Known**

HCQIA grants broad discretion to hospital boards with respect to staff privileges decisions.  Accordingly, and "as in all procedural due process cases, the role of the federal court on review of such actions is not to substitute [its] judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges."  *Bryan*, 33 F.3d at 1337 (quoting *Shahawy v. Harrisson*, 875 F.2d 1529, 1533 (11th Cir. 1989)).  Dr. Vesom's history of behavior problems at AHA is well documented.  The Board certainly had a factual basis for its action.  Given the presumption in favor of defendants, there should be no question that the Board had a reasonable belief that it should not reappoint Dr. Vesom to the medical staff.

Courts have consistently granted summary judgment to defendants when HCQIA immunity has been asserted and there is objective evidence of compliance with HCQIA standards, and the Court should grant summary judgment here.  *See*, *e.g*., *Lee v. Trinity Lutheran Hosp.*, No. 04-1553 (8th Cir. May 24, 2005); *Fox v. Parma Community Gen. Hosp.*, No. 84428, 2005 WL 793235 (Ohio Ct. App., Apr. 7, 2005); *Angelico v. Lehigh Valley Hosp., Inc.*, 85 Fed. Appx. 308, 2004 WL 75383 (3rd Cir., Pa.); *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 843 (3d Cir. 1999); *Pamintuan v. Nanticoke Mem'l Hosp., Inc.*, 192 F.3d 378, 388-90 (3d Cir. 1999); *Meyers v. Logan Mem'l Hosp.*, 82 F. Supp. 2d 707, 716-17 (W.D. Ky. 2000); *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 44 (D. Mass. 1997).  The same should apply here.

**L.     Dr. Vesom Has Failed to State a Sherman Antitrust Act Claim (Count IV)**

Dr. Vesom contends that the defendants "entered into an agreement and conspiracy to fabricate reasons for refusing to continue Vesom's staff privileges at the Hospital . . . [in order] to unreasonably [restrain] trade by preventing or restraining Vesom from practicing medicine in the community of Atchison."  (Complaint at ¶ 11, 28)  Dr. Vesom alleges that as a result of defendants' unlawful conspiracy, "defendants Thomas, Goracke and Swayze [economically]

gained unlawfully by forcing patients who would otherwise utilize the professional services of Vesom to use the less qualified, non-board-certified physicians on the Hospital's staff for medical treatment in the Atchison community."  (Complaint at ¶ 29)  Defendants actions are exempt from federal antitrust laws under the doctrine of state action.  *Marrese v. Interqual, Inc.*, 748 F.2d 373 (1984).

When analyzing plaintiff's antitrust claim, the Court should apply "the rule of reason" analysis and examine the alleged restraint's impact on competitive conditions.  Summary judgment should be granted because plaintiff was not denied hospital privileges for anticompetitive reasons.  *Everhart v. Stormont Hospital and Training School*, 1982 WL 1833 (D. Kan.) (where plaintiff's staff privileges were denied because plaintiff's personality was considered unsuited for staff membership).  The denial of staff privileges is not a plainly anticompetitive activity.  Denying staff privileges to a physician through peer review on the basis that the physician's conduct is unprofessional and inappropriate is not an activity likely to have predominantly anti-competitive effects such that the per se treatment is necessary.  *Tarabishi v. McAlester Regional Hosp.*, 951 F.2d 1558, 1571 (10th Cir. 1991) (There was no evidence, apart from the peer review process, that a conspiracy existed).  Plaintiff has also failed to satisfy the next factor under the rule of reason test, which is to establish that defendants possess market power in the relevant markets.  Patients have a choice when it comes to a choice of medical providers.  Dr. Vesom also has a choice when it comes to hospital privileges.  Dr. Vesom could have continued to maintain his independent medical practice and utilize his privileges at Horton or Cushing to admit patients when necessary.  Furthermore, it is MAC, not defendants, that benefited from Dr. Vesom's departure.

At its heart, the HCQIA was intended to deter anti-trust suits by disciplined physicians. *Gordon v. Lewistown Hosp.*, 423 F.3d 184, No. 03-3370 at 24 (3d Cir. Sept. 12, 2005) (*citing Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 633 (3d Cir. 1996).

Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.  To establish a violation of Section 1, a plaintiff must prove:  (1) concerted actions by the defendants; (2) that the concerted actions produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted actions.  *Diaz v. Farley*, 215 F.3d 1175 (10th Cir. 2000); *McKenzie v. Mercy Hosp. of Independence, Kan.*, 854 F.2d 365 (10th Cir. 1988).  Without proof of all of these elements, a Section 1 claim cannot be maintained.  *Wahi v. Charleston Area Medical Center*, 2004 WL *6, 2418316 (S.D. W.Va.).  The allegations cannot be either vague or conclusory, and the plaintiff must give some details of the time, place and effect of the conspiracy upon interstate commerce.  *Jadali v. Alamance Regional Medical Center*, 225 F.R.D. 181, 184 (2004).

