# AFFIDAVIT OF RYAN THOMAS, M.D.

STATE OF KANSAS     )
                             ) ss.
COUNTY OF ATCHISON  )

      Ryan Thomas, M.D., being of lawful age, personally appears, being first duly

sworn, and on personal knowledge states as follows:

     1.      My name is Ryan Thomas, M.D. I am a board certified family practitioner

with obstetrical privileges. I have been practicing medicine and have lived and worked in

the Atchison community since 1995.

     2.      I was employed by the Atchison Hospital Association ("AHA" or

"Hospital") until September of 2003. Currently, I am a self-employed physician, but

have an association with the Hospital through my "medical staff privilege" which has

been conferred upon me by the Governing Board of the Hospital according to the AHA

Medical Staff Bylaws. [*See generally*, AHA Medical Staff Bylaws, Article XI, Sec. 1.]

In this capacity, I am not an employee of AHA; nor is Dr. Vesom an employee of AHA.

     3.      I understand that my association with AHA, referred to as a "medical staff

privilege," is a privilege, not a "right," to which I have an absolute entitlement. AHA

Medical Staff Bylaws provide that no physician is entitled to privileges at AHA merely

because they are licensed to practice medicine and have had previous medical staff

privileges at AHA. [AHA Medical Staff Bylaws, Article XI, Sec. 3, Exhibit N.]

     4.      Attached hereto is a list of all of my medical staff appointments during my

association with AHA. [Schedule A.] I am a former chief of staff of AHA and have been

a member of the medical staff at AHA for over eight (8) years.

Exhibit HH

DEPOSITION
EXHIBIT
1
2·28·05 RC
HOSTETLER

5.      The AHA Medical Staff Bylaws provide that physicians are initially appointed medical staff privileges at AHA for a two (2) year period. [AHA Medical Staff Bylaws, Appendix A, Sec. 4(h).] All physicians wanting to maintain medical staff privileges at AHA after the two (2) year period expires are required to file an application for the reappointment of medical staff privileges. [AHA Medical Staff Bylaws, Appendix A, Sec. 5.]

6.      Like every other physician who is granted privileges at AHA, I am required to reapply for hospital privileges every two (2) years. I was last granted privileges at Atchison Hospital Association ("AHA") in 2003 and am due for consideration and reappointment in July of 2005.

7.      In 2003, I served on the Medical Executive Committee ("EC") of AHA. The AHA Medical Staff Bylaws provide that the EC shall "consist of three (3) General Officers of the Medical Staff, the immediate past Chief of Staff and a 'member at large' elected from the Active Medical Staff . . . ." [AHA Medical Staff Bylaws, Article VIII, Sec. 2.] I served on the EC in the position of Past Chief of Staff.

8.      The role of the EC is principally to review physicians for the appointment and reappointment of medical staff privileges. The EC's authority is specifically limited, however, "to making recommendations to the governing board, as such actions are not binding until approved by the governing board." [AHA Medical Staff Bylaws, Article VIII, Section 2.] In essence, the EC is an advisory body and does not have the authority to take binding action. All formal action is taken by the Governing Board of the Hospital ("Board").

CWDOCS 392991v2 :13728.422195

9.    I am aware that I have been named as an individual defendant in Dr.

Vesom's lawsuit which is captioned *Pitt Vesom, M.D. v. Atchison Hospital Association,*

*Ryan Thomas, M.D., Douglas Goracke, M.D. and Donald Swayze, D.O.*; Case No.

04-2218 CM.  It is my understanding, based upon my review of Dr. Vesom's allegations,

that I have been sued in my official capacity as a member of the EC.

10.    I am aware that in the lawsuit that Dr. Vesom filed on May 18, 2004

against myself, AHA and Drs. Goracke, and Swayze, he alleges that our actions were

motivated because Dr. Vesom is Asian and because he had reported incidents that he

believed to constitute matters of professional incompetency within the peer review

statutes (K.S.A. § 65-2836(a) and 65-4921(f)).

11.    I am very familiar with the allegations that Pitt Vesom, M.D. has made

against AHA, myself and the other individual defendant physicians.  I categorically deny

the allegations made by Dr. Vesom in each of the six (6) Counts of his Complaint.  I

would deny these allegations whether or not I was an individual defendant in this lawsuit

because the allegations in his Complaint are not true.

12.    Through my service on the EC and the consideration of Dr. Vesom's

application for reappointment, I reviewed his credentials file and was made aware of

several incidents of "disruptive behavior" by Dr. Vesom.  Additionally, I am familiar

with the facts and circumstances leading up to the Board's independent decision not to

reappoint Dr. Vesom to the AHA medical staff.

