

## AFFIDAVIT OF DOUGLAS GORACKE, M.D.

STATE OF KANSAS        )
                       ) ss.
COUNTY OF ATCHISON     )

Douglas Goracke, M.D., being of lawful age, personally appears, being first duly sworn, and on personal knowledge states as follows:

1. My name is Douglas Goracke, M.D. I am a board certified anesthesiologist. I have been practicing medicine since 1989.

2. I have lived and worked in the Atchison community since 1992.

3. I am a self-employed physician, but have an association with the Atchison Hospital Association ("AHA" or "Hospital") through my "medical staff privilege" which has been conferred upon me by the Governing Board of the Hospital according to the AHA Medical Staff Bylaws. [*See generally*, AHA Medical Staff Bylaws, Article XI, Sec. 1.] In this capacity, I am not an employee of AHA; nor is Dr. Vesom an employee of AHA.

4. I understand that my association with AHA, referred to as a "medical staff privilege," is a privilege, not a "right," to which I have an absolute entitlement. AHA Medical Staff Bylaws provide that no physician is entitled to privileges at AHA merely because they are licensed to practice medicine and have had previous medical staff privileges at AHA. [AHA Medical Staff Bylaws, Article XI, Sec. 3, Exhibit N.]

5. I have held the following medical staff positions during my association with AHA: Chief of Medical Staff (1997-98, 2003); Vice Chief of Medical Staff (1995); Secretary/Treasurer Medical Staff Executive Committee (1994); Service Chairman Anesthesia (1993-2004); Risk Management Oversight Committee (1997-98, 2001, 2003),

CWDOCS 393794v3 :13728.422195            Exhibit II

#21

Performance Improvement Committee (1997-98, 2003); ICU Committee (2002); Medical Records Committee Chairman (2000); JCAHO Co-Liaison (1997); ICU Committee (1996); Medical Staff Development Committee (1995-96); and Quality Improvement Committee (1993).

6. I have been a member of the medical staff at AHA for twelve (12) years.

7. The AHA Medical Staff Bylaws provide that physicians are initially appointed medical staff privileges at AHA for a two (2) year period. [AHA Medical Staff Bylaws, Appendix A, Sec. 4(h).] All physicians wanting to maintain medical staff privileges at AHA after the two (2) year period expires are required to file an application for the reappointment of medical staff privileges. [AHA Medical Staff Bylaws, Appendix A, Sec. 5.]

8. Like every other physician who is granted privileges at AHA, I am required to reapply for hospital privileges every two (2) years. I was last granted privileges at Atchison Hospital Association ("AHA") in 2002 and am due for consideration and reappointment in October of 2004.

9. In 2003, I served on the Medical Executive Committee ("EC") of AHA. The AHA Medical Staff Bylaws provide that the EC shall "consist of three (3) General Officers of the Medical Staff, the immediate past Chief of Staff and a 'member at large' elected from the Active Medical Staff . . . ." [AHA Medical Staff Bylaws, Article VIII, Sec. 2.] I served on the EC in the position of Chief of Staff.

10. The role of the EC is principally to review physicians for the appointment and reappointment of medical staff privileges. The EC's authority is specifically limited, however, "to making recommendations to the governing board, as such actions are not

binding until approved by the governing board." [AHA Medical Staff Bylaws, Article VIII, Section 2.] In essence, the EC is an advisory body and does not have the authority to take binding action. All formal action is taken by the Governing Board of the Hospital ("Board").

11. I am aware that I have been named as an individual defendant in Dr. Vesom's lawsuit which is captioned *Pitt Vesom, M.D. v. Atchison Hospital Association, Ryan Thomas, M.D., Douglas Goracke, M.D. and Donald Swayze, D.O.*; Case No. 04-2218 CM. It is my understanding, based upon my review of Dr. Vesom's allegations, that I have been sued in my official capacity as a member of the EC.

