IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY

PITT VESOM, M.D.,                    )
                                     )
        Plaintiff                    )
                                     )
vs.                                  )        Case No. 04-2218-CM
                                     )
ATCHISON HOSPITAL ASSOCIATION,  )
        et al.                       )
                                     )
        Defendants.                  )

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

/s/Charles D. Kugler
Charles D. Kugler Ks. No. 7031
748 Ann Avenue
Kansas City, KS 66101-3014
913-371-1930
FAX: 913-371-0147

/s/ Michael J. Gallagher
Michael J. Gallagher #70617
700 Peck's Plaza
1044 Main Street
Kansas City, MO 64105
(816) 471-4500
FAX:   (816) 221-7886

## TABLE OF CONTENTS

Plaintiff's Responses to Defendants Statement
      Of Uncontroverted Facts    4

Plaintiff's Statement of Additional Material Facts    18

Argument    58

      Standard for Summary Judgment    58

      Public Policy and the Disruptive Physician    59

      Waiver or Release of Claims    60

      Claim the No Physician has a Right to Staff Privileges    61

      Claims of Immunity for Peer Review    62

            Plaintiff was not Provided a Fair Process    66

            Peer Review was not Based on a Reasonable Effort to Obtain Facts
                Or in a Reasonable Effort to Improve Health Care    68

            Reasonable Belief that Action was Warranted by Facts    70

      The Kansas Immunity Statute    70

      Race Discrimination under Federal Civil Rights Statutes    70

      The Whistle-Blower Claims    70

      The Sherman Act Claims    80

      Intentional Interference with Business Relations    81

      Exhaustion of Administrative Remedies    81

      Time-Barred Conduct    81

      Issue of Defendants' Malice    82

Conclusion    82

## STATEMENT OF THE CASE

This is a civil action commenced by Vesom against Atchison Hospital Association ("AHA") and three individual physicians on the medical staff at AHA who voted to terminate the staff privileges of Vesom on February 18, 2003.

Vesom was originally granted staff privileges at AHA in 1983, and he developed a thriving medical practice in the Atchison, Kansas medical community. Vesom's evidence shows that members of the medical staff at AHA were openly hostile to him throughout the course of his tenure at AHA. Vesom left the medical staff of AHA in 1996 to return to his native Thailand following his father's death. Upon returning to Atchison in 1998, Vesom experienced significant difficulty in reestablishing his medical practice and staff privileges, notwithstanding an unblemished record of medical service to the community. Not once in Dr. Vesom's many years of medical practice has a complaint of medical negligence or incompetence been asserted against him. After many months of delays, Dr. Vesom was again granted staff privileges at AHA, but many restrictions were imposed on him and the hostility directed toward him by members of the medical staff increased.

The Complaint in this civil action alleges that the individual defendants who occupied positions on the Medical Executive Committee entered into an agreement and conspiracy to fabricate reasons for refusing to continue Vesom's staff privileges at AHA. Vesom presented evidence that the three individual defendants, having previously decided that they would vote to not renew Vesom's staff privileges, fabricated a reason to terminate Vesom from the hospital staff. The testimony of Dr. Rider, another member of the Medical Executive Committee, demonstrates that the three individual defendants first decided they would vote to terminate Vesom's privileges, and then met at the Bellevue Country Club in Atchison to settle on a "legal

basis" for terminating Dr. Vesom. Ultimately, Vesom's privileges were terminated on February 18, 2003, allegedly on the grounds that he was a "disruptive" physician. The evidence will show that AHA surreptitiously maintained a "file" on Vesom, in which hospital insiders kept a paper record of alleged "infractions" or instances of alleged disruptive behavior, which were then used as the putative basis for the termination of staff privileges. The evidence reveals a long-standing plan to terminate Vesom's privileges.

The complaint asserts claims under federal civil rights statutes for discrimination against Dr. Vesom because of his national origin, antitrust violations, whistleblower protections and intentional interference with business relations.

## PLAINTIFFS RESPONSES TO DEFENDANTS
## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.      Paragraph 1 is uncontroverted.

2.      Paragraph 2 is controverted.  Following the termination of Dr. Vesom's medical staff privileges, the intensive care unit of the Hospital has been reduced from six beds to two beds and has been reduced to a "critical access hospital" which can only hospitalize patients for a short period of time before discharging them or transferring them to a full-service hospital. Rider Declaration II[1] at ¶3, Asher Declaration at ¶4; Jackson Declaration at ¶5.

3.      Paragraphs 3 through 34 are uncontroverted.

4.      Paragraph 35 is controverted.  The cited regulation does not limit the authority of the Medical Executive Committee or state that the recommendations of the Medical Executive

---

[1]  Plaintiff is submitting with this Memorandum two sworn declarations from James Rider and two sworn declarations from Plaintiff Pitt Vesom.  The Rider Declaration dated July 30, 2004 is called "Rider Declaration I" and the Rider Declaration dated January 12, 2006 is called "Rider Declaration II."  The declaration of Pitt Vesom dated August 2, 2004 is called "Vesom Declaration I" and the declaration dated January 17, 2006 is called "Vesom Declaration II."  In addition, plaintiff is submitting an *in camera* declaration from Pitt Vesom dated January 1, 2006 which is designated "Vesom *in camera* Declaration."  The exhibits attached to Vesom Declaration II and Vesom *in camera* Declaration are labeled with the title of the Declaration to which each relates.

Committee are not binding until approved by the Board.  The cited regulation merely provides that each Hospital shall have a governing body which shall have the ultimate authority for the operation of the hospital, including approval or denial of applications for medical staff membership.  Moreover, the review by the Board of a decision of the Fair Hearing Panel is narrowly restricted.  The "appeal" from the ruling of the 'Fair Hearing' panel to the AHA's Governing Board is not a de novo review; rather, it is confined to the record presented to the 'Fair Hearing' panel, and the only "grounds" for appeal are: (i) the prejudicial failure of the Hearing Committee to comply with the  applicable provisions of the Medical Staff Bylaws; (ii) arbitrary, capricious or bias actions of the Hearing Committee; or actions of the Hearing Committee not supported by the evidence. AHA Bylaws, Appendix C, §(8)(b), Def.Ex. 4 at 0969.

     5.     Paragraphs 36 through 43 are uncontroverted.

     6.     Paragraphs 44 and 45 are controverted in part. Although the Bylaws do provide that no physician is entitled to staff privileges simply because he or she is licensed to practice medicine or has had previous medical staff privileges, Art. XI, Sec. 1(b) at 945 provides that no applicant shall be denied membership or privileges on the medical staff on the basis of race or national origin.

     7.     Paragraphs 46 through 83 are uncontroverted.

     8.     Paragraph 84 is controverted.  Renewals of medical staff privileges are considered under a different section of the Bylaws.  Compare Appendix A, §4 and §5 at pages 958-60.  A decision of the Medical Executive Committee renewing staff privileges is "automatic" absent an adverse action by the Board within 30 days.  §5(j) at 961.

     9.     Paragraphs 85 through 90 are uncontroverted.

10.     Paragraph 91 is controverted.  Reappointment to the medical staff is governed by Appendix A to the Bylaws, and section 5 and the evaluation for reappointment must be based on the 14 factors described in section 5(f) at pages 960-61.

11.     Paragraphs 92 through 101 are uncontroverted.

12.     Paragraph 102 is controverted.  The cited reference does not support the assertion that Dr. Swayze is a board certified surgeon.

13.     Paragraphs 103 through 110 are uncontroverted.

14.     Paragraph 111 is controverted in part.  There is no citation of authority for this factual assertion.  Plaintiff admits that Dr. Rider attended two meetings that concerned the credentialing of Dr. Vesom in 2003: one was held at the Bellevue Country Club in a meeting in with Hospital counsel and a second meeting was held on February 18, 2003 where a vote was taken to terminate the medical staff privileges of Dr. Vesom.  Dr. Rider did not attend the meeting of the Board of Directors on February 24, 2003 at which the Board discussed the termination of Dr. Vesom.  See Pl.Ex. 4.[2]  Plaintiff is unaware of whether other meetings occurred between the other four members of the Medical Executive Committee to discuss the reappointment of Dr. Vesom.  In a footnote to paragraph 111, defendants comment that it is "significant" that Dr. Vesom did not include Dr. Jones as one of the defendants in this litigation. As Dr. Vesom explained in his deposition at 455-56, Dr. Jones was not included as a defendant in this case because he lied to Dr. Vesom after the meeting of the Medical Executive Committee, telling him that he (Dr. Jones) had not voted against renewal of his staff privileges.

15.     Paragraphs 112 through 122 are uncontroverted.

---

[2]   In addition to the exhibits attached to the two Declarations of Dr. Vesom dated January 17, 2006, plaintiff is submitting additional exhibits from the business records of the defendant Hospital designated as "Pl.Ex. __."

16.     Paragraphs 123 through 125 are controverted in part.  Although Dr. Vesom did continue to utilize his courtesy medical staff privileges at Horton Community Hospital and Cushing Memorial Hospital, Dr. Vesom rarely used those hospitals in his regular practice.  The overwhelming majority of his admissions during his time in Atchison were at Atchison Hospital Association.  Vesom Dep. at 52.

17.     Paragraphs 126 through 137 are uncontroverted.

18.     Paragraph 138 is controverted.  The evidence contains substantially more than Dr. Vesom's "personal feelings" that he was discriminated against on the basis of his race.  See, e.g., plaintiff's Statement of Additional Material Facts.

19.     Paragraph 139 is controverted.  Plaintiff asserted on many occasions that he was the victim of discrimination on the basis of his race.  See, e.g., Plaintiff's Statement of Additional Material Facts.    Indeed, Vesom was secretly "written-up" for being disruptive when he complained of race discrimination in the committee assignments [D.Ex.8 at Tab 5, 21, 26].  Thus, three of the incidents which defendants used to terminate Vesom as a disruptive physician were actually complaints asserted by Vesom of racial discrimination, and it is unlawful under 42 U.S.C. §1981 for defendants to retaliate against Vesom for engaging in protected oppositional activity.  See, e.g., ***Maldonado v. City of Altus***, ___ F.3d ___, **2006 WL 52805 (10th Cir.), January 11, 2006; *O'Neal v. Ferguson Construction Co*., 237 F.3d 1248, 1258 (10th Cir. 2001)**.

20.     Paragraph 140 is controverted in part.  Plaintiff admits that the cited examples are some of the incidents which Dr. Vesom believes supports his claim of race discrimination, but there are additional facts supporting the claim that plaintiff was discharged because of his race.  See, Plaintiff's Statement of Additional Material Facts.

21.     Paragraphs 141 through 143 are uncontroverted.

22.     Paragraph 144 is controverted in part.  The incorrect responses identified in plaintiff's deposition were immaterial and inconsequential.  See, Vesom Declaration II at ¶58.

23.     Paragraphs 145 through 147 are uncontroverted.

24.     Paragraph 148 is controverted in part.  Plaintiff admits that the quotation from his deposition is accurate, but the statement that "Dr. Vesom could not provide any similar racially derogatory words in his history at AHA" is not supported by a record citation; in fact, there is substantial evidence of racially discriminatory animus in words and actions directed against Dr. Vesom as set forth in Plaintiff's Statement of Additional Material Facts.

25.     Paragraph 149 is controverted.  The citation of facts does not support the assertion that Dr. Vesom misinterprets racially neutral comments as statements displaying racially discriminatory animus.  In context, many statements made to and about plaintiff revealed a racially discriminatory bias by decision-makers associated with defendants.  See, Plaintiff's Statement of Additional Material Facts.

26.     Paragraphs 150 through 159 are uncontroverted.

27.     Paragraphs 160 through 162 are controverted.  Mid-America Cardiology did not begin its operation in Atchison, Kansas until it purchased Dr. Vesom's medical practice in June, 1996.  Rasmussen Dep. at 38, 77 and 81-82.  Prior to Dr. Vesom's decision to close his practice and return to Thailand in 1996, a number of the family practice doctors, including doctors Eplee and Wallace had urged Mid-America Cardiology to enter the Atchison Kansas market to compete with Dr. Vesom in providing cardiology services to the community.  Rasmussen Dep. at 77-80.  The family practice doctors at Atchison Hospital were urging Mid-America Cardiology to compete with Dr. Vesom for at least a couple of years prior 1996.  Rasmussen Dep. 82.

28.     Paragraphs 163 through 169 are uncontroverted.

29.     Paragraph 170 is controverted in part.   Plaintiff does not dispute that the testimony of Tracy Rasmussen as set forth in paragraph 170 was, in fact, his testimony. However, upon his return to the Atchison community in 1999, Dr. Vesom reestablished a thriving medical practice, earning significant income as a cardiologist.   See, affidavit of Kurt Kruger [Document No. 76.   Plaintiff does not concede that Mid-America Cardiology was "ingrained in the community" or that Dr. Vesom did not obtain a significant share of the market in cardiology upon his return.

30.     Paragraphs 171 through 180 are uncontroverted.

31.     Paragraph 181 is controverted to the extent it suggests that Dr. Vesom's privileges were ever suspended for a valid reason.   Paragraph 16 of the agreement provides:

> Hospital shall respond to authorized inquiries concerning whether Dr. Vesom's privileges have ever been suspended, revoked or disciplined at the Hospital as follows: yes.   If further information is requested by the Inquirer concerning Dr. Vesom's suspension at the Hospital in 1995, the Hospital response shall be as follows: on December 19, 1995, Dr. Vesom's clinical privileges were summarily suspended by decision of the Hospital's Chief of Staff and CEO for non-compliance with recommendations of the Kansas Medical Society -- medical Advocacy Program.   Thereafter, the Hospital was informed that Dr. Vesom was in compliance with the recommendations of KMS-MAP.   Accordingly, on December 22, 1995 the summary of suspension was withdrawn prior to any hearing.

DEx.38 at 9.

32.     Paragraphs 182 through 185 are uncontroverted.

33.     Paragraph 186 is controverted.   Paragraph 5(f) of Appendix A makes no such provision.

34.     Paragraphs 187 through 192 are uncontroverted.

35.     Paragraph 193 is controverted in part.  Plaintiff concedes that the detailed process for application for reappointment is spelled out in the Bylaws, but plaintiff controverts the allegation that these requirements are followed strictly.  See Vesom Declaration II.

36.     Paragraphs 194 through 197 are uncontroverted.

37.     Paragraph 198 is controverted in part.  The citation to Dr. Vesom's deposition does not support the allegation that this waiver is required of every doctor or that it is an essential part of the appointment or reappointment process.  According to Dr. Vesom's deposition testimony, he was unaware whether doctors were admitted without signing the liability waiver. Vesom Dep. at 228-29.

38.     Paragraphs 199 through 202 are uncontroverted.

39.     Paragraph 203 is controverted.  See ¶ 2 and 3 of the Declaration of James Rider dated August 30, 2004 ("Rider I") and ¶2 of the Declaration of James Rider dated January 12, 2006 ("Rider II").

40.     Paragraph 204 is uncontroverted.

41.     Paragraph 205 is controverted to the extent it states that "the MEC formally concluded" that Dr. Vesom should not be reappointed to the medical staff.  See Rider I, ¶ 2-3 and Rider II, ¶2.

42.     Paragraphs 206 through 208 are uncontroverted.

43.     Paragraph 209 is controverted.  When Dr. Vesom was deposed at the cited sections of his deposition, he was asked whether the specific provision that defining a disruptive physician has a provision requiring the Hospital to provide a disruptive physician with notice and opportunity to provide a response.  Vesom Dep. at 132-33.  However, the suggestion that the Bylaws do not require that a disruptive physician be provided notice and opportunity to provide a

response is unsupported by the whole text of the Bylaws, which are the best evidence of their

content and may not be altered with artful deposition questions.   Appendix B of the Bylaws

provides:

> Whenever, on the basis of information and belief, any member of the Medical
> Staff, the Chiefs of Staff, the Chief Executive Officer of the Hospital or any
> member of the Governing Board of the Hospital has cause to question: behavior
> or conduct on the part of any practitioner that is considered lower than the
> applicable standard of care of this Hospital, that is or may be grounds for
> disciplinary action and by the Kansas Board of Healing Arts, or *that is disruptive
> of the orderly operation of the Hospital or its Medical Staff, including the ability
> to work effectively with others* . . . then, upon receiving notice of a reportable
> incident, as defined by K.S.A. 65-4921, as amended, or upon receipt of a written
> request to investigate such an incident or matters as defined in this section, any
> officer of the Medical Staff, the chairperson of the Service or Committee, the
> Chief Executive Officer of the Hospital or any member of the Governing Board of
> the Hospital may request corrective action against such practitioner. . . .
>
> Upon receipt of this request for corrective action by the President of the
> Governing Board of the Hospital, he/she shall forthwith forward said request to
> the Executive Committee of the Medical Staff.  The Executive Committee shall
> be charged with the responsibility of investigating the facts and circumstances
> surrounding the request for corrective action.  Within fourteen (14) days after the
> Executive Committee's receipt of request for corrective action, the Committee
> shall make a written report of its investigation to the Governing Board of the
> Hospital.  Prior to making of such report, the practitioner against whom corrective
> action has been requested shall have the opportunity for an interview with the
> Executive Committee.  *At such interview, the practitioner will be informed of the
> general nature of the charges against him/her and will be invited to discuss,
> explain or refute them.*  (Emphasis supplied).

