ams

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PITT VESOM, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-2218-JAR |
| | ) | |
| | ) | |
| ATCHISON HOSPITAL ASSOCIATION, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## MEMORANDUM AND ORDER

Plaintiff Pitt Vesom, M.D. filed this action against Atchison Hospital Association
("AHA") and three physicians, Ryan Thomas, M.D., Douglas Goracke, M.D., and Donald
Swayze, D.O., who were members of the AHA Medical Executive Committee ("MEC"), and
who voted to deny plaintiff's application for reappointment of medical and staff privileges at
AHA.  Plaintiff contends that the denial of his staff privileges at AHA resulted from an
agreement and conspiracy to fabricate reasons for refusing to continue his staff privileges
because he is Asian, he had reported incidents of professional incompetence at AHA, and
because defendants prevented or restrained him from practicing medicine in the Atchison
community.

The Court now considers the following motions: (1) plaintiff's Motion for Leave to file
Declaration and Exhibits under Seal (Doc. 183); (2) defendants' Motion for Summary Judgment
(Doc. 161); (3) defendants' Motion to Exclude Declaration and Expert Testimony of John-Henry

Pfifferling, Ph.D. (Doc. 142); and (4) defendants' Motion to Exclude Affidavits and Expert Testimony of Kurt V. Krueger, Ph.D. (Doc. 145).  As described more fully below, the Court grants plaintiff's Motion for Leave to File Declaration and Exhibits under Seal, grants defendants' Motion for Summary Judgment, and denies as moot both of defendants' motions to exclude expert testimony.

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the

---

[1]Fed. R. Civ. P. 56(c).

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]*Id.*

[4]*Id.* at 251–52.

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

nonmovant's claim."[6]  The burden may be met by showing that there is no evidence to support

the nonmoving party's case.[7]  If this initial burden is met, the nonmovant must then "go beyond

the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."[8]  When examining the

underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light

most favorable to the nonmoving party and that it may not make credibility determinations or

weigh the evidence.[9]

When deciding a summary judgment motion, the Court may consider evidence submitted,

if admissible in substance, even if it would not be admissible, in form, at the trial.[10]  The Tenth

Circuit recently explained,

> Parties may, for example, submit affidavits in support of summary
> judgment, despite the fact that affidavits are often inadmissible at
> trial as hearsay, on the theory that the evidence may ultimately be
> presented at trial in an admissible form.  Nonetheless, "the content
> or substance of the evidence must be admissible."  Thus, for
> example, at summary judgment courts should disregard
> inadmissible hearsay statements contained in affidavits, as those
> statements could not be presented at trial in any form.  The
> requirement that the substance of the evidence must be admissible
> is not only explicit in Rule 56, which provides that "[s]upporting
> and opposing affidavits shall . . . set forth such facts as would be
> admissible in evidence," Fed.R.Civ.P. 56(e), but also implicit in
> the court's role at the summary judgment stage.  To determine
> whether genuine issues of material fact make a jury trial necessary,

---

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[7]*Id.*

[8]*Id.*

[9]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[10]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1199 (10th Cir. 2006).

a court necessarily may consider only the evidence that would be
available to the jury.[11]

## II.  Factual Background

### A.  Evidentiary Objections

At the outset, the Court notes that significant portions of the voluminous recitation of
facts by both parties are immaterial to the resolution of the summary judgment motion.
Although they aid in the Court's understanding of the context of the claims made in this case,
they do not impact the resolution of claims and affirmative defenses under the applicable
summary judgment standard.

There are a number of evidentiary issues the Court must resolve before determining the
material uncontroverted facts in this matter.   In their reply memorandum, defendants move to
strike numerous declarations submitted by plaintiff with his response, including plaintiff's own
declarations made subsequent to his deposition.  Specifically, defendants seek to strike the
declarations of Dr. James Rider, Kathy Jackson, Rosetta Birch, Dr. David Ware, and Dr. James
Asher on various grounds.  Plaintiff filed a separate motion for leave to file his third declaration
with exhibits under seal (Doc. 194).  In response, defendants argue that the third declaration is
irrelevant and a "sham affidavit," and should not be filed for the same reasons that they oppose
consideration of plaintiff's second declaration.  The Court ordered plaintiff to submit this third
declaration for *in camera* review so that it may decide those issues.  The Court has now reviewed
the declarations in question, as well as reviewed *in camera* plaintiff's third declaration and
supporting exhibits by plaintiff.

---

[11]*Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); Fed. R. Civ. P. 56(e))
(citations omitted).

### 1.  Plaintiff's Declarations

Plaintiff submitted two declarations with his response to the summary judgment motion, titled Vesom Declaration I ("Vesom I")  and Vesom Declaration II ("Vesom II").  Plaintiff relies on these declarations to support various factual statements in his response brief.  At the time he filed his response, plaintiff also filed a motion to file a third declaration, along with attached exhibits, under seal ("Vesom III").  To be clear, there is no citation in the fact section of plaintiff's response memorandum to Vesom III, although plaintiff does discuss the declaration in the argument section.  Defendants ask the Court in their reply to disregard all portions of plaintiff's "affidavit"[12] that are either not based on personal knowledge, or create "sham" fact issues.   Defendants also filed a separate response to the motion to file a third declaration under seal on the same grounds.

#### *Sham Affidavit*

Defendants argue that Vesom II and III should be stricken because they constitute "sham affidavits," since they were composed long after plaintiff's deposition and attempt to change the answers he gave during that deposition.  The Court may not disregard Vesom II and III simply because they conflict with plaintiff's prior sworn statements.[13]  But "such evidence may be disregarded when a court concludes that the evidence is merely an attempt to create a sham fact issue."[14]  "[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting

---

[12]The Court will discuss defendants' objections as applied to both Vesom II and III.

[13]*Martinez v. Barnhart*, 177 Fed. App'x 796, 800 (10th Cir. 2006).

[14]*Id.* (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

5

[evidence] contradicting his own prior testimony."[15]  The Court looks at the following factors to determine if Vesom II or III present a sham fact issue: "whether the [party] was cross-examined during his earlier testimony, whether the [party] had access to pertinent evidence at the time of his earlier testimony, or whether the [contested evidence] was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the [contested evidence] attempts to explain."[16]

Vesom was deposed on March 28 and June 18, 2005.  It appears from the transcripts that plaintiff was not cross-examined by his own counsel during the deposition.  Discovery was due to be complete in this case on July 15, 2005.[17]  Plaintiff argues that the documents attached to Vesom II and Vesom III were not produced to him until May 25, 2005, and that KDHE documents were not made available to him until June 16, 2005, two days before the second day of his deposition.   Plaintiff maintains that he "did not know of the content of these records and could not have testified from his personal knowledge of these examples of disparate treatment." The Court agrees that plaintiff could not have answered questions about these documents during his deposition.

Defendants point the Court to one example of plaintiff's attempt to create a sham issue of fact.  Defendants argue that during plaintiff's deposition, he itemized instances of alleged discrimination that formed the basis of his Complaint.  At the conclusion of the March 28 deposition, counsel for defendants remarked: "Also marked as Vesom Deposition Exhibit No.

---

[15]*Franks*, 796 F.2d at 1237.

[16]*Id.*

[17]*See* Doc. 95 at 2.

114 a one page handwritten notes [sic] that was on the inside cover of Dr. Vesom's version of

Vesom Deposition Exhibit No. 101 that he has referred to as an itemized list of the specific

instances, I believe of racial discrimination."[18]   Plaintiff's counsel responded, "We agree that is

Exhibit 114, notes of some of his complaints about discrimination."[19]   At the June 18 deposition,

plaintiff answered defendants' questions about Exhibit 114.   At one point, defendants' counsel

asked if the exhibit constituted a "full compilation of all the incidents that you believe support

the fact that you were racially discriminated against."[20]   Plaintiff replied, "That is correct."[21]

Defendants argue that Vesom II and III are subsequent attempts to change this answer and create

sham fact issues.

        The Court declines to find that these affidavits are "sham affidavits" as defendants urge.

Defendants seem particularly concerned that plaintiff repeatedly refers to actions that constitute

"disparate treatment" of Asian physicians compared to other similarly situated physicians at

Atchison Hospital Association.   Defendants maintain that "[n]owhere was disparate treatment, or

the specific 'examples' and arguments contained in the Declaration, mentioned."   The Court is

not persuaded by this argument.   Plaintiff alleges a number of counts in his Complaint that are

based on race discrimination.   "'Disparate treatment . . . is the most easily understood type of

discrimination.   The employer simply treats some people less favorably than others because of

---

[18](Doc. 164, Ex. 35, Vesom Depo. at 306.)   The Court is unable to locate this deposition exhibit in the
record.

[19]*Id.* at 307.

[20](Doc. 164, Ex. 36, Vesom Depo. at 357–58.)

[21]*Id.* at 358.

7

their race.  Proof of discriminatory motive is critical."[22]  Disparate treatment is simply a way of referring to intentional discrimination, as compared to disparate impact claims which "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.  Proof of discriminatory motive . . .  is not required."[23]  Although the Court sincerely doubts the term "disparate treatment" was originally coined by plaintiff without the guidance of his attorney, the Court finds no impropriety or unfair surprise in its inclusion in the declarations.  The question of its materiality will be addressed under the Court's discussion of the substantive discrimination counts, as this evidence primarily points to plaintiff's perceived differences in treatment between himself and other physicians at AHA.

Further, the Court finds that the differences in plaintiff's deposition and his declarations do not amount to the creation of a sham issue of fact.  The deposition transcript reveals that plaintiff's counsel clarified at the end of the first day of testimony, that Deposition Exhibit 114 alleged *some* of the instances of discriminatory conduct.  Further, unlike most cases that strike an affidavit as improper on these grounds, plaintiff added to an answer given in his deposition, rather than changing his answers entirely.  Given that plaintiff was not cross-examined, and that he did not have an opportunity to review many of the documents discussed in his declaration prior to the deposition, the Court declines to strike them on the grounds that they constitute sham affidavits.

---

[22]*Carpenter v. Boeing Co.*, 456 F.3d 1183, 1187 (10th Cir. 2006) (quoting *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

[23]*Id.*  The Court accepts that plaintiff's claims encompass claims of intentional discrimination.  Nothing in the briefs or the pretrial order suggest that plaintiff advances a cause of action encompassing "harassment," as defendants suggest in their Reply.   (Doc. 193 at 28.)

### Personal Knowledge Requirement

Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.[24]   Also, Fed. R. Civ. P. 56(e) requires that affidavits be made on personal knowledge and "set forth such facts as would be admissible in evidence . . . .   The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."   "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[25]   Statements of "mere belief in an affidavit must be disregarded."[26]

The Court finds that Vesom II and III contain plaintiff's statements based on personal knowledge; recitations of his attorney's correspondence with defendants; and reaction, beliefs, and opinions concerning certain documents provided to him through discovery in this case.   The majority of Vesom II contains plaintiff's arguments about why each document in his credentials file is "manufactured to make it appear that my behavior was inappropriate."   In the course of making this point, plaintiff construes the hospital bylaws, recites exhibits, and makes legal and factual arguments.   Often, plaintiff's contentions make reference to "manufactured" or "doctored" documents created by defendants.   Vesom III similarly construes documents produced through discovery, but covered by protective order.