The essence of a Section 1 claim is the existence of an agreement.  AHA acted independently in undertaking its professional review actions.  Simple unilateral action or "*Ua alone*" does not support liability; there must be a "unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, No. 03-3370 at 33-34 (3d Cir. Sept. 12, 2005) (*citing Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1131, which quotes *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).  Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff.  Accordingly, it requires proof of

123

a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator. Several courts have rejected antitrust actions. *Arnett Physician Group, P.C. v. Greater Lafayette Health Servs., Inc.*, No. 4:05-CV-00016-AS (N.D. Ind., July 29, 2005). (*See also* antitrust immunity granted by K.S.A. § 65-4929.)

Summary judgment in favor of the Hospital and the defendants is appropriate on Dr. Vesom's antitrust claims since there is no genuine issue of material fact regarding the plaintiff's failure to prove each of the essential elements of this claim.

### M.   Dr. Vesom Has Failed to State a Claim for Intentional Interference With Plaintiff's Business Relationships (Count VI)

Under Kansas law, the requirements for a cause of action for tortious interference with a prospective business advantage or relationship are:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986); *L&M Enterprises, Inc. v. BEI Sensors & Systems Co.*, 231 F.3d 1284 (10th Cir. 2000) ("unsupported conclusory allegations thus do not create a genuine issue of fact"); *DP-Tek, Inc. v. AT&T Global*, 891 F. Supp. 1510, 1520 (D. Kan. 1995).

In determining whether the defendants' conduct is improper, the following factors should be considered:

> (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties.

*Turner*, 240 Kan. at 14.

Plaintiff has failed to establish the essential elements of his claim.  There is no business relationship or expectancy between Dr. Vesom and his patients.  There was no conduct, other than privileged actions of the professional review body, and no intentional conduct can be imputed to defendants.  *Joshi v. St. Luke's Episcopal-Presbyterian*, WL 1554486 (Mo. App. E.D.2004).

**N.      Dr. Vesom Failed to Exhaust His Administrative Remedies With Regard to Requesting a Review of the Report to the National Practitioner Data Bank**

To accomplish the purpose of the HCQIA, Congress authorized the Department of Health & Human Services ("DHHS") to maintain the National Practitioner's Data Bank ("NPDB").  42 U.S.C. § 11133, et seq.  The NPDB is a database that contains information related to the professional performances of medical doctors.  *Doe v. Thompson*, 332 F. Supp. 2d 124, 126 (D.D.C. Aug. 17, 2004).  Specifically, the NPDB contains records of reports which detail any professional review actions that adversely affect the clinical privileges of a physician for a period longer than thirty (30) days.  45 C.F.R. 60.5(c) and 60.9(a)(1)(i).  AHA was required to report adverse actions on clinical privileges to the Kansas Board of Medical Examiners and the NPDB. 45 C.F.R. 60.9(a)(1) and 60.9(b).  The scope of the information to be reported is set out in the regulations.  45 C.F.R. 60.9(a)(3).  Failure to report can result in sanctions, including public censure and waiver of HCQIA immunity provisions for three (3) years.  45 C.F.R. 60.9(c).

AHA reported the objective facts related to the denial of clinical privileges to the NPDB on April 9, 2004, as required by law.  Plaintiff alleges that this "has resulted in a *false report* to the Kansas Board of Healing Arts and the National Practitioner Data Bank that Vesom lacks the credentials to be afforded staff privileges."  (Complaint at ¶ 10)  (emphasis added)

125

The regulations provide that DHHS will routinely mail a copy of the NPDB report to the physician.  45 C.F.R. 60.14(a).  Plaintiff's response was posted on the NPDB report and he was sent a copy.  However, plaintiff did not follow all of the procedures available for disputing information contained in the NPDB report.  45 C.F.R. 60.14(b).  Under these regulations, plaintiff may place the report in "disputed" status and seek a review of the report by the Secretary of DHHS.  45 C.F.R. 60.14(b)(2).  Although the report was placed in "disputed" status, there is no evidence in the record to establish that the plaintiff applied for "secretarial review" of the report under the procedures established by the DHHS regulations.  As a result, plaintiff did not exhaust his administrative remedies for challenging information in the NPDB.  Therefore, the plaintiff's claims as they relate to any request to modify or expunge the NPDB report are barred by the sixty (60) day limitations period.  45 C.F.R. 60.14(b).  Additionally, since it was mandated that AHA report the change of clinical privileges, the defendants ask that the Court enter judgment in their favor, finding as a matter of law that AHA was statutorily justified in reporting the professional review action and that the information reported complied with the objective criteria required by 45 C.F.R. 60.9 and, therefore, does not constitute a "false report."