13.    I have known Dr. Vesom since 1995.  I am aware of Dr. Vesom acting in

an unprofessional and/or disruptive fashion in several areas of the Hospital and I believe

this affected patient care adversely.  Some of these issues are from personal experience.

Others are from reports from various Hospital personnel during my tenure as Chief of Staff or Vice Chief of Staff. While I served as Chief of Staff, individuals would frequently pull me aside to complain about some behavior or interaction with Dr. Vesom. I always asked them to put their complaint in writing (as I did with any complaint I had against other doctors). Most of the time, the individuals would not follow through with this request so what the EC presented to the Fair Hearing Panel in support of its recommendation is just the "tip of the iceberg."

14.    Dr. Vesom is disrespectful of other physicians and undermines their authority with their patients, i.e. canceling all previous orders, telling patients that a certain doctor is not a good doctor, telling patients that if they go to a certain doctor he won't care for them, accusing me of being "racist" because I didn't put him in the position of ICU committee chairman, creating a false sense of division between Hospital employed physicians and non-employed physicians.

15.    Dr. Vesom intimidated nurses by yelling at them for questioning his orders, by questioning nurses on the obstetrics floor about any problems that may have occurred (one was intimidated to the point that she hid under a desk to avoid him), by hanging up on nurses, etc.

16.    Dr. Vesom treated patients inappropriately by transferring them inappropriately, by refusing to read stat EKG's, and on at least one occasion by refusing to come in when asked to care for a patient.

17.    Dr. Vesom often neglected obligations for committee meetings and patient care plan meetings. He often failed to show up to committee meetings, including the ICU

committee meetings that he was so angry about not chairing. I believe he attended nine (9) out of seventeen (17) executive meetings when he was on the EC.

18.    Having participated in the deliberations of the EC, I can truly and honestly state that the discussion of the EC about whether or not to recommend reappointment of Dr. Vesom to the AHA medical staff was based upon facts which the EC considered to have an affect on the quality of health care at the Hospital. Neither the deliberations nor the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence.

19.    I am not aware of any direct or indirect reference to Dr. Vesom's race by anyone during the EC's deliberations on his request for reappointment. In fact, I have never heard anyone at AHA, including other physicians, hospital administration, personnel, patients, or anyone else speak disparagingly about Dr. Vesom based upon his race.

20.    I am a Mexican American.

21.    Of course, as brought out during the consideration of Dr. Vesom's application for reappointment, I am aware that there have been numerous complaints made about Dr. Vesom. Those complaints served as the basis for the EC's recommendation and were discussed in detail. However, none of those incidents had any reference to Dr. Vesom's race or made racially derogatory remarks, unless made by Dr. Vesom himself, claiming that the actions of others were racially motivated.

22.    The first time I ever heard any issue related to Dr. Vesom's race come up was when Dr. Vesom himself raised the issue of "racism" with me.

-5-

CWDOCS 392991v2 :13728.422195

23. On February 12, 2002, I wrote Dr. Vesom a letter in my capacity as Chief of Staff. The purpose of the letter was to inform Dr. Vesom "of a decision to change ]his] position as Chairman of Intensive Care Unit." (*See* attached letter dated February 12, 2002.) The letter set forth the details of the telephone conversation I had with Dr. Vesom on January 8, 2002, the same day as the January EC meeting. The letter explained the basis for the EC's unanimous approval appointing Dina Seibert, D.O. as Chairman of the Intensive Care Unit.

24. In direct response to my letter dated February 12, 2002, Dr. Vesom wrote me a letter dated March 11, 2002 "regarding reassignment and removing [Dr. Vesom] as the Chairman of the Intensive Care Unit and reinstalling Dr. Dina Seibert, D.O. as Chairperson of the ICU Committees." (*See* letter dated March 11, 2002 attached hereto.) In the letter, Dr. Vesom took exception to the EC's removal of his chairmanship of the ICU and replacement of Dr. Seibert. Dr. Vesom attributed the EC's decision to "racial discrimination." Dr. Vesom specifically stated: ". . . Dr. Seibert was placed based on the fact that she is employed by the hospital and Caucasian. I am an Asian minority and could never hold the position of chairman in those regards. I will label you as RACIST." Therefore, it is Dr. Vesom who has made previous unfounded claims of racism when he has been dissatisfied or unhappy with a decision.