12. I am aware that in the lawsuit that Dr. Vesom filed on May 18, 2004 against myself, AHA and Drs. Thomas, and Swayze, he alleges that our actions were motivated because Dr. Vesom is Asian and because he had reported incidents that he believed to constitute matters of professional incompetency within the peer review statutes (K.S.A. § 65-2836(a) and 65-4921(f)).

13. I am very familiar with the allegations that Pitt Vesom, M.D. has made against AHA, myself and the other individual defendant physicians. I categorically deny the allegations made by Dr. Vesom in each of the six (6) Counts of his Complaint. I would deny these allegations whether or not I was an individual defendant in this lawsuit because the allegations in his Complaint are not true.

14. Through my service on the EC and the consideration of Dr. Vesom's application for reappointment, I reviewed his credentials file and was made aware of several incidents of "disruptive behavior" by Dr. Vesom. Additionally, I am familiar

with the facts and circumstances leading up to the Board's independent decision not to reappoint Dr. Vesom to the AHA medical staff.

15. I have known Dr. Vesom since 1992. During these twelve (12) years, I have become familiar with Dr. Vesom and have had numerous personal and professional interactions with him. I am aware of his disruptive behavior.

16. Having participated in the deliberations of the EC, I can truly and honestly state that the discussion of the EC about whether or not to recommend reappointment of Dr. Vesom to the AHA medical staff was based upon facts which the EC considered to have an affect on the quality of health care at the Hospital. Neither the deliberations nor the ultimate decision to not recommend reappointment was motivated by Dr. Vesom's race or in retaliation for his reports of what he believed to be professional incompetence.

17. I am not aware of any direct or indirect reference to Dr. Vesom's race by anyone during the EC's deliberations on his request for reappointment. In fact, I have never heard anyone at AHA, including other physicians, hospital administration, personnel, patients, or anyone else speak disparagingly about Dr. Vesom based upon his race.

18. Of course, as brought out during the consideration of Dr. Vesom's application for reappointment, I am aware that there have been numerous complaints made about Dr. Vesom. Those complaints served as the basis for the EC's recommendation and were discussed in detail. However, none of those incidents had any reference to Dr. Vesom's race or made racially derogatory remarks, unless made by Dr. Vesom himself claiming that the actions of others were racially motivated.

CWDOCS 393794v3 :13728.422195

19. There is no merit to Dr. Vesom's allegations since the deliberation and decisions of the EC were not racially motivated or in retaliation for any complaints he made. Based upon my experiences with him, Dr. Vesom has exhibited a clear pattern of disruptive behavior and repeatedly refuses to take responsibility for his own actions. Therefore, claiming race discrimination and retaliation are not surprising, given his denial and/or refusal to accept decisions that he disagrees with or the consequences of his actions.

20. I am also aware that Dr. Vesom has alleged that the EC's recommendation was based upon the fact that Dr. Vesom had been critical of the quality of medicine being practiced at AHA and because he had raised issues about what he perceived as substandard care of patients treated by myself and the other individual defendant doctors. This allegation is also false and categorically denied.

21. It is true that Dr. Vesom was one of the three (3) doctors who documented several "complaints and recommendations" in a letter to Board Chair William Thornton on January 27, 2003. (Plaintiff's Exhibit 3 in Opposition to Defendants' Motion to Dismiss.)

22. Dr. Vesom was not the only physician who signed the letter. Dr. Vesom joined David R. Ware, M.D. and A.K. Tayiem, M.D. in signing the letter.

23. At the time that these "complaints and recommendations" were raised, I did not perceive these issues to be a personal complaint against me or a matter of "professional incompetency."

CWDOCS 393794v3 :13728.422195

24. Instead, the issues in the letter had more to do with issues of "specialty care." The issues involved related to directing patient care away from physicians with a "general" practice of medicine towards physicians who specialized in obstetrical care.