Vesom Declaration II at ¶13 and DEx. 4 at 0962.

44.     Paragraph 210 is uncontroverted.

45.     Paragraph 211 is controverted.   Plaintiff concedes that the Medical Executive

Committee reported such findings, but plaintiff denies that he acted in a disruptive manner or

failed to discharge his responsibilities.  Vesom Declaration II at ¶ 10-55 and Rider Declaration I

at ¶2-3 and Rider Declaration II at ¶ 2.

46.     Paragraph 212 is uncontroverted.

47.     Paragraph 213 is controverted in part.  Plaintiff agrees that the actions taken by defendants terminating his medical staff privileges did not constitute "corrective action" within the meaning of Appendix B to the bylaws; however, the "corrective action" provisions most certainly applied to each of the alleged instances of misconduct.  At no time prior to February 18, 2003 did any of the defendants advise Dr. Vesom that he was being charged with disruptive behavior, providing notice and an opportunity to remediate under the provisions of Appendix B.  See Vesom Declaration at ¶ 13.

48.     Paragraph 214 is uncontroverted.  See Plaintiff's Statement of Additional Material Facts at ¶2.

49.     Paragraph 215 is controverted.  The "corrective actions" required by Appendix B are not limited to "infractions by the medical staff in the quality and appropriateness of medical care provided" as asserted in paragraph 215.  See Vesom Declaration II, ¶ 13.

50.     Paragraphs 216 and 217 are controverted.  See Vesom Declaration II, ¶13.

51.     Paragraph 218 is uncontroverted.

52.     Paragraphs 219 and 220 are controverted.  See Rider I, ¶ 2-3 and Rider II, ¶2.

53.     Paragraphs 221 and 222 are uncontroverted.

54.     Paragraph 223 is controverted.

55.     Paragraphs 224 and 225 are controverted.  Plaintiff concedes that defendants Thomas, Swayze and Goracke testified that the recommendation by the Medical Executive Committee not to reappoint Dr. Vesom was not taken lightly, but the remaining allegations of paragraph 224 and 225 are controverted by the declaration testimony of Dr. Rider and Dr. Vesom.  See, Rider I, ¶2; Rider II, ¶2 and 3 and Vesom Declaration II ¶ 10-61.

56.     Paragraph 226 is uncontroverted.

57.     Paragraph 227 is controverted.  Plaintiff concedes that the letter of February 18, 2003 contained the allegations of misconduct as set forth in paragraph 227, but plaintiff denies that he was guilty of any of the disruptive conduct set forth in that letter.  See, Rider I, ¶2; Rider II, ¶2 and 3 and Vesom Declaration II ¶ 10-61.

58.     Paragraphs 228 through 232 are uncontroverted.

59.     Paragraph 233 is controverted.  Plaintiff agrees that late in the process he was given a copy of the exhibits defendants used in a Fair Hearing process, but plaintiff asserts that he was denied the opportunity of meaningful review of his credentials file for the purpose of showing that the documentary evidence presented to the Fair Hearing Panel presented false assertions of misconduct and contained fabricated "cut and paste" documents presented for the purpose of misrepresenting the occurrences alleged to be instances of disruptive behavior.  See Vesom Declaration II ¶10-61.

60.     Paragraphs 234 through 240 are uncontroverted.

61.     Paragraph 241 is controverted.  Plaintiff agrees that late in the process he was given a copy of the exhibits defendants used in a Fair Hearing process, but plaintiff asserts that he was denied the opportunity of meaningful review of his credentials file for the purpose of showing that the documentary evidence presented to the Fair Hearing Panel presented false assertions of misconduct and contained fabricated "cut and paste" documents presented for the purpose of misrepresenting the occurrences alleged to be instances of disruptive behavior.  See Vesom Declaration II ¶10-61.

62.     Paragraphs 242 and 243 are controverted.  Contrary to defendants' assertion, the members of the Fair Hearing Panel were advised expressly that they may not find in favor of Dr. Vesom unless the evidence revealed that the actions of the Medical Executive Committee were

'unreasonable, arbitrary and capricious."  Andrew Ramírez, legal counsel to the Hospital and one

of the attorneys of record in this case, appeared before the Fair Hearing Panel on behalf of the

Hospital.  At the outset of the hearing he admonished the panel members as follows:

> We have to come forward with evidence to support the recommendation.  Then
> consistent with the Bylaws of the hospital, this panel has to rule against Dr.
> Vesom, unless you find that Dr. Vesom has proven, and the burden rests with him
> to prove, that the Medical Executive Committee's recommendation, adverse
> recommendation is arbitrary, unreasonable, capricious or not supported by
> evidence or otherwise unfounded.  You may ask what unreasonable, arbitrary or
> capricious means.  There is a definition in the law.  The Kansas Supreme Court
> has defined it as meaning that information was so -- the decision, rather, was so
> wide of the mark that its unreasonableness lies outside the realm of fair debate.
> The Supreme Court also said that the panel is not to reweigh the facts or substitute
> its own judgment even if it would have found differently.

Fair Hearing Transcript at 8-9, D.Ex. 16.  Indeed, the admonition of Mr. Ramírez was adopted by

the Fair Hearing Panel.  The chairperson of the Fair Hearing Panel, Dr. Mark Lierz, in a decision

upholding the termination of Dr. Vesom's staff privileges, stated the following: "The Fair

Hearing Panel understood its role to show that the decision by the Medical Executive Committee

needed to be arbitrary, unreasonable or capricious, otherwise, the Panel would rule with the

Medical Executive Committee and uphold the non-reappointment of Dr. Vesom."  DEx. 17.

Another member of the Panel, Dr. Andrea Bock-Kunz, wrote: "only if the evidence presented

during the hearing showed that the decision was 'arbitrary, unreasonable, or capricious' could the

Panel rule otherwise."  DEx. 18.  The suggestion of defendants that the Panel was instructed it

was free to make its own independent recommendation is ludicrous.  Moreover, the review of the

decision of the Fair Hearing Panel by the Board is narrowly restricted.  The 'appeal' from the

ruling of the 'Fair Hearing' panel to the AHA's Governing Board is not a de novo review; rather, it

is confined to the record presented to the 'Fair Hearing' panel, and the only 'grounds' for appeal are:

(i) the prejudicial failure of the Hearing Committee to comply with the a applicable provisions of

the Medical Staff Bylaws; (ii) arbitrary, capricious or biased actions of the Hearing Committee; or actions of the Hearing Committee not supported by the evidence. AHA Bylaws, Appendix C, §(8)(b), Def.Ex. 4 at 0969.  Accordingly, the decision of the Medical Executive Committee is effectively a final decision unless the affected physician can show that the decision is arbitrary, capricious or biased.  The Medical Executive Committee is the decision-maker for all practical purposes.

63.     Paragraphs 244 through 248 are uncontroverted.

64.     Paragraph 249 through 254 are controverted.   Plaintiff does not dispute defendants' description of the written findings of Doctors Lierz, Dock-Kunz, Klingler and Wetzel, but plaintiff does dispute the correctness and validity of the findings set forth in paragraphs 249 through 254.  Vesom Declaration II, ¶10-61.

65.     Paragraphs 255 through 258 are uncontroverted.

66.     Paragraphs 259 through 263 are controverted.   Plaintiff does not dispute defendants' description of the contents of the affidavit submitted by Dr. Podrebarac, but plaintiff does dispute the correctness and validity of the findings set forth in paragraphs 259 through 263. Vesom Declaration II, ¶10-61.

67.     Paragraphs 264 through 270 are uncontroverted.

68.     Paragraphs 271 through 272 are controverted.  The Board met with members of the Medical Executive Committee and legal counsel Andrew Ramírez four days after the Medical Executive Committee voted to terminate the medical staff privileges of Dr. Vesom to discuss and approve the actions of the Medical Executive Committee.  The Board acted on the representations of the Chief of Staff, Dr. Goracke, and the Hospital Administrator, Virgil

Bourne, and without any consideration of the pertinent information available and without any independent knowledge of the evidence.  PEx. No. 4.

69.     Paragraphs 273 through 279 are uncontroverted.

70.     Paragraphs 280 through 282 are controverted.   Vesom Declaration II, ¶10-61; Declaration of Kathy Jackson; Declaration of Rosetta Birch; Declaration of Jim Asher; Rider Declarations I and II.

71.     Paragraphs 283 and 284 are uncontroverted.

72.     Paragraphs 285 through 288 are controverted.  Declaration of David Ware, ¶ 7; Vesom Declaration II; Vesom Declaration Exhibits at 61-64.

73.     Paragraph 289 is controverted.  Declarations of Kathy Jackson and Rosetta Birch; Vesom Declaration II, ¶10-55; Declaration of Jim Asher.

74.     Paragraphs 290 through 293 are uncontroverted.

75.     Paragraph 294 is controverted.  Dr. Ware Declaration, ¶ 7-10; PEx. 5.

76.     Paragraph 295 is controverted.  No citation to the record supports the statement. See also: Dr. Ware Declaration, ¶ 7-10; PEx. 5.

77.     Paragraph 296 is controverted.  Dr. Ware Declaration, ¶ 7-10; PEx.5.

78.     Paragraph 297 is uncontroverted.

79.     Paragraphs 298 and 299 are controverted.  Dr. Ware Declaration, ¶ 7-10; PEx. 5.

80.     Paragraphs 300 through 317 are uncontroverted.

81.     Paragraph 318 is controverted.   The KDHE investigation found significant problems with maternal morbidity and mortality as articulated by Dr. Ware.   See Vesom Declaration Exhibits at 61-64.  In particular, the KDHE found that the Blackmon case had not been properly peer-reviewed [page 61]; the physician failed to document the rationale for not

transferring his patient to a facility that had adequate staff and equipment to care for a premature newborn [page 61]; the facility did not have a neonatal intensive care unit and staff with special training to care for this patient [61]; the medical staff at Atchison Hospital Association failed to review the benefits to this high-risk mother and newborn of transferring to a facility equipped to deal with the patient prior to induction of labor [62]; the patient was at high risk for delivery and delivery at this facility placed the newborn at risk [62]; the family practitioners and the OB nursing staff at Atchison Hospital Association did not have the expertise to care for the high risk obstetrics cases at the facility [62]; a review of the nursing competency in education for nurses working in OB demonstrated a lack of special training and a lack of competency testing to care for high-risk mothers and premature infants [62]; a review of historical data revealed high levels of c-section deliveries (17 of 38 deliveries in January and February 2003 were c-sections with first-time deliveries equaling 53% of the total c-sections) [62].  The defendant's assertion that the KDHE "did not substantiate any problems with patient care that Dr. Ware" complained of is wholly without justification.

82.    Paragraphs 319 and 320 are uncontroverted.

83.    Paragraph 321 is controverted.  Dr. Ware Declaration, ¶ 7-10.

84.    Paragraph 322 is uncontroverted.

85.    Paragraphs 323 through 337 are controverted.   See Plaintiff's Statement of Additional Material Facts.

86.    Paragraph 338 is uncontroverted.

87.    Paragraph 339 is controverted.  See Plaintiff's Statement of Additional Material Facts.

88.    Paragraph 340 is uncontroverted.

89.     Paragraphs 341 through 343 are controverted.   See Plaintiff's Statement of Additional Material Facts.

90.     Paragraphs 344 and 345 are uncontroverted.

91.     Paragraph 346 is controverted.  Vesom Declaration, ¶10-61.

92.     Paragraphs 347 through 363 are uncontroverted.


PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1(b)(2), plaintiff states additional facts relied upon in opposition to defendants' Motion for Summary Judgment:

1.     Counsel for AHA admonished the "Fair Hearing" panel that their job was not to investigate or even determine independently whether Dr. Vesom's privileges were properly denied.  AHA Bylaws, Appendix C(5)(i)(2), Def.Ex. X at 3; Def.Ex. A at 8-9.

2.     The "appeal" from the ruling of the "Fair Hearing" panel to the AHA's Governing Board is not a de novo review; rather, it is confined to the record presented to the "Fair Hearing" panel, and the only "grounds" for appeal are: (i) the prejudicial failure of the Hearing Committee to comply with the  applicable provisions of the Medical Staff Bylaws; (ii) arbitrary, capricious or biased actions of the Hearing Committee; or actions of the Hearing Committee not supported by the evidence. AHA Bylaws, Appendix C, §(8)(b), Def.Ex. 4 at 0969.

3.     The "charges" reflected in Def.Ex.AA against Dr. Vesom were collected in 33 separate allegations of wrongdoing; these charges were contained in a chart which was prepared by AHA and the Executive Committee after the decision to deny renewal of staff privileges to Dr. Vesom. Rider II Declaration at ¶ 2.

4.      The overwhelming majority of the incidents used to deny Dr. Vesom privileges were never raised or discussed with Dr. Vesom by any official of AHA. Vesom I Declaration. The responsibilities of the Medical Staff of AHA included the responsibility to "initiate and pursue corrective action with respect to members when warranted and to advise the Governing Board regarding such actions". Pl.Ex. No. 4, Article II, §2(f) of the Bylaws at 0932.

5.      The first time Dr. Vesom was aware of the vast majority of the "charges" set forth in the Medical Executive Committee Exhibits was when the exhibit was delivered to his legal counsel, over four months after he was informed that his privileges would not be renewed. Def.Ex. 16 at 179-80.

6.      Dr. Vesom, together with Dr. David R. Ware, an ObGyn, had complained to the Hospital management and to the Chief Executive Officer of the hospital about inadequacies in the peer review process at the hospital which they asserted were affecting adversely the quality of care at the Hospital. Def.Ex. 16 at 166-71; Vesom I Declaration ¶3.

7.      On January 3, 2003, Dr. Vesom and Dr. Ware met with the CEO of the Hospital and Dr. Goracke about these concerns, including concerns about the quality of care provided in the Blackmon case, a high-risk pregnancy treated at the hospital by Dr. Thomas. Id.

8.      On January 22, 2003, Dr. Vesom and Dr. Ware raised these complaints in a letter to the Board of Directors of the Hospital. Pl.Ex. No. 1.

9.      One day later, on January 23, 2003, a special meeting of the Board of Directors was convened to discuss "pressing medical staff issues." The meeting was attended by Dr. Goracke, the Chief of Staff, Virgil Bourne, the Hospital Administrator, and Andrew Ramirez of Lathrop & Gage, counsel for the Hospital.  The minutes of the meeting do not disclose what was

discussed, but the only action taken by the Board was a vote to terminate the agreement with or without cause with Dr. Ware.  Pl.Ex. No. 3.

10.     On February 18, 2003, both Dr. Ware and Dr. Vesom were informed that the Medical Executive Committee had decided not to renew their staff privileges, based on virtually identical assertions that the physicians were "disruptive". Compare D.Ex. No. 9 and Pl.Ex. No. 2.

11.     On February 24, 2003, the Board of Directors meet with Dr. Goracke, Virgil Bourne and Andrew Ramirez.  The minutes record the following:

> The Executive/Credentials Committee further informed the Board of their recommendation to give David Ware, MD, OB/GYN, notice of Termination of Provisional Active Staff Status and Privileges **cdk – is this right – see original** effective March 18, 2003.  They also informed the Board of their recommendation to notify Pitt Vesom, MD, Cardiology, of Termination of Active Staff Privileges effective March 18, 2003.
>
> EXECUTIVE SESSION
>
> It was moved and seconded that the Board meet in executive session with members of the hospital peer review committee and hospital counsel to discuss matters deemed privileged under the peer review privilege and the attorney/client privilege.  Thereafter the Board met in executive session with the risk manager and hospital counsel in executive session.

Pl.Ex. 4 at 2.

12.     Dr. Thomas, a member of the Executive Committee, was angry with Dr. Vesom because Dr. Vesom sought an outside review of a maternal morbidity and mortality case (Blackmon) which involved Dr. Thomas' patient and because Dr. Vesom and Dr. Ware had disputed the validity of the medical review. Rider I Declaration ¶2.

13.     Dr. Goracke and Dr. Swayze were also angry with Dr. Vesom for raising questions about the quality of care at the hospital in the meeting of January 3, 2003 with the CEO and Dr. Goracke. Rider I Declaration ¶2.

14.     Thomas, Swayze and Goracke decided to deny Dr. Vesom's application for renewal of staff privileges immediately after receiving the January 22, 2003 letter from Dr. Vesom. Rider I Declaration ¶2.

15.     After the decision not to renew Dr. Vesom's staff privileges was made by the Executive Committee, the Committee sought counsel to determine the best way to support their decision.  Rider Declaration I ¶3.

16.     The Committee reviewed Dr. Vesom's credential file and settled on using certain anecdotal notes which were made without informing Dr. Vesom, as required by the Bylaws, by characterizing Dr. Vesom as a disruptive physician. Rider Declaration I ¶3.

17.     The decision to deny Dr. Vesom staff privileges was not made in order to improve the quality of health care at AHA. Rider Declaration I ¶3.

18.     The decision to deny Dr. Vesom staff privileges was based on the fact that Dr. Vesom had been critical of the quality of medicine practiced at AHA. Rider Declaration  I ¶3.

19.     The complaints of Dr. Vesom were investigated by the KDHE, which investigation resulted in a finding that most of Dr. Vesom's complaints about substandard care were valid. Rider Declaration ¶3; Vesom I Declaration  ¶5; Vesom Declaration Exhibit at p. 58-65; Kabriel Dep. at 36-40.