The Court disregards the statements in plaintiff's declarations to the extent he attempts to construe and interpret other summary judgment evidence.   Such construction and interpretation

---

[24]Fed. R. Evid. 602.

[25]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[26]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

is not an appropriate task for a witness's affidavit, which is a tool used to present *facts* and not *beliefs* and argument.[27]  While the Court will duly consider plaintiff's arguments made in his summary judgment brief—the appropriate forum for argumentation—it will not consider such arguments couched in a party's own affidavit, which should represent pure statements of fact. Instead, the Court construes the summary judgment record under the applicable guidelines and determines if the uncontroverted evidence sufficiently demonstrates a genuine issue of material fact.

There are many statements in Vesom II and III that are not based on personal knowledge, but are conclusory opinions.  Examples of such statements in Vesom II include: "[T]he aforementioned medical staff at AHA . . . conspired to prevent me from practicing at AHA;" and "When I reapplied for privileges at AHA in 1998 . . . my application was treated differently from any other application received prior to or since that date."  The Court declines to itemize each and every incidence of such statements, as Vesom II spans fourteen pages and contains sixty-one paragraphs of statements and Vesom III spans three pages with eleven paragraphs of information. The Court will disregard all statements in Vesom II and III that are not supported by other portions of the record, or that do not represent statements based on plaintiff's personal knowledge.  The Court will only consider, for purposes of determining the uncontroverted evidence, those statements that plaintiff could have perceived or observed, and will construe the evidence in the light most favorable to plaintiff as the non-moving party.  As such, the Court

---

[27]For example, plaintiff's statement that "[t]he failure to give notice also contravened the hospital bylaws and their requirements for dealing with disruptive behavior . . . ." (Doc. 182 ¶ 13), is clearly a conclusory interpretation of other evidence in the record—the Hospital Bylaws.  Although this type of legal argument is appropriate for the Court's consideration on the summary judgment motion, it is inappropriate as a submission of fact. Indeed, it appears that much of plaintiff's statement of additional material facts is cut and pasted directly from the witnesses' declarations.

grants plaintiff's motion to file the declaration and exhibits under seal ( Doc. 183) and orders the Clerk's Office to file under seal the declaration and exhibits delivered to the Court for *in camera* review.

### 2. Birch and Jackson Declarations

Defendants urge the Court to strike the declarations of Rosetta Birch and Kathy Jackson because they were not properly disclosed under Fed. R. Civ. P. 26.  Rule 26(a)(1) requires the parties to provide, without waiting for a discovery request, the name of each person "likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment."  Under Rule 26(e), the parties are under a duty to supplement these initial disclosures.  Sanctions for violating the disclosure rules in Rule 26 are provided for in Rule 37:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(a)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.[28]

Plaintiff filed an amended witness and exhibit list on February 1, 2005, which did not list either Birch or Jackson as witnesses.  Supplemental disclosures under Fed. R. Civ. P. 26(e) were ordered to be served by June 6, 2005.  The record does not reveal that an amended witness list or a Notice of Service for supplemental disclosures under Rule 26(e) was filed after the February 1, 2005 disclosures.  Birch and Jackson both dated their declarations in January 2006, soon before the response to the summary judgment motion was filed.  Plaintiff uses these declarations to

---

[28]Fed. R. Civ. P. 37(c)(1).

support additional material facts in his response to summary judgment.  Specifically, plaintiff

uses the Birch Declaration to support his contention that certain documents relied upon by

defendants in their decision not to renew plaintiff's privileges, contain false information.  Both

declarations are used to support plaintiff's contention that any legitimate reason for the denial of

his privileges is a pretext for discrimination.  Because these declarations are being used by

plaintiff to support elements of his discrimination claims, the Court finds that the failure to

disclose Birch and Jackson as potential witnesses, who could then be deposed by defendants, is

not harmless.

Under these circumstances, the Court is unable to find that plaintiff was substantially

justified in failing to disclose this information.  Both witnesses attest that they were employed by

AHA for years, during the same period of time that plaintiff was affiliated with the hospital.

These are not instances of witnesses who were unknown to the plaintiff.  Neither declaration

relies upon documents that were not produced prior to the deadline to file supplemental

disclosures.  Even if these witnesses were discovered after that deadline, Rule 26 imposes a

continuing duty upon parties to supplement their disclosures.  Certainly, it was feasible for

plaintiff to disclose these two witnesses some time prior to when he responded to the summary

judgment motion.

Because the Court finds that plaintiff was not substantially justified in withholding this

information, and that the failure to disclose was not harmless, the Court grants defendants'

motion to strike the Birch and Jackson declarations.

### 3.  Dr. Rider's Declaration

Defendants move to strike Dr. James Rider's first declaration ("Rider I"), because it

contains hearsay statements and is not based on personal knowledge. Much like plaintiff's declarations, Dr. Rider's declaration contains both facts based on personal knowledge, as well as conclusory opinions or beliefs. The Court finds that Dr. Rider's account of the committee meetings he attended are based on personal knowledge. However, his conclusions about how the other members felt toward plaintiff could not be based on personal knowledge.

Alternatively, Dr. Rider's belief that the other committee members were "angry" at plaintiff, as stated in paragraph 2, must be based on things those members told him, which is inadmissible hearsay evidence. Inadmissible hearsay evidence in an affidavit is not to be considered on a motion for summary judgment.[29] However, the Court finds that as a member of the MEC at the time the decision about plaintiff's privileges was made, Dr. Rider does have first-hand, personal knowledge of events that transpired in the meetings that he attended and during the collective decision-making process. Therefore, the Court will only disregard the declaration to the extent it states Dr. Rider's conclusory beliefs about the feelings or intent of others.

### 4. Dr. Ware's Declaration

Defendants move to strike Dr. David Ware's Declaration because it contains inadmissible hearsay and is not entirely based on personal knowledge. The Court agrees. Paragraphs 2, 3, 4, 5, 7, and 8 all amount to inadmissible hearsay—the witness is recounting statements he heard that were made by other declarants. The Court does not anticipate any exclusion or exception to the hearsay rule that would apply to these statements. Further, Dr. Ware states his opinions about the feelings and attitudes of certain physicians toward plaintiff. The Court will only consider the small amount of Dr. Ware's declaration that is based on admissible evidence and

---

[29]*Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996); *Ryan v. Shawnee Mission Unif. Sch. Dist. No. 512*, 438 F. Supp. 2d 1233, 1236 (D. Kan. 2006).

will not consider hearsay statements or statements about Dr. Ware's conclusory opinions.

### 5. Dr. Asher's Declaration

Defendants move to strike Dr. James Asher's declaration because it is not based on personal knowledge. Dr. Asher was the chief executive officer of AHA for a number of years until his retirement in 1990. He was responsible for recruiting plaintiff to establish a practice in Atchison in 1983. Much of Dr. Asher's declaration is based on information that "he has learned" or that is his "belief."[30] As defendants point out, much of Dr. Asher's statements concern events that occurred after he retired in 1990. There is no basis provided in the declaration for his personal knowledge of these later events. Therefore, because Dr. Asher's declaration relies almost entirely on hearsay and information that Dr. Asher has not acquired through personal knowledge, the Court disregards the majority of the declaration.

### 6. Authentication of Documents

Defendants argue that many documents filed in support of plaintiff's summary judgment response are not properly authenticated and are therefore inadmissible. Specifically, defendants object to a number of handwritten notes filed as attachments to Vesom II.

> Unauthenticated documents, once challenged, cannot be
> considered by a court in determining a summary judgment motion.
> In order for documents not yet part of the court record to be
> considered by a court in support of or in opposition to a summary
> judgment motion they must meet a two-prong test: (1) the
> document must be attached to and authenticated by an affidavit
> which conforms to rule 56(e); and (2) the affiant must be a
> competent witness through whom the document can be received
> into evidence . . . . Documentary evidence for which a proper

---

[30]For example, in paragraph 4: "I have learned from staff at AHA . . . ." and " I believe the reduction in the size and function of the ICU is directly related to the termination of [his] staff privileges." In paragraph 5: "It is my belief . . . that the decision to get rid of [plaintiff] was and continues to be economically destructive to the hospital . . . ." and "I have learned that . . . the hospital census has been drastically reduced."

> foundation has not been laid cannot support a summary judgment
> motion, even if the documents in question are highly probative of a
> central and essential issue in the case.[31]

The Court agrees with defendants that the handwritten notes attached to Vesom II do not appear to be authenticated under this standard.  It appears to the Court that, at the very least, these notes were written by more than one person.  These documents could only be authenticated in Vesom II if Vesom himself composed all of these handwritten notes, or if he was familiar with the handwriting.[32]  Because Vesom II does not set forth either method of authentication, the Court may not consider these documents.

**B.  *Uncontroverted Facts*[33]**

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff.  Plaintiff is a medical doctor licensed to practice medicine by the Kansas Board of Healing Arts, certified in the specialties of cardiology and internal medicine.  Plaintiff is a citizen of the United States and of Kansas, but was born in Thailand and has Thai ancestry.  Defendant AHA is a not-for-profit corporation organized and existing under the laws of the State

---

[31]*In re Harris*, 209 B.R. 990, 996 (B.A.P. 10th Cir. 1997) (quoting 11 James Wm. Moore, et al., Moore's Federal Practice §§ 56.10[4][c][i], 56.14[2][c] (3d ed. 1997)); *see also Toney v. Cuomo*, 92 F. Supp. 2d 1186, 1196 (D. Kan. 2000), *aff'd*, 221 F.3d 1353 (10th Cir. 2000).

[32]*See* Fed. R. Evid. 901(b).

[33]In the future, the parties are encouraged to follow the local rules in this district on page limitations, as well as content of briefs, which encourages a *concise* statement of facts.  D. Kan. R. 7.1, 7.6 (limiting the argument section of briefs and memoranda to thirty (30) pages if no prior leave of court requested and providing for content of briefs).  Moreover, plaintiff's practice of controverting facts with general citations to exhibits, or a general reference to his statement of additional material facts, presents a cumbersome task for the Court in determining the truly uncontroverted material facts in this matter.  Given that plaintiff submitted 116 paragraphs of additional facts (many of which are repetitive of facts already narrated by defendants), the Court should not be presumed to glean which statements or general references plaintiff contends specifically controvert the statements made by defendants.  Plaintiff's counsel is strongly discouraged from this method of controverting factual statements and the Court declines to conduct a fishing expedition to uncover evidentiary support for plaintiff's contention that certain facts are controverted when not provided with a specific citation to the record.  *See* D. Kan. R. 56.1(b).

of Kansas and has its principal place of business in Atchison, Kansas. [34]  In 2003, defendants

Ryan Thomas, M.D., Douglas Goracke, M.D., and Donald Swayze, D.O., were members of the

Hospital's MEC.  Dr. Thomas is a board certified family practitioner with obstetrical privileges

and was the past Chief of Medical Staff.  Dr. Goracke is a board certified anesthesiologist and

was Chief of Staff at the time.  Dr. Swayze is a board certified surgeon and was Vice Chief of

Staff at the time.