### O.   Plaintiff Has Failed to Establish Recoverable Damages

#### 1.   Any Claims Based Upon Conduct Occurring Prior to 2003 Would be Time-Barred

Dr. Vesom's claim for "lost compensation" damages between fiscal years 1999 and 2003 should be precluded because any claims the plaintiff may make related to conduct that occurred prior to 2003 would be time-barred and would involve conduct prior to the precipitating event that adversely impacted his credentials.  Claims of such conduct under § 1367, Title VI, § 1983, and § 1985 would be governed and barred by the Kansas two-year statute of limitations set forth in K.S.A. 60-513.  *Crosswhite v. Brown*, 424 F.2d 495, 496 & n.2 (10th Cir. 1970); *Reynolds v.*

*Sch. Dist. No. 1*, 69 F.3d 1523, 1533 n.12 (10th Cir. 1995); *Laurino v. Tate*, 220 F.3d 1213, 1218

(10th Cir. 2000); *see also Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993) (holding

that claims accrue under federal law when a plaintiff knows or should know that his or her

constitutional rights have been violated) (citations omitted).   Any state-law and other claims

would be similarly time-barred, as well as waived, as the plaintiff alleges that he knew of his

alleged "disputes" with AHA in the early-1990s--more than ten (10) years ago. (Krueger Aff. at

2)

        **2.**       **Any Claims Arising Prior to 2003 Would be Prohibited by the Authority and Liability Waiver**

Any claims related to pre-2003 conduct would also be barred by the Authority and

Liability Waiver executed by plaintiff.   In signing the Waiver in December of 2002, plaintiff

specifically agreed to waive and hold defendants harmless from *any claim or action* in the event

his application for reappointment is denied for any reason.   This Waiver is equally enforceable to

foreclose any claims based upon conduct which is alleged to have occurred **prior** to the date of

submission of the Waiver on December 12, 2002.   Hence, the purported disputes upon which Dr.

Krueger relies in estimating the plaintiff's "lost compensation" damages between fiscal years

1999 and 2003 are precluded and should not be permitted to survive summary judgment.   *See*

*Adeduntan v. Hosp. Auth. of Clarke County*, No. 3:04-CV-65 (M.D. Ga. August 25, 2005).

        **3.**       **Plaintiff Has Failed to Establish Any Economic Loss**

The economic reality is that plaintiff is making more money after departing from the

Atchison community.   Plaintiff makes a salary of $375,000.00 plus the opportunity for

"additional compensation" under his employment contract with Poplar Bluff Regional Medical

Center.   (Ex. 39)   This is greater than the compensation he received in the years prior to his

departure from Atchison.   An essential element of any *prima facie* case is that plaintiff suffered

damages as a result of defendants' alleged actions.  Since plaintiff cannot establish that he has

sustained economic damages, summary judgment must be granted in favor of defendants.

>    **P.     There is No Evidence of Lack of Good Faith or Malice to Present a Question
>           of Material Fact for a Jury**

One theme repeated throughout each of these claims is that plaintiff must show lack of

good faith or malice as an integral part of his cause of action.  For example, a claim of tortious

interference with a contract is predicated upon malicious conduct by the defendant.  *Burcham v.*

*Unison Bancorp*, 276 Kan. 393, 425, 77 P.3d 130 (2003); *L&M Enterprises, Inc. v. BEI Sensors*

*& Systems Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000).  Malice is defined as "a state of mind

characterized by an intent to do a harmful act without reasonable justification or excuse."  (PIK

3d, 103.05)  The uncontroverted facts do not establish lack of good faith or malice in this case.

Furthermore, the facts and the law establish that the defendants were justified and acted in

exceptional circumstances which provide a lawful excuse and which excludes actual or legal

malice.  *Id.*  Where no issue of material fact is put forth to establish by clear and convincing

evidence an extrinsic character to prove actual malice on the part of the defendants, summary

judgment is appropriate.  *Davis v. Hildyard*, 34 Kan. App. 2d 22, ,113 P.3d 827 (2005); *C. Lloyd*

*v. Quorum Health Resources, L.L.C.*, 31 Kan. App. 2d 943, 77 P.3d 993 (2003) (Finding

summary judgment appropriate in case involving torts of defamation and tortious interference

with contractual relations).

Dr. Vesom cannot escape the ramifications of his conduct by relying upon theories that

attempt to attribute malicious intent where none exists.  Dr. Vesom ignores the fact that, at all

levels of the process, his conduct was found to adversely affect patient health or welfare.  Under

the law, this Court should not substitute its judgment for that of the health care professionals, the

Fair Hearing Panel, or the governing body of the Hospital as to whether Dr. Vesom's conduct could have an adverse impact on patient health or welfare.

## VI.     CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their Motion for Summary Judgment on all counts in Dr. Vesom's Complaint.

Respectfully submitted,

LATHROP & GAGE L.C.

    s/ Mark A. Ferguson
Andrew R. Ramirez, KS #10947
Mark A. Ferguson, KS #14843
Thomas V. Murray, KS #07591
Building 82, Suite 1000
10851 Mastin Boulevard
Overland Park, KS  66210-1669
Telephone:  (913) 451-5100
Telecopier:   (913) 451-0875

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2005, a copy of the foregoing Defendants' Memorandum in Support of Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

    s/ Mark A. Ferguson
An Attorney for Defendants

CWDOCS 429590v1 :13728.422195