25. There is no merit to Dr. Vesom's allegations since the deliberation and decisions of the EC were not racially motivated or in retaliation for any complaints he made. Based upon my experiences with him, Dr. Vesom has exhibited a clear pattern of disruptive behavior and repeatedly refuses to take responsibility for his own actions. Therefore, claiming race discrimination and retaliation are not surprising, given his denial

-6-

and/or refusal to accept decisions that he disagrees with or the consequences of his actions.

26.     I am also aware that Dr. Vesom has alleged that the EC's recommendation was based upon the fact that Dr. Vesom had been critical of the quality of medicine being practiced at AHA and because he had raised issues about what he perceived as substandard care of patients treated by myself and the other individual defendant doctors. This allegation is also false and categorically denied.

27.     A confidential report was made to the Kansas Department of Health and Environment ("KDHE"). At the time that the EC met, the EC was not aware of the KDHE complaint. It was not until after this lawsuit was filed on May 18, 2004 that anyone new that Dr. Vesom was the source of the KDHE complaint, and only then because he alleges he was the source of the KDHE complaints in his lawsuit.

28.     The KDHE interviews were conducted in March of 2003 and the survey was completed on March 17, 2003.

29.     The EC met during January and February of 2003. The EC voted on February 18, 2003 to recommend that the Board not reappoint Dr. Vesom's medical staff privileges. The incidents of disruptive behavior considered by the EC all occurred prior to members of the EC being made aware of a KDHE complaint. At the time that the EC was considering Dr. Vesom's application for reappointment, there had not even been an investigation by the KDHE to determine whether or not there was "substandard care of patients." As a result, the EC's recommendation could not have been in retaliation for Dr. Vesom's KDHE reports.

-7-

30.     This is confirmed by the fact that Dr. Vesom admits in his Declaration at ¶ 5 that the maternity death that he was concerned about was investigated by the KDHE **"after"** he learned that his staff privileges would not be renewed and the KDHE issued its report.

31.     AHA Medical Staff Bylaws provide that "[a]ll committees of the Medical Staff shall be considered Peer Review Committees, as their primary function is to monitor and evaluate the quality and appropriateness of health care within the institution. Such is the responsibility delegated to the Medical Staff by the Governing Board." [AHA Medical Staff Bylaws, Article VIII, Sec. 1.]  Therefore, the EC was entitled to look at all aspects of the physician and evaluate if the physician's reappointment was in the best interest of the quality of patient care provided at the Hospital.

32.     In reaching its decision on whether to recommend reappointment of a physician to the medical staff, the EC reviews the "credentials file" of the physician in question and may consider the physicians behavior in the hospital, cooperation with medical and hospital personnel, general attitude towards patients, the hospital and its personnel, the physicians attendance at committee meetings and participation in staff duties, and compliance with AHA's Medical Staff Bylaws and Policies.  [AHA Medical Staff Bylaws, Appendix A, Sec. 5 (f).]

33.     AHA has a small Medical Staff and in order to provide quality care to patients, the physicians need to cooperate with other Hospital personnel.

34.     As part of Dr. Vesom's reappointment application process, the EC reviewed Dr. Vesom's application for the reappointment of privileges and the records

from his "credentials file" at AHA.  [*See* AHA medical staff Executive Committee's Fair Hearing Exhibits, Exhibit AA.]

35.     In a meeting conducted on February 18, 2003, the EC formally concluded and recommended to the Board that Dr. Vesom should not be reappointed to the medical staff at AHA, effective March 18, 2003.  [Exhibit BB.]

36.     As permitted in the AHA Medical Staff Bylaws, at Section 5(f), the members of the EC reviewed the "credentials file" of Dr. Vesom, considered the physician's behavior in the Hospital, including his ability to cooperate with medical and Hospital personnel, his general attitude towards patients, the Hospital and its personnel, the physician's attendance at committee meetings, and participation in staff duties as well as overall compliance with AHA's Medical Staff Bylaws and Policies.

37.     I concluded, after reviewing all of the relevant information, that Dr. Vesom was a "disruptive physician" and that his disruptive behavior adversely impacts the quality of patient care at AHA  As a result, the EC formally concluded and recommended to the Board that Dr. Vesom should not be reappointed to the medical staff at AHA, effective March 18, 2003.  The EC recommended that the Board allow Dr. Vesom to continue with privileges at AHA until he had a chance to exercise his Fair Hearing rights.

38.     Despite the EC's recommendation that Dr. Vesom not be reappointed to the medical staff, Dr. Vesom's privileges at AHA remained active pending the outcome of the Fair Hearing and the decision of the Board on Appeal.