25. On January 3, 2003, a meeting occurred between Dr. Ware, Dr. Vesom, Dr. Tayiem, then CEO Virgil Bourne, and myself. It was Dr. Ware, not Dr. Vesom, who was vocal about expressing these issues. The letter dated January 27, 2003 contained Dr. Vesom's signature, but it was Dr. Ware who was advancing these recommendations at the January 3, 2003 meeting in an effort to increase the volume of patients he was treating.

26. I did not retaliate against Dr. Vesom for his support of Dr. Ware in raising these issues. Dr. Ware's issues of specialty care were addressed through normal channels and had nothing to do with the EC's decision not to recommend reappointment of his medical staff privileges.

27. The acts of disruptive behavior found in Dr. Vesom's credentials file, along with our other personal observations of his demeanor with other physicians and staff, led the EC to the conclusion that Dr. Vesom should not be recommended for reappointment.

28. A confidential report was made to the Kansas Department of Health and Environment ("KDHE"). At the time that the EC met, the EC was not aware of the KDHE complaint. It was not until after this lawsuit was filed on May 18, 2004 that anyone knew that Dr. Vesom was the source of the KDHE complaint, and only then because he alleges he was the source of the KDHE complaints in his lawsuit.

-6-

29. The KDHE interviews were conducted in March of 2003 and the survey was completed on March 17, 2003. This is confirmed by the fact that Dr. Vesom admits in his Declaration at ¶ 5 that the maternity death that he was concerned about was investigated by the KDHE **"after"** he learned that his staff privileges would not be renewed and the KDHE issued its report.

30. The EC met during January and February of 2003. The EC voted on February 18, 2003 to recommend that the Board not reappoint Dr. Vesom's medical staff privileges. The incidents of disruptive behavior considered by the EC all occurred prior to members of the EC being made aware of a KDHE complaint. At the time that the EC was considering Dr. Vesom's application for reappointment, there had not even been an investigation by the KDHE to determine whether or not there was "substandard care of patients." As a result, the EC's recommendation could not have been in retaliation for Dr. Vesom's KDHE reports.

31. AHA Medical Staff Bylaws provide that "[a]ll committees of the Medical Staff shall be considered Peer Review Committees, as their primary function is to monitor and evaluate the quality and appropriateness of health care within the institution. Such is the responsibility delegated to the Medical Staff by the Governing Board." [AHA Medical Staff Bylaws, Article VIII, Sec. 1.] Therefore, the EC was entitled to look at all aspects of the physician and evaluate if the physician's reappointment was in the best interest of the quality of patient care provided at the Hospital.

32. In reaching its decision on whether to recommend reappointment of a physician to the medical staff, the EC reviews the "credentials file" of the physician in question and may consider the physicians behavior in the hospital, cooperation with

medical and hospital personnel, general attitude towards patients, the hospital and its personnel, the physicians attendance at committee meetings and participation in staff duties, and compliance with AHA's Medical Staff Bylaws and Policies. [AHA Medical Staff Bylaws, Appendix A, Sec. 5 (f).]

33. As part of Dr. Vesom's reappointment application process, the EC reviewed Dr. Vesom's application for the reappointment of privileges and the records from his "credentials file" at AHA. [*See* AHA medical staff Executive Committee's Fair Hearing Exhibits, Exhibit AA.]

34. In a meeting conducted on February 18, 2003, the EC formally concluded and recommended to the Board that Dr. Vesom should not be reappointed to the medical staff at AHA, effective March 18, 2003. [Exhibit BB.]

35. As permitted in the AHA Medical Staff Bylaws, at Section 5(f), the members of the EC reviewed the "credentials file" of Dr. Vesom, considered the physician's behavior in the Hospital, including his ability to cooperate with medical and Hospital personnel, his general attitude towards patients, the Hospital and its personnel, the physician's attendance at committee meetings, and participation in staff duties as well as overall compliance with AHA's Medical Staff Bylaws and Policies.

36. At the time, AHA had a small medical staff of twenty (20) "Active" category members in a small community of 10,000 citizens. It is important to the quality of healthcare that the medical staff work in cooperation and concert with each other and not in conflict and constant discord.