20.     At the time his staff privileges were terminated, Dr. Vesom had thousands of patients in the Atchison area; without a local hospital to which he may refer patients, his ability to practice medicine in the Atchison area was essentially destroyed. Vesom Declaration I¶7.

21.     Accordingly, the actions of AHA denying him staff privileges have forced him to relocate to Poplar Bluff, Missouri and lose the good will he developed in Atchison from over 20 years of practice. Vesom Declaration I ¶7.

22.     AHA is the recipient of federal funds from Medicare, Medicaid and other federally-funded programs and activities. Vesom Declaration I ¶8.

23.     Pitt Vesom, M.D. is Asian.  He is a board certified internal medicine and board certified cardiology physician currently practicing in Poplar Bluff, Missouri.  He formerly practiced in Atchison, Kansas.  Vesom Declaration II, ¶ 1.

24.     Atchison Hospital Association functions as any other hospital in Dr. Vesom's experience, using a mixture of Hospital-employed physicians and independent physicians to treat the patients of the Hospital.  As a practical matter, there is no difference between the services rendered for the hospital by its employed physicians and by independent physicians who are granted access to the hospital through staff privileges.  The only difference is the independent physicians bill for their services directly to the patient or third-party payer, while the Hospital compensates its employed physicians with a salary and collects for its physician services directly from the patient or insurance company.  Independent physicians are subject to the same rules and regulations of the Hospital as employed physicians.  Vesom Declaration II, ¶2.

25.     Dr. Vesom originally came to the Atchison community to practice medicine in 1983.  He was accompanied by his wife, a board certified pathologist, and family when he relocated to the community with the support and encouragement of Jim Asher who was, at that time, the CEO of Atchison Hospital (AHA).  Vesom Declaration II, ¶3.

26.     With the exception of Mr. Asher and a few independent employed family practice doctors such as Dr. Growney, Dr. Rider, Dr. Arkom Tivorsak ( a fellow Thai doctor), and Dr. A.K. Tayiem (a foreign born surgeon) , Dr. Vesom encountered from the medical staff a collective resistance to social interaction and activity.  His wife and he were not invited to and included in the social events of the staff members, other than those members specifically

referenced above. At medical staff gatherings (such as a golf tournament), if he were to approach a group such as hospital board members to engage in conversation, he would be ignored or they would simply turn their backs upon him.  Vesom Declaration II, ¶4.

27.     Although he was highly qualified, being board certified in both internal medicine and cardiology as well as board eligible in intensive care medicine, these staff physicians, other than Dr Rider and Dr. Growney, routinely refused to refer their patients to him who were suffering from cardiac problems. They followed this practice even though it meant their patients went without cardiology follow-up when required, or that it required the patient to travel to Missouri or Kansas City for cardiology care.  Vesom Declaration II, ¶5.

28.     Dr. Eplee, Dr. Shirwise, Dr. Jones, Dr. Thomas, Dr. Swayze, Dr. Schmitt, or either of the Dr. Seiberts would only refer a patient to him for cardiac care when it was in the middle of the night or a weekend emergent situation.  Then they would call for him to consult, often in an effort to avoid their own responsibility to see the patient. This hostility against him was rooted in their prejudice against foreign born doctors which was further reflected in their refusal to socialize with him or his wife. He believes that the refusal of the medical staff physicians to refer to him cardiac patients, which would have been in the patients' best interest, and their refusal to socialize with him and family was racially motivated.  Vesom Declaration II, ¶6.

29.     Although his wife is a board certified pathologist and highly skilled and readily available in town, she was never able to find employment with the hospital.  The hospital chose, instead, to contract for pathology services elsewhere and, as a result, the service was only available one day a week.  Vesom Declaration II, ¶7.

30.     In his years of practice since 1983, Dr. Vesom never had a malpractice claim lodged against him let alone a lawsuit nor has his practice been found below the standard of care in the treatment of any patient.   Despite this well known history, the aforementioned medical staff at AHA not only refused to utilize his quality services, but conspired to prevent him from practicing at AHA both when he returned from Thailand in 1998 and when terminating his privileges in 2003.  Vesom Declaration II, ¶9.

31.     When he reapplied for privileges at AHA in 1998 upon his return from Thailand, Dr. Vesom's application was treated differently from any other application received prior to and since that date.  Karen Kelly, the medical staff coordinator, recorded suggested questions from hospital attorneys Lora Bond and Jeff Ellis designed to intimidate him during his reapplication interview in September of 1998 and designed to elicit answers which would defeat his application. This included the attorneys' suggestion that he be threatened with the fact that, if his application was denied,'this will always be a black mark on his record'.  See AHA 1955 attached to this Declaration as Vesom Declaration Exhibit p. 1. (Hereinafter "VD ex. p.").  Vesom Declaration II, ¶10.

32.     In addition to the attorney suggested questions referred to above, it appears that the attorneys for AHA also prepared an outline to be utilized by committee members during that interview.  This outline was designed to elicit derogatory information about Dr. Vesom to form as a basis for the rejection of his reapplication. (VD ex. p. 10–14) The minutes of that meeting disclose the members disrespect for him by recording, in several instances, his responses as "B.S." or "B.S. followed". (VD ex. p. 5 & 8) Even more importantly, those minutes contain the false criminal accusation that, according to Tracey Rasmussen of Mid America Cardiology, his medical records disclosed 100s of instances of Medicare fraud (VD ex. p. 15) Rasmussen has

testified in his deposition at page 27, and defendants have asserted as uncontroverted fact 167, that Mid-America Cardiology did not purchase his medical records as part of his practice when he left to go back to Thailand. Hence, there could be no basis for the alleged statement by Rasmussen that those records contained evidence of fraud because Rasmussen and Mid-America Cardiology did not, in fact, have those records. This is just an example of a scurrilous rumor circulated to undermine his application for privileges.   Vesom Declaration II, ¶11.

33.     While waiting for the approval of his application, which finally came about in March of 1999, Dr. Vesom was not granted temporary privileges at AHA which were routinely and immediately provided to other applicants.  His application for privileges was not resolved until after he entered into a contract with the hospital which included provision that he would receive immediate notice of any adverse comment about his behavior, a condition he insisted upon during the application process. He had learned from experience that it was hard to defend against comments about his conduct that were several years old when related to him.  Vesom Declaration II, ¶12.

34.     Dr. Vesom received the February 18, 2003 letter, Defendants' Exhibit 9, which contained two general allegations and seven specific allegations of disruptive conduct, shortly after the AHA MEC voted to not renew his privileges on that date.  This was the first written notification he received of disruptive behavior following his reappointment which, finally, had occurred on March 4, 1999. As part of that reappointment agreement, the hospital promised to give him notice of any misbehavior, which they did not do. (See Defendants ex. 38 at p. 4.) The failure to give notice also contravened the hospital by-laws and their requirements for dealing with disruptive behavior at Appendix B which provides:

> Whenever, on the basis of information and belief, any member of the Medical Staff, the Chiefs of Staff, the Chief Executive Officer of the

Hospital or any member of the Governing Board of the Hospital has cause to question: behavior or conduct on the part of any practitioner that is considered lower than the applicable standard of care of this Hospital, that is or may be grounds for disciplinary action and by the Kansas Board of Healing Arts, or *that is disruptive of the orderly operation of the Hospital or its Medical Staff, including the ability to work effectively with others* . . . then, upon receiving notice of a reportable incident, as defined by K.S.A. 65-4921, as amended, or upon receipt of a written request to investigate such an incident or matters as defined in this section, any officer of the Medical Staff, the chairperson of the Service or Committee, the Chief Executive Officer of the Hospital or any member of the Governing Board of the Hospital may request corrective action against such practitioner. . . .

Upon receipt of this request for corrective action by the President of the Governing Board of the Hospital, he/she shall forthwith forward said request to the Executive Committee of the Medical Staff.  The Executive Committee shall be charged with the responsibility of investigating the facts and circumstances surrounding the request for corrective action.  Within fourteen (14) days after the Executive Committee's receipt of request for corrective action, the Committee shall make a written report of its investigation to the Governing Board of the Hospital.  Prior to making of such report, the practitioner against whom corrective action has been requested shall have the opportunity for an interview with the Executive Committee.  *At such any view, the practitioner will be informed of the general nature of the charges against him/her and will be invited to discuss, explain or refute them.*  (Emphasis supplied).

Defendants ex. 4B at p. 16-19.  At no time was Dr. Vesom ever informed that he had been guilty of any act of disruption until he received the aforementioned notice of February 18, 2003 that his medical staff privileges had been terminated.  He received no formal or informal notice prior to then that any of his conduct was considered to be disruptive or violated the Bylaws of the Hospital.  Vesom Declaration II, ¶13.

35.    To prepare for the "fair hearing", Dr. Vesom's attorney began as early as March 11, 2003, to request production of documents from AHA (VD ex. p.81)  In response, my attorney received a letter dated March 12, 2003 stating that there was no basis for formal discovery and that I would be provided in due course only with the information relied upon by the Medical

Executive Committee in making its adverse recommendation.   (VD ex. p.83); Vesom

Declaration II, ¶ 14.

36.     On March 21, 2003 my attorney wrote again and requested the hospital to provide

the written records that substantiated the infractions identified in the February 18th letter.

Assuming that these exhibits had been relied upon by the Executive Committee in making its

decision on that date, I thought such documentation should have been readily available in

response to that request.  (VD ex. p. 85); Vesom Declaration II, ¶ 15.

37.     In response, Dr. Vesom's attorney received a letter dated April 2, 2003 from the

hospital's attorney Andy Ramirez merely stating that  the Hospital would submit to Dr. Vesom

the documentation relied upon by the MEC in making its adverse recommendation. (VD ex.

p.88) This of course, was not responsive to his broad requests for information which included

inspection of Dr. Vesom's credentials file from which their documentation derived to ascertain if

it contained exculpatory information or to what extent their documentation had been

manufactured.  Vesom Declaration II, ¶16.

38.     On May 22, 2003 his attorney sent a letter to the CEO of AHA with a copy to the

hospital's attorney requesting the opportunity to inspect the hospital's records with regard to Dr.

Vesom's alleged disruptive behavior, offering to schedule that meeting for Tuesday, June 3rd at

9:30AM or, otherwise, at the convenience of the hospital's attorney and the hospital.  (VD ex. p.

89-90)  Vesom Declaration II, ¶17.

39.     On May 23, 2003 his attorney received a letter from Andrew Ramirez objecting to

the direct communication with the CEO of the hospital concerning the production of Dr. Vesom's

credential's file, asserting that the hospital was prohibited by federal law from providing patient

records (which were part of the credentials file) to third parties but would produce those records

once confidentiality was agreed upon. (VD ex. p. 93-94) This letter was not otherwise responsive to Dr. Vesom's attorney's request for information.  His attorney immediately responded that confidentiality would be agreed upon in return for the right to inspect the records. (VD ex. p.95). Vesom Declaration II, ¶18.

40.     On June 10, 2003 his attorney received a letter from Mr. Ramirez stating that he had forwarded the exhibits which have been identified as the MEC Exhibits 1-32 and would provide supplemental exhibits prior to the hearing.  Despite his attorney's proffer of confidentiality, there was no provision in that letter for the inspection of Dr. Vesom's credentials' file. (VD ex. p. 91)[3]  Vesom Declaration II, ¶19.

41.     On June 20, 2003 his attorney wrote to Mr. Ramirez in response to the MEC Exhibits 1-32 and made eleven specific requests for additional information in order to prepare for the "fair hearing". (VD ex. p. 96-97) He received no response to that request.  Vesom Declaration II, ¶20.

42.     On July 29, 2003 his attorney wrote Mr. Ramirez again regarding the production of documents issue stating that in conclusion "incidentally, to call this a "fair hearing" process while refusing to produce documents in your clients' possession which are exculpatory of my client's alleged professional incompetence or otherwise shed light on this matter seems inappropriate.  I once more renew my request for those documents". (VD ex. p. 92) There was no document production in response to these requests by Defendants prior to initiation of this lawsuit.  Vesom Declaration II, ¶21.

43.     Upon Dr. Vesom finally obtaining his credentials' file through discovery, he found that the MEC's exhibits 1-32 omit in multiple instances important exculpatory documentation but,

---

[3]   Exhibits attached to Vesom Declaration II shall be identified as "VD ex. P. ___."

more importantly, contain documents that were manufactured to make it appear that his behavior was inappropriate.  Vesom Declaration II, ¶23.

44.     Dr. Vesom was never told about nor was the form titled "Feedback Questionnaire Pitt Vesom, M.D." ever reviewed with him when he rejoined the staff of AHA in March, 1999. The first time he saw the form was in June, 2003 when he saw that the MEC Exhibit at Tab 1 & 2 contained the form. The MEC asserted that Tab 1 documented that he did not attend patient skilled care planning meetings (incidentally, no physician regularly does) and Tab 2 was used to allege that he issued "questionable" patient orders.  The latter instance concerned an appropriate order for EKGs for certain of his patients on Fridays. Vesom Declaration II, ¶24.

45.     Upon receiving the production of his credentials file, Dr. Vesom found that there were an additional fourteen "feedback" questionnaires. Interestingly, those additional questionnaires included, among others, one dated May 5, 1999 stating "SNF is grateful to Dr. Vesom for attending our care plan meetings on Monday mornings". This is in total contradiction to Tab 1 of the MEC exhibits.  The questionnaire goes on to state "We feel this has, indeed, made a difference." His attendance was not in response to any reprimand since he was never informed that anyone had critiqued his failure to appear at these meetings, but was simply a part of what he did as part of my practice. His attorney's letter of March 11, 2003 specifically asked for any monthly evaluation forms. (VD ex. p. 82); Vesom Declaration II, ¶25.

46.     In addition to the foregoing, he discovered, upon review of his file, a letter dated February 28, 2000 signed by Susan Gilkinson, RN, vice-president of nursing services, concerning the collection of the quarterly "feedback" questionnaires which she characterized as regarding communication, respect for staff and patients, and compliance with policy.  In addition to the content of the feedback questionnaires, attached hereto as VD ex. p. 18-32, that letter

states, "recently, I spoke with the ER, ICU, and Social Services departments as well as various members of nursing staff to determine if they had any particular medical staff concerns regarding behavior with nursing staff.  No adverse comment was made related to Dr. Vesom's behavior." (VD ex. p. 16) The MEC exhibit at Tab 3 contains an enclosure from the Gilkinson letter but not the letter which actually contradicts the incident as an example of ongoing misconduct. That incident involved a surgeons attempt to move his patient prematurely from ICU because an extended stay there counted against this surgeon's post surgical complication rate. Dr. Vesom's delay of the patients' transfer to the unmonitored third floor was based upon patient safety. The surgeon acquiesced to his management and the patient made a good recovery. (VD ex. p. 17); Vesom Declaration II, ¶26.

47.     Tab 4 is a record of a phone call he made to the Chief of Staff (COS) at that time, Loren Welch, in which he expressed a two fold concern.  The reading of EKGs at the hospital was substandard.  This included the fact that a recently credentialed doctor, Dina Seibert D.O., was not competent to read EKGs. Dr. Vesom had attempted to provide a training procedure to provide certification to her and in the interim provide the more complex EKGs to him for review. She declined the training.  His concerns over the substandard reading of EKGs went unheeded, even though he believed the failure could and would result in a reduction of the quality of medical care and potential legal liability.  Vesom Declaration II, ¶ 28.

48.     Tab 6 purports to be a report of a telephone call received by Lora Willming from Dr. Vesom concerning his complaint that Dina Seibert D.O. had replaced him as ICU chairperson and that, in doing so, he continued to curse.  This comment at Tab 6 is in complete contradiction to the note dated three days later written by Susan Gilkinson in which she says that she contacted ICU, which would have included Lora Willming, and obtained no adverse

comment concerning his behavior. See VD ex. p. 16 stating "I spoke with the ER, ICU and Social Services departments as well as various members of nursing staff to determine if they had any particular medical staff comments regarding behavior with nursing staff. No adverse comment was made related to Dr. Vesom's behavior." Vesom Declaration II, ¶29.

49.     Tab 7 is a note by COS, Loren Welch, attempting to explain that assignment of chairmanships of cardiopulmonary and cardiac- pulmonary rehab positions at the hospital was not the result of racial discrimination.  The note attempts to explain that the chairmanship assignments are based on a rotational basis. This was absolutely not true. For example, Dr. Vesom was chairman of the ICU Committee virtually the entire time he was on the staff from 1983 until he left for Thailand in 1996 and from 2000 through 2002 and he was chairman of Cardiac/Pulmonary Rehab as long as the department existed.  The anesthesiology department was always chaired by Dr. Goracke, an anesthesiologist, and radiology was always chaired by Dr. Arkom, a radiologist.   In response to Dr. Vesom's complaint that the chairmanships of the cardiopulmonary and ICU committees should be based upon qualification and not race, Dr. Welch changed the assignments, despite stating that his complaints had no substance.  Vesom Declaration II, ¶30.

50.     Tab 8 is a note attempting to assert that Dr. Vesom counseled a patient to sue Dr. Dishman.  He cannot control what a patient decides to say, but he does know that he has not counseled a patient to sue Dr. Dishman as alleged.  If the patient was unhappy with him, Dr. Vesom would have simply told them that that was between them and Dr. Dishman. If they said they wanted to talk to a lawyer, he would have only said that's their right if that's what they want to do.  Vesom Declaration II, ¶31.