### ***The Bylaws***

The Atchison Hospital Medical Staff Bylaws ("Bylaws") are organized by the medical

staff at AHA.[35]  They "establish the mechanisms to carry out the direct and delegated

responsibilities of the Medical Staff in cooperation with the Hospital Administration and the

Governing Board."  The Governing Board ("Board") is a group of individuals who constitute the

Board of Directors at AHA, "having the ultimate responsibility for the operation of the Hospital

and for providing patient care."

The medical staff are practicing and licensed physicians and dentists who have been

formally appointed and enjoy the privilege of attending patients at AHA.  The Bylaws state that

the medical staff agrees to accept and abide by the Bylaws.  Under the Bylaws, membership to

the medical staff is a privilege and no physician is "entitled to membership to the Medical Staff

or to the exercise of particular clinical privileges at the Hospital merely by virtue of the fact that

he/she . . . has previously had Medical staff membership or privileges in this Hospital."

Physicians are appointed medical staff privileges at AHA for a two-year period.  After such

---

[34]42 U.S.C. § 2000d.

[35]The parties agree that the December 19, 2002 Bylaws, attached to defendants' motion for summary judgment, govern this dispute.

period is over, physicians must file an application for reappointment if they wish to maintain their privileges.

### *Disruptive Behavior Provisions*

Among other things, the Bylaws dictate that, as a condition to accepting medical staff membership, the member must agree to "conduct him/herself in a professional, cooperative manner with colleagues and members of the Hospital Staff."  Also, Article X of the Bylaws dictates AHA's policies concerning medical staff conduct and the impaired provider.  This article provides guidelines for medical staff concerning unacceptable disruptive behavior.  This list includes, but is not limited to: impertinent and inappropriate comments (or illustrations) made in patient medical records and physicians' orders or other official documents including the impugning of the quality of care in the Hospital or attacking particular individuals, nurses, or Hospital policies; non-constructive criticism addressed to the recipient in such a way that intimidates, undermines confidence, belittles, or implies stupidity or incompetence; refusal to accept medical staff assignments or participate in committee or departmental affairs on anything but his or her own terms or to do so in a disruptive manner; and verbal or physical threats of retribution, litigation or violence directed at individuals, Hospital personnel or patients.

Under Article X, any reports of violations of disruptive conduct or the impaired provider provision must be in writing and submitted and investigated in accordance with Article XII, which governs "Corrective Action."  Corrective action requires any report regarding a medical staff member to be made to the Chief of Staff.  The procedures set forth for implementation of corrective action in Appendix B provide that upon receiving notice of a reportable incident, including for disruptive behavior, "any officer of the Medical Staff, the chairperson of a Service

17

or Committee, the Chief Executive Officer of the Hospital or any member of the Governing Board of the Hospital may request corrective action against such practitioner."   If corrective action is requested, then the MEC investigates the report and submits a written report of the investigation to the Board.  Before the report is made, however, the practitioner has the opportunity to interview with the MEC so that he or she may discuss, explain, or refute the nature of the charge.  The summary is then submitted with the report to the Board.  Ultimately, the Board either approves or modifies the MEC recommendation.

### The MEC

The medical staff elects three officers for the purpose of carrying out certain functions on behalf of the staff.  These officers are the Chief of Medical Staff, Vice Chief of Staff, and Secretary/Treasurer and they are nominated and elected by the medical staff to serve one-year terms.  The Medical Executive Committee ("MEC") consists of these three officers, as well as the immediate past Chief of Staff and a "member at large" elected from the active medical staff annually.  In general, the MEC is charged with overseeing the functions of the medical staff.  "Its authority is limited, however, to making recommendations to the Governing Board."[36]  The Credentials Committee consists of the members of the MEC and evaluates new applicants to the medical staff, as well as those members applying for reappointment.

In 2003, defendants Dr. Thomas, Dr. Goracke, and Dr. Swayze were members of the MEC.  At that time, Dr. Thomas was the past Chief of Medical Staff, Dr. Goracke was Chief of Staff, and Dr. Swayze was Vice Chief of Staff.  In addition to the defendant, the MEC included Dr. James Rider, who was a member-at-large, and Dr. Michael Jones, who was the

---

[36](Doc. 164, Ex. 4A, Bylaws at 11 ¶ 2.)

18

Secretary/Treasurer.  Neither of these members of the Executive Committee are parties to this dispute.

### *Application Process and Fair Hearing Procedures*

Physicians seeking medical staff membership must apply in writing after a preapplication screening process.  The Credentials Committee then collects all of the documentation (licenses, references, etc.) and prepares a report to submit along with the application and supporting material to the Chief of Staff for review by the MEC.  The MEC then investigates and makes a recommendation to the Board whether the application should be granted, and if so, if any restrictions should apply.  The MEC is to evaluate evidence of character, professional and personal competence, and qualifications and ethical standing of the practitioner before making its recommendation.  Finally, the Board reviews the application material and is the ultimate authority in granting a practitioner privileges and decides whether to accept or reject the MEC's recommendation.

Once the period of appointment ends, which is usually after two years, the medical staff member must be reappointed to continue their privileges.  The same procedures apply to the reappointment process as the initial appointment process, in addition to the procedures set forth in Appendix A.  Section 5(f) of Appendix A provides a list of fourteen criteria upon which the MEC bases its recommendation for reappointment.  This criteria includes attendance at medical staff meetings and participation in staff duties; compliance with the Bylaws; and behavior in the Hospital, including cooperation with medical and Hospital personnel.  The MEC recommends to the Board whether a staff member's privileges should be increased, reduced, terminated, or remain the same.  Finally, the Board reviews the MEC's recommendation and the application materials, and makes the final reappointment decision.

The denial of reappointment by the Board, and/or a recommendation by the MEC to deny reappointment are adverse recommendations that trigger the Fair Hearing Procedure set forth in the Bylaws.  Under the Fair Hearing Procedures, the practitioner against whom the decision has been made is given special notice in writing of the recommendation or decision, which must contain a statement of and reasons for the recommendation or decision and inform the practitioner of his or her right to request a hearing.  Appendix A of the Bylaws sets forth the procedures specific to the Fair Hearing.  If a hearing is requested, the Chief Executive Officer and/or the Chief of Staff appoints a Hearing Committee, which must be composed of at least five members composed of medical staff or outside physicians who have not been actively involved in the consideration of the matter at previous levels of investigation or consideration.

At the hearing, the practitioner, the MEC and Board may each have counsel present. Each party is entitled to call and examine witnesses, to introduce written evidence, to cross-examine any witnesses, to challenge any witness and to rebut any evidence.  The Hearing Committee may consider any pertinent material on file with AHA and any evidence produced at the hearing, including "any information regarding the practitioner who requested the hearing, including, but not limited to, any material contained in the records of the Hospital regarding the practitioner who requested the hearing, so long as such material has been admitted into evidence at the hearing and the affected practitioner had the opportunity to comment thereon, or, by other evidence, to refute it."  Appendix A requires the CEO to promptly send a copy of the Hearing Committee's written report of its recommendation to the practitioner and Chief of Staff by certified mail.

Appendix A also allows for a practitioner to appeal an adverse recommendation from the Hearing Committee within ten days.  The appeal must be held only on the record upon which the

20

Hearing Committee recommendation was made based on the grounds of: (1) substantial and prejudicial failure on the part of the Hearing Committee to comply with the Bylaws or requirements of law; (2) an arbitrary or capricious decision, or decision made with bias; or (3) the action of the Hearing Committee is not supported by evidence in the record.  Appellate review is conducted by the Board.  The Board then must render a final decision in writing within ten days after the appellate review hearing.

### *1998 Application*

Plaintiff was first granted medical staff privileges at AHA in 1983.  He was born in Thailand, came to the United States in 1977, and became a United States citizen in 1996. During his time at AHA, plaintiff and his wife felt socially ostracized by other physicians at AHA.  Plaintiff applied for and was granted reappointment every two years after his initial appointment until 1996.  On July 22, 1996, plaintiff voluntarily resigned his staff privileges and left the Atchison community and spent a period of time in Thailand.  In March 1998, plaintiff returned and applied for appointment at AHA.  On October 9, 1998, the MEC recommended that plaintiff not be granted staff membership privileges.  Plaintiff requested a fair hearing, but the Board did not follow the MEC recommendation.  Instead, the Board offered plaintiff a conditional reappointment, which granted him staff membership on a provisional one-year basis pursuant to a Settlement Agreement.[37]  The Settlement Agreement provided for an independent proctor to review plaintiff's medical records for three months, and to review the manner of practice used by plaintiff, including critiquing care decisions and monitoring the results of care rendered.  For nine months, 30% of plaintiff's medical records would be reviewed randomly.

---

[37]Plaintiff was due for reappointment, however, in two years pursuant to the Bylaws.

The proctor would report his reviews to the CEO, the MEC, and to plaintiff.  The Settlement Agreement also required certain departments to submit written reports for the purpose of identifying any problems or concerns that arose regarding plaintiff's interaction with medical and hospital staff.  Also part of this agreement is a condition that during plaintiff's provisional period, he is not to be alone with any female employee or patient within the Hospital, except in emergency situations.  Finally, the Settlement Agreement releases the parties from any liability or claims that arose before the agreement.  The Settlement Agreement provides for AHA's response to inquiries about whether plaintiff's privileges had ever been suspended, revoked, or disciplined:

> On December 19, 1995, Dr. Vesom's clinical privileges were summarily suspended by decision of the Hospital's Chief of Staff and CEO for non-compliance with recommendations of the Kansas Medical Society-Medical Advocacy Program ("KMS-MAP"). Thereafter, the Hospital was informed that Dr. Vesom was in compliance with the recommendations of KMS-MAP. Accordingly, on December 22, 1995 the summary suspension was withdrawn prior to any hearing.[38]

The Settlement Agreement is signed by plaintiff and by Dr. W. David Drew, President and CEO of AHA at the time.

On February, 27, 2001, plaintiff was notified that his next application for reappointment was approved by the Board.  Plaintiff was never an employee of AHA or of the individual defendants.

### *Plaintiff's Complaints*

The Peer Review Committee at AHA performs peer review for the Medical Staff, utilizing criteria and indicators established by the Medical Staff.  Under the Bylaws, the Chief of

---

[38](Doc. 163, Ex. 38 ¶ 16.)

Staff reviews cases and the MEC then performs a screening.  The committee meets ten times per year.

On January 3, 2003, plaintiff and Dr. David Ware met with the CEO of the Hospital, Virgil Bourne, and Chief of Staff, Dr. Goracke, about concerns and recommendations they had about certain hospital policies.  According to a letter signed by plaintiff, Dr. Ware, and Dr. A.K. Tayiem documenting these concerns, AHA "employees" had been systematically violating the federal and state health rights of its patients for years through its over-reliance on generalist care and sham peer reviews, and blatantly discriminating against the federal rights of independent specialists by sanctioning them "at the behest" of its own generalists.  The physicians asked for such changes as, among other things, peer review of major cases by outside reviewers and less political credentialing of physicians.  This letter was sent to William R. Thornton, the Chairperson of the Board of Directors, on January 22, 2003.  Thornton responded on January 29, 2003 that he had forwarded the letter on to the Risk Manager for investigation.

On January 23, 2003, the Board of Directors held a meeting where they discussed Dr. Ware's contract.  A motion passed unanimously to implement a clause in Dr. Ware's contract that terminates the contract with or without cause upon ninety days written notice.  The Board agreed to immediately serve notice of this decision to Dr. Ware by letter.