CWDOCS 392991v2 :13728.422195

39.    The EC concluded that Dr. Vesom was a "disruptive physician" and was in violation of AHA's Bylaws on "disruptive behavior" and in violation for his failure to properly discharge his responsibilities for AHA staff, committee and hospital functions.

40.    AHA Medical Staff Bylaws provide that the Board has "the ultimate responsibility for the operation of the Hospital and for providing patient care." [AHA Medical Staff Bylaws, Preamble, Sec. 2.] The EC was only charged with making a recommendation to the Board. The Board would have the ultimate decision-making authority regarding Dr. Vesom's application for reappointment. In fact, in 1999 the EC recommended that the Board not appoint Dr. Vesom to the medical staff, but the Board voted to appoint him anyway.

41.    AHA's Medical Staff Bylaws provide for a Fair Hearing for physicians who are denied reappointment to the medical staff at AHA. [AHA Medical Staff Bylaws, Article XIII.] AHA's Fair Hearing procedure entitles a physician to one hearing and one appeal. [AHA Medical Staff Bylaws, Article XIII and Appendix C.]

42.    I am aware that Virgil Bourne, CEO of AHA at the time, advised Dr. Vesom of the EC's recommendation to the Board to not reappoint him for medical staff privileges. In Mr. Bourne's letter dated February 18, 2003, with which I agree, AHA advised Dr. Vesom of the specific reasons for the recommendation to deny reappointment, which were as follows:

> •     [Dr. Vesom's] failure to comply with Medical Staff Bylaws and Rules and Regulations; and
> •     [Dr. Vesom's] behavior in the hospital, which showed a lack of cooperation with medical and hospital personnel as it relates to patient care, and the orderly operation of AHA, and [his] general attitude toward AHA and its personnel; and

-10-

- [Dr. Vesom's] fail[ure] to discharge [his] responsibilities for Staff, Committee and Hospital functions for which [he] was responsible by staff category assignment, appointment, and election or otherwise; and
- [Dr. Vesom] engaged in verbal attacks on individuals and AHA personnel that were personal, irrelevant, and went beyond the bounds of fair professional conduct; and
- [Dr. Vesom] made impertinent and inappropriate comments in official documents, including the impugning of the quality of care in AHA and attacked particular individuals and AHA policies; and
- [Dr. Vesom] engaged in non-constructive criticism addressed to recipients in such a way as to intimidate, undermine confidence, belittle, or imply stupidity or incompetence and
- [Dr. Vesom] refused to accept Medical Staff assignments or participate in committee or departmental affairs on anything but [his] own terms, and did so in a disruptive manner; and
- [Dr. Vesom] made verbal threats of retribution and litigation towards individuals and AHA personnel including members of the Medical Staff; and
- [Dr. Vesom] used abusive language.

[Exhibit BB.]

43.   The recommendation made by the EC that Dr. Vesom not be reappointed to medical staff privileges at AHA was based upon legitimate, nondiscriminatory and nonretaliatory reasons.

44.   In the February 18, 2003 letter, AHA further advised Dr. Vesom that he had the right to a Fair Hearing if he requested one within thirty (30) days of his receipt of the letter. Dr. Vesom was also advised of the rights he would have at the Fair Hearing. [Exhibit BB.]

45.   On April 2, 2004, the Board issued its written decision and, based upon the EC's recommendation and the findings of the Fair Hearing panel, decided to not reappoint Dr. Vesom to the medical staff at AHA, effective April 2, 2004. Dr. Vesom was provided with the written decision from the Board. [Exhibit H.]

-11-

46.     As a member of the EC, I took my responsibility very seriously. I knew that it was extremely likely, based upon Dr. Vesom's prior conduct, that he would file a lawsuit against the Hospital, so I wanted to be sure that our recommendations were sound and based upon a thorough review of all of the issues and facts involved.

47.     After reviewing the credentials file and considering Dr. Vesom's history of "disruptive behavior," I felt that a decision not to reappoint Dr. Vesom to the Hospital's medical staff was warranted under the circumstances. Even knowing that a lawsuit was likely, the EC concluded that this recommendation was in the best interest of the Hospital and was in furtherance of the quality healthcare at the Hospital.

48.     All of the actions of the EC were taken with the reasonable belief that its actions were in the furtherance of the quality health care at the Hospital.

49.     The recommendation by the EC not to reappoint Dr. Vesom to the medical staff was not taken lightly. The recommendation was reached after a reasonable effort to obtain all the facts. Prior to a final decision being rendered by the Board, adequate notice and hearing procedures were afforded to Dr. Vesom. These procedures were fair to Dr. Vesom under the circumstances.