37. Dr. Vesom had exhibited an unacceptable pattern of disruptive behavior. Nurses and physicians were spending so much time addressing his incidents of disruptive

-8-

behavior that it became a distraction and took an inordinate amount of time away from other important matters at the Hospital. The negativity and controversy associated with Dr. Vesom's presence was having a detrimental effect on the delivery of quality healthcare at the Hospital. It was these issues, not race or retaliation, that led to the EC recommendation.

38. I concluded, after reviewing all of the relevant information, that Dr. Vesom was a "disruptive physician" and that his disruptive behavior adversely impacts the quality of patient care at AHA. As a result, the EC formally concluded and recommended to the Board that Dr. Vesom should not be reappointed to the medical staff at AHA, effective March 18, 2003.

39. Despite the EC's recommendation that Dr. Vesom not be reappointed to the medical staff, Dr. Vesom's privileges at AHA remained active pending the outcome of the Fair Hearing and the decision of the Board on Appeal. The EC recommended that the Board not terminate Dr. Vesom's privileges until he had exhausted his Fair Hearing rights.

40. The EC concluded that Dr. Vesom was a "disruptive physician" and was in violation of AHA's Bylaws on "disruptive behavior" and in violation for his failure to properly discharge his responsibilities for AHA staff, committee and hospital functions.

41. AHA Medical Staff Bylaws provide that the Board has "the ultimate responsibility for the operation of the Hospital and for providing patient care." [AHA Medical Staff Bylaws, Preamble, Sec. 2.] The EC was only charged with making a recommendation to the Board. The Board would have the ultimate decision-making authority regarding Dr. Vesom's application for reappointment. In fact, in 1999 the EC

CWDOCS 393794v3 :13728.422195

recommended not to appoint Dr. Vesom to the medical staff, but at that time the Board voted to appoint him to the Medical Staff.

42. AHA's Medical Staff Bylaws provide for a Fair Hearing for physicians who are denied reappointment to the medical staff at AHA. [AHA Medical Staff Bylaws, Article XIII.] AHA's Fair Hearing procedure entitles a physician to one hearing and one appeal. [AHA Medical Staff Bylaws, Article XIII and Appendix C.]

43. I am aware that Virgil Bourne, CEO of AHA at the time, advised Dr. Vesom of the EC's recommendation to the Board to not reappoint him for medical staff privileges. In Mr. Bourne's letter dated February 18, 2003, with which I agree, AHA advised Dr. Vesom of the specific reasons for the recommendation to deny reappointment, which were as follows:

- [Dr. Vesom's] failure to comply with Medical Staff Bylaws and Rules and Regulations; and
- [Dr. Vesom's] behavior in the hospital, which showed a lack of cooperation with medical and hospital personnel as it relates to patient care, and the orderly operation of AHA, and [his] general attitude toward AHA and its personnel; and
- [Dr. Vesom's] fail[ure] to discharge [his] responsibilities for Staff, Committee and Hospital functions for which [he] was responsible by staff category assignment, appointment, and election or otherwise; and
- [Dr. Vesom] engaged in verbal attacks on individuals and AHA personnel that were personal, irrelevant, and went beyond the bounds of fair professional conduct; and
- [Dr. Vesom] made impertinent and inappropriate comments in official documents, including the impugning of the quality of care in AHA and attacked particular individuals and AHA policies; and
- [Dr. Vesom] engaged in non-constructive criticism addressed to recipients in such a way as to intimidate, undermine confidence, belittle, or imply stupidity or incompetence and
- [Dr. Vesom] refused to accept Medical Staff assignments or participate in committee or departmental affairs on anything but [his] own terms, and did so in a disruptive manner; and
- [Dr. Vesom] made verbal threats of retribution and litigation towards individuals and AHA personnel including members of the Medical Staff; and

-10-

- [Dr. Vesom] used abusive language.