51.     Tab 9 is a letter from  Dr. Tom Shirwise, concerning the care of a patient of his who was hospitalized with a pace maker/defibrillator.  She was hospitalized under Dr. Vesom's care and Dr. Shirwise was called upon to consult regarding a complex fracture of her right distal femur.  Dr. Vesom transferred the patient at her request and after a discussion with the family to Research Hospital where she could be better managed medically.  Her transfer was not for orthopedic reasons but for medical management purposes.  This was his patient and he acted on the family's request for transfer.  Vesom Declaration II, ¶32.

52.     MEC exhibit Tab 10 is a document that was quite simply manufactured. It is a paragraph excerpted from VD ex. p. 71–80 and bears Bates stamped pages KDHE20171–KDHE20180.  To the best of Dr. Vesom's knowledge, the original document was not part of defendants' production. The actual document is not a complaint that Dr. Vesom does not cooperate but rather a multi page lament that the primary physicians abuse the system by using consultants to cover for patients admitted late hours, weekends, and holidays rather than coming to see their patient themselves. This in actuality has been an issue that he raised repeatedly throughout his tenure to no avail.  Not until reviewing this exhibit did he realize that Dr. Dishman took malicious delight in calling for his consult and then having the patient's family request Mid America Cardiology to replace him. On learning that Dr. Vesom had been told of the cancellation, the record says 'he laughed'. (VD ex. p.78)

53.     MEC Exhibits  Tab1-9 show that the Hospital was 'documenting' Dr. Vesom's behavior literally from the time he was readmitted to the staff in March, 1999 and these Tabs purportedly address conduct on his part  from 1999 through 2001.  He believes it is significant that VD ex. p. 35 bates stamped-KDHE20170  signed on February 6, 2001 by Ryan Thomas, Chairman of the Executive  Committee, records that his performance to that point was

satisfactory as opposed to "needing improvement" or "unsatisfactory" in all categories, including "ability to work with others", "use of consultants", "peer review results/activity". This directly contradicts the allegedly adverse comments contained in Tabs 1-9.  Vesom Declaration II, ¶34.

54.     Tab 11 is, once more, an example of the disparate treatment between Dr. Vesom and other applicants for privileges at AHA.  Dr. Swayze's application was approved at an emergency MEC meeting.  The note actually documents Dr. Vesom's ongoing concerns about the biased peer review at AHA.  The chart review clearly favored the hospital employed doctors because the review was by the Chief of Staff, who was invariably a hospital employee and paid by the hospital rather than by departmental chairpersons determining whose record would fall out for review.  Vesom Declaration II, ¶35.

55.     Tab 12 is a significant entry because it concerns a September 28, 2001 letter of Dr. Swayze concerning a patient of his.  Dr. Swayze had come on staff in July, 2001, as previously noted, without review of his credentials and as a result of an emergency MEC meeting.  Critical care management is an area of Dr. Vesom's expertise.  This includes the management of ventilators and the balancing of medication in patients in intensive care.  He was called in to this case by a nurse because an order by Dr. Swayze for the patient was contraindicated and the nurse was concerned that following the order would kill the patient.  Although the record shows that Dr. Eplee called for a consult with Dr. Vesom, his participation actually came about because of the nurse's concern for the welfare of this patient.  He entered appropriate orders for the patient's care, including management of the weaning of the patient off of the ventilator, a particular area of his expertise.  Dr. Swayze continually changed his orders, including a change to the ventilator setting to a level that would cause lung damage to the patient.  Contrary to Dr. Swayze's letter of September 28, 2001, Dr. Vesom informed both the

charge nurse and Dr. Eplee that he could no longer care for this patient because Dr. Swayze was

countermanding his medical management. As Dr. Swaze's letter notes, the patient died under his

care.   Subsequently, the ICU committee met, reviewed Dr. Swayze's care of this patient, and

recommended that he be proctored in ICU care. Dr. Vesom's letter to the Chief of Staff (COS) of

that finding with regard to this patient was not included as a MEC Exhibit. (VD ex. p. 68);

Vesom Declaration II, ¶ 36.

56.    Tab 13 continues to be a record of concerns over the standard of surgical care

practiced by Dr. Swayze.  The note records Dr. Vesom's concern that Dr. Swayze requires

proctoring and simply asks for peer review of the previous case.  Despite his letter and despite

Dr. Swayze's letter, the treatment of this patient was never subjected to peer review.  Vesom

Declaration II, ¶37.

57.    Tab 14 boldly asserts that Dr. Vesom does not attend staff meetings based upon a

routine reminder letter in his file. In response to that allegation, his attorney requested staff

attendance records in his letter of June 20, 2003.

'(5) In regard to exhibit No. 14, we request the attendance records of all physicians
for the years 2000, 2001, and 2003 at these meetings together with a copy of any letter sent to
any physician whose attendance record is considered deficient'.  (VD ex. p. 96)

While Dr. Vesom has not received those records to date, he did receive, in the course of

discovery, the attendance records of Dr. Jones, Dr. Swayze, Dr. Thomas, Dr. Seibert and himself.

(VD ex. p.36–41) VD ex. p. 42 discloses that for a five year period from 1999 through 2003 Dr.

Vesom's percentage attendance of medical meetings was 74% of the time.  This was exactly the

same as Dr. Jones, 8% less than Dr. Thomas, 4% less than Dr. Goracke, 2.33% higher than Dr.

Swayze, and 17% higher than Dr. Seibert who only attended 57% of the staff meetings for the

five year period.  Dr. Vesom is reasonably certain that, if provided the records of the other

34

physicians and staff members of AHA, he would find that his attendance at staff meetings met or exceeded the norm.   His request for this information in response to this allegation was rebuffed during the so-called "fair hearing" process. At no time did he fail to attend medical staff meetings under the percentage required by the Hospital Bylaws.  Vesom Declaration II, ¶ 38.

58.      Tab 15 concerns Dr. Vesom's request for a drug that was the latest in cardiac care. Subsequently, the drug became the standard of care for the condition for which he prescribed it to this patient. This allegation is an example of his attempt to increase the level of patient care and in no way does it demonstrate behavior which adversely affected patient care.  Vesom Declaration II, ¶ 39.

59.      Tab 16 is a note recorded by Virgil Bourne concerning a phone call which Dr. Vesom took while taking call for Dr. Rider who was the caller's family physician.  The patient was calling to get a scheduled drug renewed, which Dr. Vesom advised her could not be done unless she came to the ER to be examined or saw Dr. Rider during her regularly scheduled appointment with him.  She was not happy with his reluctance to diagnose or treat her over the phone and, subsequently, called and obtained consultation with the Physician's Assistant, Doug Kaufman, in the ER which Dr. Vesom considered to be inappropriate.  There was no complaint from Dr. Rider concerning the care he provided to this patient. He believes this is an example of his effort to comply with the standard of care required, and not of misconduct.  Vesom Declaration II, ¶ 40.

60.      Tab 17 is an undated note concerning two issues written once more by Lora Willming (ICU nurse). This note records her attempts during the first month of his tenure as chairperson of cardiovascular and pulmonary health in 2002 to have him review records ( a free service that he provided) at her convenience. He had explained that this service would be

provided on Thursdays after 3 when he concluded his office hours and hospital rounds but this did not meet with her work schedule. This allegation that he doesn't attend meetings concerns 3 meetings in a year long period. Secondly, the note records his dissatisfaction with the hospital soliciting his heart patients for rehab services without reviewing the request with him first to see if it's appropriate for the patient, a reasonable concern on his part.  Vesom Declaration II, ¶41.

61.     Tab 18 records Dr. Vesom's legitimate complaint that family practice doctors would routinely request EKGs in the middle of the night and then have the ER contact him in the middle of the night rather than review the results themselves. He had no contract that required him to read EKGs. As a solo practitioner with his own patients to care for, this practice was disruptive. This was especially aggravating since when these same practitioners had a cardiac question during banking hours they routinely referred to out of town cardiologists and only requested his services when others were unavailable such as in the middle of the night.   Vesom Declaration II, ¶42.

62.     Tab 19 is a continuation of his inability to create structure for the reading of EKGs. This is a call at midnight to over read a primary physician's request for an EKG. The primary physician has initial responsibility to review the EKG and here he has yet to look at it. Again, Dr. Vesom had no responsibility to over read this EKG but agreed to do so a part of his Monday routine. Vesom Declaration II, ¶43.

63.     Tab 20 is again a doctored document created by the MEC in a deliberate attempt to make it appear Dr. Vesom's behavior was unusual.  It is one paragraph from a two page letter VD ex. P. 48-49.  It is just one example according to its author of daily failures to communicate among physicians.  The particular instance addressed by the Tab 20 concerns Dr. Vesom's patient upon whom Dr. Swayze performed a botched appendectomy in which he nicked the bowel, did

not place post op drains or prescribe the appropriate post op antibiotic.  He then proceeded to prescribe a drug for Dr. Vesom's patient  that was contraindicated because of the patient's heart condition.  Vesom Declaration II, ¶44.

64.     Tab 21 documents the irrational reassignment of chairmanships based upon an unknown criteria. True statements concerning Dr. Dina Seibert's qualifications for the position should not be considered disparaging but, rather, a rational basis for committee assignments. Dr. Vesom has commented in his supplemental declaration in more detail concerning her lack of abilities for the position. As a result of his knowledge, he could conclude only that the COS's decision was racially based. Vesom Declaration II, ¶45.

65.     Tab 22 asserts that his alleged statement,"This is Monday. Don't talk to me on Monday.", a phrase he had heard often since coming to America, was inappropriate. How was he to know?  Vesom Declaration II, ¶46.

66.     Tab 23 relates to the ongoing care of the appendectomy patient previously referenced whose initial surgery was botched by Dr. Swayze. As a result, the patient was slow to heal. Dr. Swayze placed a consult request to Mid America Cardiology for this patient of Dr. Vesom's without discussing the request with him, the patient's cardiologist, in an ongoing refusal by this surgeon to communicate with Dr. Vesom concerning his patient.  Vesom Declaration II, ¶ 47.

67.     Tab 24 alleges that he refuses to read EKGs which he had no contractual obligation to read. His continuing efforts to create order in this process were once more ignored but, despite this, he provided, in this instance, a review of the EKG as documented in the note. There is no adverse affect on patient care and the note accurately reflects that he reads EKGs

during the week not at night and on weekends when the ordering physicians do not want to come to the hospital and do it.  Vesom Declaration II, ¶ 48.

68.     Tab 25 again concerns Dr. Vesom's attempt to instill order in the demands upon his time to read EKGs. At times the demands were so relentless, coming at all hours of the night, that it was difficult to continue providing quality care to his patients.  Vesom Declaration II, ¶ 49.

69.     Tab 26 concerns his discussion with Virgil Bourne the AHA CEO that the hospital practice of controlling referrals by always referring to hospital employed physicians, in his view, held anti-trust implications. He apparently concluded that this constituted a threat to contact the justice department to determine if that was correct. Again, this entry does not reflect upon patient care but a repetitive unfair practice of the hospital administration. Vesom Declaration II, ¶50.

70.     Tab 27 is a communication concerning Dr. Vesom's ongoing effort to instill order in the demands upon his time to read EKGs. Inexplicably, the arrangement to FAX them to his home or office to save a trip to the hospital was terminated except in STAT situations because of confidentiality concerns. Why confidentiality would change in STAT situations is unclear. The note does not include his letter of response, VD ex. p. 67, explaining that he was not angry but merely attempting to be assertive in dealing with their uncooperative manner.  Vesom Declaration II, ¶51.

71.     Tab 28 concerns the ongoing problem at AHA of primary physicians refusing to see their patients when required that was addressed in the KDHE document that the MEC excerpted parts from at Tab 10. (VD ex. p. 71–80)This was not Dr. Vesom's patient and he at no time had an obligation to see this patient. The primary physician did not see the patient after

admission as required. Ultimately the patient, without ever being seen by a physician for over 10 hours, was ordered transferred to KUMC. The tab once again demonstrates the disparate treatment between Dr. Vesom and the hospital employed physicians who were involved in this patients care. AHA peer review cited his conduct for refusing to see the patient as a consult but not the attending physician's failure to see the patient as substandard. The MEC deliberately ignored his written response in this matter. (VD ex. p. 69-70) KDHE, in their March audit, remarks on the medical staffs' review minutes of this case regarding the consulting physician's refusal to examine the patient without the patient first being examined by the primary physician. KDHE notes that, "the minutes did not reveal any medical staff review of the attending physician's lack of response during the night in ICU or the 2 hour delay in treatment by the attending physician in ER." (VD ex. p. 59) This is a typical example of the biased peer review that Dr. Vesom complained about in the letter to the board of AHA on January 22, 2003. Vesom Declaration II, ¶ 52

72.     Tab 29 is, once again, a glaring example of the MEC's effort to paint Dr. Vesom in a bad light by doctoring the record.  In this case, by omission. In this instance, the MEC's claim that he was abusive to a PA in the ER deliberately excludes the investigative report of Susan Gilkinson dated September 19, 2002 rebutting the assertion. (VD ex. p. 46); Vesom Declaration II, ¶ 53.

73.     Tab 30 is a petty but spiteful assertion reported by Dr. Swayze that Dr. Vesom lied to a patient because he claims he heard Dr. Vesom telling a patient there were no surgeons at AHA and he would have to find one at St. Luke's. The statement is a true statement in the context of a patient requiring any type of cardiology surgical intervention, which, in all likelihood, was the context of the statement if, in fact, he made it. Dr. Swayze admitted that he did not know

what type of surgeon Dr. Vesom was talking to his patient about and that there were a number of types of surgeons not available at AHA. (Defendants Ex. 16 p. 48); Vesom Declaration II, ¶54.

74.     Tab 31 appears to document that Dr. Vesom came to the AHA in a bad frame of mind. He has reviewed the By-Laws of AHA and he is unable to find that this occurrence constitutes disruptive behavior.  Vesom Declaration II, ¶ 55.

75.     Tab 32 again asserts that he lied concerning the basis of the need for transfer. He knows that the daughter of this patient, Rosetta Birch, has commented extensively on this occurrence in her declaration and that, accordingly, the transfer of her mother was conducted as a result of the family's request and not against their wishes as the MEC would here attempt to have one believe.  Vesom Declaration II, ¶56.

76.     Tab 33 documents an evening of frustration when, unbeknownst to Dr. Vesom, his pager was not functioning. When he came onto the unit the staff was angry at his delay in responding to their page which page he was completely unaware of when he came on to the service. It is a little demeaning to him in retrospect to have had the nurse page him while he was on the unit to see if he was telling the truth. The alleged meeting that he did not attend the next day was to deal, so far as he knew, only with the failed pager and, since that was resolved, seemed unnecessary. He certainly was never informed, as Virgil Bourne's October 22, 2002 note would suggest, that there was another agenda for the meeting.  Vesom Declaration II, ¶ 57

77.     The defendants have asserted in uncontroverted fact 144 that Dr. Vesom answered incorrectly questions on his December 12, 2002 reappointment application form. (Defendants ex 6) It is true that he made that admission in his deposition under confusing questioning that incorporated circumstances that occurred prior to 1999. However, upon reviewing the form in preparation for his declaration he found that his answers on the form were indeed true and

correct. The form asks only for occurrences "Since your last reappointment". His last

reappointment to AHA staff occurred in February of 2001. (VD ex. p. 35) Therefore, each of his

'No' responses to the questions on the form were accurate as in that period of time he had suffered

no suspension or other interruption of his privileges to practice at AHA or any other medical

facility.  Vesom Declaration II, ¶58.

78.     An important part of Dr. Vesom's complaint to the COS and CEO of AHA on

January 3, 2003 and in the subsequent letter to the Board of Directors of AHA was that peer

review at AHA was not administered properly. The KDHE audit of March 2003 that followed up

the complaint demonstrated the accuracy of his concern. The Audit of peer review minutes

disclosed the following instances of unexplained findings of compliance with the standard of

care:

> #172015 a patient returned to surgery with complications of post-op hematoma and
> wound dehiscence....
> #142728 patient who had wrong site surgery.  ...Documentation did not include the
> reason that the medical staff would determine a wrong site surgery as standard of care met ...
> #150257 review of obstetric (OB) patient who passed a surgical sponge after delivery
> and repair.  Documentation did not include findings as to the reason that the sponge was left in
> the patient after the delivery and repair...
> #188521 physician wrote in medical record "and is calling nurses damn fools, which
> may or may not be accurate"...
> #151731 cancellation of surgery due to no medication ordered by physician pre-
> operative...
> #186697 failure to provide history and physical prior to surgery...
> #139723 physician failed to come in to see patient in ICU when patient deteriorated.
> More than four hours after the first call to physician concerning the deterioration, the facility
> transferred the patient by helicopter to another hospital without seeing any physician...
> #187326 newborn sustained a laceration during C-section delivery...
> #143984 physician performed care beyond privileges authorized by the medical
> staff. (VD ex. p. 55-57)

None of these instances involved Dr. Vesom except #139723 which has been fully

addressed in his Declaration at #52.  Vesom Declaration II, ¶59.