On March 4, 2003, Mary Kabriel, a risk management specialist with the Kansas Department of Health and the Environment ("KDHE"), Bureau of Health Facilities, arrived at AHA for an unannounced survey due to a report that had been filed against AHA.  Later, it became known that Dr. Ware and plaintiff had complained about the handling of a particular case where a mother suffered an amniotic fluid embolism during birth.  Dr. Ware and plaintiff were critical of the peer review process in that case and argued for outside peer review.  In

23

Vesom I, plaintiff concedes that he filed this report with the KDHE, and that it was not

investigated until after he was notified of the denial of his application for reappointment.

Kabriel conducted a total of six on-site visits to AHA in March 2003.

### *2003 Reappointment*

When plaintiff applied for reappointment on December 15, 2002, he signed an "Authority

and Liability Waiver."  The waiver states:

> I further waive any rights under Educational Rights and Privacy
> Act or any statute granting immunity to such Boards or
> Committees and further agree to hold harmless such President,
> Board or Committees evaluating my application from any claim or
> action by or on my behalf in the event such application for
> reappointment is denied for any reason.

The waiver is a on a preprinted form and further states that the applicant, "agree[s] to abide by

the Bylaws, Rules and Regulations of the Medical/Dental Staff."[39]

In February 2003, the MEC reviewed plaintiff's application and the records from his

"credentials file" at AHA.  On February 18, 2003, plaintiff was provided a three-page letter

signed by CEO Bourne, titled Notice of Adverse Recommendation and Fair Hearing Rights that

fully advised plaintiff of his rights under the Fair Hearing provisions of the Bylaws.  The reasons

for the denial of plaintiff's reappointment stated in the letter are: (1) "failure to comply with

Medical Staff Bylaws and Rules and Regulations"; (2) "[his] behavior in the hospital, which

showed a lack of cooperation with medical and hospital personnel as it relates to patient care,

and the orderly operation of AHA, and [his] general attitude toward AHA and its personnel"; (3)

"fail[ure] to discharge [his] responsibilities for Staff, Committee and Hospital functions for

which [he] was responsible by staff category assignment, appointment, and election or

---

[39](Def. Ex. 7.)

otherwise"; (4) "[he] engaged in verbal attacks on individuals and AHA personnel that were personal, irrelevant, and went beyond the bounds of fair professional conduct"; (5) "[he] made impertinent and inappropriate comments in official documents, including the impugning of the quality of care in AHA and attacked particular individuals and AHA policies"; (6) "[he] engaged in non-constructive criticism addressed to recipients in such a way as to intimidate, undermine confidence, belittle, or imply stupidity or incompetence"; (7) "[he] refused to accept Medical Staff assignments or participate in committee or departmental affairs on anything but [his] own terms, and did so in a disruptive manner"; (8) "[he] made verbal threats of retribution and litigation towards individuals and AHA personnel including members of the Medical Staff"; and (9) "[he] used abusive language."

On February 24, 2003, the Board of Directors met and the MEC/Credentials Committee informed the Board of their recommendation to give Dr. Ware notice of Termination of his provisional privileges effective March 18, 2003.  The MEC/Credential Committee further informed the Board of their recommendation to notify plaintiff of termination of his medical staff membership effective March 18, 2003.

On March 6, 2003, plaintiff delivered a written request for a hearing to the Chief Executive Officer of AHA.[40]  The March 6, 2003 letter advised AHA that plaintiff had retained counsel to represent his interests in the matter, and that any questions regarding scheduling of the hearing should be directed to the attention of his attorney, Charles Kugler.

By letter dated March 18, 2003, AHA sent plaintiff a Notice of Hearing stating the place,

---

[40]Plaintiff requested a hearing in writing within thirty days of receipt of the February 18, 2003 letter, as provided by the Bylaws.

time, and date of the Fair Hearing. The letter identified five proposed members of the Fair

Hearing Panel.  Pursuant to the letter, plaintiff was expressly given the right to object to any of

the individuals identified to serve on the Fair Hearing Panel with whom plaintiff believed he was

in direct economic competition. The letter identified the specific charges made against plaintiff,

and included an itemized listing of the specific information upon which the MEC relied in

making its recommendation. The letter also identified the witnesses that would be requested to

testify at the Fair Hearing in support of the charges against plaintiff.

By letter dated March 21, 2003, plaintiff's legal counsel acknowledged receipt of the

March 18, 2003 letter and made written objections to the composition of two of the proposed

members of the Fair Hearing Panel.

On June 5, 2003, AHA provided plaintiff's counsel with all of the written exhibits that

would be (and were) used at the Fair Hearing in support of the charges against him.[41]

Subsequent amended notices of hearing were sent to plaintiff and ultimately the Fair Hearing

was scheduled for January 22, 2004.  Plaintiff was given a new opportunity to object to the

composition of the Fair Hearing Panel in each amended notice.  Plaintiff was also provided with

another copy of all expected exhibits on January 9, 2004, just prior to the hearing.

The Hearing Panel was composed of five physicians, only one of whom was from

Atchison.  At the Hearing, plaintiff  was represented by Charles Kugler, plaintiff's attorney in

this action. The MEC was represented by Andrew Ramirez.  Each party had the opportunity to

present witnesses and offered testimony to support their case. The witnesses were cross-

examined by the other party.  The attorneys provided statements of their position at the Hearing.

---

[41]This particular fact was stipulated to in the Pretrial Order and will be deemed uncontroverted.

The members of the Fair Hearing Panel were permitted to ask questions of the parties, the witnesses, and the attorneys during the Hearing.  Plaintiff presented evidence, including exhibits and documents to the Fair Hearing Panel.

The Fair Hearing Panel voted to uphold the MEC's recommendation to not reappoint plaintiff to the medical staff.  Dr. Mark Lierz, an adult and pediatric urologist from St. Joseph, Missouri, wrote the report of the Panel's findings as Chair of the Panel.  Dr. Lierz noted that plaintiff had "an established pattern of disruptive behavior that created a poor environment for hospital personnel, medical staff, patients and his physician colleagues as he was warned on multiple occasions that this was in direct violation of the Medical Staff Bylaws."

An Appeal Hearing was conducted before the Board on March 25, 2004.  Plaintiff was allowed legal counsel and to make oral argument at the hearing.  On April 2, 2004, the Board issued its written decision and decided to not reappoint plaintiff to the medical staff, effective April 2, 2004.  The Board's decision was based on the recommendation of the MEC and the Hearing Panel.

Between February 18, 2003, when plaintiff received notice of the MEC's adverse recommendation, and April 2, 2004, when the Board issued its decision on appeal, plaintiff had maintained active medical staff privileges at AHA.  After his appeal was denied, plaintiff resigned his other medical staff privileges with Cushing Memorial and with Horton County Hospital and decided to relocate to Poplar Bluffs, Missouri.

## III.  Discussion

Plaintiff asserts in his Complaint the following claims: (1) race discrimination under 42 U.S.C. § 1981; (2) race discrimination under Title VI of the Civil Rights Act of 1964; (3) conspiracy to discriminate under 42 U.S.C. § 1985(3); (4) an antitrust violation under Section 1

of the Sherman Act;[42] (5) retaliatory discharge in violation of Kansas public policy; and (6) intentional interference with business relations under Kansas law.  Defendants assert there is no evidence creating a genuine issue of material fact on any of plaintiff's claims and assert various defenses to suit, including waiver.  The Court first addresses the substantive claims alleged by plaintiff.  Then, the Court will turn to the affirmative defense of waiver.

### A.  Race Discrimination under Sections 1981 and Title VI

Section 1981, as amended by the Civil Rights Act of 1981, states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit off all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.[43]

In a similar vein, Title VI of the Civil Rights Act of 1964 provides that no personal shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI.[44] "[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages."[45]  Title VI only prohibits intentional discrimination.[46]

It is undisputed that plaintiff was not an employee of AHA, nor of the individual defendants.  Plaintiff's legal status in relation to defendants is that of an independent

---

[42]15 U.S.C. § 1.

[43]42 U.S.C. § 1981(a).

[44]Pub. L. 88-352, Title VI, § 601, 78 Stat. 252 (codified at 42 U.S.C. § 2000d).  The parties have stipulated that AHA is the recipient of federal financial assistance within the meaning of Title VI.

[45]*Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

[46]*Id.*

contractor.[47]  Yet, plaintiff formulates the elements of his Section 1981 claim under the

*McDonnell-Douglas Corp. v. Green*[48] burden-shifting framework, normally applicable in

employment discrimination cases that involve termination.  Defendants object that *McDonnell-*

*Douglas* is inapplicable because plaintiff is not an employee.  Defendants also maintain that

plaintiff did not have a contractual relationship with AHA, such that would allow for a claim

under Section 1981.

In the employment discrimination context, claims brought pursuant to Section 1981 and

Title VI are governed by the same evidentiary framework as claims brought under Title VII; that

is, in the absence of direct evidence of discrimination,[49] the court applies the burden-shifting

scheme of *McDonnell-Douglas* and *Texas Department of Community Affairs v. Burdine*.[50]

Under this framework, plaintiff must first prove a prima facie case of race discrimination.[51]  If

plaintiff is able to sustain this burden, the burden of production shifts to defendants to "articulate

a legitimate, nondiscriminatory reason for rejection."[52]  If defendants sustain that burden, the

---

[47]*See, e.g.*, *Shah v. Deaconess Hospital*, 355 F.3d 496 (6th Cir. 2004) (applying the common law agency test to determine that plaintiff surgeon was an independent contractor of the hospital, in accord with the Fourth, Seventh, and Fifth Circuits); *McPherson v. HCA-HealthOne*, LLC., 202 F. Supp. 2d 1156, 1164–68 (D. Colo. 2002) (collecting cases).  *See generally Lambertsen v. Utah Dept. of Corr.*, 79 F.3d 1024, 1028–29 (10th Cir. 1996) (discussing how to determine employer-employee relationship for purposes of anti-discrimination statutes).

[48]411 U.S. 792 (1973).

[49]Here plaintiff does not appear to argue that direct evidence of race discrimination is present, as he advocates the *McDonnell-Douglas* burden-shifting framework in the Pretrial Order.  Yet, in his response, he maintains that certain comments made by "individuals associated with the Hospital," constitute direct evidence of discrimination.  As the Court will discuss in more detail when it evaluates pretext, these stray comments are insufficient to support a claim of intentional discrimination.

[50]450 U.S. 248 (1981); *see Antonio v. Sygma Network, Inc.*, __F.3d__, No. 05-1374, 2006 WL 2361633, at *2 (10th Cir. Aug. 16, 2006); *Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006); *Black Educ. Network, Inc. v. AT & T Broadband, LLC*, 154 Fed. App'x 33, 44 (10th Cir. 2005).

[51]*See Burdine*, 450 U.S. at 252–53; *McDonnell Douglas Corp.*, 411 U.S. at 802.