50.     The ultimate decision was made with the reasonable belief that the action was warranted by the facts known after deliberation and reasonable efforts to obtain the facts and after meeting the requirements of the notice and hearing procedures set forth in the AHA Medical Staff Bylaws.

51.     One (1) of the five (5) members of the EC was James W. Rider, M.D. Dr. Rider was in attendance at all of the Executive Committee meetings in which the EC discussed the application for reappointment of Dr. Vesom's hospital privileges.

-12-

52.    I have reviewed the Affidavit of Dr. Rider dated July 30, 2004.  Dr. Rider
submits the Affidavit in support of Dr. Vesom's lawsuit.  However, nowhere in Dr.
Rider's Affidavit does he allege that the deliberation and discussion of the EC regarding
the reappointment of Dr. Vesom's medical staff privileges was based upon race.  This is
because there was no discussion whatsoever regarding Dr. Vesom's race.  The entire
allegation of race discrimination is fabricated and there is no evidence to support this
claim.

53.    As Dr. Rider points out, there was some discussion regarding the way in
which Dr. Vesom worked with his fellow physicians.  I never expressed any anger toward
Dr. Vesom in front of Dr. Rider.  The prior conduct of Dr. Vesom was discussed by
members of the EC because it was relevant to the EC's consideration of Dr. Vesom's
application for reappointment to the medical staff.  The EC discussed these instances
because the method and manner in which Dr. Vesom interacted with his peers and voiced
his concerns and complaints was extremely disruptive.

54.    Any personal feelings I may have had about Dr. Vesom did not influence
my objective evaluation of his reappointment application.

55.    Dr. Vesom was extremely combative, threatening, disrespectful and
unwilling to discuss issues in a professional manner.  This was relevant because his
demeanor was consistent with his disruptive behavior with other physicians on our small
medical staff and Hospital personnel over the years I had known him.  The EC concluded
that Dr. Vesom had an unacceptable pattern of disruptive behavior at all levels within the
Hospital.

-13-

56.    If requested to provide a deposition or trial testimony, I would testify consistent with the facts stated above.

FURTHER AFFIANT SAYETH NOT.

_Ryan Thomas_

Ryan Thomas, M.D.


Subscribed and sworn to before me a notary public this ___2___ day of September, 2004.

_Phyllis E. Robbins_

Notary Public


My Commission expires:
1-29-2007



NOTARY PUBLIC - State of Kansas
PHYLLIS E. ROBBINS
My Appt. Exp. 1-29-2007

-14-

# Curriculum Vitae
# Ryan Thomas, M.D.

## Professional Address:

1400 N. Second St., Suite B
Atchison, KS 66002
Phone: (913) 367-2578
Fax: (913) 367-2589

## Home Address:

174 Deer Run
Atchison, KS 66002
Phone: (913) 367-6501
E-mail: ksudoc@sbcglobal.net

## Current Position:

| | |
|---|---|
| Family Practice- Clinic/Hospital, including obstetrics | 1995-2004 |
| Clinical Assistant Professor, Family & Community Medicine, University of Kansas School of Medicine-Wichita | 2001-2004 |

## Prior Positions:

| | |
|---|---|
| Chief of Staff, Atchison Hospital | 2001-2002 |
| Executive Committee Member, Atchison Hospital | 1997-2003 |
| Vice Chief of Staff, Atchison Hospital | 1999-2001 |
| Chief Resident, Wesley Family Practice | 1994-1995 |

## Memberships:

| | |
|---|---|
| American Academy of Family Physicians | 1989-2004 |
| Kansas Academy of Family Physicians | 1989-2004 |
| Kansas Medical Society | 1989-2004 |
| American Medical Association | 1989-2003 |

## Certification:

| | |
|---|---|
| American Board of Family Practice- Board Certified | 1995-2004 |
| Advanced Cardiac Life Support-Provider | 2004 |
| Neonatal Resuscitation Program-Provider | 2003 |

## Employment:

| | | |
|---|---|---|
| Self Employed | Thomas Family Practice | 2003-current |
| Atchison Medical Services Atchison, KS | - Family Practice | 1995-2003 |
| Wesley Medical Center Wichita, KS | - Emergency Physician | 1993-1995 |

## Education:

| School | Location | Years | Degree |
|---|---|---|---|
| University of Kansas School of Medicine-FP Residency | Wichita, KS | 1992-1995 | |
| University of Kansas School of Medicine | Kansas City, KS | 1988-1992 | M.D. |
| Kansas State University | Manhattan, KS | 1983-1987 | B.S. |