[Exhibit BB.]

44. The recommendation made by the EC that Dr. Vesom not be reappointed to medical staff privileges at AHA was based upon legitimate, nondiscriminatory and nonretaliatory reasons.

45. In the February 18, 2003 letter, AHA further advised Dr. Vesom that he had the right to a Fair Hearing if he requested one within thirty (30) days of his receipt of the letter. Dr. Vesom was also advised of the rights he would have at the Fair Hearing. [Exhibit BB.]

46. On April 2, 2004, the Board issued its written decision and, based upon the EC's recommendation and the findings of the Fair Hearing panel, decided to not reappoint Dr. Vesom to the medical staff at AHA, effective April 2, 2004. Dr. Vesom was provided with the written decision from the Board. [Exhibit H.]

47. As a member of the EC, I took my responsibility very seriously. I knew that it was extremely likely, based upon Dr. Vesom's prior conduct, that he would file a lawsuit against the Hospital, so I wanted to be sure that our recommendations were sound and based upon a thorough review of all of the issues and facts involved.

48. After reviewing the credentials file and considering Dr. Vesom's history of "disruptive behavior," I felt that a decision not to reappoint Dr. Vesom to the Hospital's medical staff was warranted under the circumstances. Even knowing that a lawsuit was likely, the EC concluded that this recommendation was in the best interest of the Hospital and was in furtherance of the quality healthcare at the Hospital.

49. All of the actions of the EC were taken with the reasonable belief that its actions were in the furtherance of the quality health care at the Hospital.

-11-

50.  The recommendation by the EC not to reappoint Dr. Vesom to the medical staff was not taken lightly. The recommendation was reached after a reasonable effort to obtain all the facts. Prior to a final decision being rendered by the Board, adequate notice and hearing procedures were afforded to Dr. Vesom. These procedures were fair to Dr. Vesom under the circumstances.

51.  The ultimate decision was made with the reasonable belief that the action was warranted by the facts known after deliberation and reasonable efforts to obtain the facts and after meeting the requirements of the notice and hearing procedures set forth in the AHA Medical Staff Bylaws.

52.  One (1) of the five (5) members of the EC was James W. Rider, M.D. Dr. Rider was in attendance at all of the Executive Committee meetings in which the EC discussed the application for reappointment of Dr. Vesom's hospital privileges.

53.  I have reviewed the Affidavit of Dr. Rider dated July 30, 2004. Dr. Rider submits the Affidavit in support of Dr. Vesom's lawsuit. However, nowhere in Dr. Rider's Affidavit does he allege that the deliberation and discussion of the EC regarding the reappointment of Dr. Vesom's medical staff privileges was based upon race. This is because there was no discussion whatsoever regarding Dr. Vesom's race. The entire allegation of race discrimination is fabricated and there is no evidence to support this claim.

54.  As Dr. Rider points out, there was some discussion regarding the way in which Dr. Vesom worked with his fellow physicians. I never expressed any anger toward Dr. Vesom in front of Dr. Rider. The prior conduct of Dr. Vesom was discussed by members of the EC because it was relevant to the EC's consideration of Dr. Vesom's

CWDOCS 393794v3 :13728.422195

application for reappointment to the medical staff. The EC discussed these instances because the method and manner in which Dr. Vesom interacted with his peers and voiced his concerns and complaints was extremely disruptive.

55. Any personal feelings I may have had about Dr. Vesom did not influence my objective evaluation of his reappointment application.

56. Dr. Vesom was extremely combative, threatening, disrespectful and unwilling to discuss issues in a professional manner. This was relevant because his demeanor was consistent with his disruptive behavior with other physicians on our small medical staff and Hospital personnel over the years I had known him. The EC concluded that Dr. Vesom had an unacceptable pattern of disruptive behavior at all levels within the Hospital.

57. If requested to provide a deposition or trial testimony, I would testify consistent with the facts stated above.

FURTHER AFFIANT SAYETH NOT.