79.     VD ex. p. 44 is a handwritten undated note from Dr. Vesom's credentials file. The handwriting appears to him to be that of Carol Nieman, AHA Medical Staff Coordinator. He is uncertain how widely the note was circulated among staff but believe it was in anticipation of his 2003 reappointment application. The purpose of the note, however, is quite clear.  It solicits only negative comment about him and instructs the respondent in how to couch the negative comment so as to make it appear spontaneous.   Vesom Declaration II, ¶60.

80.     On January 9, 2003, just slightly a month before his privileges were terminated at AHA on the basis that he was a "disruptive physician", Carol Nieman, on behalf AHA, reported to Cushing Hospital regarding Dr. Vesom's professional conduct. (VD ex. p. 43) She responded YES to the following questions on that form:

2. Does applicant's clinical performance consistently meet standard of care?  YES

3. Has applicant complied with Medical Staff Bylaws and Rules and Regulations?

YES

She responded NO to the following questions:

Has he/she experienced difficulty in peer relationships? In hospital staff relationships?

NO

Are you aware of any concerns expressed by the medical staff about his/her practice?

NO.  Vesom Declaration II, ¶61.

Testimony of David Ware, M.D.

81.     Dr. David Ware is a physician licensed to practice medicine for 22 years, currently licensed in the State of Kansas, among five other states including Indiana, New York, Kentucky, Missouri and Idaho.   In July, 2002, Dr. Ware was recruited to practice ob/gyn medicine in Atchison, Kansas at the Atchison Hospital (AHA).  Prior to coming to Atchison, Dr.

Ware served on numerous committees devoted to quality of care at both hospital and state levels. Dr. Ware was not acquainted with Dr. Pitt Vesom prior to coming to Atchison and did not meet him immediately upon commencing practice. Ware Declaration, ¶ 1.

82.     Soon after his arrival in Atchison, Dr. Ware was taken on a tour of the AHA facility, by the then CEO, Virgil Bourne. On the occasion of that tour, their paths crossed with an individual who Virgil Bourne identified as Dr. Pitt Vesom. In passing, he informed Dr. Ware, 'Watch out for him. He'll stab you in the back!' Ware Declaration, ¶ 2.

83.     Shortly after this event, Dr. Ryan Thomas invited Dr. Ware to his home. While at his home, they engaged in a conversation regarding Dr. Vesom in which Dr. Thomas stated quite openly that he 'hated' Dr. Vesom. Later on December 13, 2003 after a low key chess game at his home he repeated the statement, 'It is no secret, I hate Dr. Vesom.' Ware Declaration, ¶     84.

Soon thereafter Dr. Ware met with Dr. Fast at an Atchison restaurant. He had formerly practiced obstetrics in the community and, again, discussion of Dr. Vesom arose. Dr. Fast volunteered that it was 'good we threw him out; we shouldn't have let him return.' This statement was made referring to Dr. Vesom's earlier return to Thailand and reapplication for privileges. Ware Declaration, ¶ 4.

85.     On the community golf course with Dr. Douglas Goracke, he, likewise, made disparaging remarks about Dr. Vesom, giving form to the open hatred Dr. Ware encountered among many of the medical staff for Dr. Vesom. Ware Declaration, ¶ 5.

86.     It is Dr. Ware's considered belief that the feelings and attitudes expressed against Dr. Vesom were, in part, based upon the fact that he was a foreign born doctor coupled with his standard of providing high quality care to his patients, so much so that, in the community, he held a competitive edge among his peers. Dr. Ware did not heed the warnings to avoid Dr.

Vesom and was pleased to find in their brief association at AHA that he was a consummate professional. Dr. Ware found that they shared views about what constituted appropriate and proper peer review with the purpose of promoting quality of care as opposed to what was the practice at AHA of utilizing the process to protect and punish. Dr. Ware found while he was in Atchison, Dr. Vesom and his wife were ostracized from and not included in the social events of the medical Staff.  Dr. Ware's perception of this exclusivity was that, in part, he was a foreign born doctor and not part of the "good ole' boy" inner circle of hospital employed physicians, in short, he was not like them.  Ware Declaration, ¶ 6.

87.    On December 12, 2002, at Kathy Butler's Risk Management Office, Ms. Butler informed Dr. Ware that the AHA Family Practice OB Group had three recent maternal mortalities and provided the names and global statistics indicating an extremely high 5 year maternal death rate for the hospital. Ms. Butler said that Dr. Thomas was the physician for the last two maternal mortalities, the latter directly involved Dr. Vesom as an emergent consultant; she indicated she was well aware of Dr. Vesom's criticisms of post-operative critical care management by Dr. Thomas.  Dr. Ware informed her that if this case was soon to be white washed by a cherry-picked, misled Family Practice OB reviewer (which it was)  that he and Dr. Vesom would be obligated to contact outside hospital regulatory agencies. For the foregoing reason, Ms. Butler's statement in her affidavit at paragraph 19 that, "It was not until after this lawsuit was filed on May 18, 2004 that anyone within the Hospital administration would have had any reasons to know that Dr. Vesom was the source of the KDHE complaint." is false.  Ware Declaration, ¶ 7.

88.    On January 15, 2003 Dr. Thomas visited Dr. Ware's office and asked repeated questions about escalating medical staff peer review and internal hospital political conflicts,

which Dr. Ware candidly answered. Dr. Ware informed him that Dr. Vesom had a very long list of detailed deficiencies in emergency and internal medicine care, which he felt obligated to report to appropriate agencies due to the hospital's flagrant inability to police its own physician employees.  Ware Declaration, ¶ 8.

89.     On February 1, 2003 on the Atchison golf course Dr. Goracke was informed by Dr. Ware that Dr. Vesom and Dr. Ware could not fathom his use of his Chief of Staff position to support continued generalist substandard care and that he and Dr. Vesom were being forced to seek outside regulatory intervention, and that Dr. Goracke had missed his opportunity to reform the system.  Dr. Goracke was very angry at this plan.  Ware Declaration, ¶ 9.

90.     The members of the MEC knew well in advance of the February 18, 2003 meeting that both Dr. Vesom and Dr. Ware intended to bring their concerns about improper peer review and substandard practice before a state board of review and their actions were taken in part to stifle and or punish them for their complaints which were well founded based upon the subsequent KDHE audit.  Ware Declaration, ¶ 10.

Testimony of Jim Asher

91.     Jim Asher resides in Atchison, Kansas. Mr. Asher was the chief executive officer of Atchison Hospital Association for close to 28 years, retiring in 1990.  During his tenure, ,Mr. Asher was responsible, in 1983, for encouraging Dr. Pitt Vesom to come and establish his practice in their community.  Asher Declaration, ¶ 1.

92.     Dr. Vesom was the only full time board certified cardiologist and internist to have practiced in the Atchison community.  Having a specialist with Dr. Vesom's credentials in the community raised the standard of care for the treatment of cardiac patients as well as intensive care patients. Prior to Dr. Vesom coming to their community, the standard of care for treatment

of heart related ailments was that practiced by generalists such as family practice physicians. Asher Declaration, ¶ 2.

93.     Despite Dr. Vesom's outstanding credentials and capabilities, the approximately 20 Atchison Hospital's medical staff physicians, with the exception of Dr. Growney and Dr. Rider, routinely refused to refer their patients with cardiac issues to Dr. Vesom, even though it frequently meant, to their patients detriment, that they either received a lower standard of care or no local care for their cardiac conditions. Despite the failure to regularly receive referrals, Dr. Vesom was able to establish a thriving practice of devoted patients without ever being the subject of a medical negligence lawsuit or even a complaint about his standard of care. This, in no small part, was the result of his determination to provide the very best care possible to his patients under the circumstances imposed by practice in a small community hospital.   Asher Declaration, ¶ 3.

94.     In 1990, Mr. Asher was instrumental in  creating and obtaining the funding of a six bed intensive care unit at Atchison Hospital. Mr. Asher made this decision and created this unit with Dr. Pitt Vesom in mind who, Mr. Asher knew, with his capabilities, would fully utilize the six bed unit for the care and treatment of members of this community.  During his tenure in Atchison following the creation of that unit, it was fully utilized. Mr. Asher has learned from staff at AHA that since Dr. Vesom's departure from the community, its staffing has been reduced from a six bed unit to a two bed unit and he believes the unit is no longer economically viable in its current state.  Based upon his experience and knowledge of the hospital's operations, Mr. Asher believes the reduction in the size and function of the ICU is directly related to the termination of Dr. Vesom's staff privileges.  This reduction in utilization would adversely affect

the hospital's bottom line and ability to provide quality health care to the community.   Asher Declaration, ¶4

95.    It is Mr. Asher's belief based, upon his knowledge and experience, that the decision to get rid of Dr. Pitt Vesom was and continues to be economically destructive to the hospital in many other respects.  He was, during his tenure, a high end user of the hospital and its diagnostic facilities.  Mr. Asher testified that, since his departure, the hospital census has been drastically reduced to the point that, for one 18 hour period this past summer, there was absolutely no patient hospitalized at the hospital that employs more than 250 people. Mr. Asher knows from his own personal experience that patients requiring emergent cardiac treatment have to be shipped to Heartland Hospital in St. Joseph,  Missouri or hospitals in Kansas City as there is no longer a cardiologist available in Atchison 24 hours, 7 days a week as was the case during Dr. Vesom's tenure. Mr. Asher understands that, as a result of the decline in census, the hospital has been converted to a critical access hospital which limits the length of a patient's hospitalization prior to discharge in exchange for a higher billing rate and understands that this is an effort to staunch the continuing financial losses by being able to charge more for the few patients now being treated at AHA.  Asher Declaration, ¶ 5.

96.    The AHA medical staff physicians who, for the most part, were general practitioners were concerned about competition from Dr. Vesom, a foreign born physician, and feared losing their patients to him. There was always a feeling among these physicians against foreign born doctors that was reflected in their fear of his competition. This feeling, Mr. Asher believes, led in part to their efforts to discredit him by surreptitiously placing written comments in his credentials file to be used against him to eliminate him from competing with them.  Mr. Asher testified that the MEC's 32 Exhibits cited in support of its decision to non-renew  Dr.

Vesom's privileges were not shared with him until long after the MEC's vote to non-renew. There is no improvement in the quality of health care served by this practice as it does not promote change of the alleged disruptive behaviors. Dr. Vesom's non-renewal of privileges at AHA has diminished the quality of care available to him personally, as well as to members of the community.  Asher Declaration, ¶6

97.      In 1996, Dr. Vesom withdrew from the AHA staff and returned to Thailand following his father's death.  In 1997, he and his family decided to return to Atchison and he contacted Mr. Asher because his several requests to AHA for a renewal application over several months had gone unheeded. Mr. Asher interceded with AHA and, at last, he received the application.  He returned and filed the application in early 1998.  Approval of the application was delayed for nine months.  In fact, it was not approved until shortly after Mr. Asher informed a medical staff member, Dr. Wayne Wallace, that failure to approve it would result in a discrimination lawsuit in which he and others on the hospital staff would be personally liable. This process should be compared to the application of Dr. Douglas Goracke.  His initial application was approved within a month, despite a known past history of criminal conduct resulting in suspension of his license to practice medicine.  Asher Declaration, ¶7.

98.      Although AHA is a small regional community hospital, based upon Mr. Asher's knowledge and experience, it drew patients from outlying communities which, because of its proximity to the state line, included Missouri residents. In fact, AHA, in the past, operated clinics in Rushville and Weston, Missouri and still owns a medical building at the former location. AHA received insurance reimbursements for services and supplies from companies nationwide and purchased medical supplies, including those used for emergent cardiac care, from suppliers in many different states other than Kansas. Based upon his experience and belief, the non-

renewal of Dr. Vesom's privileges reduced communities' physicians' utilization of these medical supplies and services. It certainly increased the need for AHA to immediately transport patients requiring medical stabilization, particularly in cardiac care situations, to other hospital facilities, often in Missouri.   Asher Declaration, ¶ 8.

Testimony of Dr. James Rider in his Second Declaration

99.     Dr. James Rider is a board certified family practitioner and licensed to practice medicine in the State of Kansas. Dr. Rider has, for many years, practiced in the Atchison, Kansas community and has had privileges at Atchison Hospital (AHA) since 1976. Dr. Rider has previously provided a Declaration (Rider Declaration I) in this case concerning his participation in the Medical Executive Committee (MEC) that voted to not renew Dr. Pitt Vesom's hospital privileges on February 18, 2003.  Dr. Rider incorporated his letter dated March 4, 2004 directed to the Board of Directors of Atchison Hospital Association concerning that failure and its impact upon AHA. Dr. Rider continues to stand by that Declaration and the statements made in that letter which are true to his best knowledge and belief.  Rider Declaration II ¶ 1,

100.     Dr. Rider has had an opportunity to review the document captioned "AHA" Medical Executive Committee Exhibits numbered 1–34.  Exhibit 34 is a letter directed to Dr. Pitt Vesom, ostensibly from the MEC. The letter is signed by Virgil Bourne, the CEO of AHA, and dated February 18, 2003, the same day as the MEC's  recommendation  to terminate Dr. Vesom's privileges, labeling him as a disruptive physician. The letter states that the MEC made its recommendations for two general reasons and seven particular reasons that had occurred since April 1, 1999.  Rider Declaration II ¶ 2

101.     Dr. Rider was present at the February 18, 2003, MEC meeting and the earlier meeting of the MEC at the Bellvue Country Club, and Dr. Rider categorically states that there

was never a discussion of what behavior of Dr. Vesom had been disruptive and violated hospital by-laws. There was open hostility expressed against Dr. Vesom at the Bellvue meeting and a determination that preceded that meeting by Doctors Goracke, Swayze and Thomas to get rid of him. That determination was then emboldened by the hospital attorney's, Andy Ramirez, promise at the Bellvue meeting that they could act with immunity if they shrouded their acts in the cloak of the hospital by-laws description of disruptive behavior. At no time preceding the January 13, 2003 meeting of the MEC when his renewal application first came up for approval, the subsequent Bellvue meeting, or the February 18, 2003 meeting was Dr. Vesom informed that members of the MEC had issues with his renewal application for privileges or what those issues were. This was the result of the fact that no one had equated any specific content of his credential file with any hospital by-law infraction. That was not done until after the February 18 meeting and was not done by the MEC. The so called "AHA Medical Executive Committee's Exhibits" numbered 1-33 were not created by the MEC nor were its contents ever brought before the MEC and approved as the basis of its decision. This compilation of exhibits was created after the secret vote of February 18, 2003 to terminate Dr. Vesom's hospital privileges. Rider Declaration II ¶ 2It is an apparent post decision effort to justify the MEC's predetermined action. None of the so called exhibits demonstrates that Dr. Vesom's actions disrupted the flow of patient care. The thread that runs through these exhibits is an effort by Dr. Vesom to instill order on the demands for his time and talents so as to best serve the goal of providing above standard patient care. Rider Declaration II ¶ 2.

102. As Dr. Rider predicted in his previous declaration and in his letter to the Board of March 4, 2003, AHA has suffered economically as the result of the non-renewal of Dr. Vesom's privileges and the quality of care at the Hospital has, likewise, been adversely affected. The

intensive care unit, which was originally a six bed unit, can no longer be staffed at that level because Dr. Vesom is not present to care for or hospitalize patients there.  As a result, the staffing has been reduced to operate the unit as a two bed unit.  In fact, since his termination there has been at least one occasion when there have been no patients   hospitalized in the entire hospital.  As a result of the reduced census of the hospital and the economic loss associated therewith, it has been reduced to a critical access hospital which can only hospitalize a patient for a short period before discharging or transferring.  Any patient requiring emergent cardiac care must be transferred to a tertiary hospital in Kansas City or to Heartland Hospital in St. Joseph, Missouri, often before receiving even the emergent care necessary for their safe transfer which was available 24/7 when Dr. Vesom was on staff.  This has resulted in an overall reduction the quality of health care provided to the community and is a direct result of the irresponsible failure to renew Dr. Vesom's privileges predicated upon the spurious allegation that he was disruptive.  Rider Declaration II ¶ 3.

103.    The animus directed at Dr. Vesom by members of the MEC was not the result of disruptive behavior on his part.  Rather, it was the result of professional jealousy of a better qualified foreign born doctor whose competition and demanding standards of care were resented by the hospital employed medical staff doctors.  Rider Declaration II ¶ 4.


Testimony of Rosetta Birch

104.    Rosetta Birch is a respiratory therapist/medical records clerk formerly employed by Atchison Hospital Association (AHA).Ms. Birch was employed there for 34 years, retiring in October of 2004. During her employment at AHA, Ms. Birch became acquainted with and had numerous occasions to work with Dr. Pitt Vesom.  Birch Declaration, ¶ 1.

105.    During her tenure at AHA, Ms. Birch had occasion to work extensively in respiratory therapy and, in that capacity, worked closely with Dr. Vesom with a number of patients.  Ms. Birch learned more working with and from Dr. Vesom than any other physician or all the other physicians combined at AHA. He always treated her with respect and was courteous in his dealings with her. For instance, if at 2:30 in the morning Ms. Birch experienced trouble drawing blood on a patient and Dr. Vesom was on the unit, Ms. Birch felt free to call upon him for assistance. He would provide it without complaint or criticism. If he couldn't draw the blood, then it could not be done.  The staff often submitted EKGs to him for review both in person and by FAX to his home. Sometimes the EKG requests were so numerous that Ms. Birch wondered how he had time to attend his own patients.  Birch Declaration, ¶ 2.