[52]*See McDonnell Douglas Corp.*, 411 U.S. at 802.

burden of production shifts back to plaintiff to show that defendants' proffered reason for rejection is false, or merely a pretext, and the presumption of discrimination created by establishing a prima facie case "drops out of the picture."[53]  Although the burden of production shifts back and forth between the parties, the ultimate burden of persuasion remains at all times with the plaintiff.[54]

Despite the fact that these claims do not arise in the employment context, the Court may still apply the *McDonnell-Douglas* test for indirect evidence of intentional discrimination.[55] Also, multiple courts have utilized the *McDonnell-Douglas* test for intentional discrimination claims when a physician makes such a claim against hospital entities for suspension or termination of staff privileges.[56]

The Court rejects the formulation of the prima facie case that plaintiff advocates in the Pretrial Order and, instead, would apply the elements of a claim under Section 1981 in the non-employment context, as articulated by the Tenth Circuit in *Hampton v. Dillard Department Stores, Inc.*[57]  Plaintiff must show, (1) he is a member of a protected class; (2) that defendants had an intent to discriminate on the basis of race; and (3) the discrimination interfered with a

---

[53]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

[54]*Burdine*, 450 U.S. at 253.

[55]*PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1167 (D. Kan. 2001) (collecting cases supporting use of *McDonnell Douglas* in a variety of Section 1981 cases).

[56]*See, e.g.*, *Patel v. Midland Memorial Hosp. & Med. Ctr.*, 298 F.3d 333, 341–344 (5th Cir. 2002), *cert. denied*, 537 U.S. 1108 (2003); *Jeung v. McKrow*, 264 F. Supp. 2d 557, 566–67 (E.D. Mich. 2003); *Van v. Anderson*, 199 F. Supp. 2d 550, 562–70 (N.D. Tex. 2002), *aff'd*, 66 Fed. App'x 524 (5th Cir. 2003).

[57]247 F.3d 1091 (10th Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002).  As the Court has already stated, it is uncontested that plaintiff is not an employee of AHA, nor any of the individual defendants.  *See Bhatt v. Brownsville Gen. Hosp.*, No. 03-1578, 2006 WL 167955, at *17 n.2 (W.D. Pa. Jan. 20, 2006) (explaining that the prima facie case for wrongful termination is inapplicable in a case where the physician is not an employee of the hospital).

protected activity as defined in section 1981.[58]  Plaintiff claims that defendants interfered with the protected activity of making and enforcing a contract.  It is undisputed that plaintiff is a member of a protected class. Defendants seek summary judgment because they argue plaintiff is unable to prove that he had a contract interest that defendants interfered with, and further, that there is no evidence of intentional discrimination.

### 1.  Interference with the Making and Enforcement of a Contract

Under Section 1981(b), to "make and enforce contracts" includes: "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  To state a claim under Section 1981 for interference with a contract, it must involve, "the actual loss of a contract interest, not merely the possible loss of future contract opportunities."[59]  Although most litigation under Section 1981 arises from employment discrimination claims, it has also been applied to claims regarding the retail sector and the restaurant industry if a contract is established.[60]

The parties dispute whether the Bylaws created a contract interest upon which plaintiff may base his Section 1981 claim.[61]  Plaintiff points the Court to cases that he believes show that other courts have allowed claims under Section 1981 by physicians who are denied medical staff benefits without proving the existence of a contract.  First, plaintiff points the Court to *Jatoi v.*

---

[58]*Hampton*, 247 F.3d at 1101; *see also Patel*, 298 F.3d at 341–44; *Pamintuan v. Nanticoke Memorial Hosp., Inc.*, No. 96-233-SLR, 1998 WL 743680 (D. Del. 1998), *aff'd*, 192 F.3d 378 (3d Cir. 1999).  *But see Jeung*, 264 F. Supp. 2d at 568 (applying a modified prima facie case).

[59]*Hampton*, 247 .F.3d. at 1104.

[60]*Id.* at 1102.

[61]The Court is unclear about why plaintiff insists that he need not prove he had "vested contract rights." The Court evaluates this prong of the prima facie case as whether he had an enforceable contract interest, as the statute explicitly requires.

*Hurst-Euless-Bedford Hospital Authority*,[62] where the Fifth Circuit remanded back to the district court to make specific findings on the elements of the prima facie case and did not speak to the contract issue.[63]  Next, plaintiff cites *Islami v. Covenant Medical Center*,[64] which did not consider a claim under Section 1981, but did find that, under Iowa law, the hospital bylaws created a contract between the defendants and the physician plaintiff in the context of a breach of contract action.[65]  The Supreme Court of Iowa later disagreed with that holding.[66]  Finally, plaintiffs cite *Janda v. Madera Community Hospital*,[67] which also found that hospital bylaws created a contract between the hospital and the physician plaintiff under California law.[68]

Neither party identifies, nor is the Court able to locate, Kansas law on the issue of whether hospital bylaws create an enforceable contract between the hospital and its medical staff.  The closest the Kansas Supreme Court has come to answering this question was in the context of a breach of contract action by a radiologist who sued a hospital for breach of contract based on due process provisions in the hospital bylaws.[69]  The Kansas Supreme Court declined to address the issue before this Court, stating: "The threshold issue in *Lewisburg* was whether the bylaws formed a contract with the plaintiff radiologist as a member of the medical staff.  St.

---

[62]807 F.2d 1214 (5th Cir. 1987).

[63]*Id.* at 1219.

[64] 822 F. Supp. 1361 (N.D. Iowa 1992).

[65]*Id.* at 1370–71.

[66]*Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 285–87 (Iowa 1998).

[67]16 F. Supp. 2d 1181, 1186 (E.D. Cal. 1998).

[68]*Id.* at 1188.

[69]*Dutta v. St. Francis Reg. Med. Ctr., Inc.*, 867 P.2d 1057, 1062 (Kan. 1994).

Francis, in this case at bar, has admitted to the contractual relationship."[70]  Therefore, the Court

must predict how Kansas courts would resolve the issue.

As discussed in the cases cited by plaintiff, there is a split of authority outside of the

jurisdiction.[71]  It is also difficult to discern a general rule from these cases.  Plaintiff quotes

*Corpus Juris Secundum* for the proposition that "a hospital's medical staff bylaws constitute a

contract between the hospital and its medical staff, particularly where the hospital and its staff

indicate an intent to be bound by their terms, but not otherwise."[72]  But the revised version of this

section states that there is also authority that "absent express language to the contrary, a

hospital's medical staff bylaws do not constitute a contract between the hospital and its staff

physicians, since the essential element of valuable consideration is absent."[73]

The Court concludes that the better-reasoned line of cases hold that hospital bylaws do

not create a contract.  Like the bylaws discussed in *Tredrea*, the Bylaws here do not imply an

agreement for continued staff privileges.  In fact, the Bylaws explicitly provide that medical staff

privileges are *not* a right and that staff members have *no* entitlement to continued staff

privileges.

The preamble to the Bylaws state:

> the physicians and dentists practicing at Atchison Hospital
> Association, . . . hereby organize themselves in conformity with
> these Bylaws, which establish the mechanisms to carry out the

---

[70]*Id.* (discussing *Lewisburg Comm'y Hosp. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991)).

[71]*See Janda*, 16 F. Supp. 2d at 1184–85 (collecting cases); *Islami*,  822 F. Supp. at 1370 (same); *Rahimi v. St. Elizabeth Med. Ctr., Inc.*, No. C3-96-126, 1997 WL 33426269, at *5–7 (S.D. Ohio July 16, 1997); *Kessel v. Monongalia County Gen. Hosp.*, 600 S.E.2d 321, 326 (W. Va. 2004); *Tredrea*, 584 N.W.2d at 285–87.

[72]41 C.J.S. Hospitals § 16 (1991).

[73]41 C.J.S. Hospitals § 27 (2006).

> direct and delegated responsibilities of the Medical Staff in
> cooperation with the Hospital Administration and the Governing
> Board of the Hospital, and do hereby agree to accept and abide by
> the following Bylaws and such Rules and Regulations which are
> adopted in accord with these Bylaws.

The Court finds that these Bylaws do not create a contract between physicians and the hospital.

AHA gave no consideration for any agreement created by the Bylaws, despite the fact that

plaintiff was required to abide by them as a consequence of medical staff privileges.  Further, the

Bylaws are required to be passed by state regulation,[74] so AHA is merely complying with the law

in promulgating Bylaws.[75]  The Court finds, like the Supreme Court of Iowa, that construing

medical staff bylaws as a contract could actually be contrary to public policy:

> [W]e believe it would improperly impinge on the statutory
> mandate to the board of directors to establish criteria for staff
> privileges, perpetuate the problems that had led to the
> establishment of the independent contractor system, and ultimately
> affect the successful operation of the hospital.  Such a contract,
> impacting as it would on the statutory responsibilities of the
> hospital on matters affecting staff qualifications, might well be
> argued to be against public policy.  In any event, we conclude that
> continued staff privileges are not implied by the bylaws, and we
> will not give the bylaws the effect of a contract.[76]

The Court agrees with the reasoning of the Supreme Court of Iowa.  This Court predicts

that under Kansas law, the bylaws do not constitute a contract between medical staff and the

hospital.  There is a lack of consideration, lack of intent to be bound, and it is contrary to public

policy to take away the authority of the Governing Board as "the ultimate authority in the

---

[74]*See* K.A.R. 28-34-5a(b).

[75]*See Kessel v. Monongalia County Gen. Hosp. Co.*, 600 S.E.2d 32, 326 (W. Va. 2004); *Tredrea*, 584 N.W.2d at 285.

[76]*Tredrea*, 584 N.W.2d at 287.

hospital."[77]  Accordingly, the Court finds that plaintiff is unable to establish a genuine issue of material fact over the third element of a prima facie case, which requires him to show that defendants interfered with the making or enforcement of a contract.

## 2. Pretext

Assuming *arguendo* plaintiff is able to satisfy the prima facie elements of a Section 1981 and Title VI claim, defendant must offer a legitimate, nondiscriminatory reason for the discrimination.  Defendants argue that they abided by the peer review process according to the Bylaws in denying plaintiff's application for reappointment in 2003 because he was a disruptive physician.  Plaintiff, in turn, argues that this reason is simply a pretext for discrimination.

The Court finds that defendants offer legitimate, non-discriminatory reasons for denying plaintiff's application for reappointment, and proceeds to determine if this act was a pretext for discrimination.  "'A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"[78] Plaintiffs typically show pretext in one of these three ways: (1) evidence that defendant's stated reasons for the adverse employment action was false; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken by defendant under the circumstances, and (3) evidence that the defendant acted contrary to an unwritten policy or

---

[77]K.A.R. 28-34-5(a); *see* Doc. 163, Ex. 4a at 29 ("The Governing Board of the Hospital shall have the ultimate authority in granting a practitioner clinical privileges and in all actions concerned with the exercise or limitation of the same.").

[78]*Mickelson v. New York Life Ins. Co.*, __F.3d__, 2006 WL 2468302, at *9 (10th Cir. Aug. 28, 2006) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1192–93 (10th Cir. 2005) (internal quotations omitted)).

practice when making the decision.[79]   Plaintiff also may show pretext through evidence that the "employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."[80]   Defendants argue that plaintiff's only evidence of pretext is in the form of his own conclusory opinions, found in his deposition testimony and various declarations.  The Court will now turn to each of plaintiff's arguments that the denial of his reappointment based on disruptive behavior was pretextual.