_____
Douglas Goracke, M.D.

Subscribed and sworn to before me a notary public this __2__ day of September, 2004.

_____
Notary Public

My Commission expires:

1-29-2007

NOTARY PUBLIC - State of Kansas
PHYLLIS E. ROBBINS
My Appt. Exp. 1-29-2007

# CURRICULUM VITAE

## DOUGLAS S. GORACKE, M.D.

**HOME ADDRESS:**  215 M Street
Atchison, Kansas 66002
(913) 367-1277

**PRIVATE PRACTICE:**  Atchison Hospital
Atchison, Kansas 66002
June 1992 – present

Ozark Anesthesia Associates
Springfield, Missouri
April 1991 – January 1992

Anesthesia & Critical Care Services, P.A.
Wichita, Kansas
July 1989 – January 1990

**RESIDENCY:**  Department of Anesthesia
University of Kansas Medical Center
Kansas City, Kansas  66103
July 1986 – July 1989

Rotations:  All major specialties and sub-specialties including training for extracorporeal shock wave lithotripsy, heart transplants and intraoperative radiation therapy.  Emphasis in the CA-3 year in pain management and obstetrical anesthesia.

**INTERNSHIP:**  Rotating Internship
Department of Anesthesia
University of Kansas Medical Center
Kansas City, Kansas  66103
July 1985 – July 1986

Rotations:  Neonatal Intensive Care Unit;
Cardiothoracic Intensive Care Unit;
Adult and Pediatric Cardiology
Pulmonary Medicine;
Emergency Medicine;
Neurology

Curriculum Vitae
Douglas S. Goracke, M.D.
Page 2

| | |
|---|---|
| **MEDICAL EDUCATION:** | University of Kansas<br>School of Medicine<br>Kansas City, Kansas 66103<br>1981 - 1985 |
| Honors: | Robert A. Chin Award in Recognition<br>of Academic and Clinical Excellence<br>in Anesthesiology |
| **UNDERGRADUATE EDUCATION:** | University of Kansas<br>Lawrence, Kansas 66045<br>1977 - 1981 |
| Honors and<br>Scholarships: | Beta Kappa Circle of Omicron Delta Kappa<br>Owl Society<br>Phi Delta Theta Foundation Scholarship<br>Slosson Science Research Scholarship<br>F.O. Kanehl Education Scholarship |
| **PERSONAL:** | Place of Birth:  Wichita, Kansas<br>Date of Birth:   11/24/58<br>Marital Status:  Single |
| **BOARDS:** | Board Certified by<br>American Board of Anesthesiology<br>October 12, 1990 |

# DOUGLAS GORACKE, MD - MEDICAL STAFF ASSIGNMENTS

1993  Service Chairman Anesthesia
      Quality Improvement Committee

1994  Secretary/Treasurer Medical Staff Executive Committee
      Service Chairman Anesthesia

1995  ViceChief of Medical Staff
      Service Chairman Anesthesia
      Medical Staff Development Committee

1996  Service Chairman Anesthesia
      ICU Committee
      Medical Staff Development Committee

1997  Chief of Medical Staff
      JCAHO Co-Liaison
      Service Chairman Anesthesia
      Risk Management Oversight Committee
      Performance Improvement Committee

1998  Chief of Medical Staff
      Service Chairman Anesthesia
      Risk Management Oversight Committee
      Performance Improvement Committee

1999  Immediate Past Chief of Staff
      Service Chairman Anesthesia

2000  Immediate Past Chief of Staff
      Service Chairman Anesthesia
      Medical Records Committee Chairman

2001  Service Chairman Anesthesia
      Risk Management Oversight

2002  Service Chairman Anesthesia
      ICU Committee

2003  Chief of Medical Staff
      Service Chairman Anesthesia
      Risk Management Oversight Committee
      Performance Improvement Committee

2004  Immediate Past Chief of Staff
      Service Chairman Anesthesia