106.    Ms. Birch reviewed the three documents identified as The Medical Executive Committee Exhibit 32 in support of its decision to not renew Dr. Vesom's AHA privileges. The incidents described in those documents concern the care and treatment of her mother, M. R., at AHA by Dr. Tayiem and Dr. Vesom. The documents purport to state her concerns over Dr. Vesom's care and recommendations for treatment of her mother. The statements are false in many respects.  Birch Declaration, ¶ 3.

107.    Dr. Vesom was called in for consultation by Dr. Tayiem to care for Ms. Birch's 81 year old mother after she had a feeding tube inserted by Dr. Tayiem. She had been a resident of Cray Manor nursing facility (part of AHA) and her condition had been stable up until a few days prior to this procedure. She appeared to have some complications after the peg tube procedure and Dr. Vesom was called in to consult by Dr. Tayiem for that reason. After examining her mother, Dr. Vesom asked that her family gather at AHA to meet with him to discuss her condition. He was careful not to begin the meeting until Ms. Birch arrived late for the meeting.

At the family meeting, he very thoroughly discussed her mother's condition, including his concern that she had, perhaps, aspirated gastric material into her lungs and what this meant. He discussed the relative pro and cons of various approaches to treatment which would make her more comfortable, including what advantages in treatment would be available at a larger hospital such as St. Luke's in Kansas City, Missouri. He then advised them that he would leave the family meeting to allow the family to discuss and decide how to proceed and would return later for the family's decision. When he returned, her family told him that it was their decision to request her transfer to St. Luke's for further evaluation and treatment. He agreed to their request and ordered her mother's transfer by life flight rather than ground transfer.   Ms. Birch believes that her transfer in that manner was warranted and that she, in fact, asked if he would transfer her in that fashion.   Ms. Birch believes that the care she received at St. Luke's improved the quality of her life for the remaining months of her life. Ms. Birch had no criticism or complaint about Dr. Vesom's recommendations or care. Shortly after this occurred,   Ms. Birch was approached on multiple occasions by Dr. Ryan Thomas, then Chief of Staff of AHA, who asked her to put in writing complaints about Dr. Vesom's care of her mother.   Ms. Birch did not do so since Ms. Birch did not have any complaints concerning how he had worked with her family to make sure her mother got the best care possible. At no time did Ms. Birch state to Virgil Bourne that Dr. Vesom had not cared for her mother appropriately as his letter dated October 23, 2002 in Exhibit 32 states, nor did Ms. Birch go to Mr. Bourne to discuss concerns over her mother's care; he called her in to his office. Ms. Birch certainly did not state that her family did not request her transfer to St. Luke's as that was the family's decision. The notations in Exhibit 32 seem manufactured to make it appear that Dr. Vesom transferred patients, specifically her mother, out of AHA for invalid reasons and this simply is not the case.  Birch Declaration, ¶

108.   In the latter years of her employment, Ms. Birch worked in medical records at AHA. In 2004, while reviewing medical records after Dr. Vesom was no longer practicing at AHA, Ms. Birch noted that in a months time AHA had transferred over twenty patients to hospitals in St. Josephs, Missouri and Kansas City with cardiac complaints because care was not available at AHA. Since this meant a considerable financial loss to the hospital, Ms. Birch remarked about it to a co-worker. Dr. Michael Jones overheard the remark and reported it to Kathy Butler, Risk Manager who promptly confronted Ms. Birch about having made the statement by giving her a laundry list of make work projects outside her normal work activities. When Ms. Birch asked her why she was doing this she told her that it was punishment for having commented openly about the numerous transfers. At the time, Ms. Birch did not relate her reaction to the fact that Dr. Vesom was gone and that was why so many patients had to be transferred. Ms. Birch feels that Dr. Vesom's removal from the staff contributed heavily towards ongoing financial problems of the hospital since he was no longer there to manage patients in the ICU and provide cardiac care in the Atchison Community, as well as to admit and treat a number of patients at the hospital.  Birch Declaration, ¶ 5.

109.   The AHA employed family physicians resented Dr. Vesom because he was a foreign born doctor who appeared to know more than they did about medicine and how to care for patients. They did not refer patients to him even though they knew it would be in their patients' best interests to do so because he was a foreign doctor with whom they did not want to compete. The Risk Manager at AHA, Kathy Butler, was her supervisor . On more than one occasion when discussing Dr. Vesom or some matter related to him with her she would remark, 'He needs to just go back where he came from." Ms. Birch always understood this to be a comment on him being a foreign born doctor. This attitude towards Dr. Vesom was reflected by

many of the medical staff and, Ms. Birch understood, was a reason they were out to get him by collecting written notes about him.  In her years at AHA, many of them spent in emergency care, Ms. Birch never observed Dr. Vesom disrupt the flow of care to a patient but, rather, Ms. Birch observed him, on many occasions, obtain miraculous results for patients others had given up for dead. Ms. Birch believes since his departure from the community that the quality of health care has been diminished.  Birch Declaration, ¶ 6.

Testimony of Kathy Jackson

110.     Kathy Jackson is a licensed, registered nurse, and was employed by and worked at the Atchison Hospital from 1969 to September 28, 2005.  The last 16 years of her employment were as the head nurse in the emergency room. As a result of her employment at Atchison Hospital, Ms. Jackson became acquainted with Dr. Pitt Vesom, a Board Certified internal medicine and cardiology doctor practicing in Atchison.  As a nurse working in the Atchison Hospital emergency room, Ms. Jackson had frequent contact with Dr. Vesom in the care of patients generally and his patients especially. Ms. Jackson never encountered a problem with him.  Kathy Jackson Declaration, ¶ 1.

111.     The Atchison Hospital emergency department is primarily staffed by physician assistants. It is true that Dr. Vesom expressed displeasure with the fact that the emergency room was covered by physician assistants without doctor supervision.  In fact, Dr. Vesom, Dr. Rider, and Dr. Growney each had a standing order that, when their patients were seen in the emergency room, they be contacted so that they might personally attend to their patients' needs rather than having them treated by the physician assistants. That practice of these three physicians was different from the standard practice of other medical staff physicians. Their practice was to allow the PA to treat the patient with the ER supervising physician later counter signing the record. In

fact, this type of treatment protocol was exactly what led to the unfortunate devastating injury to Mr. Noll, which resulted in a substantial malpractice claim.   Kathy Jackson Declaration, ¶ 2.

112.    The administration of AHA and the group of family practice physicians who control the hospital, such as Dr. Ryan Tomas, Dr. Michael Jones, Dr. Wayne Wallace and Dr. Eplee, have never appreciated constructive criticism and often retaliated against those who critiqued hospital procedures or standards of care. Ms. Jackson herself has experienced that response. Ms. Jackson did not realize or appreciate that Laura Willming, with whom Ms. Jackson worked closely for many years and considered a friend, was using their relationship to write up false criticisms of her behavior to be used, in part, as a basis for her termination. Ms. Jackson noted in her review of the Exhibits of the MEC that Ms. Willming frequently wrote derogatory comments concerning Dr. Vesom, apparently without reviewing the comment with Dr. Vesom prior to putting it in his file.  Kathy Jackson Declaration, ¶ 3.

113.    In her many years of service in the emergency room and literally hundreds of interactions with Dr. Vesom caring for patients, Ms. Jackson never found him to be abusive of the staff or the patient. He never disrupted the flow of care to a patient. He expected the staff to know what they were doing and, if a mistake was made, he would correct the individual so that it would not happen again. Sometimes, the medical staff members did not appreciate being corrected, but Ms. Jackson never observed Dr. Vesom to be disruptive in his handling of the situation.   Dr. Vesom's criticisms of the staff were always directed to patient care and to improving the quality of patient care delivered at the hospital.  Kathy Jackson Declaration, ¶ 4.

114.    During her many years of service in the ER, Ms. Jackson observed Dr. Vesom many times obtain results which Ms. Jackson can only describe as "miraculous".  Since his departure from the community, the standard of care for cardiac patients at AHA has been

substantially diminished.   There is no full time cardiac coverage.    Only Mid-America Cardiology provides coverage and that coverage is restricted to Monday, Wednesday and Friday from 9AM to 5PM as a clinic.  This does not provide the same level of coverage that Dr. Vesom provided. A physician is no longer available to install pace makers in the ER  or provide the emergency services to stabilize cardiac patients within minutes of their admission day or night. Now, patients with these problems must be sent to outlying institutions such as Heartland Hospital in St. Joseph, Missouri without receiving the benefit of immediate emergency intervention.  In any event, neither Mid-America Cardiology nor any other cardiologist provides emergency room coverage as did Dr. Vesom during his tenure.  His removal from the staff of Atchison Hospital diminished the quality of health care in this community.   Kathy Jackson Declaration, ¶ 5.

Other Material Facts

115.    On February 12, 2003, six days before the Medical Executive Committee voted to terminate the staff privileges of Dr. Vesom, Ryan Thomas was advised by Alana Hale, a nurse at the Hospital, that Dr. Vesom had asked her over the past several weeks to assist him in presenting a complaint to the Board of Healing Arts by providing a statement concerning Dr. Goracke performing a vaginal exam on an OB patient while placing an epidural.  Ms. Hale advised that she had falsely told Dr. Vesom that she had already called to Board of Healing Arts.  Dr. Thomas reported that he told Ms. Hale that it was okay to lie to Dr. Vesom about this and that she had done nothing wrong and should not feel bad about it.  Pl.Ex. 5.

116.    The disparity in treatment of Dr. Vesom and other Caucasian physicians on the medical staff is revealed in Vesom in camera Declaration.  Because the information contained in that declaration is obtained from confidential credentials and personnel files of similarly situated

Caucasian physicians, it will not be described in this filing, but it is available to the Court as documents filed under seal.

## ARGUMENT

**Standard for Considering Summary Judgment**

When considering a motion for summary judgment, the Court must view the evidence and draw a reasonable inference therefrom in a light most favorable to the non-moving party, usually the plaintiff. ***Matsushita Electrical Industries, Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)***. It is the responsibility of the moving party to establish the absence of any genuine issue of material fact for trial. **Id**.

In the instant case, each of the six counts involves an issue of the motive and intent of the defendants in acting to terminate the medical staff privileges of plaintiff, Dr. Vesom. Defendants' 129 page brief, containing 363 separate assertions of fact establish without question that this is a fact intensive case, where the factual determination of the defendants' motive and intent is critical. As the Court observed in ***Plotke v. White, 405 F.3d 1092, 1103 (10th Cir. 2005)***:

> **It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini-trial" to determine the defendant's true state of mind. So long as plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered a nondiscriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about the intent are best left for trial and are within the province of the jury.**

**Public Policy and the Claim that Plaintiff is a Disruptive Physician**

Defendants rely on provisions of the Acthison Hospital Association  Bylaws relating to conduct characterized as "disruptive" as justification for the termination of the medical staff privileges of Dr. Vesom. However, utilization of such provisions is often used to mask sham peer-review and as a pretext for race discrimination. See, e.g., Affidavit of John Henry

Pfifferling [Doc. No. 75].   Public policy prohibits a hospital from using the "disruptive physician" language in it Bylaws to sanction a physician who is asserting arguments intended to improve patient care or patient care issues.   As the Court observed in *McElhinney v. William Booth Memorial Hospital*, **544 S.W. 2d 216, 218 (Ken. S.Ct. 1976)**:

> **The goal of providing  high standards of medical care requires that physicians be permitted to assert their views when they feel that treatment of a patient is improper or that negligent hospital practices are being followed. Considerations of harmony in the hospital must give way where the welfare of patience is involved, and a physician by making his objections known, whether or not tactfully done, should not be required to risk his right to practice medicine.**

Likewise, in *Nanavati v. Burdette Tomlin Memorial Hospital,* **526 A.2d 697, 703-04 (N.J. Sup. Ct. 1987)**, the Court held:

> Doctors, like other people, have quirks, and some doctors are more disagreeable than others.  The mere fact that a doctor is irascible, however, does not constitute good cause for termination of his or her hospital privileges.  [Citing authorities].  Nor should allegations of "disharmony" ever be used as a ruse to deny or terminate staff privileges because of a doctor's race, religion, color, or gender.  Likewise, a doctor should not be cut off from staff membership merely because he or she has criticized hospital practices or other doctors.  [Citing authorities (valid and constructive criticism of hospital practices should not be equated with potential disharmony)].  Constructive criticism of an incompetent physician, like criticism of an unsafe or inefficient hospital practice, protects both the public and the hospital.  So strong is the public interest in open communications involving "matters directly affecting the quality of health care" that otherwise defamatory statements by one staff physician about another may be privileged.

Likewise, complaints of a staff physician regarding unlawful discrimination are protected oppositional activity under 42 U.S.C. §1981 and may not be used as a justification for the termination of staff privileges.  See, e.g., *Maldonado v. City of Altus*, **___ F.3d ___, 2006 WL 52805 (10th Cir.), January 11, 2006;** *O'Neal v. Ferguson Construction Co*., **237 F.3d 1248, 1258 (10th Cir. 2001)**.

In this case, virtually all of the alleged "disruptive" activity of Dr. Vesom centered on his attempts to improve the quality of health care at the Hospital, or his complaints that he was being discriminated against because of his race by the Hospital administration.  As a matter of law and public policy, the defendants may not resort to unfounded allegations of disruption in the circumstances to terminate Dr. Vesom's medical staff privileges.

**The Waiver or Release of Claims Argument**

The defendants argue that Dr. Vesom's antecedent execution of the papers necessary to reapply for his medical staff privileges on December 15, 2002, which included a liability waiver, constitutes a release of liability for defendant's subsequent violations of statute and  intentional torts.  Obviously, any release of claims must be knowing and voluntary, and a party may not release another from liability for intentional conduct which is yet to occur.

The defendants cite no case which involves the termination of medical staff privileges. Each of the authorities cited by defendants involves a release of contract claims against professional associations which certify medical professionals in medical specialties.  Indeed, even the authorities cited by defendants hold that a liability waiver is ineffective against intentional tort claims or federal statutory violations.  See, e.g. *Balaklaw v. American Board of Anesthesiology, Inc.*, **149 Misc. 2d 11, 562 N.Y.S.2d 360, 362 (N.Y. 1990)**(considering the validity of a tort claim against the agency and denying that claim for a lack of supporting evidence—not the liability waiver) and *Sanjuan v. American Board of Psychiatry & Neurology,* **40 F.3d 247, 250 (7th Cir. 1994)**(holding that federal statutory claims, such as a claim under the Sherman Act are unaffected by an antecedent liability waiver).

A release which purports to waive claims which may arise in the future for violations of statutory obligations or intentional torts is void because it is against public policy. Although

parties with substantially equal bargaining power may waive prospective claims for breach of contract or negligence in the performance of a contract, public policy prohibits a party from licensing another to violating statutes enacted for the public good or otherwise committing intentional wrongs.  A waiver of claims arising from violations of the various federal civil rights laws is absolutely void. *Alexander v. Gardner-Denver Co.*, **415 U.S. 36, 51-52 (1974);** *U.S. v. Allegheny-Ludlum Industries, Inc.*, **517 F.2d 826, 856-57 (5th Cir 1975);** *Rogers v. General Electric Co.*, **781 F.2d 452, 454 (5th Cir. 1986)**. Moreover, public policy prohibits the prospective waiver of any claim for intentional wrong, including claims based on intentional torts. *Mazzoni Farms, Inc. v. E.I. DuPont & Co.*, **761 So.2d 306, 312 (Fla. 2000);** *Hatch v. V.P. Foundation,Inc.*, **990 S.W.2d 126, 140 (Mo. App. 1999);** *Reece v. Finch*, **562 So.2d 195, 198-99 (Ala. 1990);** *Elmer v. Coplin*, **485 So.2d 171, 177 (La. App. 1986)**.

Each of plaintiff's six claims is predicated upon a violation of a federal statute, an intentional tort or a violation of public policy. As such, each claim cannot by waived prospectively.

**Defendants' Claim that Dr. Vesom has no "Right" to Staff Privileges**

Defendants argue that the hospital had the right to select the physicians it chooses to be on its staff, and this point is undoubtedly true. Defendants do not explain, however, why the freedom to choose physicians for its staff should be regarded as an excuse for violating the federal civil rights and anti-trust laws, violating Kansas public policy, and committing intentional torts in connection with its decision-making. As discussed below, much like the situation with employment and the employment-at-will doctrine, the hospital is free to appoint or terminate the staff privileges of any physician for any reason—a good reason, bad reason, or no reason at all—so long as it is not an unlawful reason.

A person has no "right" to purchase real estate.  However, a citizen may not be denied the opportunity to purchase real property because of his or her race.  ***Jones v. Alfred H. Mayer Co.***, **392 U.S. 409, 437-38 (1968)**.  No person has a right to any particular job; yet, no citizen may be denied a job because of his or her race.  ***Johnson v. Rliway Express Agency,*** **421 U.S. 454 (1975)**.

Defendants argue that a private hospital has the right to select its staff, and plaintiff has no quarrel with that proposition.  What defendants fail to recognize is that they have no right to discriminate against individuals because of race in the admission to medical staff.  Indeed, the Bylaws provide expressly that Atchison Hospital Association shall not exclude physicians from the medical staff because of their race.  Nor may the Hospital take actions in connection with the administration of the staff which violate the antitrust laws or which constitute intentional torts.