### *Comments and Conduct*

First, plaintiff argues that many physicians, including the individual defendants, made discriminatory comments to him or about him during his tenure at AHA.  Yet, he specifically references only two comments in his argument.  First, he references a loud comment made by Dr. Harry Franz, now deceased, at a barbeque for the hospital employees and physicians, that they should give plaintiff chopsticks to eat with.[81]   Second, in his deposition, he talks about how Dr. Eplee "years ago" laughed at his accent while dictating a medical chart, and implied that he spoke slowly.  The Court finds that these comments do not amount to either direct evidence of discrimination or of pretext.  The comment plaintiff attributes to Dr. Franz, now deceased former member of the Executive Committee, was admittedly made "years ago" and at least some time

---

[79]*Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[80]*Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759 764 (3d Cir. 1994)).

[81]He also references a statement by  "a member of Hospital Management" who said that "Dr. Vesom should just go back where he came from."  Plaintiff makes no reference to who made this comment, when it was made, or which paragraph of factual assertions or declaration it comes from.  The Court has searched the record as is unable to locate the source of this comment.

before 1998.[82]  Similarly, the incident with Dr. Eplee occurred many years prior to the decision

not to renew plaintiff's privileges.  At best, these are discriminatory comments made by non-

decision-makers, which carry little evidentiary weight.  "Discriminatory incidents which

occurred either several years before the contested action or anytime after are 'not sufficiently

connected to the employment action in question to demonstrate pretext.'"[83]  The contested action

here took place in 2003, years after these comments were made sometime prior to 1998.  These

stray remarks should not even be admitted on summary judgment, "unless plaintiff can link them

to personnel decisions or the individuals making those decisions."[84]  Plaintiff makes no attempt

to do.

        Next, plaintiff argues that he and his wife were socially ostracized by his fellow

physicians at AHA and that they refused to refer patients to him for care unless it was an

emergency that came up at night or on the weekend.  Again, plaintiff does not explain who

specifically engaged in this conduct, nor how it related to the ultimate decision to not reappoint

him.  Plaintiff's deposition testimony indicates that he and his wife were socially excluded by

other physicians for a long period of time, beginning years before.  Plaintiff enjoyed staff

privileges during the majority of this time, and was reappointed after initially being turned down

for privileges in 1999 and reappointed in again 2001.

        ***Proffered Reason was Post Hoc Fabrication***

---

[82](Doc. 182, Vesom Depo. at 169, 174.)

[83]*Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) (quoting *Simms v. Oklahoma*, 165 F.3d 1321, 1330 (10th Cir. 1999)).

[84]*Id.*; *see also Van v. Anderson*, 199 F. Supp. 2d 550, 567 (N.D. Tex. 2002), *aff'd*, 66 Fed. App'x 524 (5th Cir. 2003) (explaining that stray remarks and threats were insufficient to establish direct evidence of discrimination); *Patel v. Midland memorial Hosp. & Med. Ctr.*, 298 F.3d 333, 341–344 (5th Cir. 2002), *cert. denied*, 537 U.S. 1108 (2003).

Plaintiff argues that Dr. Rider's testimony provides evidence of pretext because he presents an alternate interpretation of the basis for the MEC's decision not to recommend that he be reappointed. According to Dr. Rider, members of the MEC had decided not to recommend reappointment before actually discussing the grounds for doing so. The Court finds that Dr. Rider's declaration supports the allegation that members of the MEC made the decision not to renew plaintiff's staff privileges before determining a basis upon which to do so. However, Dr. Rider's declaration does not support the allegation that the true reason behind the decision was racial animus.

As previously discussed, the Court disregards this declaration to the extent it provides conclusory opinions about the feelings and intent of others. At best, Dr. Rider's declaration supports the argument that the decision to not reappoint plaintiff to the medical staff was the result of plaintiff's and Dr. Ware's active disagreement with members of the MEC regarding the handling of certain peer review cases. In fact, the only statement made by Dr. Rider that even intimates there was a race-based motivation in deciding not renew plaintiff's privileges is the following paragraph from his second declaration:

> The animus directed at Dr. Vesom by members of the MEC was not the result of disruptive behavior on his part. Rather, it was the result of professional jealously of a better qualified foreign doctor whose competition and demanding standards of care were resented by the hospital employed medical staff doctors.[85]

As described in the Court's evidentiary ruling, this statement amounts to a conclusory opinion to which Dr. Rider cites no supporting facts and for which he has no personal knowledge. Further, both declarations more clearly support his view that the decision not to renew plaintiff's staff

---

[85](Doc. 182, Rider Declaration II ¶ 4.)

38

privileges was the result of hostility due to plaintiff's and Dr. Ware's complaints about the peer review process at AHA.  To be sure, Dr. Rider discusses the letter Dr. Vesom and Dr. Ware wrote on January 22, 2003, criticizing peer review at AHA: "This letter further served to anger my fellow committee members who then decided to not renew the hospital privileges of Dr. Vesom and Dr. Ware."[86]  Even though plaintiff provides evidence of an ad hoc fabrication of the reasons behind the denial of his reappointment, the Court finds that he has failed "to create a question of fact for the jury that *race* motivated [the decision]."[87]

### *Stated Reason for Decision is Contrary to the Bylaws*

Although not explicitly referenced in his argument, plaintiff contends in his declarations and factual recitations, that AHA and the MEC did not comply with the Bylaws in denying him reappointment.  Specifically, plaintiff maintains that if he was a "disruptive physician" under the Bylaws, he was entitled to "corrective action" under Appendix B when the complaints were made.  Instead, plaintiff contends that the MEC reviewed his credentials file that included a number of complaints made during his tenure that he never had a chance to explain or refute.  Defendants argue that plaintiff was never entitled to corrective action under Appendix B, and that they complied with the Fair Hearing procedures set forth in Appendix A, as the recommendation and ultimate decision not to reappoint plaintiff constituted a triggering action for a Fair Hearing and not for corrective action.  Plaintiff's argument appears to be that if the complaints referenced in his credentials file were valid, he would have been accorded corrective action each time a complaint was made.  Instead, he claims that the Fair Hearing process was the first opportunity he had to review many of these documents and complaints, and is therefore

---

[86](Doc. 182, Rider Declaration I at 2.)

[87]*Patel*, 298 F.3d at 342 (emphasis in original).

circumstantial evidence of pretext.

The Court finds that this disagreement is based on a patent misreading of the Bylaws by plaintiff. The Bylaws require allegations of disruption, under the criteria set forth in Article X, to be reported. If a report is made, Appendix B procedures apply for corrective action. However, Appendix B explicitly provides that, "any officer of the Medical Staff, the chairperson of a Service or Committee, the Chief Executive Officer of the Hospital or any member of the Governing Board of the Hospital may request corrective action against such practitioner." If corrective action is requested, then the MEC investigates the report and submits a written report of the investigation to the Board. Before the report is made, however, the practitioner has the opportunity to interview with the MEC so that he or she may discuss, explain, or refute the nature of the charge. The summary is then submitted with the report to the Board. Ultimately, the Board either approves or modifies the MEC recommendation. Contrary to plaintiff's contentions, this procedure never gets underway unless an officer, Chair of a committee, or the CEO of AHA requests corrective action.

Appendix B does not, by its plain terms, require corrective action be taken every time a report is filed. Therefore, even if plaintiff is correct that the MEC and Board evaluated his credentials file containing allegations that he was never able to explain, this does not contravene the Bylaws. It is clear from the undisputed facts in this matter that defendants complied with the Fair Hearing procedures set forth in Appendix A of the Bylaws, which apply when a member is denied reappointment to the medical staff.

### Similarly Situated Individuals

Plaintiff points to his third declaration as proof that similarly-situated Caucasian medical staff members were treated more favorably than he was. A plaintiff may show pretext by

40

proving that similarly situated nonprotected individuals were treated more favorably for committing comparable conduct.[88]  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[89]  As previously discussed, Vesom III consists of plaintiff's opinions and explanations of certain confidential documents located in other physicians' credentials files.  According to plaintiff, these documents reveal inconsistencies in the treatment of nonprotected physicians compared to him.

Plaintiff attaches "Topic Incident Reports" with regard to two of the physicians, which briefly summarize incidences of problems reported, the physicians' response, and the committee findings, comments, and recommendations.  But these reports do not indicate who the "Committee" is, or what procedure the committee went through in order to reach the conclusion it did.  There is no evidence presented by plaintiff's third declaration that leads the Court to believe that these reports were reviewed in the context of applications for renewal of medical staff privileges.  Nor do all of these reports deal with the same time period, and therefore the same MEC, as the period during which plaintiff applied for and was denied renewal of staff privileges.

Of these two physicians, one was also investigated by the KDHE after it received a complaint from plaintiff in January 2003.[90]  The allegation regarded the peer review of a particular medical decision by this physician and the KDHE found the complaint substantiated.

---

[88]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[89]*Rivera v. City & County of Denver*, 365 F.3d 912, 922-23 (10th Cir. 2004) (quoting  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) (internal quotation marks omitted)).

[90]Although not discussed in detail by the parties, this appears to be a separate complaint from the complaint regarding peer review of the maternal mortality after birth, which caused the KDHE to investigate in March 2003.

41

The hospital records show that the committee reviewing this allegation reviewed the case as a follow-up to the KDHE survey twice in 2003, and ultimately found the case to be within the standard of care and determined that no further action should be taken.  Again, this is not a similarly situated individual to plaintiff.  The stated reason for the decision to not reappoint plaintiff was based on a pattern of disruptive behavior, not a complaint over peer review in a particular case.

The third physician plaintiff references in his declaration was up for reappointment in the Fall of 2001.  This physician had a documented mental illness and problems with alcohol dependency.  Documents attached to plaintiff's declaration show that this information was disclosed to the MEC upon the physician's reapplication and that at least one physician intervened on the physician's behalf and was personally monitoring this physician's performance.  The documentation further shows that the MEC addressed these issues with that physician and assured itself that the physician had sought help through an impaired physicians group and was being treated with a number of medications.  The Court fails to see how this physician is at all similarly situated to the plaintiff.  First, the application was filed in 2001, the same year that plaintiff was reappointed for the last time, without incident.  In 2003, a different MEC was in place when plaintiff was not reappointed.  Plaintiff has not admitted, nor contended that medical impairments were involved in the decision not to renew his privileges.  Further, the issue was not ignored by the MEC, but was discussed with this other applicant and other individuals on the medical staff were monitoring the physician and would report to Dr. Thomas, Chief of Medical Staff at the time, about this physician's progress.  In fact, this appears to be more similar to the circumstances of the MEC's first recommendation in 1998 to deny plaintiff privileges, which was later rejected by the Board, under the conditions set forth in the Settlement

Agreement.

Further, defendants have come forward with evidence that Dr. Tayiem, who is
Palestinian, also had objections to the peer review process but that his medical staff privileges
were unaffected.  Dr. Tayiem also signed the letter that plaintiff and Dr. Ware sent to the Board
in January 2003.  Dr. Tayiem is a much more similarly situated individual to plaintiff, in that he
made the same types of complaints and was of a foreign nationality.  The fact that Dr. Tayiem
did not suffer from a denial of medical staff privilege reappointment belies plaintiff's conclusory
allegations that the MEC declined to renew his privileges based on race.