**Claims of Immunity under Kansas Law and the HCQIA**

In Sections III (C), (J) and (K), defendants argued that they are immune from liability for damages under K.S.A.§65-442 and under the federal Health Care Quality Improvement Act ("HCQIA").  First, it should be noted that even if the defendants were entitled to such immunity, the course of this litigation would not change.  Neither statute imposes a restriction on plaintiff's claims for injunctive relief and damages asserted in Counts I, II and III for violations of the federal Civil Rights Statutes.[4]  Likewise, each statute immunized his peer review activity only against claims for damages -- not claims for injunctive relief.

The protection provided by the statute is protection from liability for damages and not protection from suit. The distinction was the basis for dismissal of defendant's appeal of the trial court's denial of defendant's motion to dismiss in the Tenth Circuit decision, ***Decker v. IHC***

---

[4]   The HCQIA provides expressly that no immunity is granted for claims brought under the federal civil rights laws, and state law may not immunize any defendant from liability for violation of federal statutes under the Supremacy Clause of the United States Constitution.

*Hospitals, Inc.,* **982 F.2d 433, 435-37 (10th Cir. 1992)** In doing so, the Court rejected defendant's contention that the subject statute provided immunity from suit. The Court at page 436 cites, in support of its decision, the section of HCQIA entitled "limitations on damages for professional review actions" which provides in pertinent part: if a professional review action of the professional review body meets all the standards specified in Section 11112 (a) of this title . . .(A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any state, (or political subdivision thereof) with respect to the action. The Court stated that the plain meaning of this provision is that professional review bodies and covered individuals who satisfy the requirements of Section 11112 (a) are immune from liability for damages only. On its face, this provision does not explicitly establish immunity from suit. The court then reviewed the legislative history creating the act and noted that the very broad protection from suit initially in the bill was removed as a result of concern that such protection might be abused and serve as a shield for anticompetitive economic actions under the guise of quality control. Thus, as redrafted, the Bill now only provides protection from damages in private actions, and only for proper peer review, as defined in the Bill. Only if the statute provided defendants with immunity from trial or the right not to stand trial would the defendants be entitled to dismissal in the present circumstances.

Thus, even if the evidence in this case supported the application of immunity for peer review activities under federal and state law (which, on this record it plainly does not) this case would go to trial on Counts IV, V and at VI for the purpose of determining whether plaintiff is entitled to injunctive relief, including the right to reinstatement of his medical staff privileges

and to have the record of his dismissal as a disruptive physician expunged from the National Practitioners Data Bank.[5]

The HCQIA establishes a rebuttable presumption that the peer review action satisfied the "preceding standards necessary for immunity." *Brown v. PHS,* **101 F.3d 1324, 1333 (10th Cir. 1996**). The HCQIA grants qualified immunity to professional review bodies and others who participate in the review action, provided that the professional review is taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care;
> (2) after a reasonable effort to obtain the facts of the matter;
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. Section 1112(a)(1)-(4).

The plaintiff challenging the review action can rebut this presumption if he demonstrates that a reasonable jury, viewing the facts in the light most favorable to him, could find by a preponderance of the evidence that the defendants did not satisfy any **one** of the HCQIA standards. *Islami v. Covenant Medical Center, Inc.,* **822 F. Supp. 1361, 1377-78 (N.D. Iowa 1992);** *Singh v. Blue Cross/Blue Shield of Massachusetts, Inc*., **308 F.3d 25, 32 (1st. Cir. 2002).** Courts utilize an objective standard of reasonableness when considering whether a defendant has met the statutory requirements. *Egan, 971 F. Supp.* **at 42**. However, one instance of an objective basis for discipline does not *per se* permit a defendant to claim immunity. The

---

[5]   Upon Dr. Vesom's dismissal at Acthison Hospital Association, the Hospital reported the termination of his staff privileges on the basis that he was found to be a "disruptive physician" to the National Practitioners Data Bank. Following his termination, Dr. Vesom experienced enormous difficulty in obtaining medical staff privileges at other hospitals because of this data entry, which is available to all hospitals throughout the nation.  The entry in the National Practitioners Data Bank will remain on his record permanently, effectively eliminating his ability to obtain medical staff privileges at hospitals throughout his working life.  Accordingly, injunctive relief in this litigation is extremely important to plaintiff.

review of the peer review board's decision is based upon the totality of the circumstances. ***Clark v. Columbia/HCA Information Services,*** **117 Nev. 468, 25 P3d. 215 (2001).** "The relevant inquiry under (a)(2) is whether the totality of the process leading up to the professional review action evidenced a reasonable effort to obtain the facts of the matter." ***Mathews, M.D. v. Lancaster General Hospital***, **87 F.3d 624, 637(3rd Cir. 1996).** In ***Clermont, M.D. v. Fallon Clinic, Inc***., **16 Mass. L. Rep 325 (1998 Mass. Super.),** the Court found that plaintiff had produced facts upon which a reasonable jury could conclude that he had shown by a preponderance of the evidence that the investigations preceding the professional review actions were obviously insufficient, and, therefore, unreasonable. In that case, he plaintiff there successfully contended the peer review committee failed to conduct an independent investigation of the issues before it and did not review any relevant medical records or relevant documents before making its' decision. The Court reiterated the standard that the proper inquiry for the court is whether the plaintiff has provided sufficient evidence to permit a reasonable jury to find he has overcome, by a preponderance of the evidence, any **one** of the four statutory elements required for immunity under 42 U.S.C. section 1112(a*). **Brown v. PHS,** 101 F 3d. 1324, 1334 (10th Cir. 1996).* For instance, in ***Brown*** the appellate court found plaintiff had rebutted the presumption by presenting sufficient evidence for a reasonable jury to find, by a preponderance of the evidence, the peer review action was not taken after a "reasonable effort to obtain the facts of the matter". In ***Islami***, **822 F.Supp. at 1377**, the Court found that the plaintiff had rebutted the presumption by showing by a preponderance of the evidence that defendants did not provide him with a fair and adequate process under the circumstances. Those circumstances were a failure to comply with the contractual provisions of the defendant's By-Laws. In ***Clark, supra,*** **117 Nev. at 472,** the Court found plaintiff had overcome the presumption by evidence that the revocation of his

hospital staff privileges was not with reasonable belief that it was in furtherance of quality health care. Clark's evidence indicated that the revocation of privileges was in response to his acts of 'whistle blowing' rather than disruptive behavior affecting the quality of health care.

### A.  Plaintiff Was Not Provided A Fair Process

Plaintiff left the staff of AHA in 1996 to return to his native country of Thailand in order to address family needs. When he returned to Atchison to resume his practice, in order to restore his AHA privileges, he was plainly subjected to harsh and discriminatory treatment.   The Hospital initially refused to provide him an application.  It enlisted the services of legal counsel to prepare the Medical Executive Committee to find any flaw which would prevent his readmission to the medical staff.   His application was delayed for nine months, denied by the Medical Executive Committee, and only through the intercession of Jim Asher, the former long-term Hospital Administrator was he granted privileges.   Even though Dr. Vesom had not one single occurrence of delivering professional services below the standard of care, he was required to undergo an embarrassing "proctoring" for a one-year period, even though physicians fresh from medical school, like Dr. Swayze, were admitted to the staff without restrictions and without the proctoring he needed.   When Dr. Vesom was finally admitted in March, 1999, he was required to enter into a contract which provided, among other requirements, that monthly written reports regarding Dr. Vesom behavior would be obtained from four departments: social services, nursing, emergency room and ICU. Under the contract, those reports were to be reviewed with Dr. Vesom on a monthly basis in the event corrective action was necessary. Although writings were collected during the life of the contract, none were ever shared with Dr. Vesom until June of 2003 when they were served on him as supportive of the executive committee's February 2003

notice of non renewal of his AHA privileges. He was certainly never advised that any corrective action in his behavior was required in order to continue his AHA privileges.

No corrective action contemplated by Appendix B of the By-Laws was ever initiated to deal with the alleged instances of disruption. At no time was plaintiff given notice of need for corrective action with regard to any of the surreptitiously collected documents that were served upon him in June of 2003 to support the executive committee's February 2003 decision to not renew his privileges. What the record does reveal is that prior to that February 2003 notice of non renewal, Dr. Vesom was never rebuked or asked to modify his behavior by the administration of AHA. Nor, incidentally, was he ever the subject of a peer review that deemed his treatment of any patient which fell below the standard of care and Dr. Vesom  has certainly never even been the subject of a complaint of medical negligence or, much less, the subject of a law suit that claimed he was negligent.

Although defendants assert that Dr. Vesom was afforded a "fair hearing" under the procedures established by the Bylaws, the charges leveled against him and presented to the Fair Hearing Panel were exaggerated, taken out of context, and in some instances plainly fabricated. Dr. Vesom was denied the opportunity to review his credentials file for the purpose of determining the accuracy of the documentation presented by the defendants seeking to justify their actions in terminating his staff privileges.  Had he been afforded the simple opportunity to review his own file in advance of the hearing, he would have been able to establish that the defendants manufactured documents to support their position, exaggerated the seriousness of the so-called events of disruption, and excluded from consideration a significant body of documentary evidence which was totally exculpatory of the claims being falsely asserted against him.

Indeed, it may not be argued seriously that genuine issues of material fact do not exist regarding the fairness of the procedure by which Dr. Vesom lost his medical staff privileges. Accordingly, the immunity provided by the HCQIA is unavailable in this case.

### B. Peer Review Was Not Taken After A Reasonable Effort To Obtain The Facts And/Or In A Reasonable Effort To Improve The Quality Of Health Care

Indeed, this case is most unusual in that an individual who was actually present and participated in the decision-making process through which Dr. Vesom was terminated has testified on behalf of Dr. Vesom.  Dr. James Ryder, a member of the Medical Executive Committee testified that  the actual motivation for the executive committee's decision was Dr. Vesom's outspoken position on AHA's standard of care in a variety of areas of practice. In fact, a review of the defendants' exhibits discloses virtually all of what defendants call disruptive behavior was plaintiff's attempt (i) to impose some order on committee chair selections to assure departments were under the direction of the most skilled physician, (ii) to attempt to impose orderly and consistent reading of EKG's without disruption of his practice (plaintiff had no contractual obligation to read EKGs of other physicians but agreed to do so as an accommodation to AHA); (iii) to stop in- hospital patient dumping by requiring a physicians to see a patient before requesting consults, and (iv) his unsuccessful attempts to have a young surgeon with a exceedingly high rate of post surgical complications proctored.

Plaintiff's peer review concerns came to a head in late fall of 2002 when plaintiff voted to request outside peer review of a case of maternal morbidity and mortality involving a patient of Ryan Thomas, M.D., a member of the executive committee that voted not to renew plaintiff's privileges. Plaintiff and a fellow AHA physician, Dr. David Ware, were dissatisfied with the way the outside review was managed and protested the same at a staff meeting. Vesom I Dec. ¶3. They subsequently took their concerns to the CEO and COS of AHA in a January 3, 2003

meeting. On January 22, 2003 they placed their concerns in a letter to the Board of AHA. It was this action that drove the executive committee's decision to not renew the privileges of plaintiff and Dr. Ware. Only after the decision was made did the committee set about mustering some basis for terminating Dr. Vesom's privileges. No effort was made to "obtain the facts" supporting the actions of the Medical Executive Committee. Instead, the Hospital and the Medical Executive Committee intentionally misstated the record, presented altered records to support its decision, and made its decision to terminate Dr. Vesom because of his complaints of substandard health care long before any effort was made to assemble the evidence which it now claims supports the decision.

Indeed, a KDHE audit of AHA conducted in March, 2003 documented that the concerns raised in plaintiff's January letter were indeed problem areas for the Hospital. This evidence not only raises a fact question for a reasonable jury's consideration but demonstrates virtually as a matter of law that the defendants' actions were not taken in an effort to improve the quality of health care in the Atchison community but, in fact, have been detrimental to that quality. Witnesses Asher, Ware, Rider, Jackson and Birch confirm that the quality of health care in the Atchison community has, in fact, been damaged by the termination of Dr. Vesom. The irony of defendants Health Care Quality Improvement Act defense is that their action ostensibly taken under the protection of that act has deprived the Atchison Community of the quality health care provided by the only Board Certified Cardiologist and Internist there 24/7 for their protection.

### C.  Reasonable Belief that Action was Warranted by Known Facts

For all of the foregoing reasons, genuine issues of material fact exist with regard to the issue of whether the actions of the Medical Executive Committee and the Hospital were based on a reasonable belief that the actions were warranted by known facts. Indeed, the "known facts"

revealed that Dr. Vesom was not disruptive.  Plainly, from the testimony of James Rider, the basis for terminating Dr. Vesom was the desire of the family practice doctors on the staff of the Hospital to eliminate from the environment a doctor who was seeking to improve the quality of medical care at the facility.  Notwithstanding the assertions of  the defendants to the contrary, the record evidence reveals a genuine fact dispute on this issue.

**The Kansas Statute**

Much like the HCQIA, the Kansas Immunity Statute, K.S.A. §65-442 only provides immunity from actions for damages "if such member acted in good faith and without malice, and the medical staff operates pursuant to written bylaws that have been approved by the governing board of the medical care facility."  The same facts which create a genuine issue for trial on the question of HCQIA immunity also create a genuine issue of material fact regarding whether the Medical Executive Committee and the Hospital "acted in good faith and without malice . . . ." Sufficient evidence exists on which a reasonable jury could conclude that the actions of defendants were not taken in good faith and were motivated by malice.  Accordingly, a jury-triable issue exists on the applicability of the Kansas immunity statute.

**The Claims of Race Discrimination Brought under Federal Civil Rights Statutes**

In Sections III (D), (E), (F) and (G), defendants argue that they are entitled to summary judgment on the federal civil rights claims brought in Counts I, II and III under 42 U.S.C. §1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, and 42 U.S.C. §1983(3).  Each of these arguments will be addressed in this section.

First, defendants argue that there is no evidence of discrimination against Dr. Vesom because of his race.  Indeed, there is significant direct evidence of discrimination, including comments from individuals associated with the Hospital regarding Dr. Vesom's use of

"chopsticks" and the statement from a member of Hospital Management that "Dr. Vesom should just go back where he came from."  The declarations of Dr. Vesom, Dr. Rider, Dr. Ware, Rosetta Birch, Jim Asher and Kathy Jackson established evidence that Dr. Vesom, from the outset of his association with Atchison Hospital was excluded from all social activities, rebuffed in his efforts to associate with colleagues and subjected to open hostility and even hatred by members of the Hospital's administration.  Most telling, perhaps, are the observations of impartial observers to this harsh and adverse treatment, each of whom ascribes the motive to an animus directed toward foreign-born doctors by the family practitioners on a staff of the Hospital.    In addition, Dr. Vesom has presented evidence of the disparity in the treatment of similarly-situated Caucasian medical staff members.  See Vesom *in camera* Declaration.

In addition to the direct evidence of racially discriminatory animus practiced by decision-makers at the hospital, Dr. Vesom may use the burden-shifting model of proof first articulated in the case of ***McDonnell Douglas v. Green***[6] to create an inference of discrimination by producing evidence sufficient to establish a prima facie case of discrimination and, if applicable, offering proof that the legitimate, nondiscriminatory reason articulated by the defendants for their action are either false or a pretext for discrimination.

Defendants have asserted that because this is not a case involving an employer and employee the burden-shifting analysis of McDonnell Douglas should not apply.  Defendants argument fails to recognize that the model of proof which raises an inference of discrimination is a judicial rule created because of the inherent difficulty of proving discriminatory animus and intent.  The origin of the rule is grounded in logic and reasoning, not a narrow principle of employment law.

---

[6]  See ***McDonald Douglas Corp. v. Green***, 411 U.S. 792 (1973); ***St. Mary's Honor Center v. Hicks***, 509 U.S. 502 (1993); ***Reeves v. Sanderson Plumbing Co.***, 530 U.S. 133 (2000).

Indeed, the courts routinely follow the McDonnell Douglas model of proof in cases where non-employees or independent contractors claim race discrimination. ***Hampton v. Dillards Department Store***, 247 F.3d 1091, 1107 (10th Cir. 2001); ***Tyler v. RE/MAX Mountain States, Inc***., 232 F.3d 808, 812 (10th Cir. 2000); ***Chin Thi Le v. Hy-Vee, Inc.,*** 385 F.Supp.2d 1111,1117 (D.Kan. 2005); ***Smith v. Mission Associates, LTD,*** 225 F.Supp.2d 1293, 1301 (D.Kan. 2002); ***Kelly v. Bank Midwest,*** 161 F.Supp.2d 1248, 1255 (D.Kan. 2001).

Although defendants do not challenge the ability of plaintiff to establish a prima facie case in their summary judgment motion, it is apparent that plaintiff may make a prima facie showing of discrimination by showing: (i) he is Asian (ii) he was specially qualified for the position he held [he did the job for over 20 years]; (iii) his medical staff privileges were terminated; (iv) the termination occurred under circumstances which give rise to an inference of discrimination. See *Plotke v. White*, 405 F.3d 1092, 1100-01 (10th Cir. 2005). Under the ruling in *Plotke* plaintiff is not required to show that he was replaced with a non-minority doctor.