This is a case where summary judgment is appropriate because, "the record conclusively
revealed some other, nondiscriminatory reason for the employer's decision, or . . . the plaintiff
created only a weak issue of fact as to whether the employer's reason was untrue and there was
abundant and uncontroverted independent evidence that no discrimination occurred."[91]
Defendants' motion for summary judgment is granted on plaintiff's Section 1981 and Title VI
claims.

### B. Conspiracy under Section 1985(3)

The essential elements of a claim under Section 1985(3) are: (1) a conspiracy; (2) to
deprive plaintiff of equal privileges and immunities; (3) an act in furtherance of the conspiracy;
and (4) an injury resulting therefrom.[92]   Section 1985(3),

> does not 'apply to all tortious, conspiratorial interferences with the
> rights of others,' but rather, only to conspiracies motivated by
> 'some racial, or perhaps otherwise class-based, invidiously
> discriminatory animus.  The other 'class-based animus' language

---

[91]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105
(2000).

[92]*Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993).

of this requirement has been narrowly construed and does not, for example, reach conspiracies motivated by an economic or commercial bias.[93]

As the Court has already explained, there is no genuine issue of material fact concerning the second element of this claim—an intent to deprive plaintiff of equal privileges or immunities. Plaintiff has failed to present a genuine issue of material fact that would allow a reasonable factfinder to conclude that the decision to not reappoint him to the medical staff was due to an invidiously discriminatory animus. Therefore, summary judgment is granted on this claim.

### C.  Sherman Act

Plaintiff's fourth claim asserts a violation of Section 1 of the Sherman Act. He maintains that defendants conspired to deny him staff privileges at AHA for the purpose of unreasonably restraining trade, causing him to suffer economic losses. Section 1 of the Sherman Act states that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony.[94]

Generally, the Sherman Act only prohibits restraints on trade that are unreasonable.[95] The plaintiff must establish: (1) concerted action in the form of a contract, combination, or conspiracy, and (2) an unreasonable restraint of trade.[96]

---

[93]Id. (quoting Griffin v. Breckenridge, 403 U.S. 88, 102–03 (1971)) (citations omitted).

[94]15 U.S.C. § 1.

[95]Diaz v. Farley, 215 F.3d 1175, 1182 (10th Cir. 2000) (citing N.W. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co., 472 U.S. 284, 289 (1985)).

[96]Systemcare, Inc. v. Wang Labs. Corp., 117 F.3d 1137, 1139 (10th Cir. 1997) (overruling McKenzie v. Mercy Hospital, 854 F.2d 365 (10th Cir. 1988)).

"A doctor's unreasonable exclusion from the relevant market via adverse and unfair peer review proceedings obviously affects patient choice and concomitantly, interferes with competition in the marketplace."[97]  Normally, courts apply a "rule of reason" analysis to Section 1 cases, which requires "the fact finder [to] weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[98]  Under such review, the misuse of the peer review process is unjustified.[99]

Defendants argue that there was no concerted action or conspiracy and that denying staff benefits is not a plainly anti-competitive activity.  Plaintiff argues that Dr. Rider's declaration supports the allegation that "concerted actions of defendants" drove plaintiff from the Atchison community, which produced an anti-competitive effect on interstate commerce.  Plaintiff argues that he was injured because he was driven from a practice he had developed over a period of more than twenty years.

Dr. Rider's declarations attest to what occurred at certain MEC meetings at which he was present.  Taking his declarations as true, plaintiff has established concerted activity among some members of the MEC.[100]  However, as defendants stress, the Board was the ultimate authority who denied plaintiff's reappointment application and plaintiff has come forward with no evidence of concerted action by members of the Board.  "Where a hospital Board has ultimate decision making authority, '[s]imply making a peer review recommendation does not prove the

---

[97]*Cohlmia v. Ardent Health Servs., L.L.C.*, __F. Supp. 2d__, 2006 WL 2441942, at *6 (N.D. Okla. Aug. 9, 2006) (collecting cases).

[98]*Diaz*, 215 F.3d at 1182.

[99]*Cohlmia*, 2006 WL 2441942, at *6.

[100]Based on Dr. Rider's declaration, he did not join in this activity.

45

existence of a conspiracy [among the hospital and its staff]; there must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation."[101]   Plaintiff has not come forward with any evidence suggesting that the Board did not act independently in following the MEC's recommendation, after the Fair Hearing process was invoked and utilized by plaintiff.[102]   The evidence is consistent with AHA's lawful motive of following its Bylaws in denying plaintiff's reappointment.   Therefore, plaintiff is unable to present a genuine issue of material fact over whether there was concerted action by defendants and defendants' motion for summary judgment on this claim is granted.

Also, plaintiff fails to come forward with evidence tending to show an injury to consumers due to the Board's decision.   Plaintiff argues that "the evidence" in this case shows anti-competitive activity, without any specific reference to the record.   As already discussed, there is no evidence that plaintiff had exclusive contracts with any of his patients, or that the Board's decision drove up prices of cardiology service to patient consumers.   To show an antitrust injury, plaintiff would need to show that defendants' conduct "'affected the prices, quantity or quality of goods or services,' not just his own welfare."[103]   "A claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up."[104]   Plaintiff has not come forward with

---

[101]*Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639–40 (3d Cir. 1996) (quoting *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991)); *see Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1459 (11th Cir. 1991).

[102]*Mathews*, 87 F.3d at 640 (explaining that there must be evidence that excludes the possibility of independent action by the Board).

[103]*Id.* at 641 (quoting *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991)).

[104]*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), *cert. denied*, 516 U.S. 1159 (1996).

any evidence, beyond conclusory opinions that certain general physicians refused to refer patients to him, that the decision not to reappoint him affected prices or the quality of goods or services.  Even assuming plaintiff's belief about the non-referrals is true, this was happening well before the 2003 decision not to reappoint him.  The Court finds no genuine issue of material fact over the existence of an antitrust injury and grants defendant's motion on this claim.

### D.  State Law Claims

Defendants further argue that they are entitled to summary judgment on the state law claims on the merits.  Because the Court grants summary judgment to defendants on the federal claims, the Court is authorized to decline supplemental jurisdiction over the remaining state law claims.[105]  Whether to exercise supplemental jurisdiction is committed to the court's sound discretion.[106]  28 U.S.C. § 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity.'"[107]

Upon a pretrial disposition of the federal claims, district courts will generally dismiss the state law claims without prejudice.[108]  This general practice is in keeping with the holdings of the

---

[105]28 U.S.C. § 1367(c)(3).

[106]*City of Chicago  v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 541 (10th Cir. 1995).

[107]*City of Chicago*, 522 U.S. at 173 (quoting *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Gold v. Local 7 United Food & Commercial Workers Union,* 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld County Commr's*, 365 F.3d 855 (10th Cir. 2004).

[108]*Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (collecting cases); *see also Roe v. Cheyenne Mountain Conference Resort, Inc*., 124 F.3d 1221, 1237 (10th Cir. 1997).

Supreme Court and the Tenth Circuit.[109]  "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[110]  Nevertheless, in this case, the Court concludes that judicial economy and convenience weigh heavily in favor of exercising supplemental jurisdiction and deciding the state law claims on summary judgment. This case is now two years old and the events forming the basis of plaintiff's state law claims are identical to those already considered by the Court in deciding the federal claims.  Therefore, the Court exercises supplemental jurisdiction and proceeds to decide the remaining state law claims.

### 1.  Whistleblower Retaliation

Plaintiff argues that his medical staff privileges were terminated because he reported complaints about peer review and the standard of care at AHA to the KDHE, and was therefore retaliated against for his "whistleblowing" activity.  Under Kansas law,[111] there is a so-called whistleblower's exception to the employment-at-will doctrine.[112]  The at-will employment doctrine normally allows for the employer or employee to terminate the employment relationship at any time, for any reason.[113]  The Kansas Supreme Court has recognized that "termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort."[114]

---

[109]*Ball*, 54 F.3d at 669.

[110]*Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

[111]The parties do not contest that Kansas law controls the State law claims in this matter.

[112]*Zinn v. McKune*, 949 F. Supp. 1530, 1536–37 (D. Kan. 1996), *aff'd*, 143 F.3d 1353 (10th Cir. 1998).

[113]*Id.* at 1536 (citing *Moyer v. Allen Freight Lines, Inc.*, 885 P.2d 391 (Kan. Ct. App. 1995)).

[114]*Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988).

48

To establish a prima facie case of retaliation for whistleblowing, the plaintiff has the burden to show, (1) a reasonably prudent person would have concluded that the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, (2) that the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee, and (3) that the employee was discharged in retaliation for making the report.[115]  Additionally, the "whistle blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."[116]  Plaintiff must prove this claim by a preponderance of the evidence that is clear and convincing in nature.[117]

Defendants argue that plaintiff fails to establish a genuine issue of material fact on this claim because (1) he was not an employee of the hospital, (2) the tort does not extend to independent contractors, (3) the claim is preempted by other causes of action in the Complaint, and (4) there is no causation between plaintiff's report to the KDHE and the decision to not reappoint him to the medical staff.  Because the Court agrees that plaintiff has failed to come forward with evidence that he was an employee of defendants, his claim fails as a matter of law.

As the Court has already stated, it is undisputed that plaintiff was not an employee of AHA or any of the individual defendants.[118]  The Court concluded in its discussion of the discrimination claims that he is properly classified as an independent contractor.  In *Parsells v.*

---

[115]*Zinn*, 949 F. Supp. at 1537.

[116]*Id.*

[117]*Id.* (citing *Ortega v. IBP, Inc.*, 874 P.2d 1188 (1994)).

[118]*See also supra* note 44.

*Manhattan Radiology Group*,[119] Judge Lungstrum recognized that a "clear majority" of cases have held that a claim for retaliation for whistleblowing does not extend to independent contractors.[120]  Because the plaintiffs in that case had not addressed the issue in their brief, the court ordered them to show cause why the claim should not be dismissed on those grounds, as it had already found that the plaintiffs were independent contractors and not employees under Title VII.  No further order was issued by the court after the parties briefed the issue, however, as a stipulation of dismissal was filed soon after.

Plaintiff argues that *Parsells* should not control here because Judge Lungstrum did not rule on the summary judgment motion as to this tort.  While the Court acknowledges that *Parsells* did not grant summary judgment to the defendant on this ground, the court did point to the overwhelming majority position of the courts not to extend whistleblower protection to independent contractors or non-employees.  This tort is only an exception to the employment-at-will doctrine and is based on "the wrongful conduct of an entity with the power to terminate the employee."[121]  Plaintiff has come forward with no law to the contrary and no evidence that he should be considered an employee,[122] nor does he even contest this point.

Plaintiff's only argument is that medical staff physicians at AHA and employees of the hospital "performed the same services . . . under the same regulatory scheme."  The only

---

[119]255 F. Supp. 2d 1217, 1236–37 (D. Kan. 2003).

[120]*Id.* (collecting cases).

[121]*Zinn*, 949 F. Supp. at 1538.