Defendants assert that they had a legitimate, nondiscriminatory reason for terminating the medical staff privileges of Dr. Vesom. They state that Dr. Vesom was a "disruptive physician" which justified the decision to terminate his privileges. Defendants' Memorandum in Support of the Motion for Summary Judgment at 97.[7] There is ample evidence to establish that the stated reason for Dr. Vesom's termination is false and is a pretext for discrimination. As the Tenth Circuit has stated repeatedly:

> pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

---

[7] Defendants assert that plaintiff is not Asian, but, without any factual support, state that "defendants had previously provided testimony that they were unaware of plaintiff's race or national origin." Brief at 98. Dr. Vesom states in his declaration that he is Asian. The defendants admit having knowledge that Dr. Vesom was from Thailand; they make a point of noting that his name is "Pittaya Vejviboonsom" [¶112 at page 25 of the Brief]; they list Dr. Vesom as an Asian employee of the Hospital in reports to the federal government [¶340 at page 82-83 of the Brief], and at least one Hospital official said that Dr. Vesom should "go back where he came from." Perhaps one or more of these facts could reasonably be deemed to be an indication that Dr. Vesom was not a Kansas native.

its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." ***Morgan v. Hilti, Inc.***, **108 F.3d 1319, 1323 (10th Cir.1997) (quoting** *Olson v. Gen. Elec. Astrospace*, **101 F.3d 947, 951-52 (3d Cir.1996)).** A plaintiff can make a showing of pretext with evidence that the defendant's stated reason for termination was false. ***Kendrick v. Penske Transp. Servs., Inc.***, **220 F.3d 1220, 1230 (10th Cir.2000).**

Plaintiff is not required to demonstrate pretext with respect to every issue raised by the defendant as its "legitimate, nondiscriminatory reason" for its action.   Where plaintiff casts doubt on a significant number of the multiple reasons or bases for its action, the trier of fact is entitled to question the defendant's credibility and reject even those reasons which are not discredited.  See ***Bryant v. Farmers Insurance Exchange***, **____ F.3d ____, 2005 WL 3475772 (10th Cir.(Kan.) 2006) at \*10**; ***Tyler v. RE/MAX Mountain States, Inc***. ., **232 F.3d 808, 814 (10th Cir.2000).** Plaintiff has challenged the truthfulness and validity of virtually every instance relied upon by defendants as evidence of Dr. Vesom's "disruptive" behavior, precluding summary judgment.

The testimony of Dr. Rider provides evidence that the timing of the decision to terminate Dr. Vesom is inconsistent with the defendants' claims.  According to the sworn testimony of Dr. Rider, a member of the Medical Executive Committee and a participant in the meeting and discussions leading up to the termination of Dr. Vesom, the other four members of the MEC decided to terminate Dr. Vesom before there was any discussion of the grounds for terminating him and that the motive of the others on the Committee had nothing to do with assertions that he was disruptive.  As the Tenth Circuit observed in ***Plotke***, **405 F.3d at 1104:**

> The conflicting evidence concerning the timing of Dr. Morris' decision to fire Dr. Plotke coupled with the conflicting evidence regarding the reasons Dr. Morris decided to fire her raise credibility issues for the fact finder.   As the Supreme Court has reaffirmed,
>
> > [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.... In

> appropriate circumstances, the trier of fact can reasonably infer
> from the falsity of the explanation that the employer is assembling
> to cover up a discriminatory purpose.

Reeves, 530 U.S. at 147, 120 S.Ct. 2097.  If Dr. Morris' testimony concerning his timing and reasoning for terminating Dr. Plotke is "unworthy of credence," a reasonable jury could infer from "the falsity of [his] explanation" that Dr. Morris is "assembling to cover up a discriminatory purpose." *Id.*

On this record, it is apparent that a genuine issue of material fact exists for trial on the issue of pretext.

Defendants assert that the Bylaws do not create a contract between the medical staff physician and the hospital; accordingly, defendants argue that plaintiff may not assert a claim under the Civil Rights Act of 1866, 42 U.S.C. §1981.  The assertion that no contract exists between staff positions and the hospital is puzzling in view of defendants' assertion at least eight times that the Bylaws impose "agreements" and "contractual obligations" on the physicians admitted to the staff.  See, Defendants' Statement of Uncontroverted Facts at ¶7, 13, 17, 23, 24, 25, 145 and 210.

First, defendants' assertion that the Bylaws of a hospital do not constitute a contract between the hospital and medical staff is contrary to established law.  See 41 C.J.S. Hospitals, §16: "A hospital's medical staff bylaws constitute a contract between the hospital and its medical staff . . . ."  Many courts have recognized the right of physicians denied staff

privileges to assert claims of race discrimination under §1981 and 42 U.S.C. §1985(3) where a conspiracy is alleged. **See, e.g. *Jatoi v. Hurst-Euless-Bedford Hospital Authority*, 807 F.2d 1214, 1219 (5th Cir. 1987).  See also *Islami v. Covenant Medical Center*, 822 F.Supp. 1361, 1370 (D. Iowa 1992); *Janda v. Madera Community Hsopital*, 16 F.Supp.2d 1181, 1186 (E.D. Cal. 1998).**

The cases relied upon by defendants plainly do not support the position of defendants that only where one has a vested right to contract benefits may §1981 be applied. In ***Walker v. Couture***, **804 F.Supp. 1408 (D. Kan. 1992)**, (cited in footnote 10) there is no suggestion that §1981 only applies in cases of vested contract rights. Indeed, the Court considered the §1981 claim in ***Walker*** on its merits, and denied relief because the plaintiff could not establish that the stated reason for denying plaintiff access to the park was a pretext for discrimination. In ***Van v. Anderson***, **199 F.Supp.2d 550, 563-64 (N.D. Tex. 2002)**, the §1981 claim was denied because there was no contract at issue. Plaintiff was a staff physician at a Hospital, and when his renewal came up, the executive committee recommended that he not be renewed. When he appealed, the executive committee withdrew its negative recommendation, and the physician never lost his staff privileges. Accordingly, his §1981 claim against the executive committee failed to state a claim because he was not denied contractual privileges. Likewise, in ***Thompson v. Wise General Hospital***, **707 F.Supp. 849, 853-54 (W.D. Va. 1989)**, a physician who never had a contract with the defendant hospital as a staff member was found to have no §1981 claim where he merely sought permission to see his patients in the hospital. None of the authorities cited by defendants support the quite novel theory that §1981 does not apply to individuals who seek to make or enforce contracts unless it is established as a prerequisite to suit that plaintiff has a vested or guaranteed right to contract with the defendant.

Defendants correctly argue that plaintiff may not assert a Title VI claim against defendants Thomas, Goracke and Swayze because they are not recipients of federal funds. Plaintiff does not seek relief against the individual defendants under Count II.

Finally, defendants argue that the Hospital cannot conspire with its own agents, citing ***Atkins v. Boeing Company***, **No. 91-1404, 1993 WL 186170 (D. Kan. May 5, 1993)**, *aff'd*

*Atkins v. Boeing Company,* No. 93-3177, 1994 WL 274066 (10th Cir. June 14, 1994).   In *Atkins* the Court held that a corporation cannot conspire with its own employees.  It does not, however, provide that corporate employees cannot be liable for their own conspiracies to violate an individual's civil rights.  In this case, the evidence reveals that defendants Thomas, Goracke and Swayze agreed to take actions for the purpose of discriminating against Dr. Vesom.  Accordingly, they are liable under 42 U.S.C. §1981.  In addition, defendants themselves offer evidence that Doctors Goracke and Swayze are not employees of the Hospital.  See D.Ex. 28 ¶3 and 29 ¶3.  Because these defendants are independent economic entitles, the rule of *Atkins* does not apply in this case.

**Whistleblower Claim**

Citing  ***Zinn v. McKune*, 949 F. Supp. 1530, 1537–38 (D. Kan. 1996**), defendants argue that the public policy protecting whistleblowers does not extend to Dr. Vesom, as an independent contractor.  The plaintiff in *Zinn* was not an employee of the defendant and had no relationship with the defendant as an independent contractor.  The rationale for the Court's holding was that the protections of public policy would not be extended to a person who had no relationship with defendant.  The Court held:

> Thus, because there is no evidence that any of the defendants had the power to hire or fire the plaintiff, the court concludes that, based on the facts alleged, the Kansas Supreme Court would not extend the tort of whistle-blower retaliation to the defendants.

**949 F.Supp. at 1538.**  Of  course, it makes no sense to extend whistleblower protection to an individual who "blows the whistle" on an entity which has no power or authority to affect the economic interest of a party making the complaints.  Unlike Zinn, the defendants in this case did wield economic power over plaintiff and most certainly had the authority and the power to terminate his 20+ year practice of medicine in the community of Atchison, and they did.  Public

policy dictates that persons and entities should not be allowed to act with impunity to stifle complaints about unlawful or unethical conduct through economic force.

Dr. Vesom has offered evidence that the medical staff physicians at Atchison Hospital performed the same services for the Hospital as employees under the same regulatory scheme. Public policy encourages reporting of conduct contrary to the public interest, whether the reporting is done by an employee or an independent contractor.

In ***Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996),** the Supreme Court affirmed the Tenth Circuit's holding that independent contractors are entitled to protection from termination of their contracts based on the exercise of First Amendment rights.  The holding in that case in instructive:

> We therefore see no reason to believe that proper application of the Pickering balancing test cannot accommodate the differences between employees and independent contractors.   There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees.   The bright-line rule proposed by the Board and the dissent would give the government carte blanche to terminate independent contractors for exercising First Amendment rights.    And that bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake.   See Comment, Political Patronage in Public Contracting, 51 U. Chi. L.Rev. 518, 520 (1984) ("[N]o legally relevant distinction exists between employees and contractors in terms either of the government's interest in using patronage or of the employee or contractor's interest in free speech");  cf. Perry, 408 U.S., at 597, 92 S.Ct., at 2697 (the prohibition of unconstitutional conditions on speech applies "regardless of the public employee's contractual or other claim to a job").    Determining constitutional claims on the basis of such formal distinctions, which can be manipulated largely at the will of the government agencies concerned, see Logue v. United States, 412 U.S. 521, 532, 93 S.Ct. 2215, 2222, 37 L.Ed.2d 121 (1973) (noting that independent contractors are often employed to perform "tasks that would ... otherwise be performed by salaried Government employees"), is an enterprise that we have consistently eschewed.  . . .
>
> . . . .  Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government,

and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government.    The Board's and the dissent's assertion, post, at 2362, that the decision below represents an unwarranted 'extension' of  *681 special protections afforded to government employees is, therefore, not persuasive.

**518 U.S. at 678-81.**

Defendants argue as a matter of law, independent contractors are not entitled to the protections of public policy, regardless of the factual similarity between the independent contractors and employees in the case at issue. ***Wabaunsee County*** teaches that this issue may not be resolve as a matter of law in a fact vacuum.  Resolution of this on summary judgment is inappropriate because no factual record has been developed, nor have defendants offered any evidence that the relationship between independent staff physicians and employed staff physicians is functionally different.

***Parsells v. Manhattan Radiology Group,*** **255 F. Supp. 2d 1217 (D. Kan. 2003)** is not a case contrary to this principle.   In that case, Judge Lungstrum, relying principally on cases interpreting various statutes conferring whistleblower protection on 'employees' only, questioned whether plaintiff's whistleblower claim under Kansas law was viable for an independent contractor.  He asked plaintiff for briefing on the subject.  **255 F.Supp.2d at 1237.**  A review of the Court record in that case reveals that plaintiff filed his Memorandum of Law supporting his whistleblower claim on April 14, 2003 [Doc.No. 91].   Rather than dismiss the case, Judge Lungstrum set the case for trial by order dated April 22, 2003 [Doc.No. 93], and it apparently settled.   See Docket entries in Case No. 02-2008.  Parsells is not authority for the proposition defendant asserts—that in no case is an independent contractor entitled to whistleblower protection under the Kansas Common Law.

Defendants argue that they were not aware of the KDHE complaint at the time Dr.

Vesom's privileges were terminated.   The Declaration of Dr. Ware and Pl.Ex. No. 5 provide substantial evidence that the members of the Medical Executive Committee knew the complaints about the standard of care and peer review at Atchison Hospital Association by Dr. Vesom and Dr. Ware were headed to the KDHE.

Finally, citing *Polson v. Davis,* **895 F.2d 705 (10th Cir. 1990)**, defendants argue that there is an adequate statutory remedy available to plaintiff to vindicate his allegations of retaliatory discharge for whistleblowing.   In *Polson* the plaintiff's claim of whistleblowing involved the allegation that he complained of discrimination in violation of the Kansas Act Against Discrimination.   Because that statute had its own remedial provisions, the Tenth Circuit held that the additional protections of the public policy exception were unnecessary and unavailable.

The whistleblowing allegation in the instant case involves complaints of substandard medical care and inadequate peer review at the Hospital which endangered the public health and welfare.   There is no statutory scheme which protects individuals who lodge such complaints with public officials or upper management of the institution.   Accordingly, the rule in *Polson* is inapplicable in this case.

**The Sherman Act Claim**

Defendant's assertion that the defendants' actions are exempt from the Sherman Act under the "state action" doctrine is ludicrous.   Defendant does not suggest that the State of Kansas has the authority to overturn any "peer review" activity of Atchison Hospital Association, a private corporation; accordingly, the state action immunity from antitrust liability does not apply.   *Patrick v. Burget* **486 U.S. 94 (1988).**

Plaintiff agreed with defendants that the denial of staff privileges for valid

reasons cannot be an antitrust violation.   However, denial of staff privileges for the purpose of diminishing the competition for services in the Atchison community, as reflected in the evidence in this case, is prohibited anticompetitive activity which violates Sherman I.   The four elements of a Sherman I violation articulated on page 123 of defendants' brief plainly are satisfied by the record in this case.   There is little question that the testimony of Dr. Rider established concerted actions of defendants to drive Dr. Vesom from the community [or back to Thailand as some agents of the Hospital suggested];   the concerted actions produced an anti-competitive effect implicating interstate commerce;   the concerted actions were plainly illegal;   and Dr. Vesom was injured by being driven from a practice he had developed over a period of more than 20 years.

The defendants request for summary judgment on the Sherman Act claim must be denied.

**Intentional Interference with Business Relations**

Other than a recitation of the elements of the tort and the blanket statement that plaintiff cannot make out a prima facie case, defendants' argument is completely void of substance.   It is the burden of the moving party to show that there is no genuine issue of fact for trial — not just state the plaintiff cannot make a prima facie case.   Plainly, plaintiff had a thriving medical practice which was destroyed by defendants' intentional and unlawful misconduct.   This point is wholly unsupported by defendants' moving papers.

**Exhaustion of Administrative Remedies**

Defendants argue that plaintiff failed to "exhaust" his remedies by asking he Secreary of the Department of Health and Human Services to review the false allegation of Dr. Vesom's

disruptive behavior reported to the National Practitioners Data Bank.  Significantly, defendants cite no authority for the proposition that such action is a jurisdictional prerequisite to attacking the finding in Court.  This is because there is no such authority.  Nothwithstanding the absence of any merit in this point, plaintiff welcomes the opportunity to have this Court determine whether the report of the Hospital was true or false.

**The Defendants' Argument that Conduct Prior to 2003 is Time-Barred**

The defendants argue that any unlawful acts which produced injury before 2003 or, alternatively, before the two-year period of limitation provided in K.S.A. 60-513 is not actionable or may not support a damage claim.  The Tenth Circuit recently affirmed the long-standing rule that unlawful discriminatory actions, even those which preceed the running of the statute of limitations, may affect liability and damages in the period inside the statute of limitations.  See ***Goodwin v. General Motors Corporation***, **275 F.3d 1005, 1012-13 (10th Cir. 2002)**(evidence of continuing effects of past discriminatory action adversely affecting current income constitutes a current and recurring violation, entitling plaintiff to compensation).  Plaintiff has produced evidence that the defendants have maintained a long-standing practice of refusing to refer patients to him for cardiology services, often to the detriment of the patient.  To the extent those past discriminatory practices have a current effect (inside the statute of limitations), plaintiff is entitled to recover damages for those past actions.  The expert testimony of Kurt Krueger [Document No. 76], accounts properly for defendants past discriminatory actions in the calculation of damages.

**Issue of Malice**

Defendants assert there is no evidence of defendants' malice, which defendants correctly define as the intent to do a harmful act without reasonable justification or excuse.  Brief at 128.

The evidence in this case contains proof that the defendants drove plaintiff from his chosen profession because of his race and because they were angry with him for vocally and aggressively attempting to prevent harm to the patients of the Hospital and improve the delivery of quality health care services in the Atchison community.  Plaintiff respectfully suggests this evidence establishes legal malice.

**Conclusion**

For the foregoing reasons, plaintiff submits that the defendants' motion for summary judgment should be denied.

/s/Charles D. Kugler
Charles D. Kugler Ks. No. 7031
748 Ann Avenue
Kansas City, KS 66101-3014
913-371-1930
FAX: 913-371-0147
cdkugler@yahoo.com

/s/ Michael J. Gallagher
Michael J. Gallagher #70617
700 Peck's Plaza
1044 Main Street
Kansas City, MO 64105
(816) 471-4500
FAX:  (816) 221-7886
mjgallagh@aol.com

CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2006, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:  Mark A. Ferguson, Andrew R. Ramirez and Adam T. Suroff, Lathrop & Gage L.C., Building 82, Suite 1000, 10851 Mastin Boulevard, Overland Park, KS 66210-1669.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

/s/ Michael J. Gallagher