[122]*See, e.g.*, *McPherson v. HCA-HealthOne, LLC.*, 202 F. Supp. 2d 1156, 1164 –68 (D. Colo. 2002) (considering but rejecting the medical staff physician plaintiff's arguments about why he should be considered an employee of the hospital).

evidence plaintiff brings forward to support this statement is his own declaration.[123]  He argues in

his declaration that "the only difference is the independent physicians bill for the services

directly to the patient or third-party payer, while the Hospital compensates its employed

physicians with a salary."  But, he argues they are subject to the same rules and regulations.  The

Court is not persuaded by this evidence.  Plaintiff makes no attempt to argue how these facts

defeat his independent contractor status, or under what legal theory this cause of action would be

applicable to him.  They are simply conclusory opinions or beliefs made by him about purely

legal arguments.

Defendants met their burden of pointing to the absence of evidence on the point of

plaintiff's employment status, yet plaintiff was unable to come forward with evidence that would

present a genuine issue of material fact.  Because the Court finds that there is no genuine issue of

material fact about whether plaintiff was an employee of AHA, it grants defendants summary

judgment and declines to address their remaining arguments.[124]

### 2.  Intentional Interference with Business Relations

To establish a claim for tortious interference with business relations under Kansas law,

plaintiff must show, (1) the existence of a business relationship or expectancy with the

probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or

expectancy by the defendants; (3) that, except for the conduct of the defendants, plaintiff was

reasonably certain to have continued the relationship or realized the expectancy; (4) intentional

---

[123](Doc. 181 at 22 ¶ 24, citing Vesom II ¶ 2.)

[124]The Court notes, however, that plaintiff's reliance on *Wabaunsee County v. Umbehr* is misplaced.  518
U.S. 668 (1996).  That case dealt with distinguishing between employees and independent contractors with regard to
First Amendment free speech rights.  Certainly, plaintiff must concede that he is advancing a state law claim here
that is not constitutional in nature.

misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.[125]  Malice is a predicate for tortious interference.[126]

Under the first element of this tort, plaintiff alleges in the Complaint that he maintained relationships and expectancies with a large number of patients in the Atchison market with the probability of future economic benefit to him from those relationships.  Defendants argue that plaintiff has failed to come forward with evidence to support that fact.  Plaintiff's response to the summary judgment motion is the conclusory statement, "[p]lainly, plaintiff had a thriving medical practice which was destroyed by defendants' intentional and unlawful misconduct.  This point is wholly unsupported by defendants' moving papers."

The only evidence the Court is able to locate on this point is plaintiff's own declaration where he states that he had a thriving medical practice in Atchison that was destroyed when he no longer had a local hospital to which he could refer patients.  He states that this "forced" him to move to Poplar Bluffs, Missouri.  But plaintiff stated in his deposition that he was allowed to maintain active medical staff privileges during the fourteen month period between receiving notice of the MEC's recommendation and the decision on appeal, until April 2, 2004.   Further, it is undisputed that plaintiff still had privileges at two other hospitals, Horton Community Hospital and Cushing Memorial Hospital.  Until plaintiff voluntarily moved to Poplar Bluff, Missouri, he continued to treat patients at these hospitals.  Nor is there any evidence that plaintiff had an exclusive arrangement with any of his patients.[127]

---

[125]*E.g.*, *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986).

[126]*L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000).

[127]*See Van v. Anderson*, 199 F. Supp. 2d 550, 565 (N.D. Tex. 2002) (finding no tortious interference with patient contracts where plaintiff admitted in deposition that he continued to admit patients to the hospital after receipt of notice of committee recommendation and that plaintiff did not have exclusive arrangements with patients),

Plaintiff misapprehends the summary judgment burden.  Defendants need only point to the absence of evidence on an essential element of this claim before the burden shifts back to plaintiff to come forward with facts to show a genuine issue of material fact.  A one paragraph response to this showing is insufficient.  The Court finds plaintiff has failed to produce evidence upon which a reasonable factfinder could conclude that plaintiff enjoyed a business relationship or expectancy with his patients.

### F.  Waiver

Defendants raise a number of defenses to plaintiff's claims in their summary judgment motion.  Having granted summary judgment to defendants on all of plaintiff's claims on the merits, the Court need not address each and every defense raised.  Out of an abundance of caution, however, the Court proceeds to discuss the affirmative defense of waiver.  Defendants argue that all of plaintiff's claims are barred by the Authority and Liability Waiver ("the Waiver") that plaintiff signed on December 15, 2002 when he applied for reappointment to the AHA staff.  Plaintiff contends that the cases cited by defendants are inapplicable to an application for medical staff privileges, that waivers of prospective claims for intentional torts or statutory violations are void as against public policy, and that waivers for civil rights violations are "absolutely void."  "The existence of a release is an affirmative defense; the defendant bears the burden of establishing it."[128]

Plaintiff relies on a number of cases that stand for the proposition that an employee's rights under Title VII may not be prospectively waived, as it would defeat the "paramount

---

*aff'd,* 66 Fed. App'x 524 (5th Cir. 2003).

[128]*White v. Gen. Motors Corp.*, 908 F.2d 669, 672 (10th Cir. 1990), *cert. denied*, 498 U.S. 1069 (1991).

congressional purpose behind Title VII."[129]  Defendants make the overarching argument that

because plaintiff was not an employee of AHA or of any of the individually named defendants,

he may not now rely upon employment discrimination theories of recovery, such as analogies to

Title VII.  Although plaintiff does not assert a claim here under Title VII, he does assert race

discrimination under Title VI and Sections 1981 and 1985(3).

       The issue of the effect of a release or covenant not to sue is a legal question.[130]  In

Kansas, a release is treated as a contract and a party who signs a written contract "is bound by its

provisions regardless of failure to read or understand the terms, unless the contract was entered

into through fraud, undue influence, or mutual mistake."[131]  As a general rule in Kansas, the

court must ascertain the intent of the parties and "if the language of the written instrument is

clear, there is no room for rules of construction."[132]  The waiver provides that plaintiff agrees to

"hold harmless such President, Board or Committees evaluating my application from *any claim

or action* by or on my behalf in the event such application for reappointment is denied for any

reason."[133]  Here, the release language specifically states that it includes any claim that could

arise from the denial of plaintiff's reappointment for any reason.[134]  The Court finds that the

---

[129]*See, e.g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51–52 (1974).  However, the Court made clear in *Alexander*, that an employee may waive a cause of action under Title VII as part of a voluntary settlement agreement, so long as the employee's consent to the agreement was knowing and voluntary.  *Id.* at 52 n.15.

[130]*See, e.g., Cobb v. Corbett*, 95 P.3d 1028, 1030 (Kan. Ct. App. 2004).

[131]*Dorner v. Polsinelli, White, Vardeman, & Shalton, P.C.*, 856 F. Supp. 1483, 1487 (D. Kan. 1994).

[132]*Marquis v. State Farm Fire & Cas. Co.* , 961 P.2d 1213, 1219 (Kan. 1998) (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884 (1992)).

[133](Doc. 164, Ex. 7 (emphasis added)).

[134]*Am. Registry of Radiologic Technologists v. McClellan*, No. 300CV2577K, 2003 WL 22171702, at *2 (N.D. Tex. Mar. 5, 2003) (approving language in a certification application that releases all claims arising out of the application); *see Wright v. Southwestern Bell Tele. Co.*, 925 F.2d 1288, 1292–93 (10th Cir. 1991); *Bohne v. Closings of Tulsa, L.L.C.*, No. 05-0197-TCK-SAJ, 2006 WL 966517, at *4 n.2 (N.D. Okla. Apr. 12, 2006).

language is clear and unambiguous that the release proscribes all claims concerning the denial of reappointment.[135]  All of plaintiff's claims are based on the decision not to reappoint him in 2003, and are thus covered by the language in the waiver.

Plaintiff is incorrect that waivers of federal civil rights and intentional tort claims are void as against public policy.  An employee may waive potential claims under the civil rights statutes, so long as the waiver is made knowingly and voluntarily.[136]  However, "[w]aivers of federal remedial rights [], are not lightly to be inferred."[137]  To determine if a waiver is knowing and voluntary, courts look beyond the contract language to the totality of the circumstances under which the waiver is signed, considering the following factors:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether [p]laintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.[138]

The Court finds, under the totality of the circumstances, that defendants meet their

---

[135]*See Bohne*, 2006 Wl 966517, at *4–5 (waiving "any known or unknown claim"); *Rodriguez v. Wackenhut Corp.*, No. 00-0264, 2000 WL 825677, at *2 (E.D. La. June 23, 2000) (waiving claims plaintiff  "now has or may have in the future").  In this case, "current claims" is somewhat of a misnomer, as the release only applies to future conduct, i.e., in the event reappointment is denied.

[136]*Torrez v. Pub. Serv. Co. of N.M., Inc.*, 908 F.2d 687, 689 (10th Cir. 1990); *see also Stafford v. Crane*, 382 F.3d 1175, 1180 (10th Cir. 2004); *Reed v. Nellcor Puritan Bennett*, 244 F. Supp. 2d 1205, 1210–12 (D. Kan. 2003); *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000) (applying Kansas law).  Likewise, there is no prohibition under Kansas law or in the Tenth Circuit of waivers of intentional torts.  *See, e.g.*, *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1232–33 (10th Cir. 1999) (concluding scope of release included ADEA and intentional tort claims).

[137]*Torrez*, 908 F.2d at 689.

[138]*Id.* at 689–90 (quoting *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988)).

burden of showing no genuine issue of material fact regarding whether the waiver was knowing and voluntary.  In addition to the clear language of the release, there is no issue about whether plaintiff knew the implications of the document he signed.  He had applied for reappointment multiple times since he began his appointment at AHA in 1983.  In 1999, he executed a Settlement Agreement that also contained release language after he was initially denied reappointment by the MEC.  There is no evidence that plaintiff did not have adequate time to review the application materials before turning them in.  The Court finds under the language of the waiver, as well as the totality of the circumstances, plaintiff waived all claims stemming from the decision in 2003 not to reappoint him to the medical staff.  Therefore, even if the Court were to find that any of plaintiff's claims survived summary judgment on the merits, they would be waived.

## IV.  Motions to Exclude Expert Testimony

The Court declines to address defendants' Motion to Exclude Declaration and Expert Testimony of John-Henry Pfifferling, Ph.D. (Doc. 142); and Motion to Exclude Affidavits and Expert Testimony of Kurt V. Krueger, Ph.D. (Doc. 145).  The experts defendants seek to exclude from the Court's consideration were not relied upon by plaintiff at this stage of the proceedings on the issues that were dispositive on summary judgment.  Because the Court grants defendants' motion without considering these declarations, the motions to exclude should be denied as moot.

**IT IS THEREFORE ORDERED BY THE COURT** that:

1.    Plaintiff's Motion for Leave to file Declaration and Exhibits under Seal (Doc. 183) is **granted.  The Clerk's Office is directed to file plaintiff's third Declaration and exhibits submitted to the Court *in camera* on August 31, 2006;**

2.    defendants' Motion for Summary Judgment (Doc. 161) is **granted**; and

3.    defendants' Motion to Exclude Declaration and Expert Testimony of John-Henry

Pfifferling, Ph.D. (Doc. 142); and Motion to Exclude Affidavits and Expert Testimony of

Kurt V. Krueger, Ph.D. (Doc. 145) are **denied as moot**.

**IT IS SO ORDERED**.

Dated this 22nd day of September 2006.

 S/   Julie A. Robinson
Julie A. Robinson
United States